WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
William A. Maher
Paul R. DeFilippo
William F. Dahill
James N. Lawlor
Adam M. Bialek

Special Counsel for Plaintiff
Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ———————————————————— X | | |
| In re: | : | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | : | Case No. 08-13555 (SCC) |
| Debtors. | : | |
| ———————————————————— X | | |
| LEHMAN BROTHERS SPECIAL FINANCING INC. | : | |
| Plaintiff, | : | |
| − against − | : | Adversary Proceeding No.: 10-03547 (SCC) |
| BANK OF AMERICA NATIONAL ASSOCIATION, THE BANK OF NEW YORK MELLON NATIONAL ASSOCIATION, BNY MELLON CORPORATE TRUSTEE SERVICES LTD., CITIBANK, N.A., DEUTSCHE BANK TRUST COMPANY AMERICAS, U.S. BANK NATIONAL ASSOCIATION, U.S. BANK TRUST NATIONAL ASSOCIATION, WELLS FARGO BANK NATIONAL ASSOCIATION, | : : : : | |
| Trustee Defendants, | : | **THIRD AMENDED COMPLAINT** |
| − and − | : | |
| 801 GRAND CDO SPC, f/a/o THE SERIES 2006-1, as Issuer, 801 GRAND CDO SERIES 2006-1 LLC, as Co-issuer, 801 GRAND CDO SPC, f/a/o THE SERIES 2006- | : | |

2, as Issuer, 801 GRAND CDO SERIES 2006-2 LLC, as Co-    :
issuer, ALTA CDO SPC, f/a/o THE SERIES 2007-1
SEGREGATED PORTFOLIO, as Issuer, ALTA CDO LLC,    :
FOR SERIES 2007-1, as Co-issuer, ALTA CDO SPC, f/a/o
THE SERIES 2007-2 SEGREGATED PORTFOLIO, as Issuer,:
ALTA CDO LLC, FOR SERIES 2007-2, as Co-issuer,
BARTON SPRINGS CDO SPC, f/a/o THE SERIES 2005-1    :
SEGREGATED PORTFOLIO, as Issuer, BARTON SPRINGS
CDO SERIES 2005-1 LLC, as Co-issuer, BARTON SPRINGS:
CDO SPC, f/a/o THE SERIES 2005-2 SEGREGATED
PORTFOLIO, as Issuer, BARTON SPRINGS CDO SERIES    :
2005-2 LLC, as Co-issuer, BLUE POINT CDO SPC, f/a/o
THE SERIES 2005-1 SEGREGATED PORTFOLIO, as Issuer,:
BLUE POINT CDO SERIES 2005-1 LLC, as Co-issuer,
CHERRY HILL CDO SPC, f/a/o FOR SERIES 2007-1    :
SEGREGATED PORTFOLIO, as Issuer, CHERRY HILL
CDO LLC THE SERIES 2007-1, as Co-issuer, CHERRY    :
HILL CDO SPC, f/a/o THE SERIES 2007-2 SEGREGATED
PORTFOLIO, as Issuer, CHERRY HILL CDO LLC FOR    :
SERIES 2007-2, as Co-issuer, COPPER CREEK CDO SPC,
f/a/o SERIES 2007-1 SEGREGATED PORTFOLIO, as Issuer, :
COPPER CREEK CDO LLC, as Co-issuer, CROWN CITY
CDO 2005-1 LIMITED, as Issuer, CROWN CITY CDO 2005-:
1 LLC, as Co-issuer, CROWN CITY CDO 2005-2 LIMITED,
as Issuer, CROWN CITY CDO 2005-2 LLC, as Co-issuer,    :
FREEDOM PARK CDO SERIES 2005-1 LIMITED, as Issuer,
FREEDOM PARK CDO SERIES 2005-1 LLC, as Co-issuer,    :
FULLERTON DRIVE CDO LIMITED, as Issuer,
FULLERTON DRIVE CDO LLC, as Co-issuer,    :
GREYSTONE CDO SPC, f/a/o THE SERIES 2006-1
SEGREGATED PORTFOLIO, as Issuer, GREYSTONE CDO :
SERIES 2006-1 LLC, as Co-issuer, GREYSTONE CDO SPC,
f/a/o THE SERIES 2006-2 SEGREGATED PORTFOLIO, as    :
Issuer, GREYSTONE CDO SERIES 2006-2 LLC, as Co-
issuer, JEFFERSON VALLEY CDO SPC, f/a/o THE SERIES :
2006-1 SEGREGATED PORTFOLIO, as Issuer, JEFFERSON
VALLEY CDO SERIES 2006-1 LLC, as Co-issuer, KINGS    :
RIVER LIMITED, as Issuer, KINGS RIVER LLC, as Co-
issuer, LAKEVIEW CDO SPC, f/a/o THE SERIES 2007-1    :
SEGREGATED PORTFOLIO, as Issuer, LAKEVIEW CDO
LLC SERIES 2007-1, as Co-issuer, LAKEVIEW CDO SPC,    :
f/a/o THE SERIES 2007-2 SEGEGATED PORTFOLIO, as
Issuer, LAKEVIEW CDO LLC, f/a/o THE SERIES 2007-2    :
SEGREGATED PORTFOLIO, as Co-issuer, LAKEVIEW
CDO SPC, f/a/o THE SERIES 2007-3 SEGREGATED    :
PORTFOLIO, as Issuer, LAKEVIEW CDO LLC, f/a/o THE

SERIES 2007-3 SEGREGATED PORTFOLIO, as Co-issuer,  :
PANTERA VIVE CDO SPC, f/a/o THE SERIES 2007-1, as
Issuer, PANTERA VIVE CDO LLC, as Co-issuer, PEBBLE  :
CREEK LCDO 2007-2, LTD., as Issuer, PEBBLE CREEK
LCDO 2007-2, LLC, as Co-issuer, PENN'S LANDING CDO  :
SPC, f/a/o THE SERIES 2007-1 SEGREGATED
PORTFOLIO, as Issuer, PENN'S LANDING CDO LLC, as  :
Co-issuer, PYXIS ABS CDO 2007-1 LTD., as Issuer, PYXIS  :
ABS CDO 2007-1 LLC, as Co-issuer, QUARTZ FINANCE
PLC, SERIES 2004-1, as Issuer, RAACLC TRUST, SERIES  :
2003-A, as Issuer, RESTRUCTURED ASSET
CERTIFICATES WITH ENHANCED RETURNS, SERIES  :
2005-21-C TRUST, as Issuer, RESTRUCTURED ASSET
CERTIFICATES WITH ENHANCED RETURNS, SERIES  :
2006-1-C TRUST, as Issuer, RESTRUCTURED ASSET
CERTIFICATES WITH ENHANCED RETURNS, SERIES  :
2007-4-C TRUST, as Issuer, RUBY FINANCE PLC, f/a/o
THE SERIES 2005-1, CLASS A2-A9, as Issuer, RUBY  :
FINANCE PLC, f/a/o THE SERIES 2006-4, as Issuer, RUBY
FINANCE PLC, f/a/o THE SERIES 2007-1, as Issuer,  :
SECURITIZED PRODUCT OF RESTRUCTURED
COLLATERAL LIMITED SPC, f/a/o THE SERIES 2007-1  :
FEDERATION A-1 SEGREGATED PORTFOLIO, as Issuer,
SECURITIZED PRODUCT OF RESTRUCTURED  :
COLLATERAL LIMITED SPC, f/a/o THE SERIES 2007-1
FEDERATION A-2 SEGREGATED PORTFOLIO, as Issuer,  :
SOLAR V CDO SPC, f/a/o THE SERIES 2007-1
SEGREGATED PORTFOLIO, as Issuer, SOLAR V CDO  :
LLC, as Co-issuer, STOWE CDO SPC, f/a/o THE SERIES
2006-1 SEGREGATED PORTFOLIO, as Issuer, STOWE  :
CDO SERIES 2006-1 LLC, as Co-issuer, STOWE CDO SPC,
f/a/o THE SERIES 2008-2A SEGREGATED PORTFOLIO, as :
Issuer, STOWE CDO LLC, as Co-issuer, SUNSET PARK
CDO LIMITED SPC, f/a/o THE SERIES 2004-1  :
SEGREGATED PORTFOLIO, as Issuer, SUNSET PARK
CDO LIMITED SPC, f/a/o THE SERIES 2004-2  :
SEGREGATED PORTFOLIO, as Issuer, SUNSET PARK
CDO LIMITED SPC, f/a/o THE SERIES 2004-4  :
SEGREGATED PORTFOLIO, as Issuer, SUNSET PARK
CDO LLC, SUNSET PARK CDO-M LIMITED SPC, f/a/o  :
THE SERIES 2005-3 SEGREGATED PORTFOLIO, as Issuer,
SUNSET PARK CDO-M LLC, as Co-issuer, SUNSET PARK :
CDO LIMITED SPC, f/a/o THE SERIES 2005-5
SEGREGATED PORTFOLIO, as Issuer, SUNSET PARK  :
CDO SERIES 2005-5 LLC, as Co-issuer, SUNSET PARK
CDO SERIES 2005-6 LIMITED, as Issuer, SUNSET PARK  :

CDO SERIES 2005-6 LLC, as Co-issuer, SECURITIZED
PRODUCT OF RESTRUCTURED COLLATERAL                    :
LIMITED SPC, f/a/o THE SERIES 2007-1 TABXSPOKE (07-
1 40-100) SEGREGATED PORTFOLIO, as Issuer, SERIES     :
2007-1 TABXSPOKE (07-1 40-100) LLC, as Co-issuer,
TAVARES SQUARE CDO LIMITED, as Issuer, TAVARES        :
SQUARE CDO LLC, as Co-issuer, TAYLOR CREEK
LIMITED, as Issuer, TAYLOR CREEK LLC, as Co-issuer,   :
VOX PLACE CDO LIMITED, as Issuer, VOX PLACE CDO
LLC, as Co-issuer,                                    :

                Issuer Defendants,                    :

− and −                                               :

AIA INTERNATIONAL LTD., AIG TAIWAN INSURANCE :
CO. LTD., ANZ INVESTMENT BANK, ANZ NOMINEES
LIMITED, ATLANTIC CENTRAL BANKERS BANK,               :
BANCO CREDITO DEL PERU, BANK SINOPAC (F/K/A
INTERNATIONAL BANK OF TAIPEI), BASIS CAPITAL          :
PTY LIMITED, BASIS PAC- RIM OPPORTUNITY FUND
LTD., BIG HORN CDO 2007-1 COLLATERAL,                 :
BRODERICK CDO 3, LTD., CANNINGTON FUNDING,
LTD., CHEYNE CLO INVESTMENTS I LTD., CITICORP         :
NOMINEES PTY LTD.,  CITIGROUP GLOBAL
MARKETS, INC., CITY OF PHILADELPHIA PERS, CLASS :
V FUNDING III, CORP., CLASS V FUNDING III, LTD.,
CLEARSTREAM BANKING S.A., CONTINENTAL LIFE            :
INSURANCE COMPANY OF BRENTWOOD TENNESSEE,
COUNTRY LIFE INSURANCE COMPANY, CREDIT                :
SUISSE (EUROPE) LTD., CREDIT SUISSE SECURITIES
(USA) LLC, THE DAEGU BANK, LTD., DEUTSCHE             :
APOTHEKER-UND ARZTEBANK, DIVERSEY HARBOR
ABS CDO, INC., DIVERSEY HARBOR ABS CDO, LTD.,         :
EASTERN METROPOLITAN REGIONAL COUNCIL,
ELLIOTT INTERNATIONAL, L.P., ENSIGN PEAK              :
ADVISORS, EUROAMERICA ASESORIAS SA,
EUROCLEAR BANK S.A./N.V., FIRST NORTHERN BANK :
AND TRUST COMPANY, FULTON STREET CDO CORP.,
GARADEX INC.,  GATEX PROPERTIES INC., GENERAL :
SECURITY NATIONAL INSURANCE, GENWORTH LIFE
AND ANNUITY INSURANCE CO., GEOMETRIC ASSET            :
FUNDING LTD., GIBRALTAR LIFE INSURANCE
COMPANY LTD. (F/K/A AIG EDISON – GA NON DIMA),        :
GOLDMAN SACHS & CO., GOLDMAN SACHS
INTERNATIONAL, GORDON RAUSSER, GORDON                 :

RAUSSER (DEFINED BENEFIT PENSION PLAN),
GORDON RAUSSER (IRA), GUOHUA LIFE INSURANCE  :
CO., LTD., HAVENROCK II LIMITED, HHE
PARTNERSHIP LP, HSBC ISSUER SERVICES COMMON  :
DEPOSITORY NOMINEE (UK) LIMITED, ILLINOIS
TOOL WORKS, INC., ILLINOIS TOOL WORKS, INC.        :
SAVINGS AND INVESTMENT PLAN, JA HOKKAIDO
SHINREN, JP MORGAN CHASE BANK, NATIONAL        :
ASSOCIATION, JP MORGAN SECURITIES, PLC, KLIO II
FUNDING CORP., KLIO II FUNDING LTD., KLIO III       :
FUNDING CORP., KLIO III FUNDING LTD., LANCER
FUNDING II LTD., LANCER FUNDING II, LLC, LGT        :
BANK IN LIECHTENSTEIN, LTD., LIFEPLAN
AUSTRALIA FRIENDLY SOCIETY LTD., THE LINCOLN  :
NATIONAL LIFE INSURANCE COMPANY, THE
LIVERPOOL LIMITED PARTNERSHIP, LORELEY          :
FINANCING (JERSEY) NO. 15 LIMITED, MACQUARIE
BANK LTD., MACQUARIE PRISIM PTY LTD.,              :
MAGNETAR CONSTELLATION FUND II LTD.,
MAGNETAR CONSTELLATION MASTER FUND III LTD.,:
MAGNETAR CONSTELLATION MASTER FUND LTD.,
MARINER LDC, MARSH & MCLENNAN MASTER          :
RETIREMENT TRUST, MARSH & MCLENNAN
COMPANIES, INC. STOCK INVESTMENT PLAN,           :
MASTER TRUST BANK OF JAPAN LTD., MBIA, INC.,
MERRILL LYNCH INTERNATIONAL GLOBAL EQUITY  :
FINANCE, MERRILL LYNCH PIERCE FENNER & SMITH
INCORPORATED, MERRILL LYNCH PIERCE FENNER & :
SMITH / FIXED INCOME, MIZUHO INTERNATIONAL
PLC, MKP VELA CBO LTD., MODERN WOODMEN OF     :
AMERICA, INC., MONEYGRAM SECURITIES LLC,
MONTROSE HARBOR CDO I, INC., MONTROSE            :
HARBOR CDO I, LTD., MORGAN STANLEY & CO.,
INCORPORATED, MORGANS FINANCIAL LIMITED,      :
MULBERRY STREET CDO, LTD., NAN SHAN LIFE
INSURANCE CO. LTD., NATIONAL NOMINEES            :
LIMITED, NATIONWIDE LIFE INSURANCE COMPANY,
NATIONWIDE MUTUAL INSURANCE CO., NATIXIS       :
FINANCIAL PRODUCTS LLC, NIPPON LIFE
INSURANCE COMPANY, NONGHYUP BANK (F/K/A        :
KOREA'S NATIONAL AGRICULTURAL COOPERATIVE
FEDERATION), OHIO PUBLIC EMPLOYEE                :
RETIREMENT SYSTEM, OMICRON INVESTMENT
MANAGEMENT GMBH (F/K/A UNIQA ALTERNATIVE       :
INVESTMENTS GMBH), OSDF, LTD., PB CAPITAL
CORPORATION, PCA LIFE ASSURANCE CO. LTD., PHL  :

VARIABLE INSURANCE COMPANY, PHOENIX LIFE
INSURANCE COMPANY, PINNACLE POINT FUNDING    :
LTD., PINNACLE POINT FUNDING CORP., PPL
SERVICES CORPORATION MASTER TRUST, PREBON    :
FINANCIAL PRODUCTS, INC., PRINCIPAL LIFE
INSURANCE COMPANY,  PUTNAM DYNAMIC ASSET    :
ALLOCATION FUNDS – GROWTH PROTFOLIO,
PUTNAM INTERMEDIATE DOMESTIC INVESTMENT    :
GRADE TRUST, PUTNAM STABLE VALUE FUND,
PUTNAM STRUCTURED PRODUCT CDO 2002-1 LTD.,    :
PUTNAM STRUCTURED PRODUCT CDO 2002-1 LLC,
PUTNAM STRUCTURED PRODUCT CDO 2003-1 LTD.,    :
PUTNAM STRUCTURED PRODUCT CDO 2003-1 LLC,
RGA REINSURANCE CO., ROTHSCHILD BANK    :
INTERNATIONAL LIMITED, SBSI, INC., SCOR
REINSURANCE COMPANY, SECURITY BENEFIT LIFE    :
INSURANCE CO., SENTINEL MANAGEMENT GROUP
INC., SHENANDOAH LIFE INSURANCE COMPANY,    :
SHIELD SECURITIES LTD., SHINHAN BANK, SMH
CAPITAL ADVISORS, INC., SOCIETE GENERALE    :
INVESTMENT CORPORATION, ST. VINCENT DE PAUL
SOCIETY QUEENSLAND, STABFUND SUB CA AG,    :
STANDARD LIFE INSURANCE COMPANY OF INDIANA,
STANTON ABS I P.L.C., STANTON CDO I SA, STARLING:
STRATEGIES LTD., STATE STREET CUSTODIAL
SERVICES (IRELAND) LIMITED, STATE STREET    :
GLOBAL ADVISORS, STATE STREET INTERNATIONAL
IRELAND LIMITED, STORMHARBOUR SECURITIES    :
LLP, STRATEGIC GLOBAL (PUTNAM) MANAGED
TRUST, STICHTING SHELL PENSIOENFONDS,    :
STRUCTURED CREDIT AMERICA LTD., STRUCTURED
CREDIT OPPORTUNITIES FUND II, LP, SUN LIFE    :
ASSURANCE COMPANY OF CANADA, SUN LIFE
ASSURANCE COMPANY OF CANADA (U.S.),    :
SUSQUEHANNA BANK, TERWIN CAPITAL, LLC,
TIERRA ALTA FUNDING I LTD., TIERRA ALTA    :
FUNDING I, CORP., TRICADIA CREDIT STRATEGIES
MASTER FUND, LTD., UNICREDIT BANK AG, LONDON :
BRANCH, UNIEUROKAPITAL CORPORATES, UNION
INVESTMENT INSTITUTIONAL GMBH,    :
UNION INVESTMENT LUXEMBOURG S.A., UNION
UNIRESERVE EURO-CORPORATES, VALEO    :
INVESTMENT GRADE CDO LTD., WELLS FARGO
BANK, NATIONAL ASSOCIATION, WHITEHAWK CDO    :
FUNDING, LLC, WHITEHAWK CDO FUNDING LTD.,
THE WINTER GROUP, ZAIS INVESTMENT GRADE    :

LIMITED II, ZAIS INVESTMENT GRADE LIMITED V,
ZAIS INVESTMENT GRADE LIMITED X, Individually and  :
as Representatives of all others similarly situated,

                                    Noteholder Defendants.          :
_____  x

TO THE HONORABLE SHELLY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF" or "Plaintiff"), through

Lehman Brothers Holdings Inc. ("LBHI"), the Plan Administrator under the Modified Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors

(the "Plan"), by and through its undersigned counsel, brings this Complaint against certain

indenture trustees (referred to collectively as the "Trustees") and certain special-purpose entities

more fully identified on Schedule 1 hereto (referred to collectively as the "Issuers"), which is

attached and fully incorporated herein, and a class of noteholders and trust certificate holders

who received distributions from the Trustees, including the Noteholders more fully identified on

the attached Schedule 2 (referred to collectively as the "Noteholders") (the Trustees, Issuers and

Noteholders are referred to collectively as "Defendants"), and respectfully states:

## PRELIMINARY STATEMENT

1.      Plaintiff LBSF files this adversary proceeding (i) to prevent unenforceable

*ipso facto* clauses from improperly modifying LBSF's right to priority of payment of substantial

amounts under certain transaction documents related to credit default swap agreements based

solely upon LBSF and its ultimate parent, LBHI, filing for bankruptcy; and (ii) to recover funds

that were improperly paid to the Noteholders.

2.      LBSF is party to numerous credit default swap agreements (the "Swap

Agreements") pursuant to which it purchased, *inter alia*, credit protection from the Issuers in

connection with 47 collateralized debt obligation transactions (the "SPVs").  LBHI is, usually,

LBSF's credit support provider and guarantor under the Swap Agreements.  The transaction

documents for each of the SPVs provide that, upon any early termination of the Swap

Agreement, the Trustee is generally required to disburse termination payments owed to LBSF

under the Swap Agreements prior to disbursing interest and principal payments to the SPVs'

Noteholders.  The transaction documents also contain, however, clauses that modify LBSF's

foregoing senior payment priority, making such right junior to the payment rights of the

Noteholders (or eliminating LBSF's right to payment altogether) in instances where LBSF was

the "Defaulting Party" (as defined in the Swap Agreements) (the "<u>Priority Modification

Provisions</u>").  The Swap Agreements expressly include the filing of a bankruptcy petition by

LBSF (or LBHI) as an Event of Default under which LBSF becomes the "Defaulting Party."

3.       Therefore, as a direct result of LBSF and LBHI's bankruptcy filings in

2008, LBSF's right to payment priority ahead of the Noteholders was modified and, with respect

to each of the Defendant Issuers, the Defendant Trustee liquidated and distributed (in whole or in

part) to the Defendant Noteholders the SPV collateral that otherwise would have been due and

owing to LBSF.  As a result, however, LBSF's loss of its senior payment priority position by

operation of the Priority Modification Provisions cost the bankruptcy estate and its creditors

substantial amounts.  Accordingly, to restore LBSF's valuable rights and interests in the Swap

Agreements, the Court should grant the relief requested herein.

4.       LBSF's rights in and to the SPVs' assets and the proceeds thereof prior to

the application of the Priority Modification Provisions constituted property of LBSF's estate

from and after the date LBSF's Chapter 11 petition was filed.

5.       In a prior adversary proceeding in this consolidated Chapter 11 case, the

Court held that substantially similar priority modification provisions were unenforceable *ipso

facto* clauses under Sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code and that any

attempt to enforce such provisions would violate the automatic stay triggered by LBSF's

bankruptcy filing:

2

> LBHI commenced a case that entitled LBSF, consistent with the statutory language, fairly read, to claim the protections of the *ipso facto* provisions of the Bankruptcy Code because its ultimate corporate parent and credit support provider at a time of extraordinary panic in the global markets, had filed a case under the Bankruptcy Code.
>
> The Court finds that the provisions in the Transaction Documents purporting to modify LBSF's right to priority distribution solely as a result of a chapter 11 filing constitute unenforceable *ipso facto* clauses.  Moreover, any attempt to enforce such provisions would violate the automatic stay . . . . because it would deprive LBSF and its creditors of a valuable property interest.

*Lehman Bros. Special Financing, Inc. v. BNY Corp. Trustee Svcs, Ltd.,* 422 B.R. 407, 420-21

(Bankr. S.D.N.Y. 2010) (Peck, J.) ("*LBSF v. BNY*").  The Court further held that the priority

modification provisions do not fall within the limited "safe harbor" for *ipso facto* clauses in swap

agreements pursuant to Section 560 of the Bankruptcy Code because, among other reasons, the

safe harbor applies only to "the liquidation, termination or acceleration" of swap agreements or

the "offset or net out" of the parties' positions and does not apply to modifications of a debtor's

payment rights.  *Id.* at 421.

      6.     Thus, consistent with the Court's prior ruling, LBSF is entitled to a

declaration that the Priority Modification Provisions are unenforceable *ipso facto* clauses and the

purported application of those provisions by Defendant Trustees and subsequent distribution to

the Noteholders violated Section 362 of the Bankruptcy Code, the automatic stay, and the terms

of the Transaction Documents (once the application of the Priority Modification Provisions is

nullified).  Further, Plaintiff is entitled to a judgment nullifying all such actions taken in violation

of Section 362 or the stay and restoring the parties to their positions immediately prior to the

violation of Section 362 or the stay.

7.      As a direct result of LBSF and LBHI's bankruptcy filings in 2008, each of the Trustees declared an Event of Default under the transaction documents for each of the SPVs. Shortly thereafter, each of the Trustees transferred its SPV's proceeds from the liquidation of various collateral (upon which LBSF maintained a senior lien) to that Trustee's accounts to be distributed to the SPVs' respective Noteholders.  The transfers were designed to remove property from the reach of LBSF's creditors before LBSF filed for bankruptcy and thus before LBSF's bankruptcy prevented subsequent distributions to Noteholders and/or the Noteholder Class.  Each such transfer constituted an actual fraudulent transfer of an interest of LBSF in property that may be avoided under Section 548(a)(1)(A) of the Bankruptcy Code, recovered under Section 550 of the Bankruptcy Code, and preserved for the benefit of the estate under Section 551 of the Bankruptcy Code.

8.      In addition, once the Priority Modification Provisions are invalidated, LBSF has multiple legal mechanisms to recover the improper distributions from the Noteholders. The purported modification of LBSF's interest and subsequent distributions to the Noteholders wiped out LBSF's substantial "in-the-money" position under the Swap Agreements, resulting in an enormous (and unjustifiable) windfall to the Noteholders at LBSF's expense.  Accordingly, LBSF asserts claims for (i) turnover of property of the estate, (ii) unjust enrichment, (iii) money had and received, and (iv) constructive trust against the Noteholders to recover the improperly distributed amounts.  LBSF also asserts a claim of replevin to obtain the wrongfully withheld distributed amounts.  Further, LBSF asserts claims as a creditor of the Issuer Defendants to recover property, or the value thereof, fraudulently conveyed by the Issuer Defendants to the Noteholder Defendants.

9.    In the alternative, even if the Priority Modification Provisions were enforceable in whole or in part, to the extent either the Priority Modification Provisions, or distributions pursuant to those provisions took effect *before* the commencement of LBSF's bankruptcy case, the modification of LBSF's priority interest constituted either (a) a preferential transfer of an interest of LBSF in property that may be avoided under Section 547 of the Bankruptcy Code, recovered under Section 550 of the Bankruptcy Code, and preserved for the benefit of the estate under Section 551 of the Bankruptcy Code, (b) a constructive fraudulent transfer of an interest of LBSF in property that may be avoided under Section 548(a)(1)(B) of the Bankruptcy Code, recovered under Section 550 of the Bankruptcy Code, and preserved for the benefit of the estate under Section 551 of the Bankruptcy Code, or (c) an intentional fraudulent transfer of an interest of LBSF in property that may be avoided under Section 548(a)(1)(A), recovered under Section 550, and preserved for the benefit of the estate under Section 551.  To the extent that the Priority Modification Provisions were effective *after* the commencement of LBSF's bankruptcy case, the modification of LBSF's priority interest constituted an unauthorized postpetition transfer of property of LBSF's estate that may be avoided under Section 549 of the Bankruptcy Code, recovered under Section 550 of the Bankruptcy Code, and preserved for the benefit of the estate under Section 551 of the Bankruptcy Code.

10.    Moreover, in connection with one of the largest of the 47 SPV deals (the "Pyxis Transaction"), Bank of America National Association's – the indenture trustee on the Pyxis Transaction (the "Pyxis Trustee") – purported termination of the swap agreement was premature and violated multiple provisions of the Pyxis Indenture governing the Pyxis Transaction and swap agreement.   Accordingly, LBSF is entitled to, *inter alia,* a declaration that

5

the purported termination of the Pyxis Credit Default Swap Agreement (defined below) was null and void and the Pyxis swap agreement remains in full force and effect.

11.    Finally, under the Pyxis Transaction documents, the Pyxis Noteholders are contractually obligated to hold, in trust, the collateral distributed to them pursuant to the Priority Modification Provisions and to return such improperly distributed proceeds to the Pyxis Trustee for payment to the appropriate party – here, LBSF.  The Pyxis Noteholders' failure to return the improperly distributed proceeds breaches their obligations, which LBSF is entitled to enforce as an express third-party beneficiary.

## PARTIES

12.    Plaintiff LBSF is a Delaware corporation with its current principal business address at 1271 Avenue of the Americas, 46th Floor, New York, New York 10020.

13.    Bank of America, National Association is a national banking association organized under the laws of the United States with its principal place of business at 100 North Tryon Street, Charlotte, North Carolina 28202.  Upon information and belief, Bank of America is also the successor in interest to LaSalle Bank National Association.

14.    The Bank of New York Mellon National Association is a national banking association organized under the laws of the United States with its principal place of business at One Wall Street, New York, New York 10286.  The Bank of New York Mellon National Association is also the successor in trust to JPMorgan Chase Bank.

15.    BNY Corporate Trustee Services Ltd. is a limited company organized under the laws of the United Kingdom of Great Britain and Northern Ireland with its principal of business at One Canada Square, London, E14 5AL.

6

16.     Citibank, N.A. is a national banking association organized under the laws of the United States with its principal place of business at 388 Greenwich Street, 14th Floor, New York, New York 10013.

17.     Deutsche Bank Trust Company Americas is a banking association organized under the laws of the State of New York with its principal place of business at 60 Wall Street, 27th Floor, New York, New York 10005.

18.     U.S. Bank National Association is a national banking association organized under the laws of the United States with its principal place of business at 1 Federal St., 3rd Floor, Main Station EX-MA-FED, Boston, Massachusetts 02110.

19.     U.S. Bank Trust National Association is a national banking association organized under the laws of the United States with its principal place of business at 100 Wall Street, New York, New York 10005.

20.     Wells Fargo Bank, National Association is a national banking association organized under the laws of the United States with its principal place of business at 9062 Old Annapolis Road, Columbia, Maryland 21045.

21.     The Issuer Defendants are named and identified on the attached Schedule 1 and may be served with process as set forth therein.

22.     Upon information and belief, the Noteholders identified on the attached Schedule 2 are individuals or entities who received Distributions (as defined herein) from the Defendant Trustees.  The Noteholders are sued both individually, and as representatives of a class of all noteholders who received Distributions from the Trustees following LBSF's bankruptcy filing (the "Noteholder Class").

## JURISDICTION AND VENUE

23.     The Court has subject-matter jurisdiction over this proceeding under 28 U.S.C. §§ 157, 1334, and 2201.

24.     This is a "core proceeding" under 28 U.S.C. § 157(b).

25.     Venue is proper under 28 U.S.C. §§ 157(a), 1408, and 1409.

26.     The statutory prerequisites for the relief requested herein are Sections 105(a), 362(a)(3), 363, 365(e)(1), 541(c)(1), 542, 547, 548(a)(1)(A), 548(a)(1)(B), 549(a), 550, and 551 of the Bankruptcy Code, Section 2201 of Title 28 of the United States Code, Federal Rule of Civil Procedure 57, and Rules 7001 and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

27.     Pursuant to Bankruptcy Rule 7008, this adversary proceeding relates to the chapter 11 case *In re Lehman Brothers Holdings Inc.*, pending in this Court as Case No. 08-13555 (SCC).

## CLASS ACTION ALLEGATIONS

28.     The claims against the Noteholder Class are brought pursuant to Rule 23(a), 23(b)(1), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.  The named Noteholders are sued both individually and as representatives of all members of the Noteholder Class.

29.     The Noteholder Class consists of all noteholders who received Distributions from the Trustees following LBHI's bankruptcy filing, including the representative Noteholders identified on Schedule 2.

30.     The Noteholder Class is so numerous that joinder of all of its members is impracticable.  Plaintiff is informed and believes that there are in excess of 150 members of the Noteholder Class.

31.     Common questions of law and fact exist which predominate over any

questions affecting individual members of the Noteholder Class, including:

(a)     Whether the Priority Modification Provisions are unenforceable *ipso facto* clauses that violate Sections 365(e)(1), 541(c)(1)(B), and 363(l) of the Bankruptcy Code;

(b)     Whether the Priority Modification Provisions violate the automatic stay under 11 U.S.C. § 362(a);

(c)     Whether the Collateral Transfers and any subsequent distributions to the Noteholders and the Noteholder Class, were designed to remove assets from the reach of LBSF's creditors and thereby hinder or delay LBSF's creditors' recovery of LBSF's interest in the Collateral or its proceeds in violation of Section 548(a)(1)(A) of the Bankruptcy Code;

(d)     Once the Priority Modification Provisions are invalidated, whether the distributions unjustly enriched the Noteholder Class;

(e)     Once the Priority Modification Provisions are invalidated, whether the equitable remedy of money had and received requires the Noteholder Class to return LBSF's rightful share of funds distributed to the Noteholder Class ahead of LBSF pursuant to the Priority Modification Provisions;

(f)     Once the Priority Modification Provisions are invalidated, whether the Noteholder Class is wrongfully withholding distributions subject to replevin by LBSF;

(g)     Alternatively, whether the Priority Modification Provisions effected a preferential transfer of Plaintiff's property interest – its Senior Payment Priority – to or for the benefit of the Noteholder Class that is subject to avoidance pursuant to Section 547(b) of the Bankruptcy Code;

(h)     Alternatively, whether the Priority Modification Provisions effected a fraudulent transfer of Plaintiff's Senior Payment Priority to or for the benefit of the Noteholder Class that is subject to avoidance pursuant to Section 548(a)(1)(B) of the Bankruptcy Code;

(i)     Alternatively, whether the Priority Modification Provisions effected an unauthorized postpetition transfer of property of Plaintiff's estate to or for the benefit of the Noteholder Class that is subject to avoidance under Section 549 of the Bankruptcy Code;

(j)    Whether the Priority Modification Provisions are an unenforceable penalty;

(k)    Whether the law of the case doctrine bars re-litigation of this Court's prior decisions in *LBSF v. BNY* and *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd. (In re Lehman Bros. Holdings Inc.)*, 452 B.R. 31, 39 (Bankr. S.D.N.Y. 2011) ("*Ballyrock*") in which this Court decided issues similar to those involved in this case;

(l)    For purposes of the constructive trust claim, the issue of whether the Trustee Defendants breached an implicit promise not to improperly transfer Collateral in which LBSF had an interest to other parties;

(m)    For the purposes of the replevin claim, the issue of whether LBSF had a senior lien on the collateral and thus a superior right to that of the Noteholder Defendants;

(n)    The issue of whether *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny defeats Defendants' statute of limitations defenses;

(o)    The issue of whether the Trustee Defendants, the Noteholder Defendants and the members of the proposed Noteholder Class took their interest in the transferred property for value, in good faith, and without knowledge of the voidability of the transfer within the meaning of section 550(b)(1) of the Bankruptcy Code; and

(p)    Whether Defendants should be ordered to turn over property of the estate of the Plaintiff.

32.    The defenses of the named Noteholders are typical of the defenses of all members of the Noteholder Class.

33.    The named class representative Noteholders' interests are aligned with those of the absent class members and they will fairly and adequately represent such absent class members.

34.    The prosecution of separate actions by or against individual members of the Noteholder Class would create a risk of:

(a) inconsistent or varying adjudications with respect to individual members of the Noteholder Class which would establish incompatible standards of conduct; and/or

(b) adjudications with respect to individual members of the Noteholder Class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

35.     This action seeks declaratory and injunctive relief, including a declaration that the Priority Modification Provisions are unenforceable *ipso facto* clauses, and an injunction directing that the Noteholders turn over the cash proceeds from the liquidation of the Collateral to LBSF.  Class treatment of this action for injunctive relief under Rule 23(b)(2) is warranted because the declaratory and injunctive relief, if granted, would bind the entire Noteholder Class.

36.     Common issues predominate over individualized ones.  The terms of the applicable agreements and the relevant conduct of the Noteholder Defendants are substantially similar with respect to each of the 47 SPVs.  Therefore, the Noteholder Class claims principally, if not exclusively, raise common legal issues (including, in particular, the application of the Court's prior ruling in *LBSF v. BNY*) rather than individualized factual issues.

37.     A defendant class action is manageable and superior to the other available methods for the fair and efficient adjudication of this controversy.  The central issues raised in this Complaint have already been resolved by the court, notably whether (i) the Priority Modification Provisions are unenforceable *ipso facto* clauses, and (ii) application of the Priority Modification Provisions would violate the automatic stay.  For these reasons, among others, Defendants thus have little, if any, legitimate interest in individually controlling their defenses in separate actions.  Moreover, because the Notes were tradable in the secondary market it is difficult, if not impossible, for LBSF to identify and sue all the present holders of the Notes individually.  Accordingly, in the absence of a defendant class, LBSF may be unable to obtain

11

relief with respect to all Noteholders.  Finally, permitting LBSF to prosecute its claims against a

defendant class will not give rise to any significant administrative difficulties.  In fact, it will be

far more efficient and less burdensome on the Court to adjudicate LBSF's claims against the

Noteholders as a class rather than in numerous separate adversary proceedings.

## BACKGROUND

38.     LBHI was formerly the fourth largest investment bank in the United

States.  For more than 150 years, LBHI was a leader in the global financial markets by serving

the financial needs of corporations, governmental units, institutional clients, and individuals

worldwide.  LBHI's headquarters in New York and regional headquarters in London and Tokyo

were complemented by a network of offices in North America, Europe, the Middle East, Latin

America, and the Asia Pacific region.

39.     Plaintiff's and LBHI's Chapter 11 cases have been consolidated for

procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule

1015(b).

40.     Debtors were authorized to operate their businesses and manage their

properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy

Code.

41.     On September 1, 2011, the Debtors filed the Plan.

42.     On December 6, 2011, the Bankruptcy Court entered an Order Confirming

the Plan as amended.

43.     On March 6, 2012, the Debtors filed the Notice of Effective Date and

Distribution Date in Connection with the Plan.

A.      **The Transactions**

44.      In connection with the SPVs, the Issuers issued series of notes or, in certain instances, trust certificates (collectively, the "Notes") pursuant to certain transaction documents specific to each series of Notes (together with the corresponding Swap Agreements, the "Transaction Documents"), including trust or indenture documentation (the "Indentures"), in order to raise funds with which to acquire assets.[1]  The Trustees serve pursuant to the Transaction Documents.

45.      Upon the closing date of each of the SPVs, the Issuers acquired assets with the funds raised by the offerings of the Notes (the "Collateral").

46.      For each SPV, the respective Trustee set up certain accounts to, among other things, collect any proceeds from the Collateral to distribute to the persons entitled thereto (the "Payment Accounts") pursuant to the Transaction Documents.

47.      The Issuers and LBSF were parties to one or more Swap Agreements in connection with each SPV pursuant to which LBSF bought, *inter alia*, credit protection with respect to various debt obligations, including residential mortgage-backed obligations and corporate bonds (collectively, "Reference Obligations").

48.      This credit protection was extremely valuable to LBSF because a number of the underlying Reference Obligations had dramatically decreased in value, providing LBSF with a correspondingly significant increase in the value of its interest in the Swap Agreements as of the petition date.  Were LBSF or a third party to go out into the market as of the petition date and acquire the same protection provided in the Swap Agreements, the incremental additional

---

[1] Relevant Swap Agreements and Indentures are identified in Exhibit A.  Contained in Exhibit A are, among other things, certain relevant provisions of the Swap Agreements and Indentures.  The list of provisions in Exhibit A is not exclusive, and LBSF reserves its right to rely upon any other provisions.

cost, upon information and belief, would have been substantial.  LBSF's interests in the Swap

Agreements, in the assets of the SPVs, and in the proceeds of the Collateral, therefore,

represented substantial assets of the Debtors and of the Debtors' estates.

49.    The Trustees, or an agent for one of the other Defendants, held for the

benefit of (among others) LBSF and the Noteholders the Collateral and/or proceeds from the

Collateral that secures the Issuers' respective payment obligations both to LBSF and to the

Noteholders.  LBSF's and the Noteholders' recourse for payment of claims against the Issuers

was limited to the Collateral and/or any other assets of the Issuers related to that particular series

of Notes.  LBSF's and the Noteholders' respective payment priorities for their claims against the

Issuers were to be enforced and realized through the distribution of the Collateral or its proceeds.

50.    LBSF possessed a senior lien on the Collateral and its proceeds to secure

the obligations due to it under the Transaction Documents.

**B.    The Response to LBHI's Bankruptcy Filing**

51.    On September 15 and October 3, 2008, respectively, LBHI and Plaintiff

filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the

"Bankruptcy Code").  Under the Swap Agreements, the commencement of a case under the

Bankruptcy Code by either LBSF or its Credit Support Provider, LBHI, constituted an Event of

Default under the Swap Agreements with respect to LBSF.[2]  As of the commencement of the

LBSF case, LBSF held a legal or equitable interest in the Collateral, or its proceeds, which but

for the application of the Priority Modification Provisions, was senior in right to the interest of

the Defendants in that property, LBSF's interests in the Collateral or its proceeds constituted

property of the LBSF estate.

---

[2] See Exhibit A.

52.     Under certain Transaction Documents, when LBSF has a claim against a particular Issuer under its respective Swap Agreement (because an early termination payment becomes due and the swap is "in-the-money" to LBSF), LBSF's claim has priority over the claims of other Noteholders.  In other words, LBSF's claim has "Senior Payment Priority" and the Noteholders' claims have "Junior Payment Priority."[3]  But upon (a) the occurrence of an Event of Default under the Swap Agreements for which Plaintiff is deemed responsible (including a bankruptcy filing), and (b) the resulting trigger of the Priority Modification Provisions, Senior Payment Priority is transferred from LBSF to the Noteholders, leaving LBSF with, at best, only Junior Payment Priority for its claim.[4]  In some instances, LBSF's right to its termination payment is extinguished altogether.[5]  This purported "flip" of payment priorities pursuant to the Priority Modification Provisions is referred to hereafter in this Complaint as the "Payment Priority Exchange."

53.     The Priority Modification Provisions were triggered here *solely* as the result of LBSF's or LBHI's bankruptcy filing.

54.     Moreover, effecting the Payment Priority Exchange pursuant to the Priority Modification Provisions violates the automatic stay under Section 362(a)(3) of the Bankruptcy Code because it involves an improper exercise of control over property of LBSF's estate.  As such, LBSF seeks a declaratory judgment that such provisions violate the automatic stay.

---

[3] See Exhibit A.

[4] See Exhibit A.

[5] See Exhibit A.

15

55.     In addition, upon the occurrence of the Event of Default under the Swap

Agreements, the Collateral was liquidated and transferred to each of the Trustee's Payment

Accounts to be distributed to the Noteholders and/or the Noteholder Class (the "Collateral

Transfers").

56.     Each of these Collateral Transfers was made with the actual intent to

hinder or delay LBSF's creditors.

57.     Each Trustee knew or should have known that (i) Guarantor LBHI's

Chapter 11 filing caused the purported Event of Default; (ii) LBHI did not have any security

interest or other rights to the Collateral; and (iii) the bankruptcy of LBHI would inevitably lead

to the bankruptcy of other significant operating subsidiaries of LBHI, such as LBSF.  The

Collateral Transfers and subsequent distributions to Noteholders and the Noteholder Class, to

which LBSF was entitled but for the purported Event of Default, were therefore designed to

remove those assets from the reach of LBSF's creditors and thereby hinder or delay LBSF's

creditors' recovery of LBSF's interest in the Collateral.

58.     Such intent can also be inferred from the badges of fraud surrounding each

Trustee's Collateral Transfers.

59.     First, there was a close relationship between the Trustees and LBSF.

Indeed, the Trustees were LBSF's fiduciary, maintaining complete control over the Collateral for

the benefit of, among others, LBSF.

60.     Second, each Collateral Transfer was questionable, hasty and not in the

ordinary course of business.  The period during which the Collateral Transfers occurred was

characterized by disruptions in the financial markets, restrictions on the availability of credit,

massive liquidations of collateral, and an unprecedented need for government intervention to

prevent a collapse of the worldwide banking system.  During the three weeks between LBHI's

filing and that of LBSF, Defendants acted aggressively to protect their interests vis-à-vis both the

Debtors and other creditors of the Debtors, and such actions were in general designed to hinder

or delay other creditors of the Debtors from realizing on the Debtors' assets ahead of the

Defendants.

61.    The Collateral Transfers were also improper because, at the time of the

Event of Default, each Trustee knew or should have known that the Payment Priority Exchange

triggered by the LBHI bankruptcy filing constituted an unenforceable *ipso facto* clause that

violated Sections 365(e)(1), 541(c)(1) and 363(l) of the Bankruptcy Code.

62.    Third, the Collateral Transfers occurred at a time when LBSF was

insolvent and/or undercapitalized.

63.    Fourth, LBSF received no consideration in exchange for the Collateral

Transfers and was deprived of substantial amounts of valuable property because the Swap

Agreements were "in the money."

64.    Because there was an Event of Default under the Transaction Documents,

the Trustee was a fiduciary of LBSF and dominated and controlled LBSF's interest in the

Collateral and its proceeds.  Accordingly, the Trustees' intent to accomplish the Collateral

Transfers and thereby hinder or delay other creditors of LBSF from recovering on LBSF's

interests in property which were the subject of the Collateral Transfers should be imputed to

LBSF.

65.    Under the Transaction Documents, the Trustees had control over the

Collateral and the power to direct the disposition of the proceeds of the Collateral.  Because of

the Trustees' domination and control over LBSF's interest in the Collateral and Collateral's

proceeds, upon the Event of Default, the Trustees effectuated the Collateral Transfers (and subsequent transfers of the Collateral's proceeds to the Noteholders and/or the Noteholder Class) without the Debtor's consent.

66.     Pursuant to the Transaction Documents, the Trustees exclusively controlled the movement and subsequent disposition of the Collateral and Collateral's proceeds.

67.     The involuntary transfer of LBSF's interest in particular property – the Collateral or its proceeds – to or for the benefit of the Trustees and/or the Noteholders, was executed with the intent to hinder or delay LBSF's creditors.  The Collateral Transfers caused LBSF to part with interests in property – LBSF's right to payment priority and LBSF's senior lien on the Collateral and its proceeds.  LBSF's parting with those property interests constituted an involuntary avoidable "transfer" under Section 101(54) of the Bankruptcy Code.

68.     If the Payment Priority Exchange is not invalidated under the *ipso facto* doctrine, as LBSF believes it should be, then the Priority Modification Provisions work as an intercreditor agreement between LBSF and the Noteholders in connection with their respective claims against the Issuers.  If enforceable, the Priority Modification Provisions would obligate LBSF, in contractually specified circumstances, to transfer its interest in particular property – the right to Senior Payment Priority – to or for the benefit of the Noteholders, thereby enhancing the Noteholders' ability to recover on their claims against the Issuers.  The Payment Priority Exchange thus caused LBSF to part with a valuable property interest – its contractual right to Senior Payment Priority – by giving it to or for the benefit of the Noteholders resulting in a windfall to these Noteholders.  LBSF's parting with that interest would constitute an avoidable "transfer" under Section 101(54) of the Bankruptcy Code.

69.      If enforceable, the Priority Modification Provisions operate as a covenant by LBSF that, upon the occurrence of specified events, LBSF will pledge some of its property to, or for the benefit of the Noteholders, to further secure the Noteholders' claims against the Issuer. Just as such a covenant would give the Noteholders a contractual right to obtain property from LBSF through such a pledge, the Priority Modification Provisions, if enforceable, would give the Noteholders a contractual right to obtain property from LBSF through the Payment Priority Exchange.  And just as LBSF would satisfy its contractual obligation to the Noteholders under such a covenant by delivering property to, or for the benefit of, the Noteholders, through such a pledge if the Priority Modification Provisions are found to be enforceable, LBSF would, through the Payment Priority Exchange, satisfy its contractual obligation to the Noteholders to give Senior Payment Priority to, or for the benefit of, the Noteholders.  Even if the Priority Modification Provisions might be read to effectuate the Payment Priority Exchange automatically rather than through some action by LBSF, this does not change the fact that the Payment Priority Exchange constitutes a transfer of an interest of LBSF in property to, or for the benefit of, the Noteholders that satisfies an existing contractual obligation of LBSF to the Noteholders to make such transfer.

70.      Alternatively, if the Payment Priority Exchange is not effected pursuant to, and in satisfaction of, an existing contractual obligation of LBSF, then any operation of the Payment Priority Exchange would be a gratuitous transfer of a property interest by LBSF for which LBSF received no value in exchange.

71.      Moreover, LBSF was heavily "in-the-money" on each of the Swap Agreements at the time of bankruptcy.  As a result, LBSF was entitled to a substantial amount of the Collateral in the event of a distribution following a termination of the Swap Agreement.  The

Trustees, however, seizing upon the Priority Modification Provisions and the Payment Priority Exchange, declared LBSF a "defaulting party" and transferred almost all of the Collateral, including the portion to which LBSF was entitled, to the Noteholders (the "<u>Distributions</u>"), while retaining other monies to pay certain fees and costs of the Trustees, including litigation expenses. The Distributions effected a staggering windfall to the Noteholders.

72.    The Noteholders received or potentially will receive billions of dollars which, but for the invalid and unenforceable Priority Modification Provisions, were due to LBSF—funds of enormous value to the estate.  The Noteholders were, thereby, enriched at the expense of LBSF.  Additionally, the Noteholders are wrongfully withholding millions in Distributions which rightfully belong to LBSF.

73.    All conditions precedent to suit have been performed, have occurred, or have been waived.

## ADDITIONAL ALLEGATIONS REGARDING THE PYXIS TRANSACTION

74.      The Pyxis transaction is similar to transactions described above.  In addition to its Priority Modification Provision being an unenforceable *ipso facto* provision, the swap agreement between LBSF and Pyxis ABS SPV 2007-1 Ltd ("Pyxis"), the Issuer of the Pyxis transaction (the "Pyxis Credit Default Swap Agreement")[6], was terminated prematurely and in violation of multiple provisions of the Pyxis Indenture[7] governing the Pyxis transaction and the Pyxis Credit Default Swap Agreement itself.

### A.      Premature Termination of the Pyxis Credit Default Swap Agreement

75.      On February 1, 2008, the Pyxis Trustee gave notice that an Event of Default had occurred under Section 5.1(h) of the Pyxis Indenture.  This was followed on February 4, 2008, by an acceleration of the maturity of the Notes by the Controlling Class of Noteholders (the "Controlling Class").  At that time, the Controlling Class did not elect to exercise its right to seek disposition of the Collateral, and the Pyxis Trustee subsequently decided to retain the Collateral pursuant to Section 5.5(a) of the Pyxis Indenture.

76.      Over seven months later, following the September 15, 2008 Chapter 11 filing by LBHI (the "LBHI Petition Date"), the Pyxis Trustee provided LBSF with a notice stating that "[a]s a result of such event of default [the LBHI bankruptcy], the Pyxis Trustee on behalf of the Pyxis Issuer, upon the direction of the Collateral Manager and a Majority of the Controlling Class, exercised the right of the Issuer to terminate the Pyxis Credit Default Swap Agreement and the Deemed Floating Asset Hedge Agreement.  The Pyxis Trustee also

---

[6] The Pyxis Credit Default Swap Agreement is a 1992 form (Multicurrency-Cross Border) ISDA Master Agreement, dated as of March 6, 2007 ("Pyxis Master Agreement"), along with the annexed "Schedule," the relevant swap "Confirmations," and related documents.

[7] The "Pyxis Indenture" is the indenture, dated as of March 6, 2007, among Pyxis, Pyxis ABS CDO 2007-1 LLC and the Pyxis Trustee.

designated September 24, 2008, as the 'Early Termination Date' under each such agreement."
One day earlier, on September 23, 2008, the Controlling Class directed the Pyxis Trustee to
dispose of the Collateral.

77.     The Pyxis Trustee's termination of the Pyxis Credit Default Swap
Agreement was flawed in several material respects and is, therefore, ineffective.

78.     First, the Pyxis Trustee's termination failed to provide LBSF with the
requisite ten (10) business day period within which to assign the Pyxis Credit Default Swap
Agreement.  The September 15, 2008 LBHI bankruptcy filing constituted an Event of Default
under the terms of the Pyxis Credit Default Swap Agreement set out in the Pyxis ISDA Master
Agreement.  See Pyxis Credit Default Swap Agreement, § 5(a)(vii)(4).  The following day, S&P
and Moody's downgraded their ratings of LBHI and LBSF, which constituted a "Ratings Event"
under the terms of the Pyxis Credit Default Swap Agreement set out in the Schedule.  See Pyxis
Credit Default Swap Agreement, Schedule, Part 5(k)(iii).

79.     Under Part 5(k)(iv) of the Schedule, following the occurrence of a Ratings
Event, LBSF had a period of ten (10) business days (expiring on September 30, 2008) within
which, with the assistance of Pyxis, it could (i) furnish an Eligible Guarantee of its obligations
from a guarantor that satisfied the Required Ratings, or (ii) obtain a substitute counterparty that
satisfied the Required Ratings (i.e., assign its position under the Pyxis Credit Default Swap
Agreement to a creditworthy replacement counterparty).

80.     The Pyxis Trustee did not provide LBSF with the required ten (10)
business days within which to assign the Pyxis Credit Default Swap Agreement.

81.     Thus, when the occurrence of an Event of Default and a Ratings Event
under the Pyxis Credit Default Swap Agreement coincided, the Schedule provided LBSF with

the specific right to assign its interest as the result of the Ratings Event, while the Pyxis ISDA

Master Agreement provided the Trustee with the conflicting right to terminate the CDS

Agreement Transactions as the result of the event of default caused by LBHI's filing.  In other

words, LBSF's and the Pyxis Trustee's respective rights and remedies under Section 6(a) of the

Pyxis Credit Default Swap Agreement were in direct conflict with those under Part 5(k)(iv) of

the Schedule.  Such conflicts are explicitly resolved by Section 1(b) of the Pyxis ISDA Master

Agreement, which unequivocally provides that in such cases the provisions of the Schedule will

prevail.  Accordingly, LBSF's assignment and substitution rights under the Schedule were

supposed to prevail over the Pyxis Trustee's right to designate an Early Termination Date under

the Credit Default Swap Agreement.

82.    By improperly designating an Early Termination Date under the Pyxis

Credit Default Swap Agreement on September 24, 2008, with five (5) business (and seven (7)

calendar) days remaining in the Ratings Event cure period, the Pyxis Trustee cut off LBSF's

ability to exercise its rights pursuant to the Schedule.  Far from standing ready to assist LBSF, as

was its obligation, the Pyxis Trustee took steps to frustrate LBSF's ability to exercise its

assignment rights under the Schedule.

83.    Had LBSF assigned its rights under the Pyxis Credit Default Swap

Agreement, it would have substantially realized the value of its position.  Moreover, because

termination was improper, the Pyxis Credit Default Swap Agreement remains live, and LBSF's

Senior Payment Priority under the Pyxis Credit Default Swap Agreement remains operative

irrespective of any amounts owed to the Noteholders.

**B.      Improper Liquidation of the Collateral**

84.      Section 5.5(a) of the Pyxis Indenture provides that the Pyxis Trustee is obligated at all times to retain the Collateral intact absent the occurrence of one of several specified identified circumstances in which the Pyxis transaction could be unwound (each, a "Disposition Event").  One such Disposition Event occurred on January 31, 2008, months prior to LBHI's Petition Date, when it was determined that Pyxis had failed to maintain a Collateral coverage ratio required under the Pyxis Indenture.

85.      As stated above, on February 1, 2008, the Pyxis Trustee gave notice that an Event of Default had occurred, and on February 4, 2008, the Controlling Class accelerated the maturity of the Notes.  At that time, the Disposition Event entitled the Controlling Class as holder of a Majority of the Controlling Class, to seek LBSF's consent to direct the disposition of the Collateral – that is, to sell, terminate or otherwise liquidate the Collateral – in accordance with Section 5.5(a)(iii) of the Pyxis Indenture.  However, the Controlling Class elected not to exercise that right, and the Pyxis Trustee therefore retained the Collateral pursuant to Section 5.5(a).

86.      In February 2008, had the Controlling Class exercised its right to direct disposition of the Collateral pursuant to Section 5.5(a)(iii) with LBSF's consent, Pyxis would have had to make substantial termination payments to LBSF in connection with the termination of the Pyxis Credit Default Swap Agreement.  As the Pyxis Credit Default Swap Agreement was deeply "in-the-money" to LBSF by roughly $1 billion – far more than the value of Pyxis's assets – the Controlling Class would have been contractually obligated to make up any shortfall up to a specified maximum under the relevant Transaction Documents.

24

87.     In the absence of any direction from the Controlling Class at that time, the Pyxis Trustee notified the parties it would continue to retain the Collateral intact, as required by the Pyxis Indenture.

88.     Once the Pyxis Trustee retained the Collateral, Section 5.5(a) specifically provided that "[s]o long as such Event of Default is continuing, any such retention pursuant to this Section 5.5(a) may be rescinded at any time *when the conditions specified in clause (i) or (ii) exist."* Id. § 5.5(a) (emphasis added).  Tellingly, clause (iii) is omitted from the list, which is the clause giving rise to the Controlling Class's right to direct the disposition of the Collateral even if the proceeds of such disposition were insufficient to repay junior classes of noteholders and LBSF in full.  Id.  The plain reading of the Pyxis Indenture means that, by electing not to exercise its right in February 2008, the Controlling Class forfeited the opportunity to later direct disposition of the Collateral because the right of the Controlling Class under Section 5.5(a)(iii) is not a continuing right and is exercisable only so long as the Pyxis Trustee has not retained the Collateral.  Therefore, the Controlling Class's direction to the Pyxis Trustee on September 23, 2008 to dispose of the Collateral – which explicitly referred only to the February 1, 2008 Event of Default – and the Pyxis Trustee's subsequent liquidation of the Collateral and distribution of proceeds to Noteholders, contravened the plain terms of Section 5.5(a) and LBSF's rights.

## C.     Violation of Section 5.2 of the Pyxis Indenture

89.     Section 5.2(c) of the Pyxis Indenture sets out two preconditions, each of which must be met before the Pyxis Trustee may terminate the Pyxis Credit Default Swap Agreement – first, that "the liquidation of the Collateral has begun" and second, that the maturity date of the Notes has been accelerated and the declaration of acceleration "is no longer capable of being rescinded or annulled."

90.     As explained in Section B above, the first condition – commencement of liquidation of the Collateral – was not satisfied within the terms of the Pyxis Indenture.

91.     The second precondition likewise was not met.  The Controlling Class, had declared the acceleration of the Pyxis Notes following the January 2008 Disposition Event. The Controlling Class's declaration of acceleration, however, remained capable of being rescinded as of September 24, 2008.  Section 5.2(b) of the Pyxis Indenture provides that a declaration of acceleration may be rescinded "at any time" after it is made and before a judgment or decree for payment of the cash due has been obtained by the Pyxis Trustee pursuant to Article V of the Pyxis Indenture.  Given that no such judgment had been obtained, the acceleration was capable of being rescinded.

92.     The purpose of Section 5.2(c) is clear and simple.  Unless the overall Pyxis  Transaction became irretrievable, the Pyxis Credit Default Swap Agreement, given its central importance to the overall Pyxis Transaction, was to remain in place and would be the last item of the Collateral to be terminated – not, as was the case in this instance, the first to be terminated.

93.     By liquidating the Collateral improperly and terminating the Pyxis Credit Default Swap Agreement when the declaration of acceleration was capable of being rescinded, the Pyxis Trustee violated the express terms of the Pyxis Indenture.

**D.      Failure to Obtain a Substitute Credit Default Swap Agreement**

94.     Section 7.8(a)(xi) of the Pyxis Indenture expressly provided that Pyxis was prohibited from terminating the Pyxis Credit Default Swap Agreement unless either (i) there

are no CDS Agreement Transactions[8] outstanding under the Pyxis Credit Default Swap

Agreement or (ii) Pyxis has entered into a replacement credit default swap agreement.  Similarly,

Section 7.5(f) obligated Pyxis to use "reasonable efforts to enter into a replacement Credit

Default Swap Agreement" in connection with any termination of the Credit Default Swap

Agreement.

95.      CDS Agreement Transactions remained outstanding at the time of the

purported termination by the trustee of the Pyxis Credit Default Swap Agreement.  The Pyxis

Trustee, however, terminated the Pyxis Credit Default Swap Agreement without attempting to

enter into a replacement Credit Default Swap Agreement.  That purported termination violated

LBSF's rights under the Pyxis Credit Default Swap Agreement and the Pyxis Indenture.  A

replacement Credit Default Swap Agreement covering the same Reference Obligations as the

original Pyxis Credit Default Swap Agreement with LBSF would have been worth hundreds of

millions of dollars to any number of credit protection purchasers in the market at the time.  A

new Credit Default Swap counterparty would have paid Pyxis amounts that Pyxis could have

used to make the CDS Termination Payment due to LBSF upon termination of the CDS

Agreement Transactions.

96.      Had the Pyxis Trustee entered into a replacement Credit Default Swap

Agreement, LBSF could have been made whole.  Because replacing the Pyxis Credit Default

Swap Agreement, however, would have been of no benefit to the Noteholders, the Pyxis Trustee

instead terminated it, relieving the Controlling Class of its massive liability and repaying the

other Noteholders their extraordinary losses, all at the expense of LBSF.

---

[8] The Pyxis Indenture provides that "CDS Agreement Transactions" means the Synthetic Securities in the form of
credit default swap transactions entered into by the Issuer with the Credit Default Swap Counterparty under the
Credit Default Swap Agreement.

**E.**        **Violation of Section 13 of the Pyxis Indenture**

97.        In addition, under the terms of the Pyxis Indenture, the Pyxis Noteholders are required to hold, in trust, any funds that are distributed to them instead of to a party with senior priority to such funds, i.e., LBSF as the swap counterparty.  The Pyxis Noteholders are further required to return such improperly distributed funds to the Trustee for payment to the appropriate party.  LBSF is an express third-party beneficiary of the Pyxis Indenture.

**COUNT I**
**Against All Defendants**

*(Declaratory Judgment – Provisions Modifying Plaintiff's Payment Priority as a Result of the Bankruptcy Filings Are Unenforceable Ipso Facto Clauses)*

98.        LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

99.        At the time of the LBHI and LBSF bankruptcy filings, the parties' respective obligations under the Transaction Documents were continuing and the performance of obligations under the Swap Agreements and Transaction Documents remained outstanding on both sides.

100.        Accordingly, the Swap Agreements and Transaction Documents were executory contracts and subject to the protections of Sections 365(e), 541(c)(1)(B) and 363(l) of the Bankruptcy Code.

101.        The Priority Modification Provisions that purport to effect the Payment Priority Exchange as a result of LBHI's or LBSF's bankruptcy filing constitute unenforceable *ipso facto* clauses that violate Sections 365(e)(1), 541(c)(1) and 363(l) of the Bankruptcy Code.

102.    The Bankruptcy Code protects debtors from being penalized for filing a

Chapter 11 case, notwithstanding any contractual provisions or applicable law that would have

that effect.  Indeed, Section 365(e)(1) of the Bankruptcy Code provides that:

> [n]otwithstanding a provision in an executory contract . . .  an
> executory contract . . . of the debtor may not be terminated *or
> modified*, and any right or obligation under such contract or lease
> may not be terminated *or modified*, at any time after the
> commencement of the case solely because of a provision in such
> contract . . . that is conditioned on . . . the commencement of a case
> under this title . . . .

11 U.S.C. § 365(e)(1) (emphasis added).

103.    Similarly, Section 541(c)(1) of the Bankruptcy Code recognizes that a

debtor's interest in property:

> becomes property of the estate  . . . notwithstanding any provision
> in an agreement, transfer instrument, or applicable nonbankruptcy
> law . . . that is conditioned on . . . the commencement of a case
> under this title . . . and that effects or gives an option to effect a
> forfeiture, modification, or termination of the debtor's interest in
> property.

11 U.S.C. § 541(c)(1).

104.    Enforcement of the Priority Modification Provisions also violates the *ipso

facto* prohibition of Section 363(l), which provides, in relevant part, that the debtor:

> may use, sell, or lease property under section (b) or (c) of this
> section, or a plan under chapter 11, 12, or 13 of this title may
> provide for the use, sale, or lease of property, notwithstanding any
> provision in a contract, a lease, or applicable law that is
> conditioned on the insolvency or financial condition of the debtor,
> on the commencement of a case under this title concerning the
> debtor, or on the appointment of or the taking possession by a
> trustee in a case under this title or a custodian, and that effects, or
> give an option to effect, a forfeiture, modification, or termination
> of the debtor's interest in such property.

11 U.S.C. § 363(l).  As described above, property of the estate is broadly defined in Section

541(a)(1) and includes property in which the debtor did not have a possessory interest at the time

the bankruptcy proceedings commenced.

105.     Because the Priority Modification Provisions (a) become operative after

the commencement of LBHI's or LBSF's bankruptcy case, (b) effect the Payment Priority

Exchange solely because of "the commencement of a case" under the Bankruptcy Code, and (c)

deprive LBSF of Senior Payment Priority, the provisions are unenforceable *ipso facto* clauses,

and the Court should declare that the Priority Modification Provisions and the corresponding

Payment Priority Exchange are unenforceable pursuant to Sections 365(e)(1), 541(c)(1)(B) and

363(l) of the Bankruptcy Code.

106.     This Court has already determined in *LBSF v. BNY*, that a provision like

the Priority Modification Provisions is an unenforceable *ipso facto* clause.

107.     The Court should declare that the Priority Modification Provisions are

unenforceable pursuant to Section 365(e)(1), 541(c)(1)(B) and 363(l) of the Bankruptcy Code.

108.     There is an actual controversy between the parties on this issue because

the Transaction Documents on their face require the Payment Priority Exchange in violation of

the Bankruptcy Code and Defendants have not agreed to waive or disregard such Payment

Priority Exchange and pay LBSF what it is rightfully owed.

109.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001,

LBSF requests that the Court enter a declaratory judgment that (a) the Priority Modification

Provisions are unenforceable *ipso facto* clauses pursuant to Sections 365(e)(1), 541(c)(1)(B) and

363(l) of the Bankruptcy Code, and that (b) LBSF is entitled to Senior Payment Priority.

## COUNT II
## Against All Defendants

### *(Declaratory Judgment – Provisions Modifying Plaintiff's Payment Priority as a Result of the Bankruptcy Filings Violate the Automatic Stay)*

110.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

111.    Section 362(a) of the Bankruptcy Code provides, in relevant part, that the filing of a petition under Title 11 of the Bankruptcy Code "operates as a stay, applicable to all entities, of -- . . . (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . ." 11 U.S.C. § 362(a)(3).

112.    At the time LBSF commenced its case under the Bankruptcy Code, its right to Senior Payment Priority constituted a substantial asset of the estate.  Any action to exercise control over LBSF's Senior Payment Priority, including any action to effect the Payment Priority Exchange, would be, therefore, subject to, and in violation of, the automatic stay, provided under Section 362(a) of the Bankruptcy Code.  See 11 U.S.C. § 362(a)(3).

113.    Further, the Payment Priority Exchange improperly seeks to take property of LBSF because of its or LBHI's bankruptcy filing.  Property of a debtor becomes property of the estate, "notwithstanding any provision in an agreement . . . that is conditioned . . . on the commencement of a case under this title . . . and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property."  11 U.S.C. § 541(c)(1).  Invoking the Payment Priority Exchange modified LBSF's right to Senior Payment Priority, and thus caused LBSF to forfeit an interest in property because of "the commencement of a case under this title."  This violates the automatic stay provided under Section 362(a).

31

114.    There is an actual controversy between the parties on this issue because, in violation of the Bankruptcy Code, (i) the Transaction Documents require the Payment Priority Exchange and (ii) Defendants have not agreed to waive or disregard such Payment Priority Exchange and pay LBSF what it is rightfully owed.

115.    Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests that this Court enter a declaratory judgment that all actions to enforce the Payment Priority Exchange constitute willful violations of the automatic stay under Section 362(a)(3) of the Bankruptcy Code and are void *ab initio*.

### ALTERNATIVE COUNT III
### Against the Trustees, Noteholders, and Noteholder Class

#### (*Prepetition Payment Priority Exchange Constitutes*
#### *Avoidable Transfer Under Section 547 of the Bankruptcy Code*)

116.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

117.    Section 547(b) of the Bankruptcy Code provides that "any transfer of an interest of the debtor in property" may be subject to avoidance as a preference if the transfer is made: "(1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) . . . while the debtor was insolvent; (4) . . . on or within 90 days before the date of the filing of the petition . . .; and (5) that enables such creditor to receive more than such creditor would receive if – (A) the case were a case under Chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided for by the provisions of this title."  11 U.S.C. § 547(b).

118.    Pursuant to the Transaction Documents, the bankruptcy filing of LBHI on September 15, 2008 – as Credit Support Provider to LBSF under the Swap Agreements – constituted an Event of Default under the Swap Agreements with respect to LBSF.

119.    If the Payment Priority Exchange is found to be effective, it would cause LBSF to transfer to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class, an interest of LBSF in property–its right to Senior Payment Priority.

120.    To the extent that the Payment Priority Exchange is found to (a) have taken effect *before* LBSF's petition date, (b) be enforceable, and (c) have been effected pursuant to an existing contractual obligation of LBSF, it is avoidable as a preferential transfer pursuant to Section 547 of the Bankruptcy Code.

121.    If the provisions that govern the Payment Priority Exchange are found to be enforceable, they would effect a transfer of LBSF's right to Senior Payment Priority to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class, who, pursuant to their contractual rights, would, under those narrow circumstances, have been creditors of LBSF.

122.    Under the circumstances described in this count, the transfer of LBSF's right to Senior Payment Priority would be on account of an antecedent debt, consisting of LBSF's contractual obligation, in specified circumstances, to transfer its right to Senior Payment Priority to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class.

123.    Under these circumstances, any transfer would have been made no earlier than September 15, 2008 – within the 90 days preceding LBSF's bankruptcy filing – while LBSF was insolvent.

124.     If the Payment Priority Exchange is found to be enforceable and to have operated as described in this alternative Count, it would allow the Trustees, the Noteholders, and/or the members of the Noteholder Class, to receive more than they would have otherwise received if the case were a case under Chapter 7 of this title and the transfer effected by the Payment Priority Exchange had not been made.

125.     If the Payment Priority Exchange is found to be enforceable and to have operated as described in this alternative Count, it was a preferential transfer of LBSF's property interest – its Senior Payment Priority – to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class, which LBSF may avoid pursuant to Section 547(b) of the Bankruptcy Code and which LBSF may recover from the Trustees, the Noteholders, and/or the members of the Noteholder Class, as the initial transferees of LBSF's said property interest, pursuant to Section 550(a)(1) of the Bankruptcy Code, and preserve that property interest for the benefit of its estate pursuant to Section 551 of the Bankruptcy Code.

126.     To the extent that each of the Trustees, the Noteholders, and/or the members of the Noteholder Class members received subsequent transfers of LBSF's Senior Payment Priority, each of the Trustees, the Noteholders, and/or the members of the Noteholder Class constitutes an immediate and/or mediate transferee of the initial transferees within the meaning of Section 550(a)(2) of the Bankruptcy Code.  To the extent that each of the Trustees, the Noteholders, and/or the members of the Noteholder Class received such subsequent transfers, none of the Trustees, the Noteholders, and/or the members of the Noteholder Class took its interest in the transferred property for value, in good faith, and without knowledge of the voidability of the transfer within the meaning of Section 550(b)(1) of the Bankruptcy Code.

34

127.    In this alternative Count, LBSF asserts its right to avoid the Payment

Priority Exchange and to recover and preserve, for the benefit of its estate, the Senior Payment

Priority from all initial transferees and from all immediate and/or mediate transferees of such

initial transferees.

### ALTERNATIVE COUNT IV
### Against the Trustees, Noteholders and Noteholder Class

(*Avoidance of the Transfers Made with the Actual Intent to Hinder or Delay LBSF's Creditors
Under Section 548 (a)(1)(A) of the Bankruptcy Code*)

128.    LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

129.    LBSF seeks entry of a judgment against the Trustees, and any subsequent

transferees from the Trustees, including without limitation the Noteholders, avoiding the

Collateral Transfers as transfers made with the actual intent to hinder or delay LBSF's creditors,

pursuant to Section 548(a)(1)(A) of the Bankruptcy Code.

130.    The Bankruptcy Code provides that a debtor in possession "may avoid any

transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was

made or incurred on or within two years before the date of the filing of the petition, if the debtor

voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual

intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the

date that such transfer was made or such obligation was incurred, indebted."  11 U.S.C. §

548(a)(1)(A).

131.    Upon the closing date of each of the SPVs, LBSF possessed a senior lien

on the Collateral and its proceeds to secure the obligations due to it under the Transaction

Documents.  The senior lien on the Collateral and its proceeds was "an interest of LBSF in property."  In addition, LBSF's Senior Payment Priority was "an interest of LBSF in property."

132.    Pursuant to the Transaction Documents, the bankruptcy filing of LBHI – the Credit Support Provider to LBSF under the Swap Agreements – on September 15, 2008 constituted an Event of Default under the Swap Agreements with respect to LBSF.

133.    Shortly after the Event of Default, each Trustee effectuated the Collateral Transfers.

134.    Each of these Collateral Transfers was made with an actual intent to hinder or delay LBSF's creditors.

135.    Each Trustee knew or should have known that (i) the Chapter 11 filing of LBHI, the credit support provider, caused the purported Event of Default; (ii) LBHI did not have any security interest or other rights to the Collateral; and (iii) the bankruptcy of LBHI would inevitably lead to the bankruptcy of other significant operating subsidiaries of LBHI, such as LBSF.

136.    The Collateral Transfers and subsequent distributions to Noteholders and the Noteholder Class, to which LBSF were entitled but for the purported Event of Default, were therefore designed to remove those assets from the reach of LBSF's creditors and thereby hinder or delay LBSF's creditors' recovery of LBSF's interest in the Collateral or their proceeds.

137.    Such an intent to hinder, delay or defraud can also be inferred from the badges of fraud surrounding each Trustee's Collateral Transfers.

138.    First, there was a close relationship between the Trustees and LBSF. Indeed, the Trustees were LBSF's fiduciaries, holding monies and/or property for the benefit of, among others, LBSF.

139.    Second, each Collateral Transfer was questionable, hasty and not in the ordinary course of business.  The period during which the Collateral Transfers occurred was characterized by disruptions in the financial markets, restrictions on the availability of credit, massive liquidations of collateral, and an unprecedented need for government intervention to prevent a collapse of the worldwide banking system.  During the three weeks between the LBHI Petition Date and LBSF's Chapter 11 filing, Defendants acted aggressively to protect their interests vis-à-vis both the Debtors and other creditors of the Debtors, and such actions were in general designed to hinder or delay other creditors of the Debtors from realizing the Debtors' assets ahead of the Defendants.

140.    The Collateral Transfers were also improper because, at the time of the Event of Default, each Trustee knew or should have known that the Payment Priority Exchange triggered by the LBHI bankruptcy filing constituted an unenforceable *ipso facto* clause that violated Sections 365(e)(1), 541(c)(1) and 363(l) of the Bankruptcy Code.

141.    Third, the Collateral Transfers occurred at a time when LBSF was insolvent and/or undercapitalized.

142.    Finally, LBSF received no consideration in exchange for the Collateral Transfers and was deprived of substantial amounts of valuable property because the Swap Agreements were "in the money."

143.    Because there was an Event of Default under the Transaction Documents, the Trustees were fiduciaries of LBSF and dominated and controlled LBSF's interest in the Collateral and Collateral's proceeds.  Accordingly, the Trustees' intent to accomplish the Collateral Transfers and thereby hinder and delay other creditors of LBSF from recovering on

LBSF's interests in property which were the subject of the Collateral Transfers should be imputed to LBSF.

144.     Under the Transaction Documents, the Trustees controlled the Collateral and the power to direct the disposition of the proceeds of the Collateral.  Because of the Trustees' domination and control over LBSF's interest in the Collateral and its proceeds, upon the Event of Default, the Trustees were able to effectuate the Collateral Transfers (and subsequent transfers of the Collateral's proceeds to the Noteholders and/or the Noteholder Class) without the Debtors' consent.

145.     Pursuant to the Transaction Documents, the Trustees exclusively controlled the movement and subsequent disposition of the Collateral and its proceeds.

146.     The involuntary Collateral Transfers were fraudulent transfers of LBSF's interest in property – its senior lien in the Collateral and its proceeds and its Senior Payment Priority – to or for the benefit of the Trustees and/or the Noteholders, which LBSF may avoid pursuant to Section 548(a)(1)(A) of the Bankruptcy Code and which LBSF may recover from the Trustees, as the initial transferees of LBSF's said property interest, pursuant to Section 550(a)(1) of the Bankruptcy Code, and preserve for the benefit of its estate pursuant to Section 551 of the Bankruptcy Code.

147.     To the extent that each of the Trustees, the Noteholders, and/or the members of the Noteholder Class received subsequent transfers of LBSF's Collateral or proceeds from such Collateral, each of the Trustees, the Noteholders, and/or the members of the Noteholder Class constitutes an immediate and/or mediate transferee of the initial transferees within the meaning of Section 550(a)(2) of the Bankruptcy Code.  To the extent that each of the Trustees, the Noteholders, and/or the members of the Noteholder Class received such subsequent

38

transfers, none of the Trustees, the Noteholders, and/or the members of the Noteholder Class took its interest in the transferred property for value, in good faith, and without knowledge of the voidability of the transfer within the meaning of Section 550(b)(1) of the Bankruptcy Code.

148.    If the Payment Modification Provisions are found to be enforceable and to have operated as described above, LBSF asserts its right to avoid the Collateral Transfers and to recover and preserve, for the benefit of its estate, the Collateral Transfers from all initial transferees and from all immediate and/or mediate transferees of such initial transferees.

## ALTERNATIVE COUNT V
### Against the Trustees, Noteholders, and Noteholder Class

*(Prepetition Payment Priority Exchange
Constitutes Avoidable Transfer Under Section 548(a)(1)(B) of the Bankruptcy Code)*

149.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

150.    Section 548(a)(1)(B) of the Bankruptcy Code provides that a transfer of a debtor's interest in property, made within two years before the commencement of the Debtors' bankruptcy case, may be avoided as constructively fraudulent if the debtor (a) "received less than reasonably equivalent value in exchange for such transfer" and (b)(i) "was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer or obligation," (ii) "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonable small capital," or (iii) "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."  11 U.S.C. § 548(a)(1)(B)(i)-(ii).

151.    Pursuant to the Transaction Documents, the bankruptcy filing of LBHI on September 15, 2008 – as Credit Support Provider to LBSF under the Swap Agreements – constituted an Event of Default under the Swap Agreements with respect to LBSF.

152.    If the Payment Priority Exchange is found to be effective, it would cause LBSF to transfer to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class an interest of LBSF in property – its right to Senior Payment Priority.

153.    If the Payment Priority Exchange is found to be enforceable and to have operated as described in this alternative Count, it would effect a transfer of LBSF's right to Senior Payment Priority to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class.

154.    If the Payment Priority Exchange is found to be enforceable and to have operated as described in this alternative Count, and to the extent that the Payment Priority Exchange is not found to have been effected pursuant to, and in satisfaction of, an existing contractual obligation of LBSF, it would have been done gratuitously, and therefore, in exchange for less than reasonably equivalent value.

155.    If the Payment Priority Exchange is found to be enforceable and to have operated as described in this alternative Count, the Payment Priority Exchange would have occurred when LBSF was, or thereby became, insolvent, or left with unreasonably small capital, or intending or believing that it would incur debts that would be beyond its ability to pay as such debts matured.

156.    If the Payment Priority Exchange is found to be enforceable and to have operated as described in this alternative Count, the Payment Priority Exchange was a constructive fraudulent transfer of LBSF's property interest – its Senior Payment Priority – to or

for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class, which LBSF may avoid pursuant to Section 548(a)(1)(B) of the Bankruptcy Code and which LBSF may recover from the Trustees, the Noteholders, and/or the members of the Noteholder Class, as the initial transferees of LBSF's said property interest, pursuant to Section 550(a)(1) of the Bankruptcy Code, and preserve that interest for the benefit of its estate pursuant to Section 551 of the Bankruptcy Code.

157.    To the extent that each of the Trustees, the Noteholders, and/or the members of the Noteholder Class received subsequent transfers of LBSF's Senior Payment Priority, each of the Trustees, the Noteholders, and/or the members of the Noteholder Class constitutes an immediate and/or mediate transferee of the initial transferees within the meaning of Section 550(a)(2) of the Bankruptcy Code.  To the extent that each of the Trustees, the Noteholders, and/or the members of the Noteholder Class received such subsequent transfers, none of the Trustees, the Noteholders, and/or the members of the Noteholder Class took its interest in the transferred property for value, in good faith, and without knowledge of the voidability of the transfer within the meaning of Section 550(b)(1) of the Bankruptcy Code.

158.    In this alternative Count, LBSF asserts its right to avoid the Payment Priority Exchange and to recover and preserve, for the benefit of its estate, the Senior Payment Priority from all initial transferees and from all immediate and/or mediate transferees of such initial transferees.

**ALTERNATIVE COUNT VI**
**Against the Trustees, Noteholders, and Noteholder Class**

(*Postpetition Payment Priority Exchange*
*Constitutes Avoidable Transfer Under Section 549 of the Bankruptcy Code*)

159.    LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

160.    Section 549(a) of the Bankruptcy Code provides that any transfer of

property of a debtor's estate that occurs (a) "after commencement of the case," and (b) without

authorization under the Bankruptcy Code or by the Court, may be avoided.  11 U.S.C. § 549(a).

161.    If the Payment Priority Exchange is found to be enforceable and to have

operated as described in this alternative Count, to the extent that the Payment Priority Exchange

was effected *after* the commencement of LBSF's bankruptcy case, it caused LBSF to transfer to

or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class, a

property interest of LBSF's estate – its right to Senior Payment Priority and its senior interest in

the Collateral and its proceeds.

162.    Any such transfer was not authorized under the Bankruptcy Code or by the

Court.  In the alternative, any purported right to such transfer would have to be asserted as a

claim through the normal claims procedures.

163.    If the Payment Priority Exchange is found to be enforceable and to have

operated as described in this alternative Count, the Payment Priority Exchange was an

unauthorized postpetition transfer of property of LBSF's estate – its Senior Payment Priority – to

or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class,

which LBSF may avoid pursuant to Section 549 of the Bankruptcy Code and which LBSF may

recover from the Trustees, the Noteholders, and/or the members of the Noteholder Class, as the initial transferees of LBSF's said property interest, pursuant to Section 550(a)(1) of the Bankruptcy Code, and preserve for the benefit of its estate pursuant to Section 551 of the Bankruptcy Code.

164.    To the extent that each of the Trustees, the Noteholders, and/or the members of the Noteholder Class members received subsequent transfers of LBSF's Senior Payment Priority, and of LBSF's interest in the Collateral or its proceeds, each of the Trustees, the Noteholders, and/or the members of the Noteholder Class constitutes an immediate and/or mediate transferee of the initial transferees within the meaning of Section 550(a)(2) of the Bankruptcy Code.  To the extent that each of the Trustees, the Noteholders, and/or the members of the Noteholder Class received such subsequent transfers, none of the Trustees, the Noteholders, and/or the members of the Noteholder Class took its interest in the transferred property for value, in good faith, and without knowledge of the voidability of the transfer within the meaning of Section 550(b)(1) of the Bankruptcy Code.

165.    In this alternative Count, LBSF asserts its right to avoid the Payment Priority Exchange and to recover and preserve, for the benefit of its estate, the Senior Payment Priority from all initial transferees and from all immediate and/or mediate transferees of such initial transferees.

### ALTERNATIVE COUNT VII
### Against the Trustee, Noteholders and Noteholder Class

### (*Turnover under Section 542(a) of the Bankruptcy Code of Estate Property*)

166.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

167.    Section 542(a) of the Bankruptcy Code provides that "an entity, . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."  11 U.S.C. § 542(a).  If the Payment Priority Exchange had not occurred in violation of the automatic stay in the void and unenforceable *ipso facto* clauses, LBHI would have received its Senior Priority Payment in the ordinary course.

168.    Therefore, LBSF is entitled to turnover of the Senior Priority Payment because LBSF was deprived of the use of those funds by operation of the Priority Modification Provisions.

169.    Accordingly, pursuant to Section 542(a) of the Bankruptcy Code, LBSF requests an order compelling and directing Defendants to turn over the above-described property to LBSF as it constitutes property of the bankruptcy estate.

### ALTERNATIVE COUNT VIII
### Against the Trustee, Noteholders and Noteholder Class

### (*Turnover under Section 542(b) of the Bankruptcy Code of Estate Property*)

170.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

171.    Section 542(b) of the Bankruptcy Code expressly provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C. § 542(b).  If the Payment Priority Exchange had not occurred in violation of the automatic stay in

the void and unenforceable *ipso facto* clauses, LBHI would have received its Senior Priority

Payment in the ordinary course.

172.    The Senior Priority Payment constitutes a debt that has matured and is

property of the estate pursuant to Section 541(a) of the Bankruptcy Code.  As a result of the

Payment Priority Exchange, certain Defendants are in possession, custody or control of assets

consisting of proceeds of the Debtors' property in excess of a billion dollars, which is of

substantial value or benefit to the Debtors' estate and is property belonging to the Debtors (that

may be used by them).

173.    Accordingly, pursuant to Section 542(b) of the Bankruptcy Code, LBSF

requests an order compelling and directing Defendants to turn over the above-described property

to LBSF as it constitutes property of the bankruptcy estate under 541(a) of the Bankruptcy Code.

## COUNT IX
### Against the Noteholders and Noteholder Class

### (*Unjust Enrichment*)

174.    LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

175.    At the time of LBSF's filing of its voluntary petition for bankruptcy

protection, LBSF was heavily "in-the-money" on the Swap Agreements.  However, the Trustees'

enforcement of the Priority Modification Provision and distribution of the Collateral wiped away

LBSF's "in-the-money" position and funneled all the Collateral, including LBSF's share, to the

Noteholders.  The Noteholders thereby received a staggering windfall, including LBSF's entire

share of the Collateral, without providing any compensation whatsoever to LBSF.

176.    As a result of the Trustee's distribution, the Noteholders have been improperly and unjustly enriched, at LBSF's expense.  LBSF's entire interest in the Collateral, and the amount it should have received in the event of a distribution, were transferred to the Noteholders, and LBSF received nothing in return.  Equity and good conscience require that the Noteholders return the portion of the Collateral and the distribution that was due to LBSF.

## COUNT X
## Against the Noteholders and Noteholder Class

### (*Constructive Trust*)

177.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

178.    LBSF has a security interest in the Collateral and/or proceeds of the Collateral.  The Trustees have a confidential and/or fiduciary relationship with LBSF with respect to LBSF's interest in the Collateral and/or proceeds of the Collateral.  By entering into the Swap Agreements and making payments thereunder, LBSF relied on the Trustees' implicit promise not to improperly transfer Collateral and/or proceeds of the Collateral in which LBSF had a security interest to other parties.

179.    As a result of the Distributions of the Collateral and/or proceeds of the Collateral, in which LBSF held a security interest, the Noteholders were improperly and unjustly enriched at LBSF's expense.

180.    At the time of the Distributions, the Noteholders were on notice that LBHI had filed for Chapter 11 bankruptcy and that transactions relating to the estates of LBHI and its affiliated debtors were subject to the Bankruptcy Code.  Accordingly, the Noteholders were not

*bona fide* purchasers of proceeds received from the Trustees Distributions, and were unjustly enriched.

181.    Because of the unjust enrichment of the Noteholders, LBSF is entitled to the imposition of a constructive trust with respect to the Collateral and/or proceeds from the Collateral in which LBSF held a security interest that the Noteholders transferred to the Trustees.

## COUNT XI
## Against the Noteholders and Noteholder Class

### (*Money Had and Received*)

182.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

183.    LBSF was substantially "in-the-money" on the Swap Agreements.  LBSF, therefore, had an interest in the Collateral and/or the proceeds of the Collateral.  As a result of the Distributions, the Noteholders received funds that rightfully belonged to LBSF.  Indeed, the Distributions resulted in an enormous windfall to the Noteholders.  LBSF received nothing in return.  Equity and good conscience dictate that the Noteholders not be permitted to retain the portion of the Collateral and/or the proceeds of the Collateral that rightfully belong to LBSF.

## COUNT XII
## Against the Noteholders and Noteholder Class

### (*Replevin*)

184.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

185.     Pursuant to the terms of Transaction Documents, LBSF was granted a senior lien on the Collateral and the proceeds thereof.  LBSF held such a senior lien at the time of the Collateral Transfers, since Payment Priority Exchange was unlawful and should be set aside.

186.     The Trustee, the Noteholders and/or the Noteholder Class each have a more junior lien on the Collateral and the Collateral's subsequent proceeds.

187.     At the time of LBSF's filing of its voluntary petition for bankruptcy protection, LBSF was heavily "in-the-money" on the Swap Agreements.  The Trustees' enforcement of the Priority Modification Provision, however, and distribution of the Collateral's proceeds, divested LBSF of substantial value arising from its "in-the-money" positions and funneled all the Collateral's proceeds, including LBSF's share, to the Noteholders and/or Noteholder Class.

188.     LBSF possesses and still retains a senior lien and interest in the Collateral's proceeds and has the right to immediate possession of the Collateral's proceeds.

189.     Upon information and belief, all of the Collateral's proceeds wrongfully remain in the possession of the Trustees, Noteholders and/or Noteholder Class subject to LBSF's valid and superior lien.

190.     As of the date of this Complaint, the Trustees, Noteholders and/or Noteholder Class have failed to comply with LBSF's demand for immediate possession of the Collateral's proceeds.

191.     Therefore, as the direct and proximate result of the foregoing, LBSF is entitled to an Order of Replevin ordering the Trustees, the Noteholders and/or the Noteholder Class to immediately tender the Collateral's proceeds to LBSF.

## COUNT XIII
## Against all Defendants

***(Fraudulent Conveyance – New York Debtor and Creditor Law §§ 273, 274, 278, and 279)***

192.   LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action

193.   LBSF is a Creditor of the Issuer Defendants.

194.   LBSF holds matured claims and/or unmatured claims against the Issuer Defendants.

195.   Upon the occurrence of the Event of Default under the Swap Agreements, the Collateral was liquidated and transferred to the Trustee Defendants and thereafter to each of the Noteholders and/or the Noteholder Class.

196.   Each of these Collateral Transfers by the Issuer Defendants, their agents or assigns was made without fair consideration.

197.   Further, at the time of the Collateral Transfers, the Trustees, the Noteholders and/or Noteholder class knew or should have known that the Payment Priority Exchange triggered by the LBHI bankruptcy filing constituted an unenforceable *ipso facto* clause that violated Sections 365(e)(1), 541(c)(1) and 363(l) of the Bankruptcy Code.

198.   Each Issuer Defendant was insolvent at the time of the Collateral Transfer or were rendered insolvent as a result of the Collateral Transfers.

199.   At the time each Issuer Defendant made the Collateral Transfers, the Issuer Defendant was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Collateral Transfers was an unreasonably small capital.

49

200.    As a result of the foregoing, LBSF is entitled (a) to have the Collateral

Transfers set aside to the extent necessary to satisfy its claim; (b) to disregard the Collateral

Transfers and attach or levy execution upon the property conveyed; and/or (c) to recover money

damages for the entire amount of the Collateral Transfers.

**COUNT XIV**
**Against all Defendants**

(*Declaratory Judgment – The Priority Modification*
*Provisions Operate as Unenforceable Penalties*)

201.    LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

202.    There is no rational relationship between the over one billion dollars paid

to the Noteholder Defendants, on the one hand, and any damages they have suffered as a result

of the Debtors' bankruptcy filings, on the other hand.  The contractual provisions which yield

this result – the Priority Modification Provisions – do not represent even a pretextual attempt to

approximate actual damages.  These provisions were intended solely to coerce performance.

Rather than fairly compensate for any resulting harm or loss, the priority Modification Provisions

instead have produced what may fairly be described as the windfall of all windfalls for the

Noteholders, and a punitive blow to the Debtors of unprecedented proportion.

203.    Accordingly, the massive transfer of value from LBSF to the Noteholders

constitutes an unenforceable penalty.

204.    There is an actual controversy between the parties on these issues because:

(i) the Transaction Documents contain the Priority Modification Provisions; and (ii) Defendants

50

have refused to acknowledge that these contractual provisions are unenforceable and pay LBSF

what it is rightfully owed.

205.    Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001,

LBSF requests that the Court enter a declaratory judgment that the Priority Modification

Provisions operate as unenforceable penalties.

### COUNT XV
### Against Pyxis Trustee and Pyxis Noteholders

*(Declaratory Judgment – Premature Termination
of the Pyxis Credit Default Swap Agreement*)

206.    LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

207.    There is an actual controversy between the Pyxis Trustee and the Pyxis

Noteholder Defendants and granting the relief requested herein is within the Court's discretion.

208.    Pursuant to the terms of the Pyxis Schedule, LBSF was entitled to a period

of ten (10) business days following the Ratings Event caused by LBHI's filing within which to

assign its position under the Pyxis Credit Default Swap Agreement to an eligible counterparty.

The Pyxis Trustee's premature actions prevented LBSF from exercising this right and assigning

its interests in the Pyxis Credit Default Swap Agreement for valuable consideration.

209.    Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001,

LBSF requests that this Court enter a declaratory judgment that the Pyxis Trustee's purported

termination violated the terms of the Pyxis Credit Default Swap Agreement.

## COUNT XVI
### Against the Pyxis Trustee and Pyxis Noteholder

### *(Declaratory Judgment – Improper Termination of the*
### *Pyxis Swap and Violation of the Indenture)*

210.    LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

211.    There is an actual case and controversy between LBSF and the Pyxis

Trustee and Pyxis Noteholder Defendants and granting the relief requested herein is within the

Court's discretion.

212.    The actual case or controversy concerns the Pyxis Trustee's termination of

the Pyxis Credit Default Swap Agreement and liquidation of the other Collateral in violation of

the terms of the Pyxis Indenture.

213.    LBSF is an express third-party beneficiary of the Pyxis Indenture.

214.    The liquidation of the Collateral by the Pyxis Trustee at the Controlling

Class's direction violated Section 5.5(a) of the Pyxis Indenture.

215.    Termination of the Pyxis Credit Default Swap Agreement violated Section

5.2(c) of the Pyxis Indenture.

216.    Termination the of the Pyxis Credit Default Swap Agreement violated

Sections 7.8(a)(xi) and 7.5(f) of the Pyxis Indenture.

217.    Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001,

LBSF requests that this Court enter a declaratory judgment that the liquidation of the Collateral

by the Trustee at the Controlling Class's direction, including the termination of the Pyxis Credit

Default Swap Agreement, violated the terms of the Pyxis Indenture.

## COUNT XVII
### Against the Pyxis Trustee and Pyxis Noteholders

(*Breach of Contract – the Pyxis Credit Default Swap Agreement*)

218.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

219.    Pursuant to the terms of the Pyxis Schedule, LBSF was entitled to a period of ten (10) business days following the Ratings Event caused by LBHI's Chapter 11 filing within which to assign its position under the Pyxis Credit Default Swap Agreement to an eligible counterparty.  The Pyxis Trustee's premature actions prevented LBSF from exercising this right and assigning its interests in the Pyxis Credit Default Swap Agreement for valuable consideration.

220.    LBSF has satisfied its obligations under the Pyxis Credit Default Swap Agreement and any conditions precedent to suit have been performed, have occurred, or have been waived.

221.    As a result, LBSF has been damaged in an amount to be determined at trial.

## COUNT XVIII
### Against the Pyxis Trustee and Pyxis Noteholders

(*Breach of Contract – the Pyxis Indenture*)

222.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

223.    LBSF is an express third-party beneficiary of the Indenture.

224.     The liquidation of the Collateral by the Pyxis Trustee at the Controlling Class's direction violated Section 5.5(a) of the Pyxis Indenture.

225.     Termination of the Pyxis Credit Default Swap Agreement violated Section 5.2(c) of the Indenture.

226.     Termination of the Pyxis Credit Default Swap Agreement violated Section 7.8(a)(xi) and 7.5(f) of the Pyxis Indenture.

227.     Pursuant to the Pyxis Indenture, the Pyxis Noteholders are contractually required to hold all amounts distributed to them postpetition in trust and to return to the Trustee amounts that were improperly distributed so they can be paid to the appropriate party. See Section 13 of the Pyxis Indenture.

228.     As a result of the Payment Priority Exchange, amounts due to LBSF postpetition under the Pyxis Indenture were improperly distributed to the Pyxis Noteholders.

229.     By failing to return the improper distributions, the Pyxis Noteholders have breached their obligations under the Pyxis Indenture.

230.     LBSF has satisfied its obligations under the Pyxis Indenture and any conditions precedent to suit have been performed, have occurred, or have been waived.

231.     As a result of the breaches of the Pyxis Indenture, LBSF is entitled to an award of damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, LBSF respectfully requests that the Court grant the following relief:

A.     Certification of the Noteholder Class under Rule 23 of the Federal Rules of Civil Procedure;

54

B.      For declaratory judgment that the Payment Priority Exchange improperly modified LBSF's Senior Payment Priority as a result of a bankruptcy filing, and, as such, the Priority Modification Provisions constitute unenforceable *ipso facto* clauses that violate 11 U.S.C. §§ 365(e)(1), 541(c)(1) and 363(l) and LBSF is entitled to Senior Payment Priority;

C.      For preliminary declaratory relief and final declaratory judgment that any action to enforce the Payment Priority Exchange as a result of a bankruptcy filing violates the automatic stay under 11 U.S.C. § 362(a) and is void *ab initio*;

D.      Alternatively, for a judgment that the Payment Priority Exchange was a preferential transfer to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class that is avoidable pursuant to Section 547 of the Bankruptcy Code, and pursuant to Sections 550 and 551 of the Bankruptcy Code, LBSF is entitled to recover and preserve Senior Payment Priority for the benefit of its estate;

E.      In the further alternative, for a judgment that the Collateral Transfers were fraudulent transfers to or for the benefit of the Trustees that are avoidable pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and pursuant to Sections 550 and 551 of the Bankruptcy Code, LBSF is entitled to recover and preserve the funds from the Collateral Transfers for the benefit of its estate;

F.    In the further alternative, for a judgment that the Payment Priority Exchange was a constructive fraudulent transfer to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class that is avoidable pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and pursuant to Sections 550 and 551 of the Bankruptcy Code, LBSF is entitled to recover and preserve Senior Payment Priority for the benefit of its estate;

G.    In the further alternative, for a judgment that the Payment Priority Exchange was an unauthorized post-petition transfer to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class that is avoidable pursuant to Section 549(a) of the Bankruptcy Code, and pursuant to Sections 550 and 551 of the Bankruptcy Code, LBSF is entitled to recover and preserve Senior Payment Priority for the benefit of its estate;

H.    For an order requiring the Defendants account for and turn over the property of the estate now or formerly in their possession, custody or control or the value of such property;

I.    For an order imposing a constructive trust on proceeds received by the Noteholders in the Distributions;

J.    For a judgment of Replevin;

K.    For a declaratory judgment against all Defendants on the unenforceable penalty claim and ordering them to pay LBSF the

56

value of LBSF's "in-the-money position" on the Swap

Agreements;

L.    For damages against the Noteholders in an amount to be

determined at trial;

M.    For a judgment that the Distributions to the Defendants is

constructively fraudulent as to LBSF;

N.    For declaratory judgment that the liquidation of the Collateral was

improper in the Pyxis transaction violated Section 5.5(a) of the

Pyxis Credit Default Swap Agreement;

O.    For declaratory judgment that the termination of the Pyxis Credit

Default Swap Agreement was improper and violated the terms of

the Pyxis Indenture;

P.    For additional damages against the Pyxis Noteholders alternatively

for breach of contract;

Q.    For an award of interest at the appropriate rate; and

R.    Any such other and further relief as the Court deems just and

proper, including costs and attorneys' fees.

Respectfully submitted,

By:   ___/s/William A. Maher_____
William A. Maher
Paul R. DeFilippo
William F. Dahill
James N. Lawlor
Adam M. Bialek

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050

*Special Counsel for Lehman Brothers Special
Financing Inc.*

Dated:    New York, New York
September 15, 2014