**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
:    Chapter 11
In re: :
:    Case No. 08-13555 (SCC)
LEHMAN BROTHERS HOLDINGS INC., *et al.*, :
:
Debtors. :
———————————————————— x
LEHMAN BROTHERS SPECIAL FINANCING INC., :
:
Plaintiff, :
:
-against- :    Adversary Proceeding
:    No. 10-03547 (SCC)
BANK OF AMERICA NATIONAL ASSOCIATION, :
*et al.*, :
Defendants. :
———————————————————— x

**LBSF'S MEMORANDUM OF LAW IN OPPOSITION TO ANZ NOMINEES**
**LIMITED'S MOTION TO DISMISS THE THIRD AMENDED**
**COMPLAINT OF LEHMAN BROTHERS SPECIAL FINANCING INC.**

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

*Counsel for Plaintiff*
*Lehman Brothers Special Financing Inc.*

April 30, 2015

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ...................................................................................5

ARGUMENT ...................................................................................................14

I.      THE LEGAL STANDARD...........................................................................14

II.     THIS COURT HAS PERSONAL JURISDICTION OVER ANZ ...............................15

        A.      ANZ Nominees Has Consented to this Court's Jurisdiction Over its Person........15

        B.      ANZ Has Sufficient Minimum Contacts With the United States to
                Support the Exercise of Specific Jurisdiction .........................................15

        C.      ANZ's Actions Outside the United States had Significant Foreseeable
                Adverse Effects On a United States Based Entity ...................................17

        D.      Jurisdiction Lies Over ANZ in an Action Arising From Becoming the
                Registered Holder of the Notes it Knew had United States Contacts...................21

        E.      Jurisdiction Also Lies Pursuant to the New York Long-Arm Statute ..................25

        F.      The Exercise of Personal Jurisdiction Over ANZ is Reasonable .........................29

                i.      New York Choice of Law Clause ............................................31

                ii.     U.S. Interests in Application of Bankruptcy Code and
                        Administration of Bankruptcy Estates ......................................32

III.    THIS COURT HAS *IN REM* JURISDICTION OVER THE TRANSFERRED
        PROPERTY AND HAS THE POWER TO REDRESS A VIOLATION OF THE
        AUTOMATIC STAY ANYWHERE IN THE WORLD.....................................33

CONCLUSION...................................................................................................38

## TABLE OF AUTHORITIES

**Case**                                                                                                    **Page(s)**

*Allen v. Auto Specialties Mfg. Co.*,
    45 A.D.2d 331, 357 N.Y.S.2d 547 (3d Dep't 1974)........................................................28

*Amoco Chemical Co. v. Tex Tin Corp.*,
    925 F. Supp. 1192 (S.D. Tex. 1996) ..............................................................................20

*Aqualine Capital Partners LLC v. FinArch LLC*,
    861 F. Supp. 2d 378 (S.D.N.Y. 2012)............................................................................32

*Asahi Metal Indus. Co., Ltd. v. Super. Ct. Cal., Solano Cnty.*,
    480 U.S. 102 (1987).......................................................................................................16

*Banco Ambrosiano, S.P.A. v. Artoc Bank & Trust Ltd.*,
    62 N.Y.2d 65, 464 N.E.2d 432 (1984)...........................................................................25

*Bank of Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    171 F.3d 779 (2d Cir. 1999)...........................................................................................25

*Bank of Commc'ns v. Ocean Dev. Am., Inc.*,
    No. 07 CIV. 4628 (TPG), 2010 WL 768881 (S.D.N.Y. Mar. 8, 2010) ...................... 26-27

*Bensusan Rest. Corp. v. King*,
    126 F.3d 25 (2d Cir. 1997).............................................................................................28

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007)...........................................................................................16

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985).................................................................................................17, 29

*Calder v. Jones*,
    465 U.S. 783 (1984).................................................................................................20, 29

*Cent. Vt. Pub. Serv. Comm. v. Herbert*,
    341 F.3d 186 (2d Cir. 2003)...........................................................................................15

*Commodity Futures Trading Comm'n v. Co Petro Mktg. Grp., Inc.*,
    700 F.2d 1279 (9th Cir. 1983) .......................................................................................35

*Criscitelli v. Proline Boats*,
    No. 3:03 CV 1522(CFD), 2004 WL 1964507 (D. Conn. Aug. 31, 2004) ........................14

*Cruisephone, Inv. v. Cruise Ships Catering & Servs., N.V. (In re Cruisephone, Inc.)*,
    278 B.R. 325 (Bankr. E.D.N.Y. 2002)............................................................................16

*Ctr. v. Hampton Affiliates, Inc.*,
  66 N.Y.2d 782, 488 N.E.2d 828 (1985) ................................................................. 22-23

*CutCo Indus., Inc. v. Naughton*,
  806 F.2d 361 (2d Cir. 1986) ................................................................................. 14

*Davis v. C.G. Courington (In re Davis)*,
  177 B.R. 907 (9th Cir. 1995) ............................................................................... 18

*Edberg v. Neogen Corp.*,
  17 F. Supp. 2d 104 (D. Conn. 1998) ..................................................................... 14

*ESI, Inc. v. Coastal Corp.*,
  61 F. Supp. 2d 35 (S.D.N.Y. 1999) ................................................................... 23-24

*Eskofot A/S v. E.I. Du Pont De Nemours & Co.*,
  872 F. Supp. 81 (S.D.N.Y. 1995) ......................................................................... 17

*GEM Advisors, Inc. v. Corporación Sidenor, S.A.*,
  667 F. Supp. 2d 308 (S.D.N.Y. 2009) ................................................................... 23

*Gillmore v. J.S. Inskip, Inc.*,
  54 Misc.2d 218, 282 N.Y.S.2d 127 (N.Y. Sup. Ct. 1967) ...................................... 28

*Guidry v. U.S. Tobacco Co., Inc.*,
  188 F.3d 619 (5th Cir. 1999) ............................................................................... 20

*Herbstein v. Bruetman*,
  768 F. Supp. 79 (S.D.N.Y. 1998) ......................................................................... 18

*Hong Kong & Shangai Banking Corp., Ltd. v. Simon (In re Simon)*,
  153 F.3d 991 (9th Cir. 1998) ........................................................................... 34, 35

*In re Am. Aluminum Window Corp.*,
  15 B.R. 803 (Bankr. D. Mass. 1981) ..................................................................... 34

*In re Bean*,
  252 F.3d 113 (2d Cir. 2001) ................................................................................. 34

*In re Chiles Power Supply Co., Inc.*,
  264 B.R. 533 (Bankr. W.D. Mo. 2001) ............................................................. 19, 31

*In re French*,
  303 B.R. 774 (Bankr. D. Md. 2003) ..................................................................... 34

*In re Gucci*,
  309 B.R. 679 (Bankr. S.D.N.Y. 2004) ................................................................... 34

*In re Indianapolis Downs, LLC,*
    462 B.R. 104 (Bankr. D. Del. 2011) ...................................................................34

*In re Int'l Admin. Servs., Inc.,*
    211 B.R. 88 (Bankr. M.D. Fla. 1997) ................................................................34

*In re Med-Atl. Petroleum Corp.,*
    233 B.R. 644 (Bankr. S.D.N.Y. 1999) .........................................................26, 28

*In re Palumbo,*
    353 B.R. 37 (Bankr. D. Mass. 2006) .................................................................34

*In re PNP Holdings Corp.,*
    99 F.3d 910 (9th Cir. 1996) ..............................................................................15

*In re Probulk Inc.,*
    407 B.R. 56 (Bankr. S.D.N.Y. 2009) .........................................................19, 31

*In re United Mo. Bank of Kan. City, N.A.,*
    901 F.2d 1449 (8th Cir. 1990) ..........................................................................35

*In re Velichko,*
    473 B.R. 64 (Bankr. S.D.N.Y. 2012) ................................................................36

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310 (1945) ...........................................................................15, 25, 29

*Katchen v. Landy,*
    382 U.S. 323 (1966) ..........................................................................................35

*Kline v. ED. Zueblin, AG (In re Am. Exp. Grp. Int'l Servs., Inc.),*
    167 B.R. 311 (Bankr. D.D.C. 1994) .................................................................15

*Langenkamp v. Culp,*
    498 U.S. 42, 44 (1990) ......................................................................................15

*Leasco Data Processing Equip. Corp. v. Maxwell,*
    468 F.2d 1326 (2d Cir. 1972) ...........................................................................17

*Local 875 I.B.T. Pension Fund v. Pollack,*
    992 F. Supp. 545 (E.D.N.Y. 1998) ...................................................................28

*Lykes Bros. Steamship Co. v. Hanseatic Marine Serv. (In re Lykes Bros. Steamship Co.),*
    207 B.R. 282 (Bankr. M.D. Fla. 1997) .............................................................36

*Marine Midland Bank v. Keplinger & Assoc., Inc.,*
    488 F. Supp. 699 (S.D.N.Y. 1980) .............................................................26, 28

iv

*McGee v. Int'l Life Ins. Co.*,
    355 U.S. 220 (1957)......................................................................................17, 29

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996).......................................................................... 14-16

*Milliken v. Meyer*,
    311 U.S. 457 (1940)...........................................................................................15

*Morgenthau v. A.J. Travis Ltd.*,
    184 Misc. 2d 835, 708 N.Y.S.2d 827 (N.Y. Sup. Ct. 2000) .............................26

*Morrison v. Nat'l Austl. Bank Ltd.*,
    130 S.Ct. 2869 (2010).......................................................................................17

*Nakash v. Zur (In re Nakash)*,
    190 B.R. 763 (Bankr. S.D.N.Y. 1996)..............................................................36

*Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*,
    440 B.R. 274 (Bankr. S.D.N.Y. 2010) ......................................................16, 25

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec., LLC)*,
    440 B.R. 243 (Bankr. S.D.N.Y. 2010) ............................................................22

*S.E.C. v. Infinity Grp. Co.*,
    27 F. Supp. 2d 559 (E.D. PA 1998) .................................................................37

*S.E.C. v. Unifund SAL*,
    910 F.2d 1028 (2d Cir. 1990)...................................................................... 17-18

*Schwinn Plan Comm. v. AFS Cycle & Co. Ltd. (In re Schwinn Bicycle Co.)*,
    192 B.R. 461 (Bankr. N.D. Ill. 1996) ..............................................................20

*Schwinn Plan Comm. v. TI Reynolds 531 Ltd. (In re Schwinn Bicycle Co.)*,
    182 B.R. 526 (Bankr. N.D. Ill. 1995) ..............................................................15

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    474 B.R. 76 (S.D.N.Y 2012)............................................................................36

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) .............................................................31

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*,
    460 B.R. 106 (Bankr. S.D.N.Y. 2011)..........................................16, 31, 33, 36

*Studio A Entm't, Inc. v. Direct Distrib., LLC*,
    No. 06 Civ. 02275SAS, 2007 WL 437703 (S.D.N.Y. Feb. 8, 2007)................15

*Sunrise Indus. Joint Venture v. Ditric Optics, Inc.*,
    873 F. Supp. 765 (E.D.N.Y. 1995) ........................................................................... 27-28

*Sunward Elecs., Inc. v. McDonald,*
    362 F.3d 17 (2d Cir. 2004)................................................................................................31

*Tennessee Student Assistance Corp. v. Hood*,
    541 U.S. 440 (2004).........................................................................................................34

*U.S. Lines, Inc. v. GAC Marine Fuels Ltd. (In re McLean Indus. Inc.)*,
    68 B.R. 690 (Bankr. S.D.N.Y. 1986)...............................................................................36

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980).........................................................................................................29

## **Other Authorities**

11 U.S.C. § 541 .......................................................................................................................34

11 U.S.C. § 542 .......................................................................................................................35

28 U.S.C. 1334 ........................................................................................................................34

CPLR § 302...................................................................................................................... 25, 28

*Restatement (Second) of Conflict of Laws § 50 (1971)* ..................................................... 19

*Restatement (Third) of Foreign Relations Law of the United States § 421(2)(j) (1987)* .............. 19

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), through Lehman Brothers Holdings

Inc. ("LBHI"),[1] the Plan Administrator under the Modified Third Amended Joint Chapter 11

Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), the Plaintiff in

the above-captioned adversary proceeding (the "Distributed Action"), hereby submits this

memorandum of law, together with the Declaration of William F. Dahill (hereinafter, "Dahill

Dec.") dated April 30, 2015, in opposition to ANZ Nominees Limited's ("ANZ Nominees")

Motion to Dismiss the Third Amended Complaint of Lehman Brothers Special Financing Inc.

[ECF No. 841, Adv. Proc. No. 10-03547] and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Motion fails on numerous grounds, but the most compelling reason to deny

the Motion is the fact that on October 26, 2009 ANZ Nominees, the moving party, filed a proof

of claim in the LBHI Chapter 11 case.  In addition, numerous affiliates of ANZ Nominees,

including its parent, ANZ Banking Group Limited ("ANZ Bank"), which as Plaintiff shows

below is equivalent to ANZ Nominees for jurisdictional purposes, filed a number of proofs of

claim in both the LBHI and LBSF Chapter 11 cases.  ANZ Nominees thereby submitted itself to

the *in personam* jurisdiction of this Court, requiring that the Motion to Dismiss this action as

against ANZ Nominees be denied.

2.      ANZ Nominees is an employee-less department of a large, sophisticated global

banking and investment institution, ANZ Bank (sometimes together with ANZ Nominees,

"ANZ").  ANZ became the registered holder of certain notes (the "Federation Notes" or "Notes")

issued by Series 2007-1 Federation A-1 Segregated Portfolio of Securitized Product of

---

[1] As used herein, the "Estate" means LBHI and certain of its subsidiaries, including LBSF.

Restructured Collateral Limited SPC for the account of the Series 2007-1 Federation A-1

Segregated Portfolio ("Federation 2007-1") for its valued, long term clients, knowing full well of

the Notes' connection to the U.S. and the fact that the swap counterparty LBSF and its guarantor

LBHI (together, "Lehman") were in financial distress.  Indeed, ANZ became registered holder of

most of the Notes *after* LBHI filed for bankruptcy.  ANZ knew that prior to the Lehman

bankruptcy the Notes were worth far less than the amount of the distributions that ANZ received

on October 30, 2008 and that the Notes were paid 100% of their face amount only because of the

default triggered by the Lehman bankruptcy.  It is reasonable to infer that ANZ knew or could

easily have determined by consulting U.S. counsel that it was likely that Lehman would seek to

undo the reversal of payment priorities that led to the windfall to ANZ (and ultimately to its

customers).  Nevertheless, after the LBSF petition date, ANZ directed the Trustee to terminate

the CDO and indemnified it for doing so to allow ANZ to take possession, custody and control of

the Estate's property in the form of both LBSF's senior payment priority, as well as proceeds of

collateral subject to what had been, and should continue to be, LBSF's senior lien.  Thereafter,

ANZ took further steps to remove that property even further from the Estate by sending it to

ANZ's customers who until recently ANZ refused to identify.  Under prevailing case law, this

intentional conduct of knowingly obtaining property of the Estate in violation of the automatic

stay satisfies the minimum contacts required for personal jurisdiction over ANZ.

   3.   Between August 2008 and October 2008, ANZ Nominees became the record

owner of the Notes, as part of its services provided to ANZ Bank's clients.  As ANZ's

sophisticated financial advisors who acted on behalf of ANZ Nominees knew, Federation 2007-1

was structured in New York and the swap counterparty (LBSF) was based in New York.  ANZ

further knew that the reference portfolio was entirely comprised of U.S. mortgage-backed securities. Dahill Dec. Ex. 1, p. ANZN_00053575.

4.        On October 30, 2008, solely as a result of the Lehman bankruptcy filing and in violation of the prohibition against *ipso facto* clauses in section 365(e)(1) of the Bankruptcy Code and elsewhere, and of the automatic stay, ANZ Nominees received a transfer of LBSF's senior payment priority, followed by a distribution of funds rightfully subject to LBSF's senior security interest totaling $17,166,217.40 AUD in violation of the automatic stay.

5.        In an effort to escape this action before the merits are ever litigated, ANZ Nominees portrays itself as a mere custodian operating solely out of Australia and New Zealand with no knowledge as to the specifics of the Notes for which it became registered holder. In fact, ANZ Nominees exists solely on paper and, in essence is a department of ANZ Bank, a sophisticated global financial institution that provides a variety of services for its customers, including financial and investment advice. Indeed, ANZ Nominees had no employees of its own, and all of its relevant conduct in this case was performed by 26 of ANZ Bank's employees. As a sophisticated player in the global financial markets, ANZ monitored the performance of the Notes and Lehman's precarious financial state well before ANZ became the registered holder of most of the Notes. Further, ANZ actively sought out and suggested restructuring options in connection with the Notes for its customers, and ANZ has been involved with instruments in which its own credit rating was proposed to be a part of a reference portfolio of a synthetic CDO. With knowledge that the Lehman bankruptcy and the application of the invalid flip clause artificially caused the dramatic increase in the value of the Notes to Noteholders, ANZ directed the Notes' Trustee to make a transfer that violated the automatic stay, which it knew or reasonably should have known would have a substantial direct and foreseeable injurious effect

3

on LBSF in New York, and indemnified the Trustee against losses that might ensue as a result of the Trustee following ANZ's direction. The transfer in question was made by the Trustee from its New York offices. In light of the foregoing, ANZ Nominees' argument that it was not and "reasonably could not have been on notice that it would be 'hauled into court' in the United States" is not credible. *See* MTD[2] p. 6. The facts warrant the exercise of *in personam* jurisdiction over ANZ.

6.     Even assuming, *arguendo*, that this Court could not lawfully exercise *in personam* jurisdiction over ANZ, the MTD must be denied because this Court still can exercise *in rem* jurisdiction over the property of the Estate transferred to ANZ after the LBSF petition date. A bankruptcy estate is comprised of all legal or equitable interests of the debtor in property, wherever located and by whomever held, as of the commencement of a case, and this Court has exclusive worldwide jurisdiction over that property. As of the commencement of LBSF's bankruptcy case on October 3, 2008, LBSF held a senior lien in the assets of Federation 2007-1 to secure LBSF's priority right to payment from the Issuer for LBSF's in the money position on the credit default swap entered into by Federation 2007-1 and LBSF. LBSF's right to senior payment priority was transferred to ANZ after the petition date, based on an unenforceable and invalid flip clause, followed by a transfer of the collateral subject to LBSF's senior security interest, all of which constituted property of the LBSF Estate as of the LBSF petition date. Accordingly, this Court has jurisdiction over property of the LBSF Estate that was distributed to ANZ on October 30, 2008, in violation of the stay and by means of an unauthorized postpetition transfer.

7.     For the reasons set forth herein, the Motion to Dismiss should be denied.

---

[2] ANZ's Memorandum of Law in Support of ANZ Nominees Limited's Motion to Dismiss the Third Amended Complaint of Lehman Brothers Special Financing Inc. [ECF No. 844, Adv. Proc. No. 10-03547] is referred to herein as the "Motion to Dismiss" or "MTD".

## FACTUAL BACKGROUND

ANZ Nominees is a Department of ANZ Bank

8.      ANZ Nominees is a part of ANZ Bank which provided custodial services and

acted as registered holder for ANZ Bank customers.  ANZ Nominees "acted as a . . . sub-

custodian for ANZ Banking Group, Limited.  And in that role, it held assets on behalf of

customers in a custodial capacity."  Garry Tr.[3] 18:5-9.  "[T]he vast majority [of ANZ Nominees

customers] would also have had a relationship with ANZ [Bank] in some form of bank account

at the very least."  Garry Tr. 18:15-18.  ANZ Nominees is "housed" within the cash management

business of the Transaction Banking section of ANZ Bank.  Garry Tr. 16:3-12.  The Transaction

Banking part of the bank "looks after the customer transactions department. . . . [I]t has

businesses beneath it which look after trade and supply chain matters, payments, and cash

management matters."  Garry Tr. 16:3-9.  In addition to performing custodial services, ANZ

Nominees performed ancillary services including investment accounting and securities lending.[4]

Garry Tr. 52:14-53:2.

9.      ANZ Nominees has never had any employees.  Garry Tr. 8:19-22; *see* Dahill

Dec. Ex. 3.  Each of the people who performed services for ANZ Nominees were (and are)

employed by ANZ Bank.  Garry Tr. 8:23-9:7; *see* Dahill Dec. Ex. 3.  Specifically, ANZ Bank

employees who performed services on behalf of ANZ Nominees worked in the ANZ Bank

Markets Department, Markets Investor Services Group, Markets-Investor Sales, Markets Fixed

---

[3] Excerpts from the deposition of Paul Garry is annexed to the Dahill Declaration as Exhibit 2 and is referred to
herein as "Garry Tr. page:line-page:line."

[4] In December of 2009, ANZ sold the custody business to JP Morgan, at which point (and for a period prior to the
sale) it stopped accepting new business.  Garry Tr. 17:9-14.  Although ANZ Nominees still exists as an entity, "[t]he
ANZ group no longer has . . . an active custody business."  Garry Tr. 16:13-20.  Today, ANZ Nominees "holds a
number of residual assets which it is for various reasons unable to dispose of, and, consequently, it is required to
continue to hold them."  Garry Tr. 16:21-17:3.

Income Sales Team, and Fixed Income Operations Team. *See* Dahill Dec. Ex. 3. ANZ

Nominees has never had any officers, including CEO, President or Secretary. Garry Tr. 9:8-12.

Additionally, even while ANZ Nominees was still an active business, it used ANZ Bank's

letterhead. *See* Dahill Dec. Ex. 4.

10.     Essentially, ANZ Nominees exists merely on paper, and the actual entity

conducting operations with regard to the Notes in question was and is ANZ Bank.

ANZ is a Sophisticated Global Entity with Substantial
Knowledge and Understanding of the Federation Notes

11.     ANZ Bank is a sophisticated financial institution with a significant global

presence. According to its own website, ANZ Bank has relationships with "customers,

shareholders and communities in 33 countries in Australia, New Zealand, throughout Asia and

the Pacific, and in the Middle East, Europe and America."[5] ANZ Bank's presence is worldwide,

with offices located internationally, including a branch in New York.[6]

12.     ANZ "Custodian Services" itself was global in its reach. Dahill Dec. Ex. 5, p.

ANZN_00055465. As part of its "Custody brochure," ANZ represents that:



---

[5] *See Profile*, ANZ SHAREHOLDER CENTRE, http://shareholder.anz.com/our-company/profile (last visited April 28, 2015).

[6] "ANZ's New York office was opened in December 1968 and today operates as a branch of Australia and New Zealand Banking Group Limited." *ANZ in the USA*, ABOUT US: OUR COMPANY, https://www.anz.com/unitedstates/en/about-us/our-company/anz-usa/?pid=brd-pbl-text-ahp-sep11-anzintheusa (last visited April 28, 2015).

*Id.* at ANZN_00055465-ANZN-00055466, ANZN_00055468.  Indeed, representatives of the

ANZ Nominees custodian business travelled internationally to market its custodial services

globally.  Specifically, between February 23, 2007 and March 9, 2007, a member of the ANZ

Custodian Services team traveled to the U.S., London, Luxembourg, Zurich and Singapore to

solicit business.  *Id.* at ANZN_00055460.

13.    ANZ provides a variety of financial services, including providing financial

strategy advice to its customers.  *See* Dahill Dec. Ex. 6; Garry Tr. 158:11-16.  In particular,

employees in ANZ's market sales department, the department under which ANZ Nominees was

housed, were responsible for "provid[ing] advice to institutional investors, semi-government

investors."  Garry Tr. 30:9-13.  As a sophisticated global financial institution, ANZ was well

aware of the Lehman Bankruptcy.[7]  *See* Garry Tr. 35:8-15.

14.    Additionally, U.S. investments are held through ANZ.  For example, ANZ held

shares of Coeur d'Alene.  Dahill Dec. Ex. 8.  Coeur d'Alene Mines Corporation ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████  *Id*. at ANZN_00003605.

15.    Moreover, ANZ had been aware of potential issues with the Federation Notes due

to market conditions in the United States as early as August 2007.  On August 6, 2007, ANZ

received an email from one of its clients, the Executive Director Finance of Western Health,

stating "████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[7] Additionally, throughout August 2007, ANZ monitored the subprime mortgage market on a large scale, including a focus on the U.S. market.  Dahill Dec. Ex. 7, pp. ANZN_00054215-42.

██████████████████████████" Dahill Dec. Ex. 6.  That email was addressed to Brian

Buckley at ANZ, an ANZ Bank employee with the investor sales department.  *Id.*; Dahill Dec.

Ex. 3.  In September 2007, ANZ was internally monitoring the Federation Notes, ████████

██████████████████████████████████████████████" and its

impact on Australian investors in the Notes.  Dahill Dec. Ex. 9.  Angus Graham, a member of

ANZ's Markets Investor Services Group (Dahill Dec. Ex. 3), emailed Simon Mather, a member

of the Safe Custody Markets Operation Team (Dahill Dec. Ex. 3), an article entitled '████████

████████████" Dahill Dec. Ex. 9.  That article explicitly documented ██████████

██████████████████████" on Australian entities.  Dahill Dec. Ex. 9.

     16.     Later, in September 2008, Mr. Mather emailed a client the Federation Notes term

sheet, which indicated that as of March 29, 2007, "Lehman Brothers" was the arranger and it

also identified Grange Securities Limited's ("Grange") (the entity that marketed the Notes)

affiliation with LBHI.  Dahill Dec. Ex. 10, Term Sheet, pp. 1, 4.  Mr. Mather also attached a

presentation on the Federation Notes dated April 2007 in which the portfolio structure of the

notes was identified as '██████████████████████" and included, in an appendix, a Moody

Investor Services' Special Report entitled ██████████████████████████

██████" *Id.* at ANZN_00002222, ANZN_00002242-ANZN_00002248.  By February 2008,

ANZ sought to provide clients with restructuring options in connection with the Federation

Notes.  Dahill Dec. Ex. 11.  The restructuring options provided to clients acknowledged (i)

Lehman Brothers Australia Limited's affiliation with LBHI, (ii) that all information contained

within the restructuring options document "is confidential and proprietary to [LBHI]," and (iii)

disclosed ████████████████████████████████████████

██████████████████████████████" including that '██████████████████

8

████████████████████████████████████████████

████████████████████████████████████████████

████ ” *Id.* at ANZN_00002711 (emphasis added).

ANZ Became the Registered Holder of the Federation
Notes Knowing of Lehman's Distress and Bankruptcy Filing

17.     Between August 2008 and October 2008,[8] approximately 19 investors (the

"Investors") in of the Series 2007-1 Federation A-1 and A-2 notes requested that ANZ Nominees

take custody of the Notes.[9] Garry Tr. 24:9-25:5; Garry Dec.[10] ¶ 4; Dahill Dec. Ex. 12.  ANZ

became the registered holder of the Notes for at least 17 of the Investors after the LBHI

bankruptcy.  Dahill Dec. Ex. 14.

18.     The Federation Notes had numerous connections to the United States, which

ANZ, a sophisticated entity that had received a copy of the offering memorandum, knew at the

time it became the registered holder of the Notes: (i) the CDO assets included a credit default

swap between the Issuer and LBSF, a Delaware corporation with its principal place of business

in New York (which was guaranteed by LBHI, a Delaware corporation with its principal place of

business in New York) (Dahill Dec. Ex. 1, pp. ANZN_00053539, ANZN_00053568-69); (ii) the

deal was structured in New York, as the offering memorandum directs questions and requests for

additional information to Lehman Brothers Inc., Transaction Management Group, in New York

(*id.* at ANZN_00053636); (iii) Bank of New York Mellon, a financial institution headquartered

in the United States, was the Trustee under the Indenture (*id.* at ANZN_00053592) and held the

---

[8] Notably, ANZ Nominees served as custodian for the Notes for a period between May 2007 and December 3, 2007 "on behalf of Grange Securities Limited, the Australian lead manager of the Federation Notes."  Dahill Dec. Ex. 13.

[9] ANZ refused to identify the parties it contends are the beneficial noteholders prior to the fall of 2014 when, in response to class certification discovery, it provided that information.  Dahill Dec. ¶ 30.

[10] The Declaration of Paul Garry in Support of ANZ Nominees' Motion to Dismiss, Dkt. No. 843, is referred to herein as the "Garry Dec."

9

collateral for the Notes and LBSF's claim under the swap; and (iv) the reference portfolio

underlying the credit default swap was comprised entirely of U.S. residential mortgage backed

securities. *Id.* at ANZN_00053575. Furthermore, the relevant underlying agreements for the

deal are governed by New York law. *Id.* at ANZN_00053571, ANZN_00053592. At all times

prior to LBSF's petition date, LBSF had priority over the Notes for amounts payable on LBSF's

CDS with the Issuer, and LBSF's lien on the collateral was senior to the security interests

securing the Notes. *Id.* at ANZN_00053563-65.

19.     Each of the above facts was apparent from the 2007-1 Federation offering

materials. "ANZ Nominees . . . received the offering memoranda for the Federation Notes on or

about May 17, 2007, in connection with the custody services it provided to Grange Securities

Limited in 2007." Dahill Dec. Ex. 13. Therefore, ANZ Nominees was well aware of the U.S.

connections of the Notes including Grange's and Lehman Australia's affiliation with LBHI,[11]

that LBHI was the swap counterparty guarantor, that the reference portfolio for the Notes was

U.S. mortgage backed securities, and that LBSF had senior payment priority. *Supra* ¶ 18.

Additionally, ANZ has represented that "ANZ Nominees understood that at the time the other 18

beneficial noteholders [other than Balmoral] requested to transfer custody, they held their

Federation Notes through Lehman Brothers Australia custody accounts maintained at an

Australian affiliate of Citigroup, and those 18 beneficial noteholders may have been concerned

about the financial health of Lehman Brothers Australia as the then-current custodian." Dahill

Dec. Ex. 16. ANZ knew that Lehman Brothers Australia was directly related to LBHI. *See*

Dahill Dec. Ex. 11, p. ANZN_00002711.

---

[11] In fact, as noted above, in 2007, ANZ Nominees acted as custodian for the Federation Notes, among others, on
behalf of Grange. *Supra* ¶ 17, n.8. Moreover, in July 2007, ANZ closely monitored the status of certain CDOs
issued by Grange, including "Federation" and investigated whether "Lehman" guaranteed Grange. Dahill Dec. Ex.
15.

The Transfers to ANZ in Violation of the Stay

20.    "In late October 2008, BNY Mellon Australia Pty Limited, an Australian entity

that is an affiliate of BNY Mellon which served as Trustee for the Notes, sent ANZ Nominees a

'Notice of Designation of Early Termination Date' and a 'Notice of Distribution of Principal and

Interest' . . . advising that all principal and accrued and unpaid interest to the notes would be paid

to ANZ Nominees on the designated early termination date."[12]  Garry Dec. ¶ 8.  Specifically, on

October 8, 2008, ANZ Bank received a copy of the Lehman Brothers Events of Default Notice

(the "October 8, 2008 Notice").  Dahill Dec. Ex. 17.   The October 8, 2008 Notice explicitly

provided ANZ with notice of the LBHI and LBSF bankruptcy filings and informed ANZ that the

filing of the Chapter 11 petitions "constitute[d] Events of Default under Section 5(a)(vii) of the

Portfolio Swap Agreement . . . [and that a]s a result of the occurrence of such Events of Default,

no performance is due from the non-defaulting counterparty pursuant to Section 2(a)(iii) of the

Swap Agreement.  Accordingly, the Trustee hereby requests written direction and

indemnification from the Controlling Class of Noteholders . . . as to whether the Trustee shall

designate an Early Termination Date under the Portfolio Swap Agreement.  Such a designation

would constitute an Event of Default under Section 5.1(e) of the Series Indenture, resulting in the

automatic acceleration of the principal of and accrued and unpaid interest on the Notes without

any further action by the Noteholders."  *Id.* at ANZN_00000162.

21.    In that same email, the Trustee provided ANZ with a form "response document"

for execution that included an instruction to "the Trustee to designate an Early Termination Date

under the Portfolio Swap Agreement" and an indemnity provision requiring that the Trustee be

indemnified for any "claim, cause of action, litigation, proceeding, action or investigation . . . in

---

[12] As the registered holder of the Notes, ANZ Nominees received notices issued in connection with the Notes.  Garry
Tr. 36:16-20.

any way directly or indirectly, arising out of, related to, or connected with, the taking or the

failure to take, by the [Trustee], any action, in each case in accordance with the instruction" and

liabilities, costs and expenses accrued therewith.  *Id.* at ANZN_00000164-65.  The Trustee

requested that the response document be returned no later than October 21, 2008 at its New York

office located at 101 Barclay Street, New York, New York.  *Id*. at ANZN_00000160,

ANZN_00000164.  Furthermore, "the terms of the Indemnity . . . [are] governed by and

construed in accordance with the substantive laws . . . of the State of New York" and "all actions

and proceedings relating to or arising from . . . [the] Instruction and Indemnity may be brought . .

. in courts located within the State of New York."  *Id.* at ANZN_00000165.  Each of the

signatories "submit[ted] to personal jurisdiction of [the New York] courts for such actions or

proceedings."  *Id.*  ANZ did not produce in discovery an executed copy of the response

document.  However, because the Trustee demanded indemnity as a condition of taking action,

and the Trustee eventually took action, designated an Early Termination Date and distributed the

Issuer's assets to ANZ, there is a compelling inference that ANZ executed and returned the

"response document" directing the Trustee to designate an early termination date and distribute

the funds, thereby submitting itself to the jurisdiction of the New York courts in any dispute over

the indemnification it gave the Trustee.

      22.     Thereafter, ANZ received a Notice of Designation of Early Termination Date on

October 27, 2008 (the "October 27, 2008 Notice").  Dahill Dec. Ex. 18.  The October 27, 2008

Notice designated October 30, 2008 as the Early Termination Date of the Portfolio Swap

Agreement and explained that the designation of an early termination date would result in the

"automatic acceleration of the principal of and accrued and unpaid interest on the Notes without

any further action by the Noteholders."  *Id.*  On October 29, 2008, ANZ received a Notice of

Distribution of Principal and Interest (the "October 29, 2008 Notice"). Dahill Dec. Ex. 19. The

October 29, 2008 Notice explicitly stated that "[t]he designation of the Early Termination Date

under the Portfolio Swap Agreement constitutes an Event of Default under Section 5.1(e) of the

Standard Terms, resulting in the automatic acceleration of the principal of and accrued and

unpaid interest on the Notes without any further action by the Noteholders. In accordance with

Section 5.2(a) of the Standard Terms, all principal and accrued and unpaid interest on the Notes

up to but not including October 30, 2008 shall be paid to you on <u>Thursday, October 30, 2008</u>."

*Id.* Each of the three notices was addressed to, among others, LBSF at its New York office.

Dahill Dec. Exs. 17, 18, 19. Additionally, copies of both the October 27, 2008 Notice and the

October 29, 2008 Notice were sent to Weil, Gotshal & Manges, LLP and Alvarez & Marsal at

their respective New York offices. Dahill Dec. Ex. 18, 19.

      23.    On October 30, 2008, ANZ Nominees received a transfer of $17,166,217.40

AUD, "via its Exchange Settlement Account at the Reserve Bank of Australia." Garry. Dec. ¶ 8.

After receipt of the funds, ANZ Nominees distributed the funds it received to the 19 Investors.

Garry Dec. ¶ 8. Such funds were disbursed by the Trustee from its New York office. *Infra* ¶ 48.

      24.    There can be no doubt that ANZ was fully informed of the circumstances which

elevated the previously underwater Notes to par value. For example, when one of ANZ's clients,

Rous Water, expressed ███████████████████████████████████████████████

████████████████████ (Dahill Dec. Ex. 20), a financial advisor from ANZ responded:

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ █████████████████████████████ █████████████████

████████████████████████████████████████████████████

███████████████████████████████

13

Dahill Dec. Ex. 21.  This email concretely demonstrates ANZ's knowledge that the distribution arose as a result of the Lehman U.S. bankruptcy and its understanding of the mechanics for the flip clause, the relevant documents governing the Notes, and the fact that the collateral used to pay the Federation Notes was U.S. based.

25.     Finally, ANZ Nominees, ANZ Bank and its affiliates filed proofs of claim in the LBHI and LBSF Chapter 11 cases.  *See*, *e.g.*, Dahill Dec. Exs. 22, 23.  ANZ Nominees thereby consented to this Court's jurisdiction over it for purposes of the adjudication of this adversary proceeding.

## ARGUMENT

### I.     THE LEGAL STANDARD

26.     To successfully defeat a "[FRCP] 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has [personal] jurisdiction over the defendant."  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).  "At this stage in the proceedings, the plaintiffs must make out only a prima facie showing of personal jurisdiction through their own affidavits and supporting materials, and all affidavits and pleadings must be construed in the plaintiffs' favor."  *Edberg v. Neogen Corp.*, 17 F. Supp. 2d 104, 110 (D. Conn. 1998) (citing *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)).  In addition, "the court must resolve all doubts in favor of the plaintiff, regardless of controverting evidence submitted by the defendant."  *Criscitelli v. Proline Boats*, No. 3:03 CV 1522(CFD), 2004 WL 1964507, at *2 (D. Conn. Aug. 31, 2004).

27.     While some discovery has been conducted, an evidentiary hearing has not and thus the Court must credit LBSF's averments of jurisdictional facts as true.  *See*, *e.g.*, *Metro.*

14

*Life*, 84 F.3d at 567; *Studio A Entm't, Inc. v. Direct Distrib., LLC*, No. 06 Civ. 02275SAS, 2007

WL 437703, at *2 (S.D.N.Y. Feb. 8, 2007).

## II.    THIS COURT HAS PERSONAL JURISDICTION OVER ANZ

### A. ANZ Nominees Has Consented to this Court's Jurisdiction Over its Person

28.    ANZ Nominees filed proof claim number 56072 against LBHI; that claim

contains no reservation of rights to object to this Court's jurisdiction.  Dahill Dec. Ex. 22.  By

doing so, ANZ Nominees subjected itself to the broad equitable jurisdiction of the Bankruptcy

Court.  *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990); *Cent. Vt. Pub. Serv. Comm. v. Herbert*, 341

F.3d 186, 191-92 (2d Cir. 2003); *In re PNP Holdings Corp.*, 99 F.3d 910, 911 (9th Cir. 1996).

Filing a proof of claim is analogous to filing a complaint in this Court, which vests the Court

with jurisdiction over the filer for all purposes.  *Kline v. ED. Zueblin, AG (In re Am. Exp. Grp.*

*Int'l Servs., Inc.)*, 167 B.R. 311, 313 (Bankr. D.D.C. 1994); *see also Schwinn Plan Comm. v. TI*

*Reynolds 531 Ltd. (In re Schwinn Bicycle Co.)*, 182 B.R. 526, 531 (Bankr. N.D. Ill. 1995).

Accordingly, the Motion should be denied on the basis of ANZ's consent to jurisdiction over it.

### B. ANZ Has Sufficient Minimum Contacts With the
### United States to Support the Exercise of Specific Jurisdiction

29.    In order to be subjected to personal jurisdiction in the United States, due process

requires that a defendant have sufficient minimum contacts with the forum in which defendant is

sued "such that the maintenance of the suit does not offend 'traditional notions of fair play and

substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken*

*v. Meyer*, 311 U.S. 457, 463 (1940)).[13]

---

[13] ANZ repeatedly misstates the standard for finding personal jurisdiction, stating that it did not "purposefully avail itself of any contacts with the United States."  MTD at pp. 1, 6.  As the Court knows, the standard required to exercise personal jurisdiction over a defendant is "certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe*, 326 U.S. at 316.  "The crucial question is whether the defendant has 'purposefully avail[ed] itself of the privilege of

30.     In the bankruptcy context, the requisite minimum contacts need only be *with the United States at large*, not the particular state in which the forum court sits.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) ("*Madoff I*") ("A bankruptcy court's valid exercise of jurisdiction over a foreign defendant depends first on whether that defendant has 'the requisite minimum contacts with the United States at large.'") (quoting *Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010) (hereinafter "*BLMIS*") (citing *Cruisephone, Inv. v. Cruise Ships Catering & Servs., N.V. (In re Cruisephone, Inc.)*, 278 B.R. 325, 331 (Bankr. E.D.N.Y. 2002)).  Should such contacts be found to exist, the court then conducts a "reasonableness" inquiry to determine whether its exercise of jurisdiction will "offend traditional notions of fair play and substantial justice."  *Asahi Metal Indus. Co., Ltd. v. Super. Ct. Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987) (internal quotation marks omitted); *Metro. Life*, 84 F.3d at 567-68.

31.     Finally, the determination of whether there were sufficient minimum contacts here should be measured by the contacts of ANZ Bank and its employees who acted for ANZ Nominees.  As stated above, ANZ Nominees had no employees of its own, and all of its conduct was carried out by ANZ Bank employees in various departments, including the Markets Department, Markets Investor Services Group, Markets-Investor Sales, Markets Fixed Income Sales Team, and Fixed Income Operations Team.  *Supra* ¶ 9.  Thus, the conduct and knowledge of those ANZ Bank employees and the departments within which they worked, are imputed to ANZ Nominees for purposes of jurisdictional analysis.  Moreover, as discussed below, ANZ Nominees is a "mere department" of ANZ Bank, so the relevant contacts for purposes of jurisdiction are those of ANZ Bank, not the employee-less "Nominees" department.  ANZ, a

conducting activities within the forum State, thus invoking the benefits and protections of its laws,' 'such that [the defendant] should reasonably anticipate being haled into court there.'"  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242-43 (2d Cir. 2007) (internal citations omitted).

sophisticated global institution, cannot be permitted to evade this court's jurisdiction by creating

a shell on paper that, because it has no employees, has no international contacts. Rather,

international contacts of the persons through whom the business of the shell was carried out

should be attributed to the shell, thereby affording this court jurisdiction over the party, ANZ

Nominees.

### C. ANZ's Actions Outside the United States had Significant Foreseeable Adverse Effects On a United States Based Entity

32.     A court is said to have *specific* personal jurisdiction over a foreign defendant who

"purposefully direct[s] his activities at residents of the forum" and where the underlying cause of

action "arise[s] out of or relate[s] to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S.

462, 472 (1985) (internal citations and quotation marks omitted). The defendant's activity need

not have taken place within the forum, *id.* at 476, and a single transaction with the forum will

suffice. *See McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957). Here, ANZ took affirmative

action to cause the transfer to it of property of the LBSF estate after the petition date, with

knowledge of the bankruptcy and in violation of the stay, which caused serious harm to LBSF,

and the underlying causes of action against ANZ arise out of those activities.

33.     The fact that ANZ's activities in directing and indemnifying the Trustee and

receiving and distributing property of the LBSF Estate took place in Australia does not defeat

jurisdiction. The courts of the Second Circuit have long held that the minimum contacts test may

be met where the activities of a foreign defendant "have[] an effect in the United States by an act

done elsewhere." *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 87-88

(S.D.N.Y. 1995) (citing *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340

(2d Cir. 1972) *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.*, 130 S.Ct. 2869

(2010)); *see also S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) ("One circumstance

making such anticipation [of being haled into court in a forum] reasonable is where a defendant has acted in such a way as to have 'caused consequences' in the forum state.") (citation omitted).

34.     ANZ's knowing and deliberate actions in directing the Trustee to declare an early termination event and thereby trigger the flip clause, effecting a transfer of LBSF's senior payment priority and the collateral subject to LBSF's senior lien, all in violation of the stay constituted a civil wrong causing harm to LBSF in the United States.  *See Davis v. C.G. Courington (In re Davis)*, 177 B.R. 907, 911 (9th Cir. 1995).  ANZ was aware of the Lehman bankruptcy proceedings before it took the actions it took and received the offending transfers (payment priority and LBSF's collateral); indeed it was aware that the Lehman bankruptcy proceedings were the reason it was expected to receive payment.  Dahill Dec. Exs. 17, 18, 19, 21. Further, ANZ had "good reason to know[] that [its] conduct [would] have effects" in the United States, where the Lehman bankruptcy proceedings were pending, "such that [it] should reasonably anticipate being haled into court there."  *Herbstein v. Bruetman*, 768 F. Supp. 79, 81-82 (S.D.N.Y. 1998) (citation and quotation marks omitted).  Accordingly, ANZ should have anticipated being sued in this Court in respect of such transfers at the time it intentionally made arrangements to receive them, to the detriment of LBSF.

35.     Moreover, ANZ had a full and complete understanding of instruments like the Notes, as it had provided services in connection with similar instruments, and cannot deny that it knew that it was receiving a transfer due to the Lehman bankruptcy.  *See, e.g.*, Dahill Dec. Ex. 21.  At face value, the various notices ANZ received throughout October 2008 explicitly explain that ANZ was receiving a transfer in connection with the Notes as a direct result of the LBHI and LBSF bankruptcy filings.  Dahill Dec. Exs. 17, 18, 19.  ANZ demonstrated its understanding of the way the Notes worked when it explained to one of its customers how the Notes unwound due

18

to the bankruptcy filings.  Dahill Dec. Ex. 21.  Furthermore, ANZ illustrated its knowledge of

investing in CDOs similar to the Federation Notes as early as December 2007 when it developed

a list of pros and cons to provide to its clients seeking to invest in a " ███████████████ that

was proposed by Grange Securities.  Dahill Dec. Ex. 24.  Specifically, ANZ intended to explain

to its clients that that performance of the notes was directly linked to the ████████ of a variety

of banks, including ANZ.  *Id.*  Further, ANZ recognized that ████████████████████

████████████████████████████████████████████  *Id.*

36.     A court may exercise jurisdiction over a person "if at the time jurisdiction is

asserted . . . the person . . . had carried on outside the state an activity having a substantial, direct,

and foreseeable effect within the state, but only in respect to such activity."  *Restatement (Third)*

*of Foreign Relations Law of the United States* § 421(2)(j) (1987); *see also Restatement (Second)*

*of Conflict of Laws* § 50 (1971).  In particular, specific personal jurisdiction exists over ANZ

based on its knowing and intentional efforts to cause the transfer to it of property of the Debtor's

Estate in violation of the stay, which had a substantial direct and foreseeable adverse effect on

the LBSF Estate in the United States by depriving it of millions of dollars to which it was

otherwise entitled.  *See In re Chiles Power Supply Co., Inc.*, 264 B.R. 533, 543-44 (Bankr. W.D.

Mo. 2001) (finding personal jurisdiction over foreign defendants where their actions abroad

violated automatic stay and had an effect on Chapter 11 debtor's bankruptcy estate); *In re*

*Probulk Inc.*, 407 B.R. 56, 64 (Bankr. S.D.N.Y. 2009) (finding personal jurisdiction over foreign

defendants where Trustee adequately established that foreign defendant's actions abroad would

have an immediate, substantial, direct and foreseeable impact on U.S. debtors).  The *Chiles* and

*Probulk* cases are consistent with the principle that conduct outside the jurisdiction which can

foreseeably be expected to cause harm to a resident of the forum is a basis for finding minimum

contacts. *Calder v. Jones*, 465 U.S. 783, 789-90 (1984) (holding that the defendants must

"'reasonably anticipate being haled into court [in the forum]'" because "their intentional, and

allegedly tortious, actions were expressly aimed at" the forum and "they knew that the brunt of

th[e] injury would be felt" in the forum) (citations omitted).   Under *Calder,* "an act done outside

the state that has consequences or effects within the state will suffice as a basis for jurisdiction in

a suit arising from those consequences if the effects are seriously harmful and were intended or

highly likely to follow from the nonresident defendant's conduct." *Guidry v. U.S. Tobacco Co.,*

*Inc.*, 188 F.3d 619, 628 (5th Cir. 1999) (citing *Calder,* 465 U.S. at 789-90).   Here, ANZ's actions

in Australia in causing the transfer to it of property of the Estate in violation of the automatic

stay deliberately caused, or were likely to cause, harm to LBSF in the United States, justifying

the exercise of jurisdiction over ANZ in an action arising from its specific conduct.

     37.    The claims for violation of the stay derive directly from ANZ's conduct outside

the forum.   The case of *Amoco Chemical Co. v. Tex Tin Corp.* is instructive in this regard.   925

F. Supp. 1192 (S.D. Tex. 1996).   There, Amoco sued a number of parties based on Associated's

failure to pay its obligations under an agreement with Amoco.   *Id.* at 1198.   One of the

defendants, Steel Holdings, was alleged to have received a fraudulent transfer of Associated's

assets outside the forum state, which prevented Associated from funding its commitments.   *Id.* at

1198-99.   The Court held that receipt of the alleged fraudulent transfer outside the forum was

sufficient to confer specific jurisdiction over Steel Holdings.   *Id.* at 1200-01; *see also Schwinn*

*Plan Comm. v. AFS Cycle & Co. Ltd. (In re Schwinn Bicycle Co.)*, 192 B.R. 461, 473 (Bankr.

N.D. Ill. 1996) (exercising jurisdiction over foreign preference defendant, the Court noted that

"[f]oreign companies that enter into a debtor-creditor relationship with a United States company

20

should not be surprised if they must defend an action in our courts arising out of that

relationship").

38.     ANZ's assertion that it is an entirely Australian entity conducting business in only

Australia and New Zealand, besides being inaccurate, is of no avail in any event. *See*, *e.g.*, MTD

p. 2.  LBSF does not contend that ANZ has sufficient contacts with the United States to be

subject to this Court's general jurisdiction; rather LBSF contends that the activities ANZ

undertook with respect to its receipt and transfer of property of the LBSF bankruptcy estate in

violation of the automatic stay, which caused significant harm to LBSF in the United States,

provide the requisite contacts to support specific jurisdiction over ANZ in an action directly

related to those activities.

### D.   Jurisdiction Lies Over ANZ in an Action Arising From Becoming the Registered Holder of the Notes it Knew had United States Contacts

39.     ANZ Nominees argues "as an independent basis" for its motion, that it "was not

and reasonably could not have been on notice that it would be 'hauled into court' in the United

States" and that it "clearly was not on notice that it would be amenable to personal jurisdiction in

the United States."  MTD pp. 6-7.  These contentions do not pass muster.  In addition to knowing

it was to receive a distribution caused by the Lehman bankruptcy in the U.S. as described above,

it knew it was becoming the registered holder of notes with a significant United States nexus

before it became the registered holder.

40.     ANZ is a global banking institution based in Australia, a mere part of which

conducted custody services. *Supra* ¶¶ 11-16.  For the benefit of and as part of its overall

commercial relationship with its clients (which had value to ANZ), ANZ became the registered

holder of the Federation Notes which it knew had U.S. connections. *See supra* ¶ 17.  ANZ long

had possession of key deal documents, which made clear that the CDO assets consisted of a

credit default swap between the Issuer and LBSF, a Delaware corporation with its principal place of business in New York (which was guaranteed by LBHI, a Delaware corporation with its principal place of business in New York). Dahill Dec. Ex. 1, pp. ANZN_00053537, ANZN_00053539, ANZN_00053568-69. The deal was structured in New York, as the offering memorandum directs questions and requests for additional information to Lehman Brothers Inc., Transaction Management Group, in New York. *Id.* at ANZN_00053636. The Trustee was a New York bank which held the collateral for the Notes and swap. *Id.* at ANZN_00053592. The reference portfolio underlying the credit default swap was comprised entirely of U.S. residential mortgage backed securities. *Id.* at ANZN_00053575. Furthermore, the relevant underlying agreements for the deal are governed by New York law. *Id.* at ANZN_00053571, ANZN_00053592.

41.     ANZ knew as far back as 2007 that the Notes had U.S. connections and were related to Lehman. *See* Dahill Dec. Exs. 1, 13. ANZ's knowledge extended well beyond the Notes' obvious connections with the U.S. ANZ knew Lehman was in a precarious financial situation before it took custody of the Notes, and indeed, it took possession of the Notes primarily after LBHI had filed for bankruptcy. *See* Garry Tr. 35:8-20. Additionally, it offered restructuring options to its customers who had invested in the Federation Notes. Dahill Dec. Ex. 11.

42.     The knowledge of ANZ Bank employees who conducted work on behalf of ANZ Nominees is imputed to ANZ Nominees "by virtue of an agency relationship." *See Picard v. Merkin (In re Bernard L. Madoff Inv. Sec., LLC)*, 440 B.R. 243, 259 (Bankr. S.D.N.Y. 2010). "The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge." *Ctr. v. Hampton Affiliates,*

22

*Inc.*, 66 N.Y.2d 782, 784, 488 N.E.2d 828, 829 (1985).  All actions by ANZ Nominees were taken by ANZ Bank employees.  *Supra* ¶ 9.  ANZ Nominees has three directors, and each of those directors are employed by ANZ Bank.  Garry Tr. 8:19-9:19.  Thus, the knowledge of ANZ Bank employees dealing with the Notes is imputed to ANZ Nominees.

43.    While ANZ argues that only ANZ Nominees' contacts are relevant to determining whether the Court has personal jurisdiction over ANZ Nominees (MTD p. 5), that argument fails as it is the contacts of ANZ Bank and its personnel that are relevant.  To determine whether an entity is a mere department of another entity for jurisdictional purposes, four factors are reviewed:  (i) common ownership; (ii) financial dependency of the subsidiary on the parent corporation; (iii) the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and (iv) the degree of control over the marketing and operational policies of the subsidiary exercised by the parent.  *See GEM Advisors, Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009).

44.    The first and most important factor is common ownership between the parent and subsidiary.  *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 51 (S.D.N.Y. 1999); *see also GEM Advisors*, 667 F. Supp. 2d at 319. ANZ Nominees "is a wholly owned subsidiary of [ANZ Bank]."  Dahill Dec. Ex. 25, p. 4; *see ESI*, 61 F. Supp. 2d at 52 ("This factor is easily satisfied with respect to Coastal Salvador, CTS and Crystal Power – Coastal Salvador is a wholly owned direct subsidiary of Coastal Power and a wholly owned indirect subsidiary of Coastal Corp.; CTS is a wholly owned indirect subsidiary of Coastal Corp.; and Crystal Power is a wholly owned direct subsidiary of LCC.").  As for the second factor, that the subsidiary must be financially dependent on the parent, that too is easily met.  First, ANZ Nominees conducts limited business

activities and thus "the operation and existence of [the subsidiary] is dependent upon the financial support of [the parent]." *ESI*, 61 F. Supp. 2d at 54. Second, for this factor, Courts will consider "whether the subsidiary retains its own profits or whether they are received by and reported on the financial statements of the parent." *Id.* at 53. Here, ANZ Bank files financial statements on behalf of ANZ Nominees, thereby consolidating its subsidiary's profits with its own. Dahill Dec. Ex. 25 ("ANZ Nominees Limited is relieved from the Australian requirements to prepare and lodge with ASIC audited financial statements, provided the Holding Entity ([ANZ Bank]) prepares and lodges consolidated financial statements").

45.     The third factor requires Courts to examine "whether the parent shares officers with the subsidiary and shifts executives among its subsidiaries, whether the parent pays the executives' salaries, and whether the subsidiary holds separate meetings of its Board of Directors." *ESI*, 61 F. Supp. 2d at 54. ANZ Nominees had no executives or employees, and all actions by ANZ Nominees were taken by ANZ Bank employees. Moreover, ANZ Nominees has three directors, and each of those directors are employed by and thus paid by ANZ Bank. *See* Garry Tr. 8:19-9:19. Finally, that ANZ Bank determined ANZ Nominee's operational policies is self-evident, as every person performing services for ANZ Nominees was employed by ANZ Bank. Dahill Dec. Ex. 3. Therefore, ANZ Bank's knowledge regarding the Lehman bankruptcy and surrounding facts can be imputed to ANZ Nominees for jurisdictional purposes, giving rise to sufficient contacts with the United States to meet constitutional standards for jurisdiction over ANZ Nominees.

46.     ANZ employees were sophisticated market professionals well aware of the U.S. nexus of the Federation Notes, the impact of the U.S. economy on the Federation Notes, the fact that Lehman was in bankruptcy in the United States, and the need to indemnify the Trustee from

adverse claims before the transfers of LBSF property to ANZ could be effectuated.  There is a

compelling inference that ANZ understood it could end up in litigation in Lehman's bankruptcy

court over the subject conduct.  Further, in indemnifying the Trustee, ANZ actually consented to

any litigation over that indemnity being conducted in the courts of New York, under New York

law, which evidences ANZ's willingness to litigate in connection with the Notes and Lehman in

the courts of New York.

### E.   Jurisdiction Also Lies Pursuant to the New York Long-Arm Statute

47.     The New York long-arm statue (CPLR 302) also supports exercise of personal

jurisdiction in this case.  Courts have held that because the New York long-arm statute "does not

reach as far as the Constitution permits, due process will be satisfied if the New York long-arm

statute is satisfied."  *See*, *e.g.*, *BLMIS*, 440 B.R. at 280; *see also Banco Ambrosiano, S.P.A. v.

Artoc Bank & Trust Ltd.*, 62 N.Y.2d 65, 71, 464 N.E.2d 432, 434 (1984) ("The long-arm

jurisdiction legitimized by the *International Shoe* court was implemented in [New York] by

statute.").

48.     CPLR 302(a)(3) confers jurisdiction over a defendant who (i) commits a wrongful

act outside the state causing injury in the state, *and*, among other things, (ii) expects or

reasonably should expect the tortious act to have consequences in the state *and* derives

substantial revenue from interstate or international commerce.  In order to determine where the

injury occurred for jurisdictional purposes, courts apply the "situs-of-injury test."  *Bank of

Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791-92 (2d Cir. 1999).  "The

situs of injury is New York when the . . . first event causing the injury occurs in New York."  *Id.*

at 792.  Here, the original event causing the injury to the Estate was either the Trustee's receipt

of the direction and indemnification letter at its New York offices (Dahill Dec. Ex. 17, p.

ANZN_00000164) or the Trustee's action in response to that direction letter of implementing the

flip clause in the Transaction Documents.  That occurred pursuant to the notice dated October

27, 2008 issued by BNY Mellon, executed by its V.P. Stuart Rothenberg from its office at 101

Barclay St., New York, New York.  Dahill Dec. Ex. 18.  Shortly thereafter, the Trustee

distributed the collateral to ANZ, again from its New York office over the signature of its V.P.

Stuart Rothenberg.  Dahill Dec. Ex. 19.  Thus, the situs of the injury is New York.  *Marine

Midland Bank v. Keplinger & Assoc., Inc.*, 488 F. Supp. 699, 703 (S.D.N.Y. 1980) ("since all

disbursements to ADDM or its creditors were made by MMB in New York, the situs of the

injury was New York"); *In re Med-Atl. Petroleum Corp.*, 233 B.R. 644, 660 (Bankr. S.D.N.Y.

1999) ("applying the situs-of-injury test, we must look at where the first effect of the tort was

located that ultimately produced the final economic injury.  The original events that caused the

economic harm to MAPCO and eventually its bankruptcy estate were the fraudulent transfers of

funds from MAPCO's coffers, thus, localizing MAPCO's injury in New York for section

302(a)(3) purposes.").

49.     ANZ's motion largely focuses on the fact that it was not an investor in the Notes

and that, because it was not an investor, it had limited contact with New York.  MTD pp. 1, 6-8.

However, the relevant analysis under the CPLR is ANZ's knowing violation of the automatic

stay which ANZ committed when it directed and knowingly received an unauthorized and

avoidable post-petition transfer of property of the Estate in violation of the stay.[14]  And the injury

---

[14]  A tort is nothing but civil wrongdoing.  A cause of action for fraudulent conveyance is properly regarded as a
species of tort.  *See Bank of Commc'ns v. Ocean Dev. Am., Inc.*, No. 07 CIV. 4628 (TPG), 2010 WL 768881, at *3
(S.D.N.Y. Mar. 8, 2010); *Morgenthau v. A.J. Travis Ltd.*, 184 Misc. 2d 835, 843, 708 N.Y.S.2d 827, 832 (N.Y. Sup.
Ct. 2000).  There is no substantive difference between a knowing violation of the automatic stay and an avoidable
transfer for long-arm purposes, and thus ANZ's receipt of postpetition transfers of LBSF's property not authorized
by the Court or the Code constitutes a civil wrong committed outside of New York causing injury in New York.

to LBSF from those tortious actions is clear and unassailable: the Debtor was deprived of

$17,166,217.40 AUD to which it was otherwise entitled.

50.    In addition, ANZ (i) expected or reasonably should have expected the transfer to

it to have consequences in the state, and (ii) derives substantial revenue from interstate or

international commerce.  For example, ANZ was fully aware and notified of the Lehman

bankruptcy and the fact that the transfers resulted therefrom.  *See* Dahill Dec. Exs. 17; 18; 19;

21; 26 (quoting a notice from Lehman that "██████████████████████████████████

████████████████████████████████████████████████████████████████").

ANZ even explained the direct impact of the Lehman bankruptcy to a customer that expressed

surprise at its receipt of "████████████████████████████████████" when just

a week before the Notes were worth substantially less.  Dahill Dec. Ex. 21.  Essentially, ANZ

explained to that same client that it was obtaining a windfall in relation to the Federation Notes

that had been performing poorly, as to the Noteholders, up until the LBHI and LBSF

bankruptcies.  ANZ knew that LBSF was based in the United States, where its bankruptcy was

pending, and that the transfer would have consequences to LBSF.  Dahill Dec. Exs. 17, 18, 19.

51.    In *Bank of Commc'ns*, 2010 WL 768881, at *3-4, the Court held that plaintiff

made a prima facie showing of personal jurisdiction under the long-arm statute, where plaintiff

alleged that defendants receipt of a conveyance that frustrated a Bank's attempts to satisfy a New

York judgment was a tortious act which the defendants reasonably should have expected to have

consequences in New York.  *Accord Sunrise Indus. Joint Venture v. Ditric Optics, Inc.*, 873 F.

Supp. 765, 771 (E.D.N.Y. 1995) ("In this Court's view jurisdiction under section 302(a)(3)(ii) is

appropriate, because Signal's actions regarding the sale of Ditric's assets and the subsequent

transfer of the proceeds to Signal ***could reasonably have been expected to have had***

27

*consequences in New York* with respect to Sunrise's ability to recover the reserved rent, in the event of a default in rent payment by Ditric's assignee.") (emphasis added); *see also In re Med-Atl. Petroleum Corp.*, 233 B.R. at 659-60.

52.    Furthermore, ANZ derives substantial revenue from international commerce. ANZ markets itself as a global entity with a presence in 33 countries. *Supra* ¶ 11; *see Local 875 I.B.T. Pension Fund v. Pollack*, 992 F. Supp. 545, 557 (E.D.N.Y. 1998) (defendant did not contest that this aspect of plaintiffs' burden was met where defendant's brochure described defendant's "participation in major financial markets across the globe").  The point of the "substantial revenue" requirement is to exclude foreign entities "whose business operations are of a local character." *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 29 (2d Cir. 1997) (citations and internal quotation marks omitted).[15]  While ANZ continuously attempts to portray itself as a Nominee only operating in Australia and New Zealand, this argument is directly contradicted by the facts set forth above.

---

[15] For the purpose of CPLR § 302(a)(3)(ii), substantial revenue derived from international commerce includes income derived from "participation in major financial markets across the globe." *Local 875 I.B.T. Pension Fund*, 992 F.Supp. at 557 ("With respect to the issue of revenue, the plaintiffs, by reference to a CEPA brochure that describes CEPA's participation in major financial markets across the globe, assert that CEPA derives regular and substantial income from international commerce.  CEPA does not contest that this aspect of the plaintiffs' burden has been met.") (internal citation omitted); *see also Marine Midland*, 488 F.Supp. at 703-04 (representations in defendant's brochure sufficient to establish *prima facie* case that defendant derives substantial revenue from interstate commerce).  Additionally, "[w]hat constitutes 'substantial revenue' under CPLR 302 (subd. [a], par. 3, cls. [i] and [ii]) is not defined in the statute.  The phrase should be construed to require comparison between a defendant's gross sales revenue from interstate or international business with total gross sales revenue, and between a defendant's net profit from interstate or international business with total net profit." *Allen v. Auto Specialties Mfg. Co.*, 45 A.D.2d 331, 333, 357 N.Y.S.2d 547, 550 (3d Dep't 1974); *see also Gillmore v. J.S. Inskip, Inc.*, 54 Misc.2d 218, 221, 282 N.Y.S.2d 127, 133 (N.Y. Sup. Ct. 1967) ("the phrase ['substantial revenue'] should, logically, be construed to require comparison of New York (or interstate or international) gross sales revenue with a defendant's total gross sales revenue, or New York, interstate or international net profits with a defendant's total net profit") (internal citation omitted).

### F. The Exercise of Personal Jurisdiction Over ANZ Is Reasonable

53.     Once it has been decided that a defendant purposefully established minimum

contacts within the forum State, these contacts may be considered in light of other factors to

determine whether the assertion of personal jurisdiction would comport with "fair play and

substantial justice." *Int'l Shoe Co.*, 326 U.S. at 320.  Thus, courts in "appropriate case[s]" may

evaluate "the burden on the defendant," "the forum State's interest in adjudicating the dispute,

the plaintiff's interest in obtaining convenient and effective relief, . . . the interstate judicial

system's interest in obtaining the most efficient resolution of controversies; and the shared

interest of the several States in furthering fundamental substantive social policies." *World-Wide

Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (internal citations omitted).  These

considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser

showing of minimum contacts than would otherwise be required.  *See, e g.*, *Calder*, 465 U.S. at

788-89; *McGee*, 355 U.S. at 223-24. "On the other hand, where a defendant who purposefully

has directed his activities at forum residents seeks to defeat jurisdiction, he must present a

**compelling case** that the presence of some other considerations would render jurisdiction

unreasonable." *Burger King Corp.*, 471 U.S. at 477 (emphasis added).

54.     ANZ does not provide a compelling case that the exercise of jurisdiction would be

unreasonable.  ANZ argues that jurisdiction would be unreasonable because it "had no notice" it

would be subject to jurisdiction and because it was a custodian who was not in privity of contract

with any U.S. entity, and it only took custody of the Notes after the Investors purchased the

Notes.  MTD p. 7-8.  ANZ's short argument on reasonableness is not compelling, and ANZ

cannot hide behind the shell of ANZ Nominees, which itself could perform no activities were it

not for employees of ANZ Bank.  The reasonableness of the exercise of jurisdiction over ANZ is

manifest from ANZ Nominees' and ANZ Bank's submission to this Court's jurisdiction by filing numerous proofs of claim; every institutional lender knows that the Bankruptcy Court has jurisdiction to rule on the validity of those claims and that if those claims were challenged ANZ would be litigating their validity in New York. As discussed in detail above, the relevant events here for jurisdictional purposes are ANZ's knowledge of the Lehman bankruptcy, its direction to the Trustee to take action adverse to LBSF directly as a result of that bankruptcy, the effectuation of that direction by implementation of the flip clause by the Trustee located in New York, the distribution of the collateral to ANZ by the Trustee located in New York, and ANZ's receipt of transfers consisting of LBSF's senior payment priority (when the flip clause was activated) and of the collateral subject to LBSF's senior lien, all in knowing violation of the automatic stay, followed by ANZ's filing of multiple proofs of claim against LBHI and LBSF. Although ANZ did not itself purchase the Notes, it agreed to become the registered holder of the Notes on behalf of its clients with a complete understanding of the type of instrument and its ties to the United States, and particularly to Lehman, who ANZ knew to be in bankruptcy. *See* Dahill Dec. Exs. 24; 14. ANZ consented to the jurisdiction of the New York courts, and to the application of New York law, in any dispute with the Trustee over the indemnification ANZ provided to the Trustee. Furthermore, ANZ has an office in New York and a representative of the custodial business went on at least one trip to the U.S., including a stop in New York, to recruit business. *Supra* ¶ 12. The transaction actually has more significant connections to New York than to Australia, and ANZ's claim that it was not on notice that it may be subject to jurisdiction in New York is simply not credible.

55.    Moreover, case law recognizes that bankruptcy litigation should be centralized in the Court handling the bankruptcy case. The burden on ANZ defending itself is minimal given

the conveniences of modern communication, the ease of travel, and the retention of U.S. counsel

with offices in New York.  The cases uniformly recognize the strong interest of the United States

in centralizing bankruptcy litigation in the Court in which the Chapter 11 case is venued.  *Madoff

I*, 460 B.R. at 119-21; *see also In re Chiles*, 264 B.R. at 540-43; *In re Probulk Inc.*, 407 B.R. at

61-62, 64.  Finally, Noteholders such as ANZ received billions of dollars in the aggregate which,

but for the invalid and unenforceable flip clauses, were due to LBSF.  The litigation over those

transfers is pending before this Court, and LBSF has no other means available to it to obtain

redress against ANZ for its share of those wrongful distributions.

### i.  New York Choice of Law Clause

56.    Courts have held that a choice of law clause is a significant factor in a personal

jurisdiction analysis because the parties, by so choosing, purposely avail themselves of the

benefits and protections of the laws of the forum whose laws they agreed would govern their

relationship.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 480 B.R. 501, 516

(Bankr. S.D.N.Y. 2012) (citing *Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 23 (2d Cir.

2004)).  Here, the relevant underlying agreements (*i.e.*, the indenture, the notes, the portfolio

management agreement, the credit default swap, the permitted long-term investment the

purchase agreement, and the guarantee) are all governed by New York law.  Dahill Dec. Ex. 1,

pp. ANZN_00053571, ANZN_00053592.  So is ANZ's indemnity agreement with the Trustee,

which also includes a consent by the Noteholder to jurisdiction of the courts of New York.

57.    ANZ argues that the choice of law provisions in the transaction documents do not

apply to it because it was not a party to the contract.  Rather, it argues, the custody agreements

entered into between ANZ and the Investors (with Victoria Australia choice of law provisions)

should govern jurisdiction, and thus the New York choice of law provisions of the transaction

documents does not provide a basis for jurisdiction.  MTD pp. 6-7.  However, ANZ's argument

is flawed, as is its reliance on *Aqualine Capital Partners LLC v. FinArch LLC*, 861 F. Supp. 2d

378 (S.D.N.Y. 2012).  The Notes are governed by New York law and ANZ's right to receive the

subject transfers, as well as its liability for doing so, derive from the Notes, not from custody

agreements with its customers.  This suit concerns a dispute over transfers that ANZ knew

concerned a bankruptcy estate in New York, not the custody arrangement between ANZ and the

Investors.  Thus, the choice of law provision of the custody agreement is wholly irrelevant.  It is

for precisely the same reason that *Aqualine* is distinguishable.  In *Aqualine*, the Court determined

that there was no jurisdiction over a Belgian defendant where the dispute arose from an

agreement between the plaintiff and defendant that explicitly contained a Belgian choice of law

provision.  *Id.* at 389, 391.  Here, that is simply not the case – LBSF is not asserting a claim

based on the custodial arrangement between ANZ and the Investors.

### ii. U.S. Interests in Application of Bankruptcy Code and Administration of Bankruptcy Estates

58.      ANZ also argues this Court should does not have jurisdiction over it because the

Notes were "not marketed in the United States or held by United States investors."  MTD p. 6.

Yet, the deal was structured in New York and directs questions and requests for additional

information to Lehman Brothers Inc., Transaction Management Group, in New York, and the

reference portfolio underlying the credit default swap was comprised entirely of U.S. residential

mortgage backed securities.  More importantly, the tortious conduct of ANZ in directing the stay

violations detailed above violated U.S. bankruptcy laws and injured a debtor before the U.S.

Bankruptcy Court.  Numerous courts, including the SDNY Bankruptcy Court, have repeatedly

recognized that exercising personal jurisdiction in similar circumstances is reasonable based on

the United States' strong interest in applying the provisions of the Bankruptcy Code to adjudicate claims arising under U.S. bankruptcy laws. *Madoff I*, 460 B.R. at 119-20.

59.    Furthermore, ANZ has not established that it is burdened by litigating in New York. First, there is no language barrier as ANZ is a global, English speaking institution. ANZ also has already appeared in this action and participated in discovery through its U.S. counsel. Additionally, ANZ provided a witness in New York for its 30(b)(6) deposition, at its own recommendation. And ANZ must have been prepared to litigate in New York because that is where it filed its proofs of claim, and that is the venue which it agreed for any dispute with the Trustee over the indemnity.

60.    ANZ has not made the "compelling" case required to avoid this Court's exercise of jurisdiction over it, especially given its consent to such jurisdiction in order to recover claims against the Debtors.

### III.    THIS COURT HAS *IN REM* JURISDICTION OVER THE TRANSFERRED PROPERTY AND HAS THE POWER TO REDRESS A VIOLATION OF THE AUTOMATIC STAY ANYWHERE IN THE WORLD

61.    Even assuming, *arguendo*, that this Court did not have personal jurisdiction over ANZ, the Motion to Dismiss should be denied in any event due to (i) this Court's *in rem* jurisdiction over the property at issue, and (ii) the Court's power to enforce the automatic stay outside the United States. The wrongful acts taken by ANZ occurred after the LBSF petition date. Once the unenforceability of the invalid flip clause is determined, ANZ's violation of section 362 (by exercising possession and control over property of the Estate), and section 542 (by refusing to account for and turnover property of the Estate to the Trustee), both of which have extraterritorial application, is clear.

62.      This Court has the power to adjudicate issues involving property of the Estate by its exercise of *in rem* jurisdiction, "even if the court does not have *in personam* jurisdiction over all the parties affected by that adjudication." *In re Indianapolis Downs, LLC*, 462 B.R. 104, 112 (Bankr. D. Del. 2011).[16]

63.      Section 541 of the Code defines the bankruptcy estate: "'Such estate is comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case.'" *In re Bean*, 252 F.3d 113, 116 (2d Cir. 2001) (quoting 11 U.S.C. § 541(a)(1)).  The estate is comprised of property "wherever located and by whomever held."  11 U.S.C. § 541(a).  LBSF's senior security interest in the Federation collateral, and its priority right to payment, constitute property interests which became property of the estate on the petition date.

64.      The court with jurisdiction over the chapter 11 case has "exclusive jurisdiction-- (1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate."  28 U.S.C. 1334(e).  This jurisdiction extends to property outside the territorial bounds of the United States.  *See In re Gucci*, 309 B.R. 679, 681-82 (Bankr. S.D.N.Y. 2004); *In re French*, 303 B.R. 774, 778-79 (Bankr. D. Md. 2003); *Hong Kong & Shangai Banking Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 996 (9th Cir. 1998); *see also In re Int'l Admin. Servs., Inc.*, 211 B.R. 88, 93 (Bankr. M.D. Fla. 1997) ("Congress intended § 541 to be as inclusive as possible and all encompassing.  Therefore, property of the debtor that is located outside of the United States constitutes property of the estate, and the bankruptcy court may exercise jurisdiction over such property.") (internal citations omitted).

---

[16]  *See also Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 450 & 453 (2004) ("the bankruptcy court's jurisdiction is premised on the res, not the persona" and "the Bankruptcy Court's *in rem* jurisdiction allows it to adjudicate the debtor's discharge claim without *in personam* jurisdiction over the [defendant]"); *In re Palumbo*, 353 B.R. 37, 42 (Bankr. D. Mass. 2006) ("The notion that a Bankruptcy Court can exercise *in rem* jurisdiction without subjecting a party to *in personam* jurisdiction is likewise not a novel one."); *In re Am. Aluminum Window Corp.*, 15 B.R. 803, 805 (Bankr. D. Mass. 1981) ("recovery of a preference requires an in rem jurisdiction over the property of the estate and not necessarily an in personam jurisdiction over the Defendant").

65.     "The court's exercise of 'custody' over the debtor's property, via its exercise of *in rem* jurisdiction, essentially creates a fiction that the property—regardless of actual location—is *legally* located within the jurisdictional boundaries of the district in which the court sits." *In re Simon*, 153 F.3d at 996 (emphasis in original); *see Katchen v. Landy*, 382 U.S. 323, 327 (1966) *superseded by statute on other grounds as recognized by In re United Mo. Bank of Kan. City, N.A.*, 901 F.2d 1449 (8th Cir. 1990) (noting that bankruptcy courts have "constructive possession" over estate property) (internal quotation marks and citations omitted); *Commodity Futures Trading Comm'n v. Co Petro Mktg. Grp., Inc*., 700 F.2d 1279, 1282 (9th Cir. 1983) (noting that under the Bankruptcy Code, "all property of the debtor, wherever located, is in *custodia legis* of the bankruptcy court") (citation omitted).   11 U.S.C. § 542(a) unambiguously compels virtually all entities to account for and deliver to the debtor property of the estate in their possession, custody or control.   Once the flip clause is rendered unenforceable, section 542(a) required both the Trustee and ANZ to deliver to LBSF, not to Noteholders, such property. ANZ instead transferred the funds it received, subject to LBSF's senior security interest, to its customers.   The Court's worldwide jurisdiction over property of the Estate must of necessity include the power to redress a violation of the section designed to cause such property to be assembled in the possession of the debtor.

66.     Property of the Estate encompasses more than the funds transferred by the Trustee.   The Estate also included LBSF's property interest in senior payment priority.   Upon Lehman's bankruptcy filing, ANZ received LBSF's right to senior payment priority.   Dahill Dec. Ex. 1, pp. ANZN_00053563-64.   ANZ still holds possession of that right, and therefore maintains possession of property of the Estate over which this court has *in rem* jurisdiction.

35

67.    Furthermore, ANZ's custodial agreements ensured that ANZ's customers indemnified ANZ.  *See, e.g.*, Dahill Dec. Ex. 27, p. ANZN_00000671.  Specifically, ANZ's safe custody agreement with one investor required that the investor "███████████████████

███████████████████████████████████████████████████████████████

█████████████████    *Id.*  Because ANZ can recover its losses through the indemnification provisions it required from its customers to whom it distributed the proceeds of the collateral, ANZ should be treated as an agent of the current holders of the proceeds for purposes of an *in rem* analysis.

68.    In addition, the automatic stay applies outside the United States and the Court has the power to redress an extraterritorial violation of the stay.  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 474 B.R. 76, 81-84 (S.D.N.Y 2012); *Lykes Bros. Steamship Co. v. Hanseatic Marine Serv. (In re Lykes Bros. Steamship Co.)*, 207 B.R. 282, 287 (Bankr. M.D. Fla. 1997); *see also Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768-69 (Bankr. S.D.N.Y. 1996); *U.S. Lines, Inc. v. GAC Marine Fuels Ltd. (In re McLean Indus. Inc.)*, 68 B.R. 690, 694 (Bankr. S.D.N.Y. 1986).

69.    Here, as of the petition date, and assuming the unenforceable nature of the flip clause, the Court had worldwide jurisdiction over the property of the Estate, including LBSF's senior payment priority and lien in and to the funds.  The automatic stay that went into effect on the date of the petition was an essential tool for protecting the Court's jurisdiction over that property of the Estate and ANZ's violation of the stay was void *ab initio*. *See In re Velichko*, 473 B.R. 64, 68 (Bankr. S.D.N.Y. 2012) ("Even where a stay violation is not willful, the action taken in violation of the stay is void *ab initio*."); *Madoff I*, 460 B.R. at 115, 123 (holding an action that violated the automatic stay void *ab initio*).  Sections 541 and 542 of the Code, read together, provide that all legal or equitable interests of the debtor in property as of the commencement of

the case, *wherever located and by whomever held*, are part of the estate and must be surrendered to the debtor.  The Court's worldwide jurisdiction over the property of the estate would be undermined if the Court did not have the power to redress violations by foreign defendants, not only of the stay, but of the turnover command in section 542.  The fact that ANZ may no longer have possession of that property should be of no moment; the Court's power to enforce the relevant statutes which ANZ violated provides a basis for the exercise of jurisdiction over ANZ.  *See S.E.C. v. Infinity Grp. Co.*, 27 F. Supp. 2d 559, 563 (E.D. PA 1998) (holding there is *in personam* jurisdiction over the defendant "by virtue of the federal securities laws" which "give the federal district courts jurisdiction to enforce 'any liability or duty' created by the Securities Exchange Act of 1934 and the Securities Act of 1933.").  Moreover, since ANZ still holds LBSF's senior payment priority, it still has possession of property of the estate sufficient to provide this court *in rem* jurisdiction.

## **CONCLUSION**

70.     For the foregoing reasons, LBSF respectfully requests that the Court deny ANZ's

Motion to Dismiss.


Dated: New York, New York
        April 30, 2015

                                        By:  /s/ William F. Dahill
                                        Paul R. DeFilippo
                                        William F. Dahill
                                        Adam M. Bialek
                                        Joanna H. Schorr

                                        WOLLMUTH MAHER & DEUTSCH LLP
                                        500 Fifth Avenue
                                        New York, New York 10110
                                        (212) 382-3300

                                        *Counsel for Plaintiff Lehman Brothers Special
                                        Financing Inc.*