**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————————x

In re:

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

                         Debtors.

——————————————————————————x

LEHMAN BROTHERS SPECIAL FINANCING INC.,

                       Plaintiff,

-against-

BANK OF AMERICA NATIONAL ASSOCIATION,
*et al.*,

                       Defendants.

——————————————————————————x

Chapter 11
Case No. 08-13555 (SCC)

Adversary Proceeding
No. 10-03547 (SCC)

**MEMORANDUM DECISION**

A P P E A R A N C E S :

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110
By:    Paul R. DeFilippo, Esq.
        William F. Dahill, Esq.
        Joanna Schorr, Esq.
*Attorneys for Lehman Brothers Special Financing Inc.*

FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue, 31st Floor
New York, NY 10022
By:    Timothy P. Harkness, Esq.
        David Livshiz, Esq.
        Abbey Walsh, Esq.
        Shannon Leitner, Esq.
*Attorneys for Shield Securities Limited*

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion to dismiss filed by Shield Securities Limited ("Shield") in the above-captioned adversary proceeding brought by Lehman Brothers Special Financing Inc. ("LBSF"). Shield takes the position that this Court has neither *in personam* jurisdiction nor *in rem* jurisdiction to resolve this adversary proceeding as it relates to Shield. LBSF responds that Shield's actions outside the United States had significant and foreseeable effects on LBSF in the United States and that such actions provide the requisite "minimum contacts" necessary to support *in personam* jurisdiction. LBSF further argues that the Court may exercise jurisdiction over Shield, an investment holding vehicle affiliated with the Rothschild corporate family, because Shield is properly viewed as a "mere department" of one or more Rothschild entities over which this Court has jurisdiction. In the alternative, LBSF takes the position that this Court has *in rem* jurisdiction to resolve this adversary proceeding as it relates to Shield because this adversary proceeding concerns a dispute over property of the LBSF estate. For the reasons set forth below, the Court grants Shield's motion to dismiss for lack of personal jurisdiction. The Court further holds that it has *in rem* jurisdiction over the property that is the subject of this adversary proceeding as it relates to Shield.

<u>**BACKGROUND**</u>

LBSF, a wholly-owned subsidiary of Lehman Brothers Inc. and an indirect subsidiary of Lehman Brothers Holdings Inc. ("LBHI"), initiated this adversary proceeding on September 14, 2010 against certain investment vehicles, trustees, and noteholders who had participated in certain transactions involving credit default swap agreements. In each of these transactions, LBSF (as the credit default swap counterparty) and the noteholder held competing interests in collateral securing an issuer's obligations to LBSF under a credit default swap and a noteholder

under a credit-linked synthetic portfolio note. The transaction documents for these transactions include provisions that govern the priority of payment from the liquidation of such collateral. Those so-called priority of payment provisions entitle the relevant noteholder or noteholders, under certain circumstances, to receive distributions from the liquidation of the collateral prior to LBSF. In each transaction subject to this adversary proceeding, LBSF alleges that the noteholders received such distributions. Among other reasons, LBSF brings this action to obtain a declaratory judgment that the so-called priority of payment provisions are unenforceable *ipso facto* clauses and to avoid distributions made to noteholders pursuant to those provisions.

As between LBSF and movant Shield, this adversary proceeding concerns the so-called Ruby Transaction, which culminated in an approximately $41 million distribution to Shield after the bankruptcy filings of LBHI and LBSF. LBSF now seeks to recover that distribution.

**A. The Ruby Transaction**

Lehman Brothers International (Europe) ("LBIE") was the primary European broker-dealer for the Lehman Brothers corporate group and was located in London.[1] In the summer of 2006, LBIE developed a multi-issuer secured obligation program (the "Dante Program"), under which certain investment vehicles issued synthetic portfolio notes linked to a credit default swap.[2] LBIE created the Ruby Transaction under the Dante Program and marketed and sold it to N.M. Rothschild & Sons Limited ("NMR"),[3] an English company based in London and a member of the Rothschild corporate family.[4]

---

[1] Documents Concerning U.K. Admin. of Lehman Bros. Int'l (Europe), Feb. 11, 2009, Case No. 08-13555, ECF No. 2819, Ex. A (Order Appointing Joint Administrators).

[2] Declaration of Peter Jaffe in Support of Shield Securities Limited's Motion to Dismiss for Lack of Personal Jurisdiction, Oct. 15, 2014, ECF No. 848 (hereinafter, the "Jaffe Decl."), Ex. A (Base Prospectus).

[3] *Id.*

[4] Declaration of Leigh Enevoldson in Support of Shield Securities Limited's Motion to Dismiss, Oct. 15, 2014, ECF No. 846 (hereinafter, the "Enevoldson Decl.") ¶ 2.

1.  *The Transaction*

On January 18, 2007, the Ruby Transaction was executed.[5]  LBIE created an investment vehicle called Ruby Finance Public Limited Company ("Ruby Finance"), which was incorporated in Ireland.[6]  Ruby Finance entered into a credit default swap (the "Swap") for which LBIE selected LBSF as the counterparty.[7]  At the same time, Ruby Finance issued a $40 million synthetic portfolio note linked to the Swap (the "Ruby Note").[8]  Ruby Finance's obligations under the Ruby Note and the Swap were secured,[9] and LBSF's obligations under the Swap were guaranteed by LBHI.[10]  NMR acted as portfolio manager for the Ruby Note and, initially, as the noteholder.[11]

Both the Swap and the Ruby Note provide for payments based on the performance of a portfolio of reference securities.  Under the Ruby Note, Ruby Finance made payments to the noteholder if the portfolio performed as expected.  Under the terms of the Swap, Ruby Finance made payments to LBSF if the reference securities did not perform as expected and LBSF made payments to Ruby Finance equaling those that Ruby Finance made to the noteholder.[12]  Thus, investors in the Ruby Note gained synthetic long exposure to a portfolio of reference securities and LBSF gained synthetic short exposure to the same reference portfolio.[13]

---

[5] Jaffe Decl. Ex. C (Series Prospectus); Enevoldson Decl. ¶ 5.

[6] Jaffe Decl. Ex. C (Series Prospectus), at 1.

[7] Enevoldson Decl. ¶¶ 8–9.

[8] Jaffe Decl. Ex. D (Principal Trust Deed).

[9] *Id.* at 6 § 5.2; Jaffe Decl. Ex. B (Supplemental Trust Deed), at 9–10 § 8.1.

[10] Jaffe Decl. Ex. O (LBHI Guarantee); Jaffe Decl. Ex. B (Supplemental Trust Deed), at 24.

[11] Declaration of William F. Dahill in Opposition to Shield Securities Limited's Motion to Dismiss, Mar. 6, 2015, ECF No. 1058 (hereinafter, the "Dahill Decl."), Ex. L (Portfolio Management Agreement); Jaffe Decl. Ex. G (Asset Purchase Agreement).

[12] Jaffe Decl. Ex. C (Series Prospectus), at 21 § 39(v); Enevoldson Decl. ¶ 10.

[13] Enevoldson Decl. ¶ 10.

### 2. *The Collateral*

Ruby Finance used the proceeds of the sale of the Ruby Note[14] to purchase from LBIE $20 million in bonds issued by General Electric Corporation, which Ruby Finance transferred, along with $20 million in cash (such cash, together with the bonds issued by General Electric Corporation, the "Collateral"),[15] to a custodian bank based in London.[16] Ruby Finance granted a security interest in the Collateral to BNY Corporate Trustee Services Limited (the "Trustee") and to LBSF.[17] The security interest secured "payment of all sums due under . . . the Notes" and "performance of [Ruby Finance's] obligation (if any) under the Swap []."[18] The Trustee's security interest in the Collateral became enforceable upon the termination of the Swap,[19] and if demanded to do so by the noteholder, the Trustee was obligated to take possession of the Collateral, liquidate it, and distribute the proceeds in accordance with the applicable payment priority.[20]

### 3. *The Governing Documents*

The Ruby Transaction was governed by seven related documents (collectively, the "Transaction Documents"): (1) a base prospectus (the "Base Prospectus") governing the terms of the Dante Program;[21] (2) a principal trust deed (the "Principal Trust Deed") governing the terms of an initial transaction with Ruby Finance's predecessor-in-interest to the Ruby Transaction, Dante Finance Public Limited Company ("Dante");[22] (3) a deed of accession (the "Deed of Accession") governing Ruby Finance's accession to Dante's interest in the

---

[14] Jaffe Decl. Ex. C (Series Prospectus), at 97.
[15] Jaffe Decl. Ex. B (Supplemental Trust Deed), at 3.
[16] *Id.* at 2, 4.
[17] Jaffe Decl. Ex. D (Principal Trust Deed), at 6 § 5.1; Jaffe Decl. Ex. B (Supplemental Trust Deed), at §§ 5.1, 5.3.
[18] Jaffe Decl. Ex. D (Principal Trust Deed), at 6 § 5.2.
[19] *Id.* at 7 § 5.5.
[20] *Id.* at 9–11 § 6.
[21] Jaffe Decl. Ex. A (Base Prospectus).
[22] Jaffe Decl. Ex. D (Principal Trust Deed).

transaction;[23] (4) a supplemental trust deed (the "Supplemental Trust Deed") governing the specific terms of the Ruby Transaction;[24] (5) a series prospectus (the "Series Prospectus") governing the terms of the Ruby Note;[25] (6) an ISDA Master Agreement (the "ISDA Master Agreement") governing the basic terms of the Swap;[26] and (7) a Swap Confirmation (the "Swap Confirmation") governing more specific terms of the Swap as between LBSF and Ruby Finance.[27]

All of the relevant Transaction Documents include forum selection and choice of law clauses, which mandate that any dispute arising under the Ruby Transaction be heard in an English court and governed by English law.[28] The Series Prospectus provides for the Ruby Note to be registered on the Irish Stock Exchange.[29]

The Transaction Documents also govern how and when the Ruby Transaction can be terminated. Under the Transaction Documents, the bankruptcy or insolvency of LBSF or LBHI constitutes an "Event of Default," under which LBSF would be the defaulting party.[30] An Event of Default gives the non-defaulting party the right to call for an early termination of the Swap.[31] An early termination of the Swap automatically causes an early redemption of the Ruby Note.[32] In the event of an early termination, the Collateral is to be liquidated and the amount due to each

---

[23] Jaffe Decl. Ex. E (Deed of Accession).
[24] Jaffe Decl. Ex. B (Supplemental Trust Deed).
[25] Jaffe Decl. Ex. C (Series Prospectus).
[26] Jaffe Decl. Ex. H (ISDA Master Agreement). *See also* Jaffe Decl. Ex. B (Supplemental Trust Deed), at 21 § 39(v).
[27] Jaffe Decl. Ex. F (Swap Confirmation). *See also* Jaffe Decl. Ex. B (Supplemental Trust Deed), at 21 § 39(v).
[28] Jaffe Decl. Ex. A (Base Prospectus), at 51–52 ¶16; Jaffe Decl. Ex. B (Supplemental Trust Deed), at 15 ¶¶15.1–15.2; Jaffe Decl. Ex. C (Series Prospectus), at 3.
[29] Jaffe Decl. Ex. C (Series Prospectus), at 30 § 49.
[30] *See* Jaffe Decl. Ex. H (ISDA Master Agreement), at § 5(a)(vii).
[31] *Id.* at § 6(a).
[32] Jaffe Decl. Ex. D (Principal Trust Deed), at 81, Condition 6(d)(ii).

party is to be distributed from the proceeds of the Collateral in accordance with the applicable payment priority waterfall.[33]

The payment priority waterfall at issue in the Transaction Documents is triggered upon a termination of the Swap.[34] In most cases of termination, the Trustee would be obligated to make distributions to satisfy LBSF's claims before satisfying any noteholder claims.[35] However, in the case of an early termination due to an LBSF default, the Transaction Documents provide that the Trustee is obligated to make distributions to satisfy noteholder claims before satisfying any LBSF claims ("Noteholder Priority").[36] Moreover, under the same circumstances that trigger Noteholder Priority, the amount due to each noteholder upon termination of the Ruby Note is the full amount of principal and interest on the Ruby Note, as opposed to the Ruby Note's *pro rata* share of the collateral proceeds to which each noteholder would otherwise be entitled.[37]

## B. The Sale to Shield

On June 30, 2008, NMR sold a portfolio of investments, including the Ruby Note, to Shield,[38] an investment holding vehicle formed in June 2008.[39] NMR and Shield memorialized the sale in an asset purchase agreement governed by English law.[40] Following the sale, Shield was the sole beneficial owner of the Ruby Note.[41] The admitted purpose of the sale was to take the Ruby Note off the "Rothschild" balance sheet.[42] Rothschild Bank International, Ltd. ("RBI"), another member of the Rothschild corporate family, held the Ruby Note, on behalf of

---

[33] *Id.* at 7–11 §§ 5.5, 5.6, 6.2.
[34] Jaffe Decl. Ex. B (Supplemental Trust Deed), at 7 § 5.5.
[35] *Id.*
[36] Jaffe Decl. Ex. D (Principal Trust Deed), at 11 § 6.2(iii); Jaffe Decl. Ex. B (Supplemental Trust Deed), at § 5.5.
[37] Jaffe Decl. Ex. C (Series Prospectus), at 28 § 43; Jaffe Decl. Ex. D (Principal Trust Deed), at 81, Condition 6(d)(ii).
[38] Enevoldson Decl. ¶ 11; Dahill Decl. Ex. E (Jan. 16, 2015 Yeates Dep.), at 8:7–10.
[39] Dahill Decl. Ex. E (Jan. 16, 2015 Yeates Dep.), at 8:7–25; Jaffe Decl. Ex. K (Certificate of Registration).
[40] Jaffe Decl. Ex. G (Asset Purchase Agreement).
[41] Dahill Decl. Ex. O, at Response to Interrogatory No. 3.
[42] Dahill Decl. Ex. E (Jan. 16, 2015 Yeates Dep.), at 13:14–22.

Shield,[43] and NMR continued to act as the asset manager for the Ruby Note.[44] RBI also financed Shield's purchase of the NMR portfolio of investments, lending Shield £120 million at an interest rate of "RBI Libor" plus 1% margin.[45] Shield asserts that the interest rate it received on the loan was comparable to that which would have been offered to third-party market participants.[46]

Apart from its investment in the Ruby Note, Shield has little, if any, connection to the United States. Shield is organized and headquartered in Guernsey.[47] It does not have offices, employees, or property in the United States, nor does it advertise for, conduct, or solicit business here.[48] It does not pay taxes in the United States, nor has it filed a tax return here.[49] Indeed, it has no employees at all,[50] and its four directors are employees of RBI.[51] Shield is a wholly-owned subsidiary of Shield Holdings, which is owned by Rothschild Continuation Holdings, itself an indirect subsidiary of Paris Orleans SCA.[52] Paris Orleans SCA is the ultimate parent of the Rothschild corporate family. Shield is located "across the road" from Rothschild's corporate finance business, and, as LBSF emphasizes, if mail were sent to the wrong address, it would "tend to find its way back" to Shield.[53]

---

[43] Dahill Decl. Ex. B (Termination Letter).

[44] Dahill Decl. Ex. M (Project Union), at SL_0001160.

[45] *Id.*

[46] Declaration of Philip Yeates in Further Support of Shield Securities Limited's Motion to Dismiss, Mar. 27, 2015, ECF No. 1066 (hereinafter, the "Yeates Decl.") ¶ 5.

[47] Declaration of David Gordon Oxburgh in Support of Shield Securities Limited's Motion to Dismiss, Oct. 15, 2014, ECF No. 847 (hereinafter, the "Oxburgh Decl.") ¶¶ 2–3; Dahill Decl. Ex. E (Jan. 16, 2015 Yeates Dep.), at 8:7–10.

[48] Oxburgh Decl. ¶¶ 4–6.

[49] *Id.* at ¶ 8.

[50] Dahill Decl. Ex. E (Jan. 16, 2015 Yeates Dep.), at 8:7–10.

[51] *Id.* at 9:22–23.

[52] Dahill Decl. Ex. E (Jan. 16, 2015 Yeates Dep.), at 8:18–25.

[53] *Id.* at 76:22–77:4.

**C.  Termination of the Swap Agreement and the Distribution**

On September 15, 2008, LBHI commenced a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  LBSF did the same on October 3, 2008 (the "LBSF Petition Date").[54]  Each bankruptcy filing constituted an Event of Default under the Transaction Documents,[55] permitting Shield to terminate the Swap.[56]

In October 2008, RBI, acting on behalf of Shield, executed and delivered two letters to the Trustee.  First, it sent a letter providing an indemnity (the "Indemnity") to the Trustee for any liability the Trustee might incur in connection with the Trustee's compliance with any requests from Shield in relation to the Ruby Transaction.[57]  According to Shield, the Trustee "would not act without an indemnity."[58]  Second, it delivered a letter directing the Trustee to terminate the Swap, redeem the Ruby Note, liquidate the Collateral, and distribute the proceeds in accordance with Noteholder Priority.[59]  Shortly after Shield sent the two letters to the Trustee, Ruby Finance sent a letter to LBSF citing LBHI's bankruptcy filing as an Event of Default and designating October 20, 2008 as the "Early Termination Date" with respect to the Swap.[60]

Before the Trustee followed Shield's direction to liquidate the Collateral and make a distribution to Shield, LBSF and Shield communicated.  First, on April 20, 2009, Andrew Weber at LBIE sent an e-mail message, on behalf of LBSF, to Leigh Enevoldson at Shield acknowledging the early termination and the application of Noteholder Priority, stating that

---

[54] Between October 14 and 29, 2009, three members of the Rothschild corporate family, including RBI and NMR, filed proofs of claim against LBHI.  *See* Declaration of William F. Dahill Supplementing the Record for LBSF's Opposition to Shield Securities Limited's Motion to Dismiss for Lack of Personal Jurisdiction, May 6, 2015, ECF No. 1096 (hereinafter, the "Dahill Supp. Decl."), Exs. C, D, E.

[55] Jaffe Decl. Ex. H (ISDA Master Agreement), at § 5(a)(vii).

[56] *Id.* at § 6(a).

[57] Dahill Decl. Ex. A (Trustee Indemnification Letter).

[58] Dahill Decl. Ex. E (Jan. 16, 2015 Yeates Dep.), at 23:24.

[59] Dahill Decl. Ex. B (Termination Letter).

[60] Jaffe Decl. Ex. I (Designation of Early Termination Date).

LBSF would object neither to a liquidation of the Collateral nor to a distribution of the proceeds thereof; Mr. Weber's email also reserved LBSF's rights.[61]  On May 5, 2009, LBSF clarified its reservation of rights by letter to the Trustee,[62] which the Trustee provided to Shield on May 8, 2009.[63]

On the same day, the Trustee set the final wheels of the distribution (the "Distribution") in motion and designated May 8, 2009 as the Early Redemption Date for the Ruby Note.[64]  Also on May 8, in accordance with the October 2008 agreement reached in the Indemnity,[65] Shield and RBI cash collateralized the Indemnity.[66]  RBI and Shield explicitly acknowledged the possibility that LBSF could bring claims that would be covered by the Indemnity.[67]  The Indemnity further provided that the Trustee could request additional cash to be held until certain termination events occurred, including confirmation in writing from LBHI and LBSF that they would not pursue legal action against the Trustee in respect of the Ruby Note.[68]  On May 12, 2009, the Trustee liquidated the Collateral, applied Noteholder Priority to the proceeds, and transferred approximately $41 million to Shield.[69]

**D. Procedural History**

This adversary proceeding was commenced on September 14, 2010 [ECF No. 1].  LBSF filed an amended complaint (the "First Amended Complaint") on October 1, 2010 [ECF No. 8]. Shield was served with the First Amended Complaint in accordance with Rule 7004 of the

---

[61] Declaration of Shannon M. Leitner in Further Support of Shield Securities Limited's Motion to Dismiss for Lack of Personal Jurisdiction, Mar. 27, 2015, ECF No. 1067 (hereinafter, the "Leitner Decl."), Ex. A.

[62] Dahill Dec. Ex. N (Letter).

[63] LBSF's Memorandum of Law in Opposition to Shield Securities Limited's Motion to Dismiss for Lack of Personal Jurisdiction, Mar. 6, 2015, ECF No. 1057 (hereinafter, the "LBSF Opp.") ¶ 20.

[64] Jaffe Decl. Ex. J (Default Notice), at LBHI_SPV_0023859.

[65] Dahill Decl. Ex. A (Trustee Indemnification Letter), at ¶ 3.2.

[66] Dahill Decl. Ex. C (Indemnity).

[67] *Id.*

[68] *Id.* at § 6(a)(iii).

[69] Dahill Decl. Ex. O, at Response to Interrogatory Nos. 1 and 2.

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") on March 7, 2011 [ECF No. 184]. Shield does not dispute the propriety of service of process. On July 23, 2012, LBSF filed a second amended complaint [ECF No. 303], and on September 15, 2014, LBSF filed a third amended complaint [ECF No. 831].

Beginning on October 20, 2010, litigation in this action was stayed by a series of orders [Case No. 08-13555, ECF Nos. 12199, 17763, 24198, 29506, 33970, 34697, 38806, 42081]. On January 31, 2014, this Court entered a bridge order (the "Bridge Order") extending the litigation stay until the later of May 20, 2014 or thirty days after the date on which the Court entered a scheduling order governing this adversary proceeding [Case No. 08-13555, ECF No. 42417]. On July 14, 2014, this Court entered such a scheduling order, which, among other things, permitted defendants to submit letter requests seeking the Court's permission to raise individualized defenses [ECF No. 794].

Shield submitted such a letter request on August 1, 2014, seeking to file a motion to dismiss for lack of personal jurisdiction [ECF No. 803]. LBSF filed a letter opposing Shield's request [ECF No. 811]. On October 6, 2014, this Court granted Shield's request and permitted limited jurisdictional discovery [ECF No. 837]. Shield filed its motion to dismiss on October 15, 2014 [ECF Nos. 845, 851] and declarations in support thereof [ECF Nos. 846, 847, 848, 849, 850]. Shield and LBSF agreed to briefing and discovery schedules on November 3, 2014 [ECF No. 876]. After completing jurisdictional discovery, LBSF filed its opposition to Shield's motion to dismiss on March 6, 2015 [ECF No. 1057] and a declaration in support thereof [ECF No. 1058]. On March 27, 2015, Shield filed its reply [ECF No. 1065] and supplemental declarations in support thereof [ECF Nos. 1066, 1067].

The parties scheduled oral argument for May 8, 2015.  On May 7, 2015, LBSF filed a
motion seeking leave to file a sur-reply, to which it attached its proposed sur-reply [ECF
No. 1097].  In the early hours of the morning of May 8, Shield filed an opposition to LBSF's
motion for leave to file a sur-reply [ECF No. 1099].  The same day, the Court heard oral
argument from both parties on whether to consider LBSF's late-filed sur-reply and on whether to
grant Shield's motion to dismiss.  After oral argument, the parties exchanged further letters to the
Court [ECF Nos. 1107, 1114, 1122], which the Court has also reviewed and considered.

## STANDARD OF REVIEW

Rule 12(b)(2) of the Federal Rules of Civil Procedure, incorporated into Rule 7012(b) of
the Bankruptcy Rules, provides that a case may be dismissed for lack of personal jurisdiction.
*See* Fed. R. Bankr. P. 7012(b).  To survive a Rule 12(b)(2) motion, the plaintiff bears the burden
to make a *prima facie* showing that jurisdiction exists.  *See O'Neill v. Asat Trust Reg. (In re
Terrorist Attacks on September 11, 2001)*, 714 F.3d 659, 673 (2d Cir. 2013) (citing *Penguin Grp.
(USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)).  The plaintiff's *prima facie* showing
must include an averment of facts, which, if credited, would suffice to establish jurisdiction over
the defendant.  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)
(citing *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir. 1994)) (internal
quotation marks omitted).  However, "[w]hen a defendant rebuts plaintiffs' unsupported
allegations with direct, highly specific testimonial evidence regarding a fact essential to
jurisdiction – and plaintiffs do not counter that evidence – the allegation may be deemed
refuted."  *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, No. 1:00-1898, MDL
No. 1358, 2014 WL 1778984, at *1 (S.D.N.Y. May 5, 2014).

## DISCUSSION

Before addressing the merits of Shield's motion to dismiss, the Court must address whether to grant LBSF's motion for leave to file its sur-reply. "[C]ourts have broad discretion to consider arguments in a sur-reply, particularly when new arguments are put forth in a reply brief." *Grocery Haulers, Inc. v. C&S Wholesale Grocers, Inc.*, No. 11 Civ. 3130, 2012 WL 4049955, at *6 (S.D.N.Y. Sept. 14, 2012) (granting leave to file sur-reply). The Court declines to exercise such discretion here.

LBSF sets forth two arguments to convince Court to consider the arguments raised in its sur-reply. First, LBSF contends that Shield's submission of the Declaration of Philip Yeates [ECF No. 1066] in connection with Shield's reply included information beyond that which Shield provided prior to the close of jurisdictional discovery. Second, LBSF alleges that Shield did not produce certain requested information and materials during jurisdictional discovery that LBSF seeks to use in support of its arguments in favor of asserting jurisdiction and that LBSF includes in its sur-reply. Shield counters that LBSF's motion for leave to file its sur-reply is untimely because LBSF's six-week delay between receiving Shield's reply and making its motion to file a sur-reply was too long.

While the Court appreciates LBSF counsel's candor in explaining the delay,[70] the Court agrees with Shield that six weeks is too long to wait to request leave to file a sur-reply in this instance. LBSF's delay is not only unjustified, it is also prejudicial to Shield, which scrambled to submit a response within twelve hours of receiving LBSF's motion and eight hours prior to the start of the hearing to which it related. *See Clarex Ltd. v. Natixis Securities Americas LLC*, 988

---

[70] *See* Tr. of Oral Argument at 5:24–6:3, ECF No. 1100 (hereinafter, the "H'rg Tr.").

F. Supp. 2d 381, 384 (S.D.N.Y. 2013) (finding that delay of more than a month to submit letter regarding "new" issue was unacceptable).

Accordingly, LBSF's motion for leave to file a sur-reply is denied.  On the basis of Shield's motion to dismiss, LBSF's response, Shield's reply, oral argument, and the parties' letters to the Court, the Court will consider the parties' *in personam* and *in rem* arguments in turn.

## A.  *In Personam* **Jurisdiction**

Rule 7004(d) of the Bankruptcy Rules permits nationwide service of process.  *See* Fed. R. Bankr. P. 7004(d).  A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States."  Fed. R. Bankr. P. 7004(f).  Because valid service of process under Rule 7004(d) "is sufficient to establish personal jurisdiction, state long-arm statutes are inapplicable, and the only remaining inquiry for a bankruptcy court is whether exercising personal jurisdiction over the defendant would be consistent with the Due Process Clause of the Fifth Amendment."  *Bickerton v. Bozel S.A. (In re Bozel S.A.)*, 434 B.R. 86, 97 (Bankr. S.D.N.Y. 2010) (citing *In re Enron Corp.,* 316 B.R. 434, 440, 444–45 (Bankr. S.D.N.Y. 2004)).  The "forum state" is the United States as a whole, and "a court should consider the defendant's contacts throughout the United States."  *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 527 (S.D.N.Y. 2008).

### 1.  Specific *In Personam* Jurisdiction

A court must consider two related inquiries to determine whether a defendant is subject to specific personal jurisdiction: whether the defendant has sufficient "minimum contacts" with the

forum state and whether the exercise of jurisdiction over that defendant would be reasonable. *See Metro. Life*, 84 F.3d at 567.

Shield argues that it does not have minimum contacts with the United States and that, therefore, the exercise of jurisdiction over it would not comport with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In Shield's view, the transaction at issue was "purposefully organized . . . to really have its economic center of gravity in England."[71] *See Official Comm. of Unsecured Creditors v. Transpacific Corp. Ltd. (In re Commodore Int'l, Ltd.)*, 242 B.R. 243, 250 (Bankr. S.D.N.Y. 1999) ("TPC maintains that we lack specific jurisdiction over it because . . . the economic center of gravity of the loan and security transactions upon which the Committee's claims are predicated was in the Bahamas."). The Ruby Transaction, says Shield, involved LBIE, an English entity, approaching NMR, also an English entity, to enter into a transaction governed by English and Irish law, with collateral held by an English trustee. All of the negotiations and discussions leading to Shield's ownership of the Ruby Note occurred in the United Kingdom among English and Irish counterparties under English and Irish law. When the transaction was terminated, the proceeds of the Collateral were distributed from an English bank account. Aside from its attenuated connection to LBSF through the Ruby Transaction, Shield argues that it has no other connection to the United States.

LBSF submits that Shield's limited contact with the United States is merely a product of its status as an investment holding vehicle.[72] To LBSF, Shield is a "piece of paper in a file somewhere that holds assets" and "to say that Shield is immune from jurisdiction because it has

---

[71] H'rg Tr. 57:11–13
[72] LBSF does not argue that the Court has general jurisdiction over Shield, *see* H'rg Tr. 37:2–15, so the Court will not address the question.

no contacts is to elevate form over substance."[73]    LBSF argues that Shield's purposeful act of terminating the Swap had foreseeable effects in the United States, and that act was sufficient to establish Shield's minimum contacts with the United States.  *See, e.g.*, *Calder v. Jones*, 465 U.S. 783 (1984).  Moreover, LBSF alleges that Shield's post-petition termination of the Swap violated the automatic stay, which, in LBSF's view, provides additional support for the exercise of jurisdiction.  Finally, LBSF contends that the Court need not engage in the minimum contacts analysis because the Court need only look to the New York long-arm statute to find jurisdiction over Shield.

    a.   The Doctrine of Specific *In Personam* Personal Jurisdiction

To establish specific *in personam* jurisdiction, the defendant's "suit-related conduct" must create the necessary connection to the forum state.  *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014).  The defendant's connection to the forum must arise out of contacts the "defendant *himself* creates," and those contacts must be between the defendant and "the forum [s]tate itself, not . . . persons who reside there."  *Id.* at 1122 (emphasis in original).  To show minimum contacts with the United States, the plaintiff must demonstrate that the defendant "purposefully availed" itself of the privilege of doing business in the forum and "could foresee being haled into court there."  *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002).  However, the foreseeability of causing harm in the forum state, without more, is not enough to establish minimum contacts.  *See Walden*, 134 S. Ct. at 1125.  This is to ensure "that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the unilateral activity of another party or a third person."  *Burger*

---

[73] H'rg Tr. 36:1–7.

*King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770 (1984)).

Even if a court finds that the defendant has the requisite minimum contacts, it can refuse to exercise jurisdiction if the exercise of jurisdiction would not be reasonable. *MTBE*, 2014 WL 1778984, at *2. The reasonableness inquiry "asks whether it is reasonable under the circumstances of the particular case to assert personal jurisdiction." *Amaranth*, 587 F. Supp. 2d at 527.

b.    No Specific *In Personam* Jurisdiction over Shield

Shield relies on *Walden v. Fiore*, 134 S. Ct. 1115 (2014) to support its position that it was not subject to this Court's jurisdiction. As in *Walden*, Shield argues, Shield's only connection to the United States is LBSF's fortuitous presence there. LBSF, on the other hand, relies on *Calder v. Jones*, 465 U.S. 783 (1984) to demonstrate that Shield is subject to this Court's jurisdiction. As in *Calder*, LBSF contends, Shield's termination of the Swap was conduct "purposefully" directed at the United States and Shield knew that its conduct would have effects here. Although the facts present here do not squarely fit within the contours of either *Walden* or *Calder*, Shield has the better argument on this point, for the reasons that follow.

*Walden* concerned a *Bivens* action brought in Nevada against a DEA agent who detained two Nevada residents on their way through the Atlanta airport from San Juan. The Supreme Court refused to permit the exercise of jurisdiction over the DEA agent based on his "random, fortuitous, or attenuated contacts" with persons affiliated with the forum state. *Walden*, 134 S. Ct. at 1123 (quoting *Burger King*, 471 U.S. at 475) (internal quotation marks omitted). The agent's actions in Georgia did not create sufficient minimum contacts with Nevada, even though the agent knew of the plaintiffs' Nevada connections. Moreover, the Supreme Court expressly

17

disavowed the lower court's analysis that the DEA agent's knowledge of the plaintiffs' connection to Nevada and the foreseeability that the harm would be felt there were sufficient to establish minimum contacts. *See id.* at 1124.

In *Calder*, the defendants' contact with California, the forum state, was the act of publishing an allegedly libelous article about a California resident in a magazine with circulation in California. The Supreme Court found that the various contacts the defendants had with California, including the magazine's circulation in that state and the defendants' intentional and tortious conduct directed at the forum, supported a finding that the defendants "must 'reasonably anticipate being haled into court [in California]' to answer for the truth of the statements made in their article." *Calder*, 465 U.S. at 790 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)) (alteration in original).

LBSF contends that the foreseeability of the injury being felt in the forum state was critical to the holding in *Calder*. However, both *Walden* and *Calder* make clear that the minimum contacts analysis requires more. *See Walden*, 134 S. Ct. at 1123 ("[In *Calder*,] we examined the various contacts the defendants had created with California (and not just with the plaintiff) by writing the allegedly libelous story."). The *Calder* defendants directed intentional and tortious conduct at the forum state, did most of their research for the article in the forum state, and were aware that the harm would be felt in the forum state. *See Calder*, 465 U.S. at 788–90 ("[T]hey knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the *National Enquirer* has its largest circulation.").

Here, LBSF alleges no facts to suggest that Shield's connection to the forum state was more substantial than that of the DEA agent in *Walden*. LBSF's allegations of Shield's connection to the United States are limited to Shield's knowledge that LBSF was domiciled in

the United States and Shield's ability to foresee that the harm caused by the Distribution would be felt in the United States. LBSF concedes that, at the time of the Distribution, Shield was organized and headquartered outside of the United States; had no offices, employees, or property in the United States; was not registered to, and did not, conduct business in the United States; and did not advertise or otherwise solicit business in the United States.[74] The facts alleged show that Shield's only active connection to the United States was its indirect relationship, as a creditor of the Irish entity Ruby Finance, to LBSF, a counterparty chosen not by Shield or NMR, but by LBIE. *See Amaranth*, 587 F. Supp. 2d at 536–37 (finding no personal jurisdiction where defendants' only contact with forum was through investment in foreign hedge fund).

Nor did Shield "purposefully avail" itself of the "benefits and protections of the [United States'] laws." *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) (internal quotation marks omitted). None of Shield's rights with respect to the Ruby Transaction was affected, much less enhanced, by LBSF's status as a United States domiciliary. Even the Transaction Documents' Event of Default provisions were indifferent to the domicile of the Swap counterparty and its guarantor. Those provisions were tripped by any insolvency, not just a United States bankruptcy.[75] Nor were the Noteholder Priority or early termination provisions impacted by domicile. It was, in fact, "entirely irrelevant whether the Swap Counter Party in the Ruby Transaction was LBSF or [LBIE]."[76]

---

[74] *See* Oxburgh Decl. ¶¶ 4–8. *See Amaranth*, 587 F. Supp. 2d at 537 ("Within the United States, the defendant has never commenced any suit, registered an office, been qualified or licensed to do business, paid or been required to pay taxes, employed any officers or agents, leased or purchased any property, acquired a telephone number, or engaged in any other activity reasonably expected of a business venture under the protection and permission of domestic laws.").

[75] *See* Jaffe Decl. Ex. H (ISDA Master Agreement), at § 5(a)(vii) (Event of Default occurs upon instituting "a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights.").

[76] Enevoldson Decl. ¶ 8.

LBSF argues emphatically that Shield knew that the Distribution would later be challenged by LBSF and thus could foresee being haled into court in the United States. LBSF points to the Indemnity and LBSF's reservation of rights letter to show that Shield knew it would be subject to suit here. Shield responds that it had no idea that the Distribution would be the subject of future dispute because Andrew Weber's email stated that "LBSF [did] not object" to the Distribution. In spite of the parties' repeated emphasis on these facts, Shield's May 2009 belief as to the likelihood of a dispute over the Distribution is of no moment. As explained above, the foreseeability of harm being felt in the forum state and, relatedly, of being haled into court in the forum state is not sufficient to meet the minimum contacts test. *See Walden*, 134 S. Ct. at 1125 ("Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections."). Moreover, even if in May 2009 Shield foresaw this very dispute over the Distribution, foreseeing a dispute is not the same as foreseeing being haled into court in the forum.[77]

LBSF also argues that minimum contacts are met here because this case involves actions that allegedly violated the automatic stay. LBSF alleges that "the funds paid to Shield were still encumbered by LBSF's senior security interest, which constituted property of the estate, over which Shield exercised possession and control in violation of [the automatic stay]."[78] LBSF asserts that a party's alleged violation of the automatic stay itself confers personal jurisdiction

---

[77] LBSF also urges reliance on *Amoco Chemical Co. v. Tex. Tin. Corp.*, 925 F. Supp. 1192 (S.D. Tex. 1996) (finding sufficient minimum contacts where defendant received fraudulent transfer outside forum with knowledge of harm occurring in forum) and *Schwinn Plan Comm. v. AFS Cycle & Co. Ltd. (In re Schwinn Bicycle Co.)*, 192 B.R. 461, 473 (Bankr. N.D. Ill. 1996) (finding sufficient minimum contacts where defendant entered ongoing commercial relationship with debtor). *Schwinn* is distinguishable on its facts, and both cases came before *Walden*, which, as noted above, unequivocally clarifies that the foreseeability of the injury being felt in the forum state is insufficient to establish minimum contacts.

[78] LBSF Opp. ¶ 5.

over the party, relying on *LaMonica v. N. of Eng. Protecting and Indem. Ass'n Ltd. (In re Probulk)*, 407 B.R. 56 (Bankr. S.D.N.Y. 2009) and *In re Chiles Power Supply Co. Inc.*, 264 B.R. 533 (Bankr. W.D. Mo. 2001). *Probulk* and *Chiles* do not support LBSF's position, however, because they are both fundamentally concerned with a bankruptcy court's jurisdiction over property of the bankruptcy estate; the automatic stay is simply the means through which to protect that property and implement the policy goals of the Bankruptcy Code. Indeed, *Probulk* and *Chiles* fall more readily into the *in rem* line of bankruptcy jurisdiction cases, which hold, as discussed in further detail below, that a court cannot enforce an *in rem* judgment against a foreign defendant unless the foreign defendant has the requisite minimum contacts with the United States. *See Hong Kong & Shanghai Banking Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 996 (9th Cir. 1998), *cert. denied*, 525 U.S. 1141 (1999); 1 COLLIER ON BANKRUPTCY ¶ 3.01[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Consistent with the *in rem* line of cases, the courts in *Probulk* and *Chiles* engaged in and relied upon a minimum contacts analysis to find personal jurisdiction over the defendant. *See Probulk*, 407 B.R. at 64 ("[T]he Trustee has shown a substantial course of business between the parties and a substantial effect within the United States."); *Chiles*, 264 B.R. at 543–44 ("In order for this Court to exercise personal jurisdiction over the Defendants, I must find that they had minimum contacts with the United States."). Similarly, in order for this Court to exercise *in personam* jurisdiction over Shield, it must find that Shield has the requisite minimum contacts with the United States.

Moreover, LBSF's automatic stay arguments assume its desired conclusion of this adversary proceeding: that Noteholder Priority is an *ipso facto* clause and invoking it violated the automatic stay. This Court cannot rest its finding of jurisdiction over the defendant on the very subject of the dispute. *See Electra Aviation, Inc. v. European Org. for the Safety of Air*

*Navigation* (*In re EAL (Delaware) Corp.*), No. 93-578-SLR, 1994 WL 828320, at *16 (D. Del. Aug. 3, 1994) ("Because the question of whether the automatic stay was violated is the underlying dispute in the case, the alleged violation cannot constitute the basis for the personal jurisdiction.").

Finally, LBSF argues that the Court need not even engage in the minimum contacts inquiry because Shield is subject to the Court's jurisdiction under the New York long-arm statute, N.Y. C.P.L.R. § 302, and because the long-arm statute "does not reach as far as the Constitution permits, due process will be satisfied if the New York long-arm statute is satisfied." *Picard v. Chais (In re BLMIS)*, 440 B.R. 274, 280 (Bankr. S.D.N.Y. 2010). Shield counters that LBSF's long-arm argument "turns the personal jurisdiction analysis on its head,"[79] and alternatively points the Court to *Ehrenfeld v. Bin Mahfouz*, 881 N.E.2d 830 (N.Y. 2007) and *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) to show that the New York long-arm statute is not satisfied.[80]

The parties veer off-course with these arguments. Shield's citations to *Ehrenfeld* and *Marvel* are highly instructive as to the reach of the New York long-arm statute, but they are instructive *only* as to the reach of the New York long-arm statute, not as to the requirements of constitutional due process. New York courts are "guided . . . by U.S. Supreme Court opinions delineating proper bases for personal jurisdiction under the Federal Due Process Clause," *Ehrenfeld*, 9 N.Y.3d at 508, but as Shield itself suggests, that analysis is of no precedential value when considering whether the exercise of personal jurisdiction over a foreign defendant is consistent with constitutional due process in federal court. Under Rule 7004(f) of the

---

[79] Memorandum of Law in Further Support of Shield Securities Limited's Motion to Dismiss for Lack of Personal Jurisdiction, Mar. 27, 2015, ECF No. 1065 (hereinafter, the "Shield Reply"), at 9.
[80] *See* H'rg Tr. at 22:2–22.

Bankruptcy Rules, this Court is guided by cases defining the constitutional reach of a federal court's jurisdiction, rather than New York cases defining the reach of the New York long-arm statute. *See In re Bozel S.A.*, 434 B.R. 86, 97 (Bankr. S.D.N.Y. 2010).

Moreover, even if the long-arm statute applied, the Court's jurisdiction over Shield would depend both on whether Shield's contacts with the United States satisfied the constitutional standard and on whether those contacts satisfied the New York long-arm statute. *See, e.g.*, *J.L.B. Equities, Inc. v. Ocwen Financial Corp.*, 131 F. Supp. 2d 544, 547 (S.D.N.Y. 2001). Thus, even if Shield can be reached under the New York long-arm statute, that conclusion would not invalidate the minimum contacts analysis performed above, nor would it eliminate this Court's obligation to engage in it.

Having engaged in the required minimum contacts analysis, it is clear that Shield's contacts with the United States are too limited to support the assertion of *in personam* jurisdiction over Shield, and none of LBSF's arguments to the contrary convinces this Court otherwise. As this Court finds that Shield does not have the requisite minimum contacts with the United States, the Court need not reach the analysis of whether the exercise of *in personam* jurisdiction would be reasonable. *See Amaranth*, 587 F. Supp. 2d at 527.

2. <u>Derivative "Mere Department" Theory of Jurisdiction</u>

LBSF argues that even if the Court cannot find *in personam* jurisdiction over Shield *qua* Shield, Shield's relationship with the Rothschild corporate family is sufficient to establish the Court's jurisdiction under the theory that Shield is a "mere department" of Rothschild.[81] Shield maintains that it and its parents and affiliates sufficiently observed corporate formalities such that it cannot be considered a "mere department" of Rothschild. It argues, moreover, that LBSF

---

[81] For ease of discussion and for purposes of faithfully describing LBSF's argument, the Rothschild corporate family will be referred to in this section simply as "Rothschild."

does not specify *which* Rothschild entity it believes Shield to be a department of, reflecting an inappropriate disregard for corporate distinctness within Rothschild.

    a.   The "Mere Department" Doctrine

A court may exercise jurisdiction over a defendant not otherwise subject to the court's jurisdiction where the defendant is a "mere department" of an entity over which the court has personal jurisdiction. *See GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009). The question under the mere department analysis is "whether the allegedly controlled entity was a shell for the allegedly controlling party," *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 475 F. Supp. 2d 456, 458 (S.D.N.Y. 2007) (internal quotation marks omitted); it is not necessary that the entity was used to commit fraud, a showing normally required to pierce the corporate veil under U.S. law. *See GEM*, 667 F. Supp. 2d at 319. To determine whether a party is a mere department of a controlling entity, courts consider four factors set forth by the Second Circuit in *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120–22 (2d Cir. 1984):

    (1)      Whether there exists common ownership and the presence of an interlocking directorate and executive staff,

    (2)      The degree of financial dependency of the subsidiary on the parent,

    (3)      The degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities, and

    (4)      The degree of the parent's control of the subsidiary's marketing and operational policies.

*Id.*; *see also GEM*, 667 F. Supp. 2d at 319. A court may assert jurisdiction where there is a subsidiary amenable to jurisdiction that is a mere department of the parent-defendant, *see Storm LLC v. Telenor Mobile Commc'ns AS*, No. 06 Civ. 13157, 2006 WL 3735657, at *13 (S.D.N.Y. Dec. 15, 2006), or where there is a subsidiary-defendant that is a "mere department" of a parent amenable to jurisdiction, *see Int'l Equity Invs.*, 475 F. Supp. 2d at 458.

b.  No Derivative Jurisdiction over Shield

Even before engaging in an analysis of the *Beech* factors, the Court concludes that LBSF's derivative jurisdiction theory fails because LBSF has not established that this Court has jurisdiction over any of the relevant Rothschild entities – NMR, RBI, or Paris Orleans SCA.  The only facts alleged to support jurisdiction over the Rothschild entities are the presence of some offices in the United States and generalized allegations that "Rothschild . . . derive[s] substantial revenue from international commerce."[82]  There is no allegation, however, that the revenue or the offices are in any way related to the transaction at issue in this case, a necessary element for a finding of specific personal jurisdiction.  *See J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780, 2799 (2011) ("[S]pecific jurisdiction [is justified] in a suit arising out of or related to the defendant's contacts with the forum.").[83]  Nor does LBSF assert a theory of general jurisdiction.[84]  Thus, even assuming that Shield's relationship with Rothschild satisfies the *Beech* factors, this Court cannot assert jurisdiction based on the mere department theory.

Moreover, LBSF's argument does not specify the Rothschild entity of which Shield should be deemed a mere department.  The mere invocation of "Rothschild" does not suffice to support LBSF's alleged derivative basis for jurisdiction.  Indeed, Rothschild's use of a common

---

[82] LBSF Opp. at ¶¶ 12–13, 41.

[83] Although not considered by the Court, *see supra* at pp. 12–13, the arguments in LBSF's unauthorized sur-reply are also unconvincing as to the Court's personal jurisdiction over any Rothschild entity.  LBSF argues that because NMR and RBI filed proofs of claim in the LBHI bankruptcy case, Rothschild should be deemed to have submitted to the personal jurisdiction of this Court for the purposes of this adversary proceeding.  *See Glinka v. Abraham & Rose Co. Ltd.*, 199 B.R. 484, 496 (D. Vt. 1996).  However, a proof of claim against LBHI in its bankruptcy case does not suffice as an all-purpose submission to jurisdiction for suits brought by procedurally consolidated but substantively distinct debtors.  *See, e.g., Andros Compania Maritima, S.A. v. Intertanker Ltd.*, 718 F. Supp. 1215, 1217–18 (S.D.N.Y. 1989) (noting that defendant's personal jurisdiction waiver in one case does not suffice to waive its personal jurisdiction defense in another, related case).  *See also Evergreen Systems, Inc. v. Geotech Lizenz AG*, 697 F. Supp. 1254, 1257 (E.D.N.Y. 1987) (noting that N.Y. C.P.L.R. § 303 provides a basis for waiver of personal jurisdiction defense in related cases but only if the plaintiff in the related case is a party to both cases).  Thus, by filing proofs of claim against LBHI, neither RBI nor NMR submitted to this Court's jurisdiction for purposes of an avoidance action brought by LBSF.

[84] *See* H'rg Tr. 37:2–15.

25

trade name or references to itself as a collective entity "cannot create a single entity structure given the sophistication and complexity of today's corporate world." *Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189, 193 (S.D.N.Y. 2000); *see also Ocwen*, 131 F. Supp. 2d at 550.

Even if this Court could assert jurisdiction over Rothschild (or any entity thereof), Shield's relationship to Rothschild does not satisfy any of the *Beech* factors but the first. The first *Beech* factor – common ownership – is easily met. Shield's parent, Shield Holdings, its indirect parent, Rothschild Continuation Holdings, and its affiliates RBI and NMR are all commonly owned by Paris Orleans SCA.

The second *Beech* factor – financial dependency – is not met. This factor is satisfied only if the subsidiary "cannot run its business without the financial backing of its parent." *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 403, 410 (S.D.N.Y. 2002). In LBSF's view, Shield could not have purchased the Ruby Note or received the Distribution but for the loan provided by RBI for the purchase of the Ruby Note and the Indemnity provided by RBI to the Trustee. While the Indemnity provides some evidence of financial dependency, the loan does not. Even under LBSF's formulation of the facts, the loan provided by RBI appears to be a well-documented loan to Shield at a market interest rate. The deposition testimony of NMR's Philip Yeates specifically refutes LBSF's contention that this was not an arm's-length, market-rate transaction.[85] LBSF has not made a *prima facie* case for financial dependency.

The third *Beech* factor – failure to observe corporate formalities – is clearly not met. In support of this factor, LBSF points to the facts that Shield has no employees and that its location "across the road" from Rothschild's corporate finance business meant that mail would "tend to

---

[85] Mr. Yeates, the co-head of Debt Fund Management at NMR, asserts that "Shield did not get a discount on the interest rate that RBI could charge a third-party market participant." Yeates Decl. ¶ 5.

find its way back" to Shield.[86]    Such evidence is too thin to support a finding that corporate formalities were not observed.   The evidence put forth by Shield and unrefuted by LBSF, including the loan from RBI to Shield and the documented sale of the Ruby Note from NMR to Shield, suggests more strongly that corporate formalities were indeed observed.

LBSF also fails to make a *prima facie* case for the fourth *Beech* factor – control over marketing and operational policies.   The only evidence presented by LBSF is that Shield's directors are all employees of RBI.   Since Shield itself has no employees, all of its policies, LBSF argues, must be determined by Rothschild employees.   These conclusory arguments cannot support a finding that this factor has been satisfied.

3. No *In Personam* Jurisdiction over Shield

For all of the foregoing reasons, the Court finds that there is no basis for the exercise of personal jurisdiction over Shield and grants Shield's motion to dismiss as to *in personam* jurisdiction.

**B.  *In Rem* Jurisdiction**

Echoing its automatic stay arguments, LBSF also argues that this Court has *in rem* jurisdiction to resolve this dispute because "LBSF's senior security interest in the [Collateral], and its priority right to payment" are property of the LBSF estate.[87]   Shield responds that LBSF's *in rem* theory fails because the property is not property of the estate, the property is not physically situated in the forum, and Shield does not have minimum contacts with the forum in any event.

---

[86] Dahill Decl. Ex. E (Jan. 16, 2015 Yeates Dep.), at 76:22–77:4.
[87] LBSF Opp. ¶¶ 51–56.

1.   The Doctrine of *In Rem* Jurisdiction

The court in which a bankruptcy proceeding is pending has "exclusive jurisdiction of all the property, wherever located, of the debtor *as of the commencement of such case*, and of property of the estate."  28 U.S.C. § 1334(e) (emphasis supplied); *see also Sinatra v. Gucci (In re Gucci)*, 306 B.R. 679, 681 (S.D.N.Y. 2004).   Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), and includes "even strictly contingent interests,"  *Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In re Mid-Island Hosp., Inc.)*, 276 F.3d 123, 128 (2d Cir. 2002).  A debtor's security interest in collateral or a debtor's interest in an executory contract as of the commencement of the case comprises property of the estate.  *See Lehman Bros. Special Financing Inc. v. BNY Corp. Tr. Servs. Ltd.*, 422 B.R. 407, 411, 418 (Bankr. S.D.N.Y. 2010).  A contract is executory if "termination requires the non-debtor party to undertake some post-petition affirmative act."  *In re Margulis*, 323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005) (citations omitted).

The bankruptcy court's *in rem* jurisdiction is broad and reaches property wherever located.  *See* 28 U.S.C. § 1334(e).  In other contexts, a court may only exercise *in rem* jurisdiction over property physically within the court's jurisdiction at the time of the suit.  *See* 4A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 107 (3d ed.).  However, in the bankruptcy context, Congress explicitly gave bankruptcy courts global reach over the debtor's property via section 541(a) of the Bankruptcy Code and section 1334(e) of title 28 of the United States Code.  *See Hong Kong & Shanghai Banking Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 996 (9th Cir.1998), *cert. denied*, 525 U.S. 1141 (1999) ("Congress intended extraterritorial application of the Bankruptcy Code as it applies to property of the

estate."); *Gucci*, 309 B.R. at 683 (declaring that "[s]ection 1334(e) . . . embodies a Congressional determination that bankruptcy courts should determine rights in property of bankrupt estates regardless of where that property may be found"); *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) (exercising *in rem* jurisdiction to enforce automatic stay against foreign receiver related to foreign assets of foreign debtor).

Despite the bankruptcy court's broad reach to assert jurisdiction over foreign property, the bankruptcy court's *in rem* jurisdiction cannot be enforced extraterritorially without *in personam* jurisdiction over the defendant. *See Found. for Research v. Globo Communicacoes e Participacoes S.A. (In re Globo Comunicacoes e Partipacoes S.A.)*, 317 B.R. 235, 251–52 (S.D.N.Y. 2004). In other words, "the bankruptcy court is precluded from exercising control over property of the estate located in a foreign country without the assistance of the foreign courts." *In re Int'l Admin. Servs., Inc.*, 211 B.R. 88, 93 (Bankr. M.D. Fla. 1997)*.*

2. *In Rem* Jurisdiction Exists

This Court has *in rem* jurisdiction to resolve this adversary proceeding as it relates to Shield because, as of the LBSF Petition Date, LBSF had an undisputed security interest in the Collateral and a property interest in the Transaction Documents. Although neither party relies on Judge Peck's opinion in *Lehman Bros. Special Financing Inc. v. BNY Corporate Trustee Services Ltd.* ("*BNY*"), Judge Peck's findings with respect to LBSF's property interests in that adversary proceeding are directly on point here. In *BNY*, Judge Peck found that, as of the LBSF Petition Date, LBSF had "a valuable property interest" in the transaction documents at issue in that proceeding and that such transaction documents were property of the estate under section

541(a) of the Bankruptcy Code. *BNY*, 422 B.R. at 418. Judge Peck also found that LBSF had a security interest in the collateral at issue in that proceeding.[88] *See id.* at 411.

The circumstances in *BNY* are virtually identical to those here, including the timing of the termination, the reason for termination, the identity of the trustee, and the provisions of the transaction documents. The transaction documents at issue in *BNY*, just like those at issue here, were part of LBIE's Dante Program. In both cases, termination of the contracts required the non-debtor party to undertake some post-petition affirmative act. *See Margulis*, 323 B.R. at 135. As in *BNY*, it is undisputed that here, Shield, as the noteholder, had a right to terminate the Transaction Documents as of the LBSF Petition Date, but no steps were taken to exercise that right until after the LBSF Petition Date: Shield had not sent a termination notice, directed the liquidation of the collateral, made the necessary calculations, or received the distributions as of the LBSF Petition Date. It is also undisputed that, as of the LBSF Petition Date, the Collateral securing the Swap had not been sold and LBSF had a security interest in that Collateral.[89]

Consistent with *BNY*, the Court finds that the Transaction Documents and LBSF's security interest in the Collateral were property of the estate as of the LBSF Petition Date and are subject to this Court's *in rem* jurisdiction. Shield's arguments against the exercise of *in rem* jurisdiction are inapposite – the property at issue is indeed property of the estate, that property need not be physically situated in the United States, and Shield need not have minimum contacts with the United States for this Court to exercise *in rem* jurisdiction over the property at issue. Accordingly, because LBSF had a property interest in the Transaction Documents and the

---

[88] The Supreme Court of the United Kingdom came to a similar conclusion in the so-called Perpetual Litigation. Although that court held that Noteholder Priority did not violate the "anti-deprivation principle" under English law, it nonetheless recognized that, as of the LBSF Petition Date, LBSF had an interest in the collateral securing the swap agreement at issue in that proceeding. *See Belmont Park Invs. PTY Ltd. v. BNY Corp. Tr. Servs. Ltd.*, [2011] UKSC 38 [53].
[89] Jaffe Decl. Ex. D (Principal Trust Deed), at 6 § 5.1; Jaffe Decl. Ex. B (Supplemental Trust Deed), at §§ 5.1, 5.3.

Collateral as of the commencement of the LBSF case, this Court can and shall exercise its *in rem* jurisdiction over that property in LBSF's dispute with Shield.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Shield's motion to dismiss for lack of personal jurisdiction is granted.  Notwithstanding the Court's lack of personal jurisdiction over Shield, the Court has *in rem* jurisdiction and concomitant adjudicatory authority over the property at issue in this dispute and shall exercise such jurisdiction.  The parties are directed to settle an order consistent with this decision.

Dated: August 24, 2015
New York, New York

/s/ Shelley C. Chapman
UNITED STATES BANKRUPTCY JUDGE