WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
Paul R. DeFilippo
William A. Maher
William F. Dahill
James N. Lawlor
Adam M. Bialek

Counsel for Plaintiff Lehman
Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ———————————————————— X | | Chapter 11 |
| In re: | : | |
| | | Case No. 08-13555 (SCC) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | : | |
| Debtors. | : | |
| ———————————————————— X | | |
| LEHMAN BROTHERS SPECIAL FINANCING INC. | : | |
| Plaintiff, | : | |
| − against − | : | Adversary Proceeding No.: 10-03547 (SCC) |
| BANK OF AMERICA NATIONAL ASSOCIATION, THE BANK OF NEW YORK MELLON NATIONAL ASSOCIATION, BNY MELLON CORPORATE TRUSTEE SERVICES LTD., CITIBANK, N.A., U.S. BANK NATIONAL ASSOCIATION, U.S. BANK TRUST NATIONAL ASSOCIATION, WELLS FARGO BANK NATIONAL ASSOCIATION, | : : : : : | |
| Trustee Defendants, | : | **FOURTH AMENDED** **COMPLAINT** |
| − and − | : | |
| 801 GRAND CDO SPC, f/a/o THE SERIES 2006-1, as Issuer, 801 GRAND CDO SERIES 2006-1 LLC, as Co-issuer, 801 GRAND CDO SPC, f/a/o THE SERIES 2006-2, as Issuer, 801 GRAND CDO SERIES 2006-2 LLC, as Co- | : : : | |

issuer, ALTA CDO SPC, f/a/o THE SERIES 2007-1      :
SEGREGATED PORTFOLIO, as Issuer, ALTA CDO LLC,
FOR SERIES 2007-1, as Co-issuer, ALTA CDO SPC, f/a/o   :
THE SERIES 2007-2 SEGREGATED PORTFOLIO, as Issuer,
ALTA CDO LLC, FOR SERIES 2007-2, as Co-issuer,     :
BARTON SPRINGS CDO SPC, f/a/o THE SERIES 2005-1
SEGREGATED PORTFOLIO, as Issuer, BARTON SPRINGS :
CDO SERIES 2005-1 LLC, as Co-issuer, BARTON SPRINGS
CDO SPC, f/a/o THE SERIES 2005-2 SEGREGATED     :
PORTFOLIO, as Issuer, BARTON SPRINGS CDO SERIES
2005-2 LLC, as Co-issuer, BLUE POINT CDO SPC, f/a/o   :
THE SERIES 2005-1 SEGREGATED PORTFOLIO, as Issuer,
BLUE POINT CDO SERIES 2005-1 LLC, as Co-issuer,    :
CHERRY HILL CDO SPC, f/a/o THE SERIES 2007-1
SEGREGATED PORTFOLIO, as Issuer, CHERRY HILL    :
CDO LLC FOR SERIES 2007-1, as Co-issuer, CHERRY
HILL CDO SPC, f/a/o THE SERIES 2007-2 SEGREGATED :
PORTFOLIO, as Issuer, CHERRY HILL CDO LLC FOR
SERIES 2007-2, as Co-issuer, COPPER CREEK CDO SPC,  :
f/a/o SERIES 2007-1 SEGREGATED PORTFOLIO, as Issuer,
COPPER CREEK CDO LLC, as Co-issuer, CROWN CITY  :
CDO 2005-1 LIMITED, as Issuer, CROWN CITY CDO 2005-
1 LLC, as Co-issuer, CROWN CITY CDO 2005-2 LIMITED, :
as Issuer, CROWN CITY CDO 2005-2 LLC, as Co-issuer,
FREEDOM PARK CDO SERIES 2005-1 LIMITED, as Issuer, :
FREEDOM PARK CDO SERIES 2005-1 LLC, as Co-issuer,
FULLERTON DRIVE CDO LIMITED, as Issuer,      :
FULLERTON DRIVE CDO LLC, as Co-issuer,
GREYSTONE CDO SPC, f/a/o THE SERIES 2006-1    :
SEGREGATED PORTFOLIO, as Issuer, GREYSTONE CDO
SERIES 2006-1 LLC, as Co-issuer, GREYSTONE CDO SPC, :
f/a/o THE SERIES 2006-2 SEGREGATED PORTFOLIO, as
Issuer, GREYSTONE CDO SERIES 2006-2 LLC, as Co-   :
issuer, JEFFERSON VALLEY CDO SPC, f/a/o THE SERIES
2006-1 SEGREGATED PORTFOLIO, as Issuer, JEFFERSON :
VALLEY CDO SERIES 2006-1 LLC, as Co-issuer, KINGS
RIVER LIMITED, as Issuer, KINGS RIVER LLC, as Co-  :
issuer, LAKEVIEW CDO SPC, f/a/o THE SERIES 2007-1
SEGREGATED PORTFOLIO, as Issuer, LAKEVIEW CDO  :
LLC SERIES 2007-1, as Co-issuer, LAKEVIEW CDO SPC,
f/a/o THE SERIES 2007-2 SEGREGATED PORTFOLIO, as  :
Issuer, LAKEVIEW CDO LLC, f/a/o THE SERIES 2007-2
SEGREGATED PORTFOLIO, as Co-issuer, LAKEVIEW   :
CDO SPC, f/a/o THE SERIES 2007-3 SEGREGATED
PORTFOLIO, as Issuer, LAKEVIEW CDO LLC, f/a/o THE :
SERIES 2007-3 SEGREGATED PORTFOLIO, as Co-issuer,

PANTERA VIVE CDO SPC, f/a/o THE SERIES 2007-1, as        :
Issuer, PANTERA VIVE CDO LLC, as Co-issuer, PEBBLE
CREEK LCDO 2007-2, LTD., as Issuer, PEBBLE CREEK          :
LCDO 2007-2, LLC, as Co-issuer, PENN'S LANDING CDO       :
SPC, f/a/o THE SERIES 2007-1 SEGREGATED
PORTFOLIO, as Issuer, PENN'S LANDING CDO LLC, as         :
Co-issuer, PYXIS ABS CDO 2007-1 LTD., as Issuer, PYXIS
ABS CDO 2007-1 LLC, as Co-issuer, QUARTZ FINANCE          :
PLC, SERIES 2004-1, as Issuer, RESTRUCTURED ASSET
CERTIFICATES WITH ENHANCED RETURNS, SERIES               :
2005-21-C TRUST, as Issuer, RESTRUCTURED ASSET
CERTIFICATES WITH ENHANCED RETURNS, SERIES               :
2006-1-C TRUST, as Issuer, RESTRUCTURED ASSET
CERTIFICATES WITH ENHANCED RETURNS, SERIES               :
2007-4-C TRUST, as Issuer, RUBY FINANCE PLC, f/a/o
THE SERIES 2005-1, CLASS A2-A9, as Issuer, RUBY          :
FINANCE PLC, f/a/o THE SERIES 2007-1, as Issuer,
SECURITIZED PRODUCT OF RESTRUCTURED                      :
COLLATERAL LIMITED SPC, f/a/o THE SERIES 2007-1
FEDERATION A-1 SEGREGATED PORTFOLIO, as Issuer,   :
SECURITIZED PRODUCT OF RESTRUCTURED
COLLATERAL LIMITED SPC, f/a/o THE SERIES 2007-1          :
FEDERATION A-2 SEGREGATED PORTFOLIO, as Issuer,
SOLAR V CDO SPC, f/a/o THE SERIES 2007-1                 :
SEGREGATED PORTFOLIO, as Issuer, SOLAR V CDO
LLC, as Co-issuer, STOWE CDO SPC, f/a/o THE SERIES        :
2006-1 SEGREGATED PORTFOLIO, as Issuer, STOWE
CDO SERIES 2006-1 LLC, as Co-issuer, STOWE CDO SPC,  :
f/a/o THE SERIES 2008-2A SEGREGATED PORTFOLIO, as
Issuer, STOWE CDO LLC, as Co-issuer, SUNSET PARK          :
CDO LIMITED SPC, f/a/o THE SERIES 2004-1
SEGREGATED PORTFOLIO, as Issuer, SUNSET PARK             :
CDO LIMITED SPC, f/a/o THE SERIES 2004-2
SEGREGATED PORTFOLIO, as Issuer, SUNSET PARK             :
CDO LIMITED SPC, f/a/o THE SERIES 2004-4
SEGREGATED PORTFOLIO, as Issuer, SUNSET PARK             :
CDO LLC, as Co-issuer, SUNSET PARK CDO-M LIMITED
SPC, f/a/o THE SERIES 2005-3 SEGREGATED                  :
PORTFOLIO, as Issuer, SUNSET PARK CDO-M LLC, as
Co-issuer, SUNSET PARK CDO LIMITED SPC, f/a/o THE        :
SERIES 2005-5 SEGREGATED PORTFOLIO, as Issuer,
SUNSET PARK CDO SERIES 2005-5 LLC, as Co-issuer,         :
SUNSET PARK CDO SERIES 2005-6 LIMITED, as Issuer,
SUNSET PARK CDO SERIES 2005-6 LLC, as Co-issuer,         :
SECURITIZED PRODUCT OF RESTRUCTURED
COLLATERAL LIMITED SPC, f/a/o THE SERIES 2007-1          :

TABXSPOKE (07-1 40-100) SEGREGATED PORTFOLIO, as Issuer, SERIES 2007-1 TABXSPOKE (07-1 40-100) LLC, as Co-issuer, TAVARES SQUARE CDO LIMITED, as Issuer, TAVARES SQUARE CDO LLC, as Co-issuer, VOX PLACE CDO LIMITED, as Issuer, VOX PLACE CDO LLC, as Co-issuer, :

 :

 :

 :

     Issuer Defendants, :

− and − :

AIA CO., LTD. SINGAPORE BRANCH, AIA INTERNATIONAL LTD., AIG, INC., AIG TAIWAN INSURANCE CO. LTD., ANZ INVESTMENT BANK, ANZ NOMINEES LIMITED, ARMIDALE DUMARESQ COUNCIL, ATLANTIC CENTRAL BANKERS BANK, BALMORAL AUSTRALIA PTY LTD, BANCO CREDITO DEL PERU, BANK OF AMERICA NATIONAL ASSOCIATION, THE BANK OF NEW YORK MELLON, LONDON BRANCH, THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., BASIS CAPITAL PTY LIMITED, BASIS PAC- RIM OPPORTUNITY FUND LTD., BELMONT PARK INVESTMENTS PTY LTD, BIG HORN CDO 2007-1 COLLATERAL, BLAND SHIRE COUNCIL, BLUE MOUNTAINS CITY COUNCIL, BNY MELLON CORPORATE TRUSTEE SERVICES LTD., BOYSTOWN, BOYSTOWN FAMILY CARE, BRODERICK CDO 3, LTD., CABONNE COUNCIL, CANNINGTON FUNDING, LTD., CARROLL 2 CC/CARROLL HOLDINGS COMPANY AND/OR THE HOLDERS OF AN ACCOUNT IN THAT NAME, CATHOLIC DEVELOPMENT FUND FOR THE CATHOLIC DIOCESE OF BATHURST, CDO SQUARED TRUSTEES, CHEYNE CLO INVESTMENTS I LTD., CITIBANK, N.A., CITICORP NOMINEES PTY LTD., CITIGROUP GLOBAL MARKETS, INC., CITY OF ALBANY, CITY OF KWINANA, CITY OF SWAN, CLASS V FUNDING III, CORP., CLASS V FUNDING III, LTD., CONTINENTAL LIFE INSURANCE COMPANY OF BRENTWOOD TENNESSEE, COUNTRY LIFE INSURANCE COMPANY, CREDIT SUISSE SECURITIES (EUROPE) LTD., CREDIT SUISSE SECURITIES (USA) LLC, THE DAEGU BANK, LTD., DEUTSCHE BANK TRUST COMPANY AMERICAS, DIVERSEY HARBOR ABS CDO, INC., DIVERSEY HARBOR ABS CDO, LTD., EASTERN METROPOLITAN REGIONAL COUNCIL, ELLIOTT INTERNATIONAL, L.P., EUROAMERICA :

 :

 :

 :

 :

 :

 :

 :

 :

 :

 :

 :

 :

 :

 :

 :

 :

 :

ASESORIAS S.A., EUROCLEAR BANK S.A./N.V., FIIG
SECURITIES LIMITED, FIRST NORTHERN BANK AND    :
TRUST COMPANY, LOWER MURRAY WATER, FULTON
STREET CDO CORP., G & F YUKICH                            :
SUPERANNUATION PTY LTD, GARADEX INC.,  GATEX
PROPERTIES INC., GENERAL SECURITY NATIONAL    :
INSURANCE, GENWORTH LIFE AND ANNUITY
INSURANCE CO., GEOMETRIC ASSET FUNDING LTD.,   :
GILGANDRA SHIRE COUNCIL, GOLDMAN, SACHS &
CO., GOLDMAN SACHS INTERNATIONAL, GOSFORD    :
CITY COUNCIL, GUOHUA LIFE INSURANCE CO., LTD.,
GUYRA SHIRE COUNCIL, HAVENROCK II LIMITED,      :
HHE PARTNERSHIP LP, HSBC ISSUER SERVICES
COMMON DEPOSITORY NOMINEE (UK) LIMITED,         :
INVERELL SHIRE COUNCIL, JP MORGAN CHASE
BANK, NATIONAL ASSOCIATION, JP MORGAN             :
SECURITIES, PLC, KIAMA MUNICIPAL COUNCIL, KLIO
II FUNDING CORP., KLIO II FUNDING LTD., KLIO III      :
FUNDING CORP., KLIO III FUNDING LTD., KMCL
CARROLL AND/OR THE HOLDERS OF AN ACCOUNT     :
IN THAT NAME, LANCER FUNDING II LTD., LANCER
FUNDING II, LLC, LEETON SHIRE COUNCIL,                 :
LEITHNER & COMPANY PTY. LTD, LGT BANK IN
LIECHTENSTEIN, LTD., LIFEPLAN AUSTRALIA             :
FRIENDLY SOCIETY LTD., THE LINCOLN NATIONAL
LIFE INSURANCE COMPANY, THE LIVERPOOL             :
LIMITED PARTNERSHIP, LORELEY FINANCING
(JERSEY) NO. 15 LIMITED, LYNDOCH LIVING INC.,      :
MAGNETAR CONSTELLATION FUND II LTD.,
MAGNETAR CONSTELLATION MASTER FUND III LTD.,:
MAGNETAR CONSTELLATION MASTER FUND LTD.,
MANLY COUNCIL, MARINER LDC, MARSH &               :
MCLENNAN MASTER RETIREMENT TRUST, MARSH &
MCLENNAN COMPANIES, INC. STOCK INVESTMENT    :
PLAN, MBIA, INC., MDA NATIONAL INSURANCE PTY
LTD, MERRILL LYNCH INTERNATIONAL GLOBAL        :
EQUITY FINANCE, MERRILL LYNCH PIERCE FENNER
& SMITH INCORPORATED, MERRILL LYNCH PIERCE    :
FENNER & SMITH / FIXED INCOME, MODERN
WOODMEN OF AMERICA, INC., MONEYGRAM             :
SECURITIES LLC, MONTROSE HARBOR CDO I, INC.,
MONTROSE HARBOR CDO I, LTD., MORGAN STANLEY:
& CO., INCORPORATED, MORGANS FINANCIAL
LIMITED, MULBERRY STREET CDO, LTD., NARRABRI  :
SHIRE COUNCIL, NATIONAL NOMINEES LIMITED,
NATIONWIDE HYBRID MAND/NATIONWIDE SF           :

HYBRID AND/OR THE HOLDERS OF AN ACCOUNT IN
THAT NAME, NATIONWIDE SUPERANNUATION                    :
AND/OR THE HOLDERS OF AN ACCOUNT IN THAT
NAME, NATIXIS FINANCIAL PRODUCTS LLC,                   :
NEWCASTLE CITY COUNCIL, NIPPON LIFE
INSURANCE COMPANY, NONGHYUP BANK (F/K/A                 :
KOREA'S NATIONAL AGRICULTURAL COOPERATIVE
FEDERATION), OBERON COUNCIL, OHIO PUBLIC                :
EMPLOYEE RETIREMENT SYSTEM, OMICRON
INVESTMENT MANAGEMENT GMBH (F/K/A UNIQA                 :
ALTERNATIVE INVESTMENTS GMBH), OSDF, LTD.,
OVERSEAS PROPERTY INVESTMENT CORPORATION,  :
PANORAMA RIDGE PTY LTD, PARKES SHIRE
COUNCIL, PCA LIFE ASSURANCE CO. LTD., PHL               :
VARIABLE INSURANCE COMPANY, PHOENIX LIFE
INSURANCE COMPANY, PINNACLE POINT FUNDING               :
LTD., PINNACLE POINT FUNDING CORP., PREBON
FINANCIAL PRODUCTS, INC., PRINCIPAL LIFE                :
INSURANCE COMPANY,  PUTNAM DYNAMIC ASSET
ALLOCATION FUNDS – GROWTH PROTFOLIO,                    :
PUTNAM INTERMEDIATE DOMESTIC INVESTMENT
GRADE TRUST, PUTNAM STABLE VALUE FUND, RGA  :
REINSURANCE CO., ROTHSCHILD BANK
INTERNATIONAL LIMITED, ROUS COUNTY COUNCIL,  :
ROUS WATER, SBSI, INC., SCOR REINSURANCE
COMPANY, SECURITY BENEFIT LIFE INSURANCE CO., :
SENTINEL MANAGEMENT GROUP INC.,
SHENANDOAH LIFE INSURANCE COMPANY,                      :
SHINHAN BANK, SHOALHAVEN CITY COUNCIL, SMH
CAPITAL ADVISORS, INC., SOCIETE GENERALE                :
INVESTMENT CORPORATION, ST LUKES MEDICAL &
HOSPITAL BENEFITS ASSOCIATION, ST. VINCENT DE  :
PAUL SOCIETY QUEENSLAND, STABFUND SUB CA
AG, STANDARD LIFE INSURANCE COMPANY OF                  :
INDIANA, STANTON ABS I P.L.C., STANTON CDO I SA,
STARLING STRATEGIES LTD., STATE STREET                  :
GLOBAL ADVISORS, STATE STREET BANK AND
TRUST COMPANY, STATE STREET INTERNATIONAL              :
IRELAND LIMITED, STRATEGIC GLOBAL (PUTNAM)
MANAGED TRUST, STICHTING SHELL                          :
PENSIOENFONDS, STRUCTURED CREDIT
OPPORTUNITIES FUND II, LP, SUSQUEHANNA BANK,  :
TENTERFIELD SHIRE COUNCIL, TERWIN CAPITAL,
LLC, TIERRA ALTA FUNDING I LTD., TIERRA ALTA           :
FUNDING I, CORP., TOPDANMARK EDB A/S, TRICADIA
CREDIT STRATEGIES MASTER FUND, LTD., U.S. BANK :

NATIONAL ASSOCIATION, UNICREDIT BANK AG,
LONDON BRANCH, UNITING CHURCH IN AUSTRALIA  :
PROPERTY TRUST (SA), URALLA SHIRE COUNCIL,
VALEO INVESTMENT GRADE CDO LTD., WALCHA       :
COUNCIL, WELLS FARGO BANK, NATIONAL
ASSOCIATION, WHITEHAWK CDO FUNDING, LLC,      :
WHITEHAWK CDO FUNDING, LTD., THE WINTER
GROUP, ZAIS INVESTMENT GRADE LIMITED II, ZAIS  :
INVESTMENT GRADE LIMITED V, ZAIS INVESTMENT
GRADE LIMITED X, Individually and as Representatives of  :
all others similarly situated,

                                                                                    :

                          Noteholder Defendants.

_____  x

TO THE HONORABLE SHELLY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF" or "Plaintiff"), through

Lehman Brothers Holdings Inc. ("LBHI"), the Plan Administrator under the Modified Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors

(the "Plan"), by and through its undersigned counsel, brings this Complaint against certain

indenture trustees (referred to collectively as the "Trustees"), certain special-purpose entities

more fully identified on Schedule 1 hereto (referred to collectively as the "Issuers"), which is

attached and fully incorporated herein, and a class of noteholders and trust certificate holders

who received distributions from the Trustees, including the noteholders more fully identified on

the attached Schedule 2 (referred to collectively as the "Noteholders")[1] (the Trustees, Issuers and

Noteholders are referred to collectively as "Defendants"), and respectfully states:

## PRELIMINARY STATEMENT

1.     On September 15, 2008 (the "LBHI Petition Date"), LBHI commenced

the largest bankruptcy proceeding in U.S. history by filing a voluntary petition for relief under

chapter 11.  Soon thereafter, on October 3, 2008, LBSF filed its own chapter 11 proceeding (the

"Petition Date").  In reaction to the foregoing, the Defendants herein began a series of steps to

unwind swap transactions which deprived LBSF of billions in value to which it was otherwise

entitled.  Through this action, LBSF seeks declaratory and other relief to undo the application of

the unenforceable *ipso facto* clauses which resulted in LBSF being deprived of valuable property

interests, as well as an order returning to LBSF the property transferred or its value.

---

[1] The term Noteholder shall also encompass any holder of securities issued by one of the Issuers that
received distributions from the Trustees, and that is itself a special purpose entity or CDO (a  "CDO-
squared"), as well as investors in any investment vehicle that has liquidated and distributed its assets to its
investors subsequent to receiving a distribution.

2.       LBSF is party to numerous credit default swap agreements (the "Swap Agreements") pursuant to which it purchased, *inter alia*, credit protection from the Issuers in connection with 47 collateralized debt obligation transactions (the "CDOs").  LBHI is LBSF's credit support provider and guarantor under the Swap Agreements (the "Credit Support Provider").  The transaction documents for each of the CDOs provide that, upon early termination of the Swap Agreement, the Trustee is generally required to disburse termination payments owed to LBSF under the Swap Agreements prior to disbursing interest and principal payments to the CDOs' Noteholders (such right, "Senior Payment Priority").  However, the transaction documents also contain clauses that modify LBSF's foregoing Senior Payment Priority, making such right junior to the payment rights of the Noteholders (or eliminating LBSF's right to payment altogether) in instances where LBSF was the "Defaulting Party" (as defined in the Swap Agreements) (the "Priority Modification Provisions").  The Swap Agreements expressly include the filing of a bankruptcy petition by LBSF or LBHI as an Event of Default under which LBSF becomes the "Defaulting Party."

3.       Starting on or after September 15, 2008, when LBHI commenced its chapter 11 case, LBSF's right to payment priority ahead of the Noteholders in respect of each CDO was modified solely as a result of the commencement of a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  In connection with each of the CDOs, the Trustees terminated the Swap Agreements and caused modifications of LBSF's rights to priority payment, and the transfer of LBSF's Senior Payment Priority to the Noteholders.  Thereafter, the Trustees liquidated and distributed (in whole or in part) to the Defendant Noteholders the Issuers' assets that are subject to the lien and security interest securing LBSF's Senior Payment

Priority, and that but for the enforcement of the Priority Modification Provisions would have been due and owing to LBSF upon early termination.

4.      LBSF's rights under the Transaction Documents,[2] including its right to Senior Payment Priority, and LBSF's rights in and to the Issuers' assets, including LBSF's security interests, constituted an interest of LBSF in property, and became property of LBSF's estate on the date LBSF's chapter 11 petition was filed.

5.      In *Lehman Bros. Special Financing, Inc. v. BNY Corp. Trustee Svcs., Ltd.*, 422 B.R. 407, 420-21 (Bankr. S.D.N.Y. 2010) (Peck, J.) ("*LBSF v. BNY*"), the Court held that substantially similar priority modification provisions were unenforceable *ipso facto* clauses under Sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code and that any attempt to enforce such provisions would violate the automatic stay triggered by LBSF's bankruptcy filing.

6.      As a direct result of LBHI's (and, with respect to certain CDOs, of LBSF's) bankruptcy filings in 2008, each of the Trustees declared an Event of Default under the Swap Agreements and the Indentures (as defined below) applicable to each of the Issuers, enforced the Priority Modification Provisions, and transferred LBSF's rights under the Transaction Documents to Senior Payment Priority on termination (the "Priority Transfers") to or for the benefit of the Noteholders.  Shortly thereafter, each of the Trustees caused each of the Issuers to liquidate its assets, and caused the proceeds to be deposited into the Trustees' accounts and ultimately to be distributed to the respective Noteholders (the "Collateral Transfers").  The Priority Transfers and the Collateral Transfers are sometimes referred to herein as the "Transfers."  The Transfers were designed to remove valuable property from the reach of LBSF's creditors.  Each such Transfer that occurred prior to LSBF's Petition Date constituted an

---

[2] The documents governing the rights of the Trustees, Noteholders, and LBSF with respect to each of the Issuers (the "Transaction Documents") constituted executory contracts of the debtor LBSF.

actual fraudulent transfer of an interest of LBSF in property that may be avoided under Section 548(a)(1)(A) of the Bankruptcy Code, recovered under Section 550 of the Bankruptcy Code, and preserved for the benefit of the estate under Section 551 of the Bankruptcy Code.

7.    In addition, once the Priority Modification Provisions are invalidated, and/or severed from the Transaction Documents, LBSF has additional means to recover the Transfers from the Trustees or the Noteholders, including declaring the Transfers void in violation of the automatic stay, and ordering the Trustees to reimburse LBSF for the value of the property wrongly distributed.  The modification of LBSF's right to Senior Payment Priority and subsequent distributions to the Noteholders wiped out LBSF's substantial "in-the-money" position under the Swap Agreements, resulting in an enormous (and unjustifiable) windfall to the Noteholders at LBSF's expense.  Accordingly, LBSF asserts claims for (i) turnover of property of the estate, (ii) avoidance of the Transfers, (iii) unjust enrichment, (iv) money had and received, and (v) constructive trust against the Noteholders to recover the improperly distributed amounts.  LBSF also asserts a claim of replevin to obtain the wrongfully withheld distributed amounts.  Moreover, LBSF asserts claims as a creditor of the Issuer Defendants to recover property, or the value thereof, fraudulently conveyed by the Issuer Defendants to the Trustees and Noteholder Defendants.  Additionally, LBSF asserts claims for breach of contract against the Trustees to recover funds erroneously distributed to the Noteholders that were owed to LBSF.

8.    In the alternative, to the extent any of the Transfers took effect *before* the commencement of LBSF's bankruptcy case, such Transfer constituted either (a) a preferential transfer of an interest of LBSF in property that may be avoided under Section 547 of the Bankruptcy Code, recovered under Section 550 of the Bankruptcy Code, and preserved for the benefit of the estate under Section 551 of the Bankruptcy Code, (b) a constructive fraudulent

transfer of an interest of LBSF in property that may be avoided under Section 548(a)(1)(B) of the

Bankruptcy Code, recovered under Section 550 of the Bankruptcy Code, and preserved for the

benefit of the estate under Section 551 of the Bankruptcy Code, or (c) an intentional fraudulent

transfer of an interest of LBSF in property that may be avoided under Section 548(a)(1)(A),

recovered under Section 550, and preserved for the benefit of the estate under Section 551.  To

the extent that the Transfers were effective ***after*** the commencement of LBSF's bankruptcy case,

in addition to violating the automatic stay, the Transfers constituted unauthorized postpetition

transfers of property of LBSF's estate that may be avoided under Section 549 of the Bankruptcy

Code, recovered under Section 550 of the Bankruptcy Code, and preserved for the benefit of the

estate under Section 551 of the Bankruptcy Code.

   9. Moreover, in connection with one of the largest of the 47 CDO deals (the

"Pyxis Transaction"), Bank of America National Association's – the indenture trustee on the

Pyxis Transaction (the "Pyxis Trustee") – purported termination of the swap agreement violated

provisions of the Pyxis Indenture (defined below) governing the Pyxis Transaction and swap

agreement.  Accordingly, LBSF is entitled to, *inter alia*, a declaration that the purported

termination of the Pyxis Credit Default Swap Agreement (defined below) is null and void and

the Pyxis Credit Default Swap Agreement remains in full force and effect.

   10. In addition, under the Pyxis Transaction documents, the Pyxis

Noteholders are contractually obligated to hold, in trust, the collateral distributed to them

pursuant to the Priority Modification Provisions and to return such improperly distributed

proceeds to the Pyxis Trustee for payment to the appropriate party – here, LBSF.  The Pyxis

Noteholders' failure to return the improperly distributed proceeds breaches their obligations,

which LBSF is entitled to enforce as an express third-party beneficiary.

11.     Finally, in connection with two of the 47 CDO deals (the "Federation[3] Transactions"), the distribution of the Collateral proceeds by the Federation Trustee violated the Federation Indentures (defined below).  Accordingly, LBSF is entitled to, *inter alia*, a declaration that the distribution of the Federation Collateral was improper and violated the terms of the Federation Indentures, as well as for additional damages against the Federation Trustee and the Federation Noteholders for breach of contract.

## PARTIES

12.     Plaintiff LBSF is a Delaware corporation with its current principal business address at 1271 Avenue of the Americas, 46th Floor, New York, New York 10020.

13.     Bank of America, N.A. is a national banking association organized under the laws of the United States with its principal place of business at 100 North Tryon Street, Charlotte, North Carolina 28202.  Upon information and belief, Bank of America, N.A. is also the successor in interest to LaSalle Bank National Association.  Bank of America, N.A. serves as a Trustee for the CDOs listed on Exhibit A.  The allegations against Bank of America, N.A. are limited to its actions in serving as trustee for the CDOs listed on Exhibit A, and its actions in serving as trustee for any CDO-squareds.

14.     The Bank of New York Mellon N.A. is a national banking association organized under the laws of the United States with its principal place of business at One Wall Street, New York, New York 10286.  The Bank of New York Mellon N.A. is also the successor in trust to JPMorgan Chase Bank.  Bank of New York Mellon N.A. serves as a Trustee for the CDOs listed on Exhibit A.  The allegations against Bank of New York Mellon N.A. are limited

---

[3] As used herein, "Federation" refers to Securitized Product of Restructured Collateral Limited SPC f/a/o the Series 2007-1 Federation A-1 Segregated Portfolio and Securitized Product of Restructured Collateral Limited SPC f/a/o the Series 2007-1 Federation A-2 Segregated Portfolio.

to its actions in serving as trustee for the CDOs listed on Exhibit A, and its actions in serving as

trustee for any CDO-squareds.

15.     BNY Corporate Trustee Services Ltd. is a limited company organized

under the laws of the United Kingdom of Great Britain and Northern Ireland with its principal of

business at One Canada Square, London, E14 5AL.  BNY Corporate Trustee Services Ltd. serves

as a Trustee for the CDOs listed on Exhibit A.  The allegations against BNY Corporate Trustee

Services Ltd. are limited to its actions in serving as trustee for the CDOs listed on Exhibit A, and

its actions in serving as trustee for any CDO-squareds.

16.     Citibank, N.A. is a national banking association organized under the laws

of the United States with its principal place of business at 388 Greenwich Street, 14th Floor,

New York, New York 10013.  Citibank, N.A. serves as a Trustee for the CDOs listed on Exhibit

A.  The allegations against Citibank, N.A. are limited to its actions in serving as trustee for the

CDOs listed on Exhibit A, and its actions in serving as trustee for any CDO-squareds.

17.     U.S. Bank N.A. is a national banking association organized under the

laws of the United States with its principal place of business at 1 Federal Street, 3rd Floor, Main

Station EX-MA-FED, Boston, Massachusetts 02110.  U.S. Bank N.A. serves as a Trustee for the

CDOs listed on Exhibit A.  The allegations against U.S. Bank N.A. are limited to its actions in

serving as trustee for the CDOs listed on Exhibit A, and its actions in serving as trustee for any

CDO-squareds.

18.     U.S. Bank Trust N.A. is a national banking association organized under

the laws of the United States with its principal place of business at 100 Wall Street, New York,

New York 10005.  U.S. Bank N.A. serves as a Trustee for the SPVs listed on Exhibit A.  The

allegations against U.S. Bank Trust N.A. are limited to its actions in serving as trustee for the CDOs listed on Exhibit A, and its actions in serving as trustee for any CDO-squareds.

19.     Wells Fargo Bank, N.A. is a national banking association organized under the laws of the United States with its principal place of business at 9062 Old Annapolis Road, Columbia, Maryland 21045. Wells Fargo Bank, N.A. serves as a Trustee for the CDOs listed on Exhibit A. The allegations against Wells Fargo Bank, N.A. are limited to its actions in serving as trustee for the CDOs listed on Exhibit A, and its actions in serving as trustee for any CDO-squareds.

20.     The Issuer Defendants are named and identified on the attached Schedule 1 and may be served with process as set forth therein.

21.     Upon information and belief, the Noteholders identified on the attached Schedule 2 are individuals or entities who received Priority Transfers and Collateral Transfers. The Noteholders are sued both individually, and as representatives of a class of all noteholders who received Transfers following LBHI's bankruptcy filing (the "Noteholder Class").

22.     Upon information and belief, the defendants identified on Schedule 3 are entities who served as Trustees and/or administrators for Noteholders that are CDO-squareds or managed funds, and are sued herein as nominal defendants.

## JURISDICTION AND VENUE

23.     The Court has subject-matter jurisdiction over this proceeding under 28 U.S.C. §§ 157, 1334, and 2201. The Court has supplemental jurisdiction over claims for which it does not have original jurisdiction under 28 U.S.C. § 1367.

24.     This is a "core proceeding" under 28 U.S.C. § 157(b).

25.     Venue is proper under 28 U.S.C. §§ 157(a), 1408, and 1409.

8

26.    The statutory prerequisites for the relief requested herein are Sections

105(a), 362(a)(3), 363, 365(e)(1), 541(c)(1), 542, 547, 548(a)(1)(A), 548(a)(1)(B), 549(a), 550,

and 551 of the Bankruptcy Code, Section 2201 of Title 28 of the United States Code, Federal

Rule of Civil Procedure 57, and Rules 7001 and 9006 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

27.    Pursuant to Bankruptcy Rule 7008, this adversary proceeding relates to

the chapter 11 case *In re Lehman Brothers Holdings Inc.*, pending in this Court as Case No. 08-

13555 (SCC).

## CLASS ACTION ALLEGATIONS

28.    The claims against the Noteholder Class are brought pursuant to Rule

23(a), 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(iv) of the Federal Rules of Civil Procedure.  The

named Noteholders are sued both individually and as representatives of all members of the

Noteholder Class.

29.    The Noteholder Class consists of all Noteholders who received Transfers

following LBHI's bankruptcy filing, including the representative Noteholders identified on

Schedule 2.

30.    The Noteholder Class is so numerous that joinder of all of its members is

impracticable.  Plaintiff is informed and believes that there are in excess of 140 members of the

Noteholder Class.

31.    Common questions of law and fact exist which predominate over any

questions affecting individual members of the Noteholder Class, including:

(a)    Whether the Priority Modification Provisions are unenforceable *ipso facto*
clauses that violate Sections 365(e)(1), 541(c)(1)(B), and 363(l) of the
Bankruptcy Code;

9

(b)      Whether the Transfers violated the automatic stay under 11 U.S.C. § 362(a);

(c)      Whether the Collateral Transfers and any subsequent distributions to the Noteholders and the Noteholder Class, were designed to remove assets from the reach of LBSF's creditors and thereby hinder, delay, or defraud LBSF's creditors' recovery of LBSF's interest in the Collateral or its proceeds in violation of Section 548(a)(1)(A) of the Bankruptcy Code;

(d)      Once the Priority Modification Provisions are invalidated, whether the distributions unjustly enriched the Noteholder Class;

(e)      Once the Priority Modification Provisions are invalidated, whether the equitable remedy of money had and received requires the Noteholder Class to return LBSF's rightful share of funds distributed to the Noteholder Class ahead of LBSF pursuant to the Priority Modification Provisions;

(f)      Once the Priority Modification Provisions are invalidated, whether the Noteholder Class is wrongfully withholding distributions subject to replevin by LBSF;

(g)      Alternatively, whether the Priority Modification Provisions effected a preferential transfer of Plaintiff's property interest – its Senior Payment Priority – to or for the benefit of the Noteholder Class that is subject to avoidance pursuant to Section 547(b) of the Bankruptcy Code;

(h)      Alternatively, whether the Priority Modification Provisions effected a fraudulent transfer of Plaintiff's Senior Payment Priority to or for the benefit of the Noteholder Class that is subject to avoidance pursuant to Section 548(a)(1)(B) of the Bankruptcy Code;

(i)      Alternatively, whether the Priority Modification Provisions effected an unauthorized postpetition transfer of property of Plaintiff's estate to or for the benefit of the Noteholder Class that is subject to avoidance under Section 549 of the Bankruptcy Code;

(j)      Whether the Priority Modification Provisions are an unenforceable penalty;

(k)      Whether as a creditor of the Issuers LBSF may recover from transferees of the Issuers under any of the provisions of the New York Debtor and Creditor Law (the "NYDCL");

(l)    For purposes of the constructive trust claim, the issue of whether the Trustee Defendants breached an implicit promise not to improperly transfer Collateral in which LBSF had an interest to other parties;

(m)    For the purposes of the replevin claim, the issue of whether LBSF had a senior lien on the collateral and thus a superior right to that of the Noteholder Defendants;

(n)    The issue of whether *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny defeats certain Defendants' statute of limitations defenses;

(o)    The issue of whether the Trustee Defendants, the Noteholder Defendants and the members of the proposed Noteholder Class took their interest in the transferred property for value, in good faith, and without knowledge of the voidability of the transfer within the meaning of Section 550(b)(1) of the Bankruptcy Code; and

(p)    Whether Defendants should be ordered to turn over property of the estate of the Plaintiff.

32.    The defenses of the named Noteholders are typical of the defenses of all members of the Noteholder Class.

33.    The named class representative Noteholders' interests are aligned with those of the absent class members and they will fairly and adequately represent such absent class members.

34.    The prosecution of separate actions by or against individual members of the Noteholder Class would create a risk of:

(a)    inconsistent or varying adjudications with respect to individual members of the Noteholder Class which would establish incompatible standards of conduct; and/or

(b)    adjudications with respect to individual members of the Noteholder Class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

35.    This action seeks declaratory and injunctive relief, including a declaration that the Priority Modification Provisions are unenforceable *ipso facto* clauses, and an injunction

11

directing that the Noteholders turn over the cash proceeds from the liquidation of the Collateral

to LBSF.  Class treatment of this action for injunctive relief under Rule 23(b)(2) is warranted

because the declaratory and injunctive relief, if granted, would bind the entire Noteholder Class.

36.    Common issues predominate over individualized ones.  The terms of the

applicable agreements and the relevant conduct of the Noteholder Defendants are substantially

similar with respect to each of the 47 CDOs.  Therefore, the Noteholder Class claims principally,

if not exclusively, raise common legal issues (including, in particular, the application of the

Court's prior ruling in *LBSF v. BNY*) rather than individualized factual issues.

37.    A defendant class action is manageable and superior to the other

available methods for the fair and efficient adjudication of this controversy.  The central issues

raised in this Complaint have already been resolved by the court, notably whether (i) the Priority

Modification Provisions are unenforceable *ipso facto* clauses, and (ii) application of the Priority

Modification Provisions would violate the automatic stay.  For these reasons, among others,

Defendants thus have little, if any, legitimate interest in individually controlling their defenses in

separate actions.  Moreover, because the Notes (as defined below) were tradable in the secondary

market it is difficult, if not impossible, for LBSF to identify and sue all the present holders of the

Notes individually.  Indeed, discovery remains ongoing regarding the identity of Noteholders,

including due to new disclosures and defenses asserted by Defendants.  Accordingly, in the

absence of a defendant class, LBSF may be unable to obtain relief with respect to all

Noteholders.  Finally, permitting LBSF to prosecute its claims against a defendant class will not

give rise to any significant administrative difficulties.  In fact, it will be far more efficient and

less burdensome on the Court to adjudicate LBSF's claims against the Noteholders as a class

rather than in numerous separate adversary proceedings.

## BACKGROUND

38.     LBHI was formerly the fourth largest investment bank in the United States.  For more than 150 years, LBHI was a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients, and individuals worldwide.  LBHI's headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America, and the Asia Pacific region.  LBHI primarily operated its worldwide businesses through numerous foreign and domestic subsidiaries, including LBSF, Lehman Brothers, Inc. ("LBI") and others.

39.     For most of 2008 LBHI operated in an extremely unfavorable global business environment, including lack of liquidity in the credit markets and declining values of financial assets, particularly domestic subprime residential mortgage backed securities and structured credit products.  This constrained LBHI's liquidity to the point where LBHI began searching for an investor or acquirer, a process which continued throughout the period immediately preceding the LBHI Petition date.

40.     Beginning on September 12, 2008 and continuing through most of the weekend preceding the LBHI Petition Date, LBHI engaged in emergency meetings with the Treasury Secretary, the Federal Reserve and the heads of major financial institutions to attempt to resolve LBHI's liquidity crisis.  When it became apparent that a transaction that would enable the firm to remain viable was not possible, LBHI had precious little time to prepare and file a chapter 11 petition before the markets opened the following Monday.

41.     After the filing of the petition, management's focus turned to hastily arranging a transaction to sell the majority of the assets of LBI to Barclays, in order to preserve as many jobs as possible and to minimize the disruption to LBI's brokerage customers.

42.     Complicating matters was the need to interface simultaneously with the Securities Investor Protection Corporation, so that the LBI liquidation proceeding could be coordinated with the LBHI chapter 11 case in order to obtain simultaneous court approval for the Barclays transaction.

43.     The scale and scope of LBHI's operation was unprecedented in the annals of American bankruptcy law: when it filed, LBHI reported consolidated assets of $639 billion and liabilities of $613 billion. Most prior major chapter 11 cases (all of which were substantially smaller than LBHI) require weeks or month of advance planning to properly manage, during which time the prospective debtor's advisors would have the luxury of time to gain an intimate understanding of the debtor's business, operations, capital structures as well as expected issues that would arise early in the case. For LBHI, that time was telescoped to a matter of hours.

44.     The vast majority of the external financing which supported the operations of LBHI and its subsidiaries was obtained from funding provided to LBHI. LBHI had historically acted essentially as a central banker for LBHI and its subsidiaries, aggregating excess cash for investment and advancing money to certain subsidiaries to cover shortfall. Even though many of LBHI's subsidiaries, including LBSF, were dependent on the credit support provided to them by LBHI and could not continue in normal operation without the support of LBHI, there was simply insufficient time available to LBHI and its advisors to investigate, understand and plan for the chapter 11 case filings of those subsidiaries at the time of commencement of the LBHI and LBI insolvency proceedings.

45.     Thus, the LBHI chapter 11 filing was unprecedented on a number of levels, in addition to its size and scope: never before had such a massive enterprise had so little time to plan and prepare for the simultaneous commencement of a chapter 11 case and a

14

Securities Investor Protection Act proceeding for its broker/dealer units, without knowing what issues faced its other non-debtor entities and how best to address those issues.

46.     Ultimately LBHI's foreign units became the subject of insolvency proceedings in their home venues, and LBHI's other material domestic units became the subject of chapter 11 cases of their own.  Accordingly, on October 3, 2008, Plaintiff filed a voluntary petition for relief under chapter 11.

47.     Plaintiff's and LBHI's chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

48.     LBHI and LBSF were authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

49.     On September 1, 2011, LBHI and LBSF filed the Plan.

50.     On December 6, 2011, the Bankruptcy Court entered an Order Confirming the Plan as amended.

51.     On March 6, 2012, the LBHI and LBSF filed the Notice of Effective Date and Distribution Date in Connection with the Plan.

A.     **The Transactions**

52.     In connection with the CDOs, the Issuers issued series of notes or, in certain instances, trust certificates (collectively, the "Notes") pursuant to trust or indenture

15

documentation (the "Indentures"), in order to raise funds with which to acquire assets.[4]  The

Trustees serve pursuant to the Indentures.

53.     Upon the closing date of each of the CDOs, the Issuers acquired assets

with the funds raised by the offerings of the Notes (the "Collateral").

54.     For each CDO, the respective Trustee set up certain accounts (the

"Payment Accounts") to, among other things, collect any proceeds from the Collateral to

distribute to the persons entitled thereto pursuant to the Transaction Documents.

55.     The Issuers and LBSF were parties to one or more Swap Agreements in

connection with each CDO pursuant to which LBSF bought, *inter alia*, credit protection with

respect to various debt obligations, including residential mortgage-backed obligations and

corporate bonds (collectively, "Reference Obligations").

56.     This credit protection was extremely valuable to LBSF because a number

of the underlying Reference Obligations had dramatically decreased in value, providing LBSF

with a correspondingly significant increase in the value of its interest in the Swap Agreements as

of the petition date.  Were LBSF or a third party to go out into the market as of the petition date

and acquire the same protection provided in the Swap Agreements, the incremental additional

cost, upon information and belief, would have been substantial.  LBSF's interests in the Swap

Agreements, in the priority right to payment under the Indentures, and in the Collateral and its

proceeds, therefore, represented substantial assets of LBSF and of LBSF's estate.

57.     The Trustees, or an agent for the Trustees, held for the benefit of (among

others) LBSF and the Noteholders the Collateral and/or proceeds from the Collateral that secures

---

[4] Relevant Swap Agreements and Indentures are identified in Exhibit B.  Contained in Exhibit B are,
among other things, certain relevant provisions of the Swap Agreements and Indentures.  The list of
provisions in Exhibit B is not exclusive, and LBSF reserves its right to rely upon any other provisions.

the Issuers' respective payment obligations both to LBSF and to the Noteholders.  The Trustees

held and exercised dominion and control over the Issuers' rights under the Transaction

Documents, as well as over the Collateral and the proceeds.  LBSF's and the Noteholders'

recourse for payment of claims against the Issuers was limited to the Collateral and/or any other

assets of the Issuers related to that particular series of Notes.  LBSF's and the Noteholders'

respective payment priorities for their claims against the Issuers were to be enforced and realized

through the distribution of the Collateral or its proceeds.

58.    LBSF possessed a senior lien on the Collateral and its proceeds to secure

the obligations due to it under the Transaction Documents.

**B.    The Response to LBHI's and LBSF's Bankruptcy Filings**

59.    The commencement of a case under the Bankruptcy Code by either LBSF

or its Credit Support Provider, LBHI, constituted an "Event of Default" under the Swap

Agreements with respect to LBSF.[5]

60.    LBSF held a legal or equitable interest in the Transaction Documents and

the Collateral, or its proceeds, which but for the application of the Priority Modification

Provisions, was senior in right to the interest of the Noteholders in that property.  LBSF's

interests in the Transaction Documents and the Collateral or its proceeds constituted interests of

LBSF in property, and on the Petition Date constituted property of the LBSF estate.

61.    Under the Transaction Documents, when LBSF has a claim against a

particular Issuer under its respective Swap Agreement (because an early termination payment

becomes due (the "Early Termination Payment") and the swap is "in-the-money" to LBSF),

LBSF's claim has priority over the claims of Noteholders.  In other words, LBSF's claim has

---

[5] See Exhibit B.

"Senior Payment Priority" and the Noteholders' claims have "Junior Payment Priority."[6]  But

upon (a) the occurrence of an Event of Default under the Swap Agreements for which Plaintiff is

deemed responsible (including a bankruptcy filing of LBHI), and (b) the resulting application of

the Priority Modification Provisions, LBSF's rights were modified and Senior Payment Priority

was transferred from LBSF to the Noteholders, leaving LBSF with, at best, only Junior Payment

Priority for its claim.[7]  In some instances, LBSF's right to its termination payment was

extinguished altogether.[8]  This modification of payment priorities pursuant to the Priority

Modification Provisions is sometimes referred to hereafter in this Complaint as the "Payment

Priority Exchange."

62.    The Priority Modification Provisions were invoked by the Trustees *solely*

as the result of LBSF's or LBHI's bankruptcy filing.  Each of the Trustees for each of the CDOs

identified the commencement of a chapter 11 case by either LBHI or LBSF as the only default

providing the basis for the modification of LBSF's rights.

63.    Effecting the Priority Transfers after the LBSF Petition Date pursuant to

the Priority Modification Provisions violated the automatic stay under Section 362 of the

Bankruptcy Code because, *inter alia*, it involved an improper exercise of control over property of

LBSF's estate.

64.    In addition, upon the occurrence of the Event of Default under the Swap

Agreements, the Collateral was liquidated and transferred to each of the Trustee's Payment

---

[6] See Exhibit B.

[7] See Exhibit B.

[8] See Exhibit B.

Accounts and thereafter distributed to the Noteholders and/or the Noteholder Class. Such

Collateral Transfers after the Petition Date violated the automatic stay.

65.        Each of the Payment Priority Exchanges and Collateral Transfers which

occurred prior to the Petition Date was made with the actual intent to hinder, delay, or defraud

LBSF's creditors.

66.        Each Trustee knew or should have known that (i) the commencement of

LBHI's and/or LBSF's chapter 11 case was the sole basis for the purported Event of Default;

(ii) LBSF had a security interest and other rights to the Collateral and a property interest in its

Senior Payment Priority under the Transaction Documents; (iii) the bankruptcy of LBHI would

inevitably lead to the bankruptcy of other significant operating subsidiaries of LBHI, such as

LBSF; and (iv) LBSF's interest in the Swap Agreements was valuable to LBSF. The Payment

Priority Exchanges and Collateral Transfers, which were based on the application of

unenforceable *ipso facto* clauses, were therefore designed to remove those assets from the reach

of LBSF's creditors and thereby hinder, delay, or defraud LBSF's creditors by depriving them of

access to LBSF's valuable property rights.

67.        Such intent can also be inferred from the badges of fraud surrounding

each Trustee's actions in effectuating the Transfers.

68.        First, there was a close relationship between the Trustees and LBSF.

Indeed, the Trustees were LBSF's fiduciaries under the Indentures, and owed LBSF duties with

respect to the Collateral. Moreover, the Trustees maintained control over the Issuers, and their

assets for the benefit of LBSF and the Noteholders.

69.        Second, each Transfer completed prior to the Petition Date was

questionable, hasty and not in the ordinary course of business. The period during which the

Collateral Transfers occurred was characterized by disruptions in the financial markets,

restrictions on the availability of credit, massive liquidations of collateral, and an unprecedented

need for government intervention to prevent a collapse of the worldwide banking system.

During the time between LBHI's filing and that of LBSF (and subsequently in certain instances),

Defendant Noteholders and Trustees acted aggressively to gain an unfair advantage vis-à-vis

both LBSF and creditors of LBSF, and such actions were in general designed to hinder, delay, or

defraud creditors of LBSF from realizing on the value of LBSF's property.  On information and

belief, in respect of Transfers occurring prior to the Petition Date, each of the Trustees was

directed by one or more Noteholders in each CDO to enforce the *ipso facto* clauses as a result of

the commencement of a chapter 11 case.  Certain Trustees demanded indemnification from the

respective Noteholders prior to carrying out such Noteholders' directives with respect to

termination of the CDOs and application of the Priority Modification Provisions and, on

information and belief, each Trustee sought, and was provided with, such indemnification from

the respective Noteholders prior to taking any action.  Such demands for indemnification

evidenced the questionable nature of the Transfers made in reliance on the Priority Modification

Provisions.  The circumstances of LBHI's bankruptcy, the damage such bankruptcy would

inevitably cause LBSF, and the drastic upheavals in world financial markets contemporaneous

with the LBHI filing, made it readily apparent to the Trustees and the Noteholders who effected

the Payment Priority Exchanges and Collateral Transfers prior to the LBSF Petition Date, that

they should act quickly and aggressively in their efforts to improve their positions at the expense

of LBSF's creditors.

70.        The Trustees' activities in effecting the Transfers on multiple occasions

prior to the LBSF Petition Date constituted a pattern or series of transactions all of which had the

same objective, to remove the Issuers' assets from the reach of LBSF's creditors. The Trustee

Defendants knew or should have known, among other things, that the Priority Modification

Provisions constituted unenforceable *ipso facto* clauses that violated Sections 365(e)(1),

541(c)(1), and 363(l) of the Bankruptcy Code, and that the application of those provisions to

effect the Payment Priority Exchange would violate the automatic stay that would arise on the

inevitable commencement of LBSF's chapter 11 case. With respect to any Payment Priority

Exchange that occurred before LBSF's Petition Date, each such Trustee intended to accomplish

the Payment Priority Exchange in order to hinder, delay, or defraud LBSF's creditors in their

ability to realize on the value inherent in the property so transferred.

71.     Each Trustee knew that LBSF held secured claims against the Issuers

which the Issuers would be unable to satisfy once the Trustees effectuated the Transfers.

72.     Third, the Transfers occurred at a time when LBSF was insolvent, or such

transfers rendered LBSF insolvent. The Transfers were made at a time when LBSF was engaged

in business or transactions, or was about to engage in business or transactions, for which the

balance of its remaining property constituted unreasonably small capital.

73.     Fourth, LBSF received no consideration in exchange for the Transfers

and was deprived of substantial amounts of valuable property because the Swap Agreements

were "in-the-money."

74.     The Trustees were fiduciaries of LBSF and dominated and controlled

LBSF's property interest in the Transaction Documents, the Collateral, and its proceeds.

Accordingly, the Trustees' intent to accomplish the Transfers, and thereby hinder, delay, or

defraud creditors of LBSF and prevent those creditors from recovering on LBSF's interests in

property which were the subject of the Transfers, should be imputed to LBSF.

21

75.     Under the Transaction Documents, the Trustees (often acting at the direction of the Noteholders) had control over the enforcement of the Transaction Documents, and the Collateral, and had the power to direct the disposition of LBSF's interest in the Transaction Documents, and in the Collateral and its proceeds.  Under the Transaction Documents, certain Noteholders had the right to direct the Trustees to take certain actions, and on information and belief, certain of the Noteholders exercised that power to direct the Trustees to take action in an effort to hinder, delay, or defraud the realization by LBSF's creditors of LBSF's valuable rights in and to the Transaction Documents and the Collateral.  In many instances, the Noteholders and Trustees acted hastily in an effort to consummate the Transfers before LBSF filed a chapter 11 case and thereby obtained the ability to interfere with their objective to utilize the *ipso facto* clauses to cause the transfer of LBSF's valuable property interests.  The Noteholders' actions were designed to hinder and delay LBSF's creditors' ability to realize on LBSF's property interests.  The intent of such Noteholders to hinder, delay, or defraud LBSF's creditors should be imputed to LBSF given the Noteholders' ability to direct the activities of the Trustees who acted as their agents.  Because of the Trustees' dominion and control over LBSF's interest in the Transaction Documents, and in the Collateral and its proceeds, upon the Event of Default, the Trustees effectuated the Payment Priority Exchange and Collateral Transfers (and subsequent transfers of the Collateral's proceeds to the Noteholders and/or the Noteholder Class) without LBSF's consent, and often at the direction and insistence of the Noteholders.

76.     Pursuant to the Transaction Documents, the Trustees controlled the movement and subsequent disposition of the Collateral and Collateral's proceeds, often in concert with, or at the direction of the Noteholders.

77.     The involuntary transfer of LBSF's interest in particular property – the interest in the Transaction Documents, the Collateral and/or its proceeds – to or for the benefit of the Trustees and/or the Noteholders, was executed with the intent to hinder, delay, or defraud LBSF's creditors.  The Payment Priority Exchange and Collateral Transfers thus caused LBSF to be deprived of its interests in property – LBSF's right to payment priority and LBSF's senior lien on the Collateral and its proceeds.  Depriving LBSF of those property interests constituted an involuntary avoidable "transfer" under Section 101(54) and 548(a)(1)(A) of the Bankruptcy Code.

78.     If the Payment Priority Exchange is not invalidated under the *ipso facto* doctrine, as LBSF believes it should be, then the Priority Modification Provisions work as an intercreditor agreement between LBSF and the Noteholders in connection with their respective claims against the Issuers.  If enforceable, the Priority Modification Provisions would obligate LBSF, in contractually specified circumstances, to transfer its interest in particular property – the right to Senior Payment Priority – to or for the benefit of the Noteholders, thereby enhancing the Noteholders' ability to recover on their claims against the Issuers.  The Payment Priority Exchange thus caused LBSF to be deprived of a valuable property interest – its contractual right to Senior Payment Priority – by giving it to or for the benefit of the Noteholders resulting in a windfall to these Noteholders.  Depriving LBSF of those property interests would constitute an avoidable "transfer" under Section 101(54) of the Bankruptcy Code.

79.     If enforceable, the Priority Modification Provisions operate as a covenant by LBSF that, upon the occurrence of specified events, LBSF will pledge some of its property to, or for the benefit of the Noteholders, to further secure the Noteholders' claims against the Issuer.  Just as such a covenant would give the Noteholders a contractual right to obtain property from

LBSF through such a pledge, the Priority Modification Provisions, if enforceable, would give the

Noteholders a contractual right to obtain property from LBSF through the Payment Priority

Exchange.  And just as LBSF would satisfy its contractual obligation to the Noteholders under

such a covenant by delivering property to, or for the benefit of, the Noteholders, through such a

pledge if the Priority Modification Provisions are found to be enforceable, LBSF would, through

the Payment Priority Exchange, satisfy its contractual obligation to the Noteholders to give

Senior Payment Priority to, or for the benefit of, the Noteholders.  Even if the Priority

Modification Provisions might be read to effectuate the Payment Priority Exchange

automatically rather than through some action by LBSF, this does not change the fact that the

Payment Priority Exchange constitutes a transfer of an interest of LBSF in property to, or for the

benefit of, the Noteholders that satisfies an existing contractual obligation of LBSF to the

Noteholders to make such transfer.

      80.     Alternatively, if the Payment Priority Exchange is not effected pursuant

to, and in satisfaction of, an enforceable contractual obligation of LBSF, then any operation of

the Payment Priority Exchange would be a gratuitous transfer of a property interest by LBSF for

which LBSF received no value in exchange.

      81.     Moreover, LBSF was heavily "in-the-money" on each of the Swap

Agreements at the time of bankruptcy.  As a result, LBSF was entitled to a substantial amount of

the Collateral in the event of a distribution following a termination of the Swap Agreement.  The

Trustees, however, seizing upon the Priority Modification Provisions and the Payment Priority

Exchange, declared LBSF a "defaulting party" and transferred almost all of the Collateral,

including the portion to which LBSF was entitled, to the Noteholders (the "Distributions"), while

retaining other monies to pay certain fees and costs of the Trustees, including litigation expenses. The Distributions effected a staggering windfall to the Noteholders.

82.    The Noteholders received or potentially will receive billions of dollars which, but for the invalid and unenforceable Priority Modification Provisions, were due to LBSF – funds of enormous value to creditors of the estate.  The Noteholders were, thereby, enriched at the expense of LBSF's creditors.  Additionally, the Noteholders are wrongfully withholding millions in Distributions which rightfully belong to those creditors.

83.    All conditions precedent to suit have been performed, have occurred, or have been waived.

84.    The modification of LBSF's payment priority solely as a result of a bankruptcy filing did not constitute a liquidation, termination, or acceleration of the obligations under any Swap Agreement.  By changing LBSF's payment priority under the Indentures and subordinating LBSF to Noteholders, the Priority Modification Provisions modified LBSF's rights under an executory contract solely as a result of the commencement of a chapter 11 case.

85.    LBSF has diligently attempted to identify all Noteholders and other potential defendants, and has spent substantial funds on this effort.

86.    Despite its substantial efforts, when it filed its initial, Amended, Second Amended, and Third Amended Complaints, LBSF was not able to identify some of the Noteholders who received distributions relevant to this litigation.

87.    To provide notice to potential unnamed Noteholders LBSF filed this action as a putative defendant class action.

88.    LBSF filed this action as a defendant class action in reasonable reliance on existing case law relating to *American Pipe and Construction Co. v. Utah*, 414 U.S. 938

(1974), which indicated that the filing of this action would toll the running of the statute of

limitations with respect to unnamed defendants who are encompassed within the putative class.

89.    Until shortly before it added new defendants in each of the Second,

Third, and Fourth Amended Complaints in this action, LBSF lacked sufficient knowledge

regarding the conduct or potential liability of those newly named defendants.

90.    Upon information and belief, prior to being named in this case, the

Defendants newly named in the Second, Third, and Fourth Amended Complaints had actual or

constructive knowledge of this case because, among other things, affiliates, agents, or

representatives of those Defendants possessed actual or constructive knowledge of this lawsuit

and communicated such knowledge to those defendants.  In addition, those Defendants were

themselves provided with notice of this litigation by trustees or administrators, or learned about

this litigation from other sources.  Moreover, Noteholder Defendants received distributions

earlier than expected and in amounts substantially higher than they knew, or should have known,

they would receive at that time.  Furthermore, Defendants themselves became aware, or

constructively aware, of the pendency of this class action which encompasses those defendants

as absent class members.

**ADDITIONAL ALLEGATIONS REGARDING THE PYXIS TRANSACTION**

91.    The Pyxis Transaction is similar to transactions described above.  In

addition to its Priority Modification Provision being an unenforceable *ipso facto* provision, the

swap agreement between LBSF and Pyxis ABS SPV 2007-1 Ltd ("Pyxis"), the Issuer of the

Pyxis Transaction (the "Pyxis Credit Default Swap Agreement")[9], was terminated prematurely

---

[9] The Pyxis Credit Default Swap Agreement is a 1992 form (Multicurrency-Cross Border) ISDA Master Agreement, dated as of March 6, 2007 ("Pyxis Master Agreement"), along with the annexed "Schedule," the relevant swap "Confirmations," and related documents.

and in violation of multiple provisions of the Pyxis Indenture[10] governing the Pyxis Transaction

and the Pyxis Credit Default Swap Agreement itself.

**A.    Premature Termination of the Pyxis Credit Default Swap Agreement**

92.    On February 1, 2008, the Pyxis Trustee gave notice that an Event of

Default had occurred under Section 5.1(h) of the Pyxis Indenture.  This was followed on

February 4, 2008, by an acceleration of the maturity of the Notes by the controlling class of

Pyxis Noteholders (the "Controlling Class").  At that time, the Controlling Class did not elect to

exercise its right to seek disposition of the Collateral, and the Pyxis Trustee subsequently

decided to retain the Collateral pursuant to Section 5.5(a) of the Pyxis Indenture.

93.    Over seven months later, following the LBHI Petition Date, the Pyxis

Trustee provided LBSF with a notice stating that "[a]s a result of such event of default [the LBHI

bankruptcy], the Pyxis Trustee on behalf of the Pyxis Issuer, upon the direction of the Collateral

Manager and a Majority of the Controlling Class, exercised the right of the Issuer to terminate

the Pyxis Credit Default Swap Agreement and the Deemed Floating Asset Hedge Agreement.

The Pyxis Trustee also designated September 24, 2008, as the 'Early Termination Date' under

each such agreement."  One day earlier, on September 23, 2008, the Controlling Class directed

the Pyxis Trustee to dispose of the Collateral.

94.    The Pyxis Trustee's termination of the Pyxis Credit Default Swap

Agreement was flawed in several material respects and is, therefore, ineffective.

95.    First, the Pyxis Trustee's termination failed to provide LBSF with the

requisite ten (10) business day period within which to assign the Pyxis Credit Default Swap

Agreement.  The September 15, 2008 LBHI bankruptcy filing constituted an Event of Default

---

[10] The "Pyxis Indenture" is the indenture, dated as of March 6, 2007, among Pyxis, Pyxis ABS CDO
2007-1 LLC and the Pyxis Trustee.

under the terms of the Pyxis Credit Default Swap Agreement set out in the Pyxis Master

Agreement.  See Pyxis Credit Default Swap Agreement, § 5(a)(vii)(4).  The following day, S&P

and Moody's downgraded their ratings of LBHI and LBSF, which constituted a "Ratings Event"

under the terms of the Pyxis Credit Default Swap Agreement set out in the Schedule.  See Pyxis

Credit Default Swap Agreement, Schedule, Part 5(k)(iii).

96.    Under Part 5(k)(iv) of the Schedule, following the occurrence of a

Ratings Event, LBSF had a period of ten (10) business days (expiring on September 30, 2008)

within which, with the assistance of Pyxis, it could (i) furnish an Eligible Guarantee of its

obligations from a guarantor that satisfied the Required Ratings, or (ii) obtain a substitute

counterparty that satisfied the Required Ratings (i.e., assign its position under the Pyxis Credit

Default Swap Agreement to a creditworthy replacement counterparty).

97.    The Pyxis Trustee did not provide LBSF with the required ten (10)

business days within which to assign the Pyxis Credit Default Swap Agreement.

98.    Thus, when the occurrence of an Event of Default and a Ratings Event

under the Pyxis Credit Default Swap Agreement coincided, the Schedule provided LBSF with

the specific right to assign its interest as the result of the Ratings Event, while the Pyxis Master

Agreement provided the Trustee with the conflicting right to terminate the CDS Agreement

Transactions[11] as the result of the Event of Default caused by LBHI's filing.  In other words,

LBSF's and the Pyxis Trustee's respective rights and remedies under Section 6(a) of the Pyxis

Credit Default Swap Agreement were in direct conflict with those under Part 5(k)(iv) of the

Schedule.  Such conflicts are explicitly resolved by Section 1(b) of the Pyxis Master Agreement,

which unequivocally provides that in such cases the provisions of the Schedule will prevail.

---

[11] The Pyxis Indenture provides that "CDS Agreement Transactions" means the Synthetic Securities in
the form of credit default swap transactions entered into by the Issuer with the Credit Default Swap
Counterparty under the Credit Default Swap Agreement.

Accordingly, LBSF's assignment and substitution rights under the Schedule were supposed to prevail over the Pyxis Trustee's right to designate an Early Termination Date under the Credit Default Swap Agreement.

99.     By improperly designating an Early Termination Date under the Pyxis Credit Default Swap Agreement on September 24, 2008, with five (5) business (and seven (7) calendar) days remaining in the Ratings Event cure period, the Pyxis Trustee cut off LBSF's ability to exercise its rights pursuant to the Schedule.  Moreover, the Pyxis Trustee issued a termination notice on September 19, 2008, which informed market participants that the transaction was terminated, and in so doing, blocked LBSF's ability to exercise its rights pursuant to the Schedule.  Far from standing ready to assist LBSF, as was its obligation, the Pyxis Trustee took steps to frustrate LBSF's ability to exercise its assignment rights under the Schedule.

100.     Had LBSF assigned its rights under the Pyxis Credit Default Swap Agreement, it would have realized substantially all of the value of its position.  Moreover, because termination was improper, the Pyxis Credit Default Swap Agreement remains live, and LBSF's Senior Payment Priority under the Pyxis Credit Default Swap Agreement remains operative irrespective of any amounts owed to the Noteholders.

**B.     Improper Liquidation of the Collateral**

101.     Section 5.5(a) of the Pyxis Indenture provides that the Pyxis Trustee is obligated at all times to retain the Collateral intact absent the occurrence of one of several specified identified circumstances in which the Pyxis transaction could be unwound (each, a "Disposition Event").  One such Disposition Event occurred on January 31, 2008, months prior

to LBHI's Petition Date, when it was determined that Pyxis had failed to maintain a Collateral

coverage ratio required under the Pyxis Indenture.

102.    As stated above, on February 1, 2008, the Pyxis Trustee gave notice that

an Event of Default had occurred, and on February 4, 2008, the Controlling Class accelerated the

maturity of the Notes.  At that time, the Disposition Event entitled the Controlling Class as

holder of a Majority of the Controlling Class, to seek LBSF's consent to direct the disposition of

the Collateral – that is, to sell, terminate or otherwise liquidate the Collateral – in accordance

with Section 5.5(a)(iii) of the Pyxis Indenture.  However, the Controlling Class elected not to

exercise that right, and the Pyxis Trustee therefore retained the Collateral pursuant to Section

5.5(a).

103.    In February 2008, had the Controlling Class exercised its right to direct

disposition of the Collateral pursuant to Section 5.5(a)(iii) with LBSF's consent, Pyxis would

have had to make substantial termination payments to LBSF in connection with the termination

of the Pyxis Credit Default Swap Agreement.  As the Pyxis Credit Default Swap Agreement was

deeply "in-the-money" to LBSF by roughly $1 billion – far more than the value of Pyxis's assets

– the Controlling Class would have been contractually obligated to make up any shortfall up to a

specified maximum under the relevant Transaction Documents.

104.    In the absence of any direction from the Controlling Class at that time,

the Pyxis Trustee notified the parties it would continue to retain the Collateral intact, as required

by the Pyxis Indenture.

105.    Once the Pyxis Trustee retained the Collateral, Section 5.5(a) specifically

provided that "[s]o long as such Event of Default is continuing, any such retention pursuant to

this Section 5.5(a) may be rescinded at any time *when the conditions specified in clause (i) or (ii)*

30

*exist.*"  Id. § 5.5(a) (emphasis added).  Tellingly, clause (iii) is omitted from the list, which is the

clause giving rise to the Controlling Class's right to direct the disposition of the Collateral even

if the proceeds of such disposition were insufficient to repay junior classes of noteholders and

LBSF in full.  Id.  The plain reading of the Pyxis Indenture means that, by electing not to

exercise its right in February 2008, the Controlling Class forfeited the opportunity to later direct

disposition of the Collateral because the right of the Controlling Class under Section 5.5(a)(iii) is

not a continuing right and is exercisable only so long as the Pyxis Trustee has not retained the

Collateral.  Therefore, the Controlling Class's direction to the Pyxis Trustee on September 23,

2008 to dispose of the Collateral – which explicitly referred only to the February 1, 2008 Event

of Default – and the Pyxis Trustee's subsequent liquidation of the Collateral and distribution of

proceeds to Noteholders, contravened the plain terms of Section 5.5(a) and LBSF's rights.

## C.    Violation of Section 5.2 of the Pyxis Indenture

106.    Section 5.2(c) of the Pyxis Indenture sets out two preconditions, each of

which must be met before the Pyxis Trustee may terminate the Pyxis Credit Default Swap

Agreement – first, that "the liquidation of the Collateral has begun" and second, that the maturity

date of the Notes has been accelerated and the declaration of acceleration "is no longer capable

of being rescinded or annulled."

107.    As explained in Section B above, the first condition – commencement of

liquidation of the Collateral – was not satisfied within the terms of the Pyxis Indenture.

108.    The second precondition likewise was not met.  The Controlling Class,

had declared the acceleration of the Pyxis Notes following the January 2008 Disposition Event.

The Controlling Class's declaration of acceleration, however, remained capable of being

rescinded as of September 24, 2008.  Section 5.2(b) of the Pyxis Indenture provides that a

declaration of acceleration may be rescinded "at any time" after it is made and before a judgment

or decree for payment of the cash due has been obtained by the Pyxis Trustee pursuant to Article

V of the Pyxis Indenture.  Given that no such judgment had been obtained, the acceleration was

capable of being rescinded.

109.     The purpose of Section 5.2(c) is clear and simple.  Unless the overall

Pyxis  Transaction became irretrievable, the Pyxis Credit Default Swap Agreement, given its

central importance to the overall Pyxis Transaction, was to remain in place and would be the last

item of the Collateral to be terminated – not, as was the case in this instance, the first to be

terminated.

110.     By liquidating the Collateral improperly and terminating the Pyxis Credit

Default Swap Agreement when the declaration of acceleration was capable of being rescinded,

the Pyxis Trustee violated the express terms of the Pyxis Indenture.

**D.     Failure to Obtain a Substitute Credit Default Swap Agreement**

111.     Section 7.8(a)(xi) of the Pyxis Indenture expressly provided that Pyxis

was prohibited from terminating the Pyxis Credit Default Swap Agreement unless either (i) there

are no CDS Agreement Transactions outstanding under the Pyxis Credit Default Swap

Agreement or (ii) Pyxis has entered into a replacement credit default swap agreement.  Similarly,

Section 7.5(f) obligated Pyxis to use "reasonable efforts to enter into a replacement Credit

Default Swap Agreement" in connection with any termination of the Credit Default Swap

Agreement.

112.     CDS Agreement Transactions remained outstanding at the time of the

purported termination by the trustee of the Pyxis Credit Default Swap Agreement.  The Pyxis

Trustee, however, terminated the Pyxis Credit Default Swap Agreement without attempting to

enter into a replacement Credit Default Swap Agreement.  That purported termination violated

LBSF's rights under the Pyxis Credit Default Swap Agreement and the Pyxis Indenture.  A

replacement Credit Default Swap Agreement covering the same Reference Obligations as the

original Pyxis Credit Default Swap Agreement with LBSF would have been worth hundreds of

millions of dollars to any number of credit protection purchasers in the market at the time.  A

new Credit Default Swap counterparty would have paid Pyxis amounts that Pyxis could have

used to make the CDS Termination Payment due to LBSF upon termination of the CDS

Agreement Transactions.

113.    The Pyxis Trustee terminated the Credit Default Swap Agreement,

relieving the Controlling Class of its massive liability and repaying the other Noteholders their

extraordinary losses, all at the expense of LBSF's creditors.

**E.    Violation of Section 13 of the Pyxis Indenture**

114.    In addition, under the terms of the Pyxis Indenture, the Pyxis Noteholders

are required to hold, in trust, any funds that are distributed to them instead of to a party with

senior priority to such funds, *i.e.*, LBSF as the swap counterparty.  The Pyxis Noteholders are

further required to return such improperly distributed funds to the Trustee for payment to the

appropriate party.  LBSF is an express third-party beneficiary of the Pyxis Indenture.

**ADDITIONAL ALLEGATIONS REGARDING THE FEDERATION TRANSACTIONS**

115.    The Federation Transactions are similar to transactions described above.

In addition to their Priority Modification Provisions being unenforceable *ipso facto* provisions,

the swap agreements between LBSF and Securitized Product of Restructured Collateral Limited

SPC f/a/o the Series 2007-1 Federation A-1 Segregated Portfolio, and LBSF and Securitized

Product of Restructured Collateral Limited SPC f/a/o the Series 2007-1 Federation A-2

Segregated Portfolio (the "<u>Federation Credit Default Swap Agreements</u>") were terminated in violation of multiple provisions of the Federation Indentures[12] and the Federation Credit Default Swap Agreements themselves.

116.    The Federation Transactions documents contemplated a sequence of events following an "Event of Default," which included a bankruptcy filing by LBSF (or LBHI as guarantor), under the Federation Credit Default Swap Agreements. The Federation Issuers had the right (but not the obligation) to send a notice designating an "Early Termination Date," and, if they did so, they were also obligated to calculate the early termination amount, which would be the amount owing to one or the other of the parties. ISDA Master Agreements[13] Section 5(a)(vii)(4), 6(d); Schedule to ISDA Master Agreement Part 1(i). Events of Default occurred on September 15, 2008 (LBHI's bankruptcy filing) and October 3, 2008 (LBSF's bankruptcy filing). Consequently, on October 27, 2008, the Federation Trustee designated October 30, 2008 as the Early Termination Date for each of the Federation Credit Default Swap Agreements. However, neither the Trustee nor the Issuers calculated the applicable amount due upon early termination, which would have resulted in substantial amounts due to LBSF.

117.    Once the Issuers designated an Early Termination Date under the Federation Credit Default Swap Agreement, an "Event of Default" was automatically triggered under the Indentures, immediately accelerating the Notes, which became due and payable.

---

[12] The "Federation Indentures" is defined as (i) the indenture, dated as of May 9, 2007, between Securitized Product of Restructured Collateral Limited SPC f/a/o the Series 2007-1 Federation A-1 Segregated Portfolio, The Bank of New York and The Bank of New York, London Branch and (ii) the indenture, dated as of May 9, 2007, between Securitized Product of Restructured Collateral Limited SPC f/a/o the Series 2007-1 Federation A-2 Segregated Portfolio, The Bank of New York and The Bank of New York, London Branch.

[13] The ISDA Master Agreements are the 1992 (Multicurrency-Cross Border) ISDA Master Agreements, dated as of May 9, 2007, between LBSF and Federation, along with the annexed "Schedule," the relevant swap "Confirmations," and related documents.

Federation Indentures, Standard Terms, Section 5.1(e) at 26.  The Issuers were deemed to receive

an "Enforcement Notice" on the date of the Event of Default under the Indentures.  Federation

Indentures, Standard Terms, Section 5.2(a) at 26.

      118.     Under the Federation Indentures, an "Early Termination Payment Date"

occurs on the first "Payment Date" following the date of (deemed) delivery of the Enforcement

Notice.  Federation Indentures, Section 2.  A Payment Date is defined as "[t]he tenth day of each

February, May, August and November (or if any such day is not a Business Day, the next

following Business Day), commencing on the Payment Date in August 2007 and ending on the

Effective Maturity Date (unless the Notes are redeemed or repaid prior thereto)."  Id.  The

"Effective Maturity Date" was defined to include the Early Termination Payment Date.  Id.

Therefore, on the Early Termination Payment Date, also known as the "Final Scheduled Payment

Date," the Custodians of the Collateral were directed to make payments to LBSF and the

Noteholders in order of priority set forth in Section 5 of the Indenture.  Id., Section 5(a)(iv) at

16-17.

      119.     In violation of the Federation Indentures and the Federation Credit

Default Swap Agreements, neither the Federation Issuers nor the Trustee calculated the amount

due upon early termination under the Federated Credit Default Swap Agreement.  In addition, the

date on which the Issuers designated an Early Termination Date under the Federation Credit

Default Swap Agreement (here, October 27, 2008) was also the date the Enforcement Notice was

deemed delivered to the Issuers under the Indentures.   Federation Indenture, Standard Terms §

5.2(a) at 26.  However, under the Indentures, an Early Termination Payment Date (and Final

Scheduled Payment Date) cannot occur prior to the first Payment Date following the

Enforcement Notice date.  Since the Enforcement Notice date was October 27, 2008, the

35

immediately following Payment Date did not occur until November 10, 2008. Therefore, the

Early Termination Payment Date/Final Scheduled Payment Date did not occur, and Section 5(a)

of the Series Indentures which sets out various "Priority of Payments" applicable for different

payment dates, did not come into operation. Nonetheless, the Trustees purported to liquidate the

collateral in accordance with section 5(a)(iv) of the Series Indentures, and on October 29, 2008,

paid the proceeds of the Federation Collateral to the Federation Noteholders pursuant to

subsections 5(a)(iv)(C) and (D).

### COUNT I
### Against All Defendants

***(Declaratory Judgment – Provisions Modifying Plaintiff's Payment Priority as a Result of the
Bankruptcy Filings Are Unenforceable Ipso Facto Clauses*)**

120.    LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

121.    At the time of the LBHI and LBSF bankruptcy filings, the parties'

respective obligations under the Transaction Documents were continuing and the performance of

material obligations under the Swap Agreements, Indentures, and Transaction Documents

remained outstanding on both sides. Accordingly, the Swap Agreements, Indentures, and

Transaction Documents were executory contracts and subject to the protections of Section

365(e), and were otherwise subject to the protections of Sections 541(c)(1)(B), and 363(l) of the

Bankruptcy Code.

122.    The Priority Modification Provisions that purport to effect the Payment

Priority Exchange and modify LBSF's rights as a result of LBHI's or LBSF's bankruptcy filing

36

constitute unenforceable *ipso facto* clauses that violate Sections 365(e)(1), 541(c)(1) and 363(l) of the Bankruptcy Code.

123.    The Bankruptcy Code protects debtors from being penalized for filing a chapter 11 case, notwithstanding any contractual provisions or applicable law that would have that effect.  Indeed, Section 365(e)(1) of the Bankruptcy Code provides that:

> [n]otwithstanding a provision in an executory contract . . .  an executory contract . . . of the debtor may not be terminated *or modified*, and any right or obligation under such contract or lease may not be terminated *or modified*, at any time after the commencement of the case solely because of a provision in such contract . . . that is conditioned on . . . the commencement of a case under this title . . . .

11 U.S.C. § 365(e)(1) (emphasis added).

124.    Similarly, Section 541(c)(1) of the Bankruptcy Code recognizes that a debtor's interest in property:

> becomes property of the estate  . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law . . . that is conditioned on . . . the commencement of a case under this title . . . and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1).

125.    Enforcement of the Priority Modification Provisions also violates the *ipso facto* prohibition of Section 363(l), which provides, in relevant part, that the debtor:

> may use, sell, or lease property under section (b) or (c) of this section, or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a case under this title or a custodian, and that effects, or give an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

11 U.S.C. § 363(l).  As described above, property of the estate is broadly defined in Section 541(a)(1) and includes property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced.

126.     Because the Priority Modification Provisions (a) become operative after the commencement of LBHI's or LBSF's bankruptcy case, (b) effect the Payment Priority Exchange solely because of "the commencement of a case" under the Bankruptcy Code, and (c) modify LBSF's right to Senior Payment Priority, the provisions are unenforceable *ipso facto* clauses, and the Court should declare that the Priority Modification Provisions and the corresponding Payment Priority Exchange are unenforceable pursuant to Sections 365(e)(1), 541(c)(1)(B) and 363(l) of the Bankruptcy Code.

127.     This Court has already determined in *LBSF v. BNY*, that a provision like the Priority Modification Provisions is an unenforceable *ipso facto* clause.

128.     The Court should declare that the Priority Modification Provisions are unenforceable pursuant to Section 365(e)(1), 541(c)(1)(B) and 363(l) of the Bankruptcy Code.

129.     There is an actual controversy between the parties on this issue because the Transaction Documents on their face apply the Payment Priority Exchange in violation of the Bankruptcy Code and Defendants have not agreed to waive or disregard such Payment Priority Exchange and pay LBSF what it is rightfully owed.

130.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests that the Court enter a declaratory judgment that (a) the Priority Modification Provisions are unenforceable *ipso facto* clauses pursuant to Sections 365(e)(1), 541(c)(1)(B) and 363(l) of the Bankruptcy Code, and that (b) LBSF is entitled to Senior Payment Priority.

## COUNT II
### Against the Trustees, Noteholders, and Noteholder Class

*(Provisions Modifying Plaintiff's Payment Priority as a
Result of the Bankruptcy Filings Violate the Automatic Stay)*

131.    LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

132.    Section 362(a) of the Bankruptcy Code provides, in relevant part, that the

filing of a petition under chapter 11 of the Bankruptcy Code "operates as a stay, applicable to all

entities, of -- . . . (3) any act to obtain possession of property of the estate or of property from the

estate or to exercise control over property of the estate . . . ." 11 U.S.C. § 362(a)(3).

133.    At the time LBSF commenced its case under the Bankruptcy Code, its

right to Senior Payment Priority constituted a substantial asset of the estate.  The actions of the

Trustees to exercise control over LBSF's Senior Payment Priority, including any action to effect

the Payment Priority Exchange, would be, therefore, subject to, and in violation of, the automatic

stay, provided under Section 362(a) of the Bankruptcy Code.  See 11 U.S.C. § 362(a)(3).

134.    Further, the Payment Priority Exchange improperly seeks to take property

of LBSF because of its or LBHI's bankruptcy filing.  Property of a debtor becomes property of

the estate, "notwithstanding any provision in an agreement . . . that is conditioned . . . on the

commencement of a case under this title . . . and that effects or gives an option to effect a

forfeiture, modification, or termination of the debtor's interest in property."  11 U.S.C. §

541(c)(1).  Invoking the Payment Priority Exchange modified LBSF's right to Senior Payment

Priority, and thus caused LBSF to forfeit an interest in property because of "the commencement

of a case under this title."  This violates the automatic stay provided under Section 362(a).

135.    There is an actual controversy between the parties on this issue because, in violation of the Bankruptcy Code, (i) the Transaction Documents require the Payment Priority Exchange; and (ii) Defendants have not agreed to waive or disregard such Payment Priority Exchange and pay LBSF what it is rightfully owed; and (iii) the Trustees effectuated the Payment Priority Exchange without LBSF's consent or approval of the Bankruptcy Court.

136.    Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests that this Court enter a declaratory judgment that all actions to enforce the Payment Priority Exchange after the Petition Date constitute violations of the automatic stay under Section 362(a)(3) of the Bankruptcy Code and are void *ab initio*.

137.    In addition, by violating the automatic stay, the Payment Priority Exchanges are void *ab initio*.

138.    As a result, LBSF has been damaged in an amount to be proven at trial.

## COUNT III
### Against the Trustees, Noteholders, and Noteholder Class

*(Collateral Transfers Following the Payment Priority Exchange Violate the Automatic Stay)*

139.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

140.    Section 362(a) of the Bankruptcy Code provides, in relevant part, that the filing of a petition under chapter 11 of the Bankruptcy Code "operates as a stay, applicable to all entities, of -- . . . (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . ." 11 U.S.C. § 362(a)(3).

141.    Upon the occurrence of the Events of Default under the Swap Agreements, the Collateral was liquidated and transferred to each Trustee's Payment Account and thereafter distributed to the Noteholders and/or the Noteholder Class.

142.    At the time that LBSF commenced its case under the Bankruptcy Code, LBSF had a property interest in the Collateral or its proceeds, which constituted a substantial interest of the estate.  The actions of the Trustees to exercise control over LBSF's interest in the Collateral or its proceeds, including any action to effect the Collateral Transfers, were, therefore, subject to, and in violation of, the automatic stay, provided under Section 362(a) of the Bankruptcy Code.  See 11 U.S.C. § 362(a)(3).

143.    Further, the Collateral Transfers improperly seized property of LBSF because of its or LBHI's bankruptcy filing.  Property of a debtor becomes property of the estate, "notwithstanding any provision in an agreement . . . that is conditioned . . . on the commencement of a case under this title . . . and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property."  11 U.S.C. § 541(c)(1).  Effectuation of the Collateral Transfers deprived LBSF of its interest in the Collateral or its proceeds because of "the commencement of a case under this title," in violation of the automatic stay provided under Section 362(a).

144.    There is an actual controversy between the parties on this issue because, in violation of the Bankruptcy Code, the Trustees effectuated the Collateral Transfers (and subsequent transfers of the Collateral's proceeds to the Noteholders and/or the Noteholder Class) without LBSF's consent or approval of the Bankruptcy Court.

145.    Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests that this Court enter a declaratory judgment that all actions to effectuate the

Collateral Transfers constitute willful violations of the automatic stay under Section 362(a)(3) of the Bankruptcy Code and are void *ab initio*.

146.    In the alternative, by violating the automatic stay, the Collateral Transfers are void *ab initio*.

147.    As a result, LBSF has been damaged, in an amount to be proven at trial.

### ALTERNATIVE COUNT IV
### Against the Trustees, Noteholders, and Noteholder Class

(*Prepetition Payment Priority Exchange Constitutes*
*Avoidable Transfer Under Section 547 of the Bankruptcy Code*)

148.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

149.    Section 547(b) of the Bankruptcy Code provides that "any transfer of an interest of the debtor in property" may be subject to avoidance as a preference if the transfer is made: "(1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) . . . while the debtor was insolvent; (4) . . . on or within 90 days before the date of the filing of the petition . . .; and (5) that enables such creditor to receive more than such creditor would receive if – (A) the case were a case under Chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided for by the provisions of this title."  11 U.S.C. § 547(b).

150.    Pursuant to the Transaction Documents, the bankruptcy filing of LBHI on September 15, 2008 – as Credit Support Provider to LBSF under the Swap Agreements – constituted an Event of Default under the Swap Agreements with respect to LBSF.

151.    If the Payment Priority Exchange is found to be effective, it would cause LBSF to transfer to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class, an interest of LBSF in property – its right to Senior Payment Priority.

152.    To the extent that the Payment Priority Exchange is found to (a) have taken effect *before* LBSF's petition date, (b) be enforceable, and (c) have been effected pursuant to an existing contractual obligation of LBSF, it is avoidable as a preferential transfer pursuant to Section 547 of the Bankruptcy Code.

153.    If the provisions that govern the Payment Priority Exchange are found to be enforceable, they would effect a transfer of LBSF's right to Senior Payment Priority to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class.

154.    Under the circumstances described in this count, the transfer of LBSF's right to Senior Payment Priority would be on account of an antecedent debt, consisting of LBSF's contractual obligation, in specified circumstances, to transfer its right to Senior Payment Priority to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class.

155.    Under these circumstances, any transfer would have been made no earlier than September 15, 2008 – within the 90 days preceding LBSF's bankruptcy filing – while LBSF was insolvent.

156.    If the Payment Priority Exchange is found to be enforceable and to have operated as described in this alternative Count, it would allow the Trustees, the Noteholders, and/or the members of the Noteholder Class, to receive more than they would have otherwise received if the case were a case under chapter 7 of this title and the transfer effected by the Payment Priority Exchange had not been made.

157.    If the Payment Priority Exchange is found to be enforceable and to have operated as described in this alternative Count, it was a preferential transfer of LBSF's property interest – its Senior Payment Priority – to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class, which LBSF may avoid pursuant to Section 547(b) of the Bankruptcy Code and which LBSF may recover from the Trustees, the Noteholders, and/or the members of the Noteholder Class, as the initial transferees of LBSF's said property interest, pursuant to Section 550(a)(1) of the Bankruptcy Code, and preserve that property interest for the benefit of its estate pursuant to Section 551 of the Bankruptcy Code.

158.    To the extent that each of the Trustees, the Noteholders, and/or the members of the Noteholder Class members received subsequent transfers of LBSF's Senior Payment Priority, each of the Trustees, the Noteholders, and/or the members of the Noteholder Class constitutes an immediate and/or mediate transferee of the initial transferees within the meaning of Section 550(a)(2) of the Bankruptcy Code.  To the extent that each of the Trustees, the Noteholders, and/or the members of the Noteholder Class received such subsequent transfers, none of the Trustees, the Noteholders, and/or the members of the Noteholder Class took its interest in the transferred property for value, in good faith, and without knowledge of the voidability of the transfer within the meaning of Section 550(b)(1) of the Bankruptcy Code.

159.    In this alternative Count, LBSF asserts its right to avoid the Payment Priority Exchange and to recover and preserve, for the benefit of its estate, the Senior Payment Priority from all initial transferees and from all immediate and/or mediate transferees of such initial transferees.

## ALTERNATIVE COUNT V
### Against the Noteholders and Noteholder Class

*(**Avoidance of the Priority Transfers Made with the Actual Intent to Hinder, Delay
or Defraud LBSF's Creditors Under Section 548(a)(1)(A) of the Bankruptcy Code**)*

160.    LBSF repeats, realleges, and incorporates by reference the allegations
contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of
action.

161.    LBSF seeks entry of a judgment against the Noteholders and/or
Noteholder Class avoiding the Payment Priority Exchange effected prior to the Petition Date as
transfers made with the actual intent to hinder, delay, or defraud LBSF's creditors, pursuant to
Section 548(a)(1)(A) of the Bankruptcy Code.

162.    The Bankruptcy Code provides that a debtor in possession "may avoid
any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that
was made or incurred on or within two years before the date of the filing of the petition, if the
debtor voluntarily or involuntarily – (A) made such transfer or incurred such obligation with
actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or
after the date that such transfer was made or such obligation was incurred, indebted."  11 U.S.C.
§ 548(a)(1)(A).

163.    Upon the closing date of each of the CDOs, LBSF's Senior Payment
Priority was "an interest of LBSF in property."

164.    Pursuant to the Transaction Documents, the bankruptcy filing of LBHI –
the Credit Support Provider to LBSF under the Swap Agreements – on September 15, 2008
constituted an Event of Default under the Swap Agreements with respect to LBSF.

45

165.    After the Event of Default, each Trustee effected the Priority Transfers from LBSF to the Noteholders.

166.    Each of the Priority Transfers that occurred before the Petition Date was made with the actual intent to hinder, delay, or defraud LBSF's creditors.

167.    Each Trustee knew or should have known that (i) the commencement of LBHI's chapter 11 case was the sole basis for the purported Event of Default; (ii) LBSF had the right to Senior Payment Priority under the Transaction Documents, and the provisions of the Transaction Documents that purported to modify LBSF's Senior Payment Priority were unenforceable *ipso facto* clauses; (iii) the bankruptcy of LBHI would inevitably lead to the bankruptcy of other significant operating subsidiaries of LBHI, such as LBSF; and (iv) LBSF's right to Senior Payment Priority on the early termination of the Swap Agreements was valuable to LBSF. The Priority Transfers were therefore designed to remove those assets from the reach of LBSF's creditors and thereby hinder, delay, or defraud LBSF's creditors by depriving them of access to LBSF's valuable property rights.

168.    Such intent can also be inferred from the badges of fraud surrounding each Trustee's actions in effectuating the Transfers.

169.    First, there was a close relationship between the Trustees and LBSF. Indeed, the Trustees were LBSF's fiduciaries under the Indentures, and owed LBSF duties with respect to the Collateral. Moreover, the Trustees maintained control over the Issuers, and their assets for the benefit of, among others, LBSF.

170.    Second, the Transfers depleted all or substantially all of the assets of some or all of the Issuers, and left LBSF without a source from which to recover all of its valuable interests in the Swap Agreements.

46

171.    Third, each Transfer completed prior to the Petition Date was

questionable, hasty and not in the ordinary course of business.  The period during which the

Payment Priority Exchanges occurred was characterized by disruptions in the financial markets,

restrictions on the availability of credit, massive liquidations of collateral, and an unprecedented

need for government intervention to prevent a collapse of the worldwide banking system.

During the time between LBHI's filing and that of LBSF (and subsequently in certain instances),

Defendant Noteholders and Trustees acted aggressively to gain an unfair advantage vis-à-vis

both LBSF and creditors of LBSF, and such actions were in general designed to hinder, delay, or

defraud creditors of LBSF from realizing on LBSF's assets.  On information and belief, in

respect of Priority Transfers occurring prior to the Petition Date, each of the Trustees was

directed by one or more Noteholders in each CDO to enforce the *ipso facto* clauses as a result of

the commencement of a chapter 11 case.  On information and belief, the Trustees demanded

indemnification from the respective Noteholders prior to carrying out such Noteholders'

directives with respect to termination of the CDOs and application of the Priority Modification

Provisions.  Such demands for indemnification evidenced the questionable nature of the

Transfers made in reliance on the Priority Modification Provisions.  The circumstances of

LBHI's bankruptcy, the damage such bankruptcy would inevitably cause to LBSF, and the

drastic upheavals in world financial markets contemporaneous with the LBHI filing, made it

readily apparent to the Trustees and the Noteholders who effected the Payment Priority

Exchanges prior to the LBSF Petition Date, that they should act quickly and aggressively in their

efforts to improve their positions at the expense of LBSF's creditors.

172.    The Trustees' activities in effecting the Priority Transfers on multiple

occasions prior to the LBSF Petition Date constituted a pattern or series of transactions all of

which had the same objective, to remove the Issuers' assets from the reach of LBSF's creditors.

The Trustee Defendants knew or should have known, among other things, that the Priority

Modification Provisions constituted unenforceable *ipso facto* clauses that violated Sections

365(e)(1), 541(c)(1), and 363(l) of the Bankruptcy Code, and that the application of those

provisions to effect the Payment Priority Exchange would violate the automatic stay that would

arise on the inevitable commencement of LBSF's chapter 11 case, and that time was of the

essence in accomplishing the Transfers prior to the date of LBSF's inevitable bankruptcy.  With

respect to any Priority Transfer that occurred before LBSF's Petition Date, each such Trustee

intended to accomplish the same in order to hinder, delay, or defraud LBSF's creditors in their

ability to realize on the value inherent in the property so transferred.

173.    Each Trustee knew that LBSF held secured claims against the Issuers

which the Issuers would be unable to satisfy once the Trustees effectuated the Transfers.

174.    Fourth, the Payment Priority Exchange occurred at a time when LBSF

was insolvent, or such transfers rendered LBSF insolvent.  The Payment Priority Exchange was

made at a time when LBSF was engaged in business or transactions, or was about to engage in

business or transactions, for which the balance of its remaining property constituted

unreasonably small capital.

175.    Finally, LBSF received at most an unreasonably small consideration, or

as in most cases, no consideration in exchange for the Payment Priority Exchange and was

deprived of substantial amounts of valuable property because the Swap Agreements were "in-

the-money."

176.    The Trustee was a fiduciary of LBSF and dominated and controlled

LBSF's interest in the Transaction Documents, the Collateral, and its proceeds.  Accordingly, the

Trustees' intent to accomplish the Payment Priority Exchange, and thereby hinder, delay, or

defraud creditors of LBSF and prevent those creditors from recovering on LBSF's interests in

property which were the subject of the Payment Priority Exchange, should be imputed to LBSF.

177.    Under the Transaction Documents, the Trustees (often acting at the

direction of the Noteholders) had control over the enforcement of the Transaction Documents

and had the power to direct the disposition of LBSF's interest in the Transaction Documents.

Under the Transaction Documents, certain Noteholders had the right to direct the Trustees to

take certain actions and, on information and belief, the Noteholders often exercised that power to

direct the Trustees to take action in an effort to hinder, delay, or defraud the realization by

LBSF's creditors of LBSF's valuable rights in and to the Transaction Documents and the

Collateral.  The Noteholders and Trustees acted hastily in an effort to consummate the Priority

Transfers before LBSF filed a chapter 11 case and thereby obtained the ability to interfere with

their objective to utilize the *ipso facto* clauses to cause the transfer of LBSF's valuable property

interests.  The Noteholders' actions were designed to hinder and delay LBSF's creditors' ability

to realize on LBSF's property interests.  The intent of such Noteholders to hinder, delay, or

defraud LBSF's creditors should be imputed to LBSF given the Noteholders' ability to direct the

activities of the Trustees who acted as their agents.  Because of the Trustees' dominion and

control over LBSF's interest in the Transaction Documents, upon the Event of Default, the

Trustees effectuated the Payment Priority Exchange without LBSF's consent, and often at the

direction and insistence of the Noteholders.

178.    Pursuant to the Transaction Documents, the Trustees controlled the

movement and subsequent disposition of the Collateral and Collateral's proceeds, often in

concert with, or at the direction of the Noteholders.

179.    The involuntary transfer of LBSF's interest in particular property – the interest in the Transaction Documents – to or for the benefit of the Trustees and/or the Noteholders, was executed with the intent to hinder, delay, or defraud LBSF's creditors.  The Payment Priority Exchange deprived LBSF of its interests in property – LBSF's right to payment priority.  Depriving LBSF of those property interests constituted an involuntary avoidable "transfer" under Section 101(54) and 548(a)(1)(A) of the Bankruptcy Code.

180.    The Noteholders are the initial transferees of the Priority Transfers.

181.    LBSF asserts its right to avoid the Priority Transfers and to recover and preserve, for the benefit of its estate, the Priority Transfers or their value from all initial transferees and from all immediate and/or mediate transferees of such initial transferees.

### ALTERNATIVE COUNT VI
### Against the Trustees, Noteholders, and Noteholder Class

*(Avoidance of the Collateral Transfers Made with the Actual Intent to Hinder
or Delay LBSF's Creditors Under Section 548(a)(1)(A) of the Bankruptcy Code)*

182.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

183.    LBSF seeks entry of a judgment against the Trustees and Noteholders avoiding the Collateral Transfers effected prior to the Petition Date as transfers made with the actual intent to hinder, delay, or defraud LBSF's creditors, pursuant to Section 548(a)(1)(A) of the Bankruptcy Code.

184.    The Bankruptcy Code provides that a debtor in possession "may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within two years before the date of the filing of the petition, if the debtor

voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual

intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the

date that such transfer was made or such obligation was incurred, indebted."  11 U.S.C. §

548(a)(1)(A).

185.    Upon the closing date of each of the CDOs, LBSF possessed a senior lien

on the Collateral and its proceeds to secure the obligations due to it under the Transaction

Documents.  The senior lien on the Collateral and its proceeds was "an interest of LBSF in

property."

186.    Pursuant to the Transaction Documents, the bankruptcy filing of LBHI –

the Credit Support Provider to LBSF under the Swap Agreements – on September 15, 2008

constituted an Event of Default under the Swap Agreements with respect to LBSF.

187.    After the Event of Default, each Trustee effectuated the Collateral

Transfers.

188.    Each of the Collateral Transfers that occurred before the Petition Date was

made with the actual intent to hinder, delay, or defraud LBSF's creditors.

189.    Each Trustee knew or should have known that (i) the commencement of

LBHI's chapter 11 case was the sole basis for the purported Event of Default; (ii) LBSF had a

security interest and other rights to the Collateral; (iii) the bankruptcy of LBHI would inevitably

lead to the bankruptcy of other significant operating subsidiaries of LBHI, such as LBSF; and

(iv) LBSF's right to Senior Payment Priority on the early termination of the Swap Agreements

was valuable to LBSF.  The Collateral Transfers were therefore designed to remove those assets

from the reach of LBSF's creditors and thereby hinder, delay, or defraud LBSF's creditors by

depriving them of access to LBSF's valuable property rights.

190.    Such intent can also be inferred from the badges of fraud surrounding each Trustee's actions in effectuating the Collateral Transfers.

191.    First, there was a close relationship between the Trustees and LBSF. Indeed, the Trustees were LBSF's fiduciaries under the Indentures, and owed LBSF duties with respect to the Collateral.  Moreover, the Trustees maintained control over the Issuers, and their assets for the benefit of, among others, LBSF.

192.    Second, the Collateral Transfers depleted all or substantially all of the assets of some or all of the Issuers, and left LBSF without a source from which to recover all of its valuable interests in the Swap Agreements.

193.    Third, each Collateral Transfer completed prior to the Petition Date was questionable, hasty and not in the ordinary course of business.  The period during which the Collateral Transfers occurred was characterized by disruptions in the financial markets, restrictions on the availability of credit, massive liquidations of collateral, and an unprecedented need for government intervention to prevent a collapse of the worldwide banking system. During the time between LBHI's filing and that of LBSF (and subsequently in certain instances), Defendant Noteholders and Trustees acted aggressively to gain an unfair advantage vis-à-vis both LBSF and creditors of LBSF, and such actions were in general designed to hinder, delay, or defraud creditors of LBSF from realizing on LBSF's assets.  On information and belief, in respect of Collateral Transfers occurring prior to the Petition Date, each of the Trustees was directed by one or more Noteholders in each CDO to enforce the *ipso facto* clauses as a result of the commencement of a chapter 11 case.  On information and belief, the Trustees demanded indemnification from the respective Noteholders prior to carrying out such Noteholders' directives with respect to termination of the CDOs and application of the Priority Modification

52

Provisions. Such demands for indemnification evidenced the questionable nature of the

Collateral Transfers made in reliance on the Priority Modification Provisions. The

circumstances of LBHI's bankruptcy, the damage such bankruptcy would inevitably cause to

LBSF, and the drastic upheavals in world financial markets contemporaneous with the LBHI

filing, made it readily apparent to the Trustees and the Noteholders who effected the Collateral

Transfers prior to the LBSF Petition Date, that they should act quickly and aggressively in their

efforts to improve their positions at the expense of LBSF's creditors.

194.    The Trustees' activities in effecting the Collateral Transfers on multiple

occasions prior to the LBSF Petition Date constituted a pattern or series of transactions all of

which had the same objective, to remove the Issuers' assets from the reach of LBSF's creditors.

The Trustee Defendants knew or should have known, among other things, that the Priority

Modification Provisions constituted unenforceable *ipso facto* clauses that violated Sections

365(e)(1), 541(c)(1), and 363(l) of the Bankruptcy Code, and that the application of those

provisions to effect the Collateral Transfers would violate the automatic stay that would arise on

the inevitable commencement of LBSF's chapter 11 case, and that time was of the essence in

accomplishing the Transfers prior to the date of LBSF's inevitable bankruptcy. With respect to

any Collateral Transfer that occurred before LBSF's Petition Date, each such Trustee intended to

accomplish the same in order to hinder, delay, or defraud LBSF's creditors in their ability to

realize on the value inherent in the property so transferred.

195.    Each Trustee knew that LBSF held secured claims against the Issuers

which the Issuers would be unable to satisfy once the Trustees effectuated the Transfers.

196.    Fourth, the Collateral Transfers occurred at a time when LBSF was

insolvent, or such transfers rendered LBSF insolvent. The Collateral Transfers were made at a

time when LBSF was engaged in business or transactions, or was about to engage in business or

transactions, for which the balance of its remaining property constituted unreasonably small

capital.

197.    Finally, LBSF received at most an unreasonably small consideration, or as

in most cases, no consideration in exchange for the Collateral Transfers and was deprived of

substantial amounts of valuable property because the Swap Agreements were "in-the-money."

198.    The Trustees were fiduciaries of LBSF and dominated and controlled

LBSF's interest in the Collateral and its proceeds.  Accordingly, the Trustees' intent to

accomplish the Collateral Transfers, and thereby hinder, delay, or defraud creditors of LBSF and

prevent those creditors from recovering on LBSF's interests in property which were the subject

of the Collateral Transfers, should be imputed to LBSF.

199.    Under the Transaction Documents, the Trustees (often acting at the

direction of the Noteholders) had control over the Collateral, and had the power to direct the

disposition of LBSF's interest in the Collateral and its proceeds.  Under the Transaction

Documents, certain Noteholders had the right to direct the Trustees to take certain actions, and

on information and belief, the Noteholders often exercised that power to direct the Trustees to

take action in an effort to hinder, delay, or defraud the realization by LBSF's creditors of LBSF's

valuable rights in and to the Collateral.  The Noteholders and Trustees acted hastily in an effort

to consummate the Priority Transfers before LBSF filed a chapter 11 case and thereby obtained

the ability to interfere with their objective to utilize the *ipso facto* clauses to cause the transfer of

LBSF's valuable property interests.  The Noteholders' actions were designed to hinder and delay

LBSF's creditors' ability to realize on LBSF's property interests.  The intent of such Noteholders

to hinder, delay, or defraud LBSF's creditors should be imputed to LBSF given the Noteholders'

ability to direct the activities of the Trustees who acted as their agents.  Because of the Trustees'

dominion and control over the Collateral and its proceeds, upon the Event of Default, the

Trustees effectuated the Collateral Transfers (and subsequent transfers of the Collateral's

proceeds to the Noteholders and/or the Noteholder Class) without LBSF's consent, and often at

the direction and insistence of the Noteholders.

200.    Pursuant to the Transaction Documents, the Trustees controlled the

movement and subsequent disposition of the Collateral and the Collateral's proceeds, often in

concert with, or at the direction of the Noteholders.

201.    The involuntary transfer of LBSF's interest in particular property – the

interest in the Collateral and/or its proceeds – to or for the benefit of the Trustees and/or the

Noteholders, was executed with the intent to hinder, delay, or defraud LBSF's creditors.  The

Collateral Transfers deprived LBSF of its interests in property – LBSF's senior liens on the

Collateral and its proceeds.  Depriving LBSF of those property interests constituted an

involuntary avoidable "transfer" under Section 101(54) and 548(a)(1)(A) of the Bankruptcy

Code.

202.    To the extent that the Trustees received transfers of LBSF's Collateral or

proceeds of such Collateral, the Trustees constitute the initial transferees of LBSF's interest in

property.

203.    LBSF asserts its right to avoid the Collateral Transfers and to recover and

preserve, for the benefit of its estate, the Collateral Transfers or their value from all initial

transferees and from all immediate and/or mediate transferees of such initial transferees.

55

**ALTERNATIVE COUNT VII**
**Against the Trustees, Noteholders, and Noteholder Class**

(*Prepetition Payment Priority Exchange Constitutes Avoidable*
*Transfer Under Section 548(a)(1)(B) of the Bankruptcy Code*)

204.    LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

205.    Section 548(a)(1)(B) of the Bankruptcy Code provides that a transfer of a

debtor's interest in property, made within two years before the commencement of the debtor's

bankruptcy case, may be avoided as constructively fraudulent if the debtor (a) "received less than

reasonably equivalent value in exchange for such transfer" and (b)(i) "was insolvent on the date

that such transfer was made . . . or became insolvent as a result of such transfer or obligation,"

(ii) "was engaged in business or a transaction, or was about to engage in business or a

transaction, for which any property remaining with the debtor was an unreasonable small

capital," or (iii) "intended to incur, or believed that the debtor would incur, debts that would be

beyond the debtor's ability to pay as such debts matured."  11 U.S.C. § 548(a)(1)(B)(i)-(ii).

206.    Pursuant to the Transaction Documents, the bankruptcy filing of LBHI on

September 15, 2008 – as Credit Support Provider to LBSF under the Swap Agreements –

constituted an Event of Default under the Swap Agreements with respect to LBSF.

207.    If the Payment Priority Exchange is found to be enforceable, it would

cause LBSF to transfer to or for the benefit of the Trustees, the Noteholders, and/or the members

of the Noteholder Class an interest of LBSF in property – its right to Senior Payment Priority.

208.    If the Payment Priority Exchange is found to be enforceable and to have

operated as described in this alternative Count, it would effect a transfer of LBSF's right to

56

Senior Payment Priority to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class.

209.    If the Payment Priority Exchange is found to be enforceable and to have operated as described in this alternative Count, and to the extent that the Payment Priority Exchange is not found to have been effected pursuant to, and in satisfaction of, an existing contractual obligation of LBSF, it would have been done gratuitously, and therefore, in exchange for less than reasonably equivalent value.

210.    If the Payment Priority Exchange is found to be enforceable and to have operated as described in this alternative Count, the Payment Priority Exchange would have occurred when LBSF was, or thereby became, insolvent, or left with unreasonably small capital, or intending or believing that it would incur debts that would be beyond its ability to pay as such debts matured.

211.    If the Payment Priority Exchange is found to be enforceable and to have operated as described in this alternative Count, the Payment Priority Exchange was a constructive fraudulent transfer of LBSF's property interest – its Senior Payment Priority – to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class, which LBSF may avoid pursuant to Section 548(a)(1)(B) of the Bankruptcy Code and which LBSF may recover from the Trustees, the Noteholders, and/or the members of the Noteholder Class, as the initial transferees of LBSF's said property interest, pursuant to Section 550(a)(1) of the Bankruptcy Code, and preserve that interest for the benefit of its estate pursuant to Section 551 of the Bankruptcy Code.

212.    To the extent that each of the Trustees, the Noteholders, and/or the members of the Noteholder Class received subsequent transfers of LBSF's Senior Payment

Priority, each of the Trustees, the Noteholders, and/or the members of the Noteholder Class constitutes an immediate and/or mediate transferee of the initial transferees within the meaning of Section 550(a)(2) of the Bankruptcy Code.  To the extent that each of the Trustees, the Noteholders, and/or the members of the Noteholder Class received such subsequent transfers, none of the Trustees, the Noteholders, and/or the members of the Noteholder Class took its interest in the transferred property for value, in good faith, and without knowledge of the voidability of the transfer within the meaning of Section 550(b)(1) of the Bankruptcy Code.

213.    In this alternative Count, LBSF asserts its right to avoid the Payment Priority Exchange and to recover and preserve, for the benefit of its estate, the Senior Payment Priority from all initial transferees and from all immediate and/or mediate transferees of such initial transferees.

### ALTERNATIVE COUNT VIII
### Against the Noteholders and Noteholder Class

(*Postpetition Payment Priority Exchange Constitutes*
*Avoidable Transfer Under Section 549 of the Bankruptcy Code*)

214.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

215.    Section 549(a) of the Bankruptcy Code provides that any transfer of property of a debtor's estate that occurs (a) "after commencement of the case," and (b) without authorization under the Bankruptcy Code or by the Court, may be avoided.  11 U.S.C. § 549(a).

216.    To the extent that the Payment Priority Exchange was effected *after* the commencement of LBSF's bankruptcy case, it caused LBSF to transfer to or for the benefit of

the Noteholders and/or the members of the Noteholder Class, a property interest of LBSF's estate – its right to Senior Payment Priority.

217.    Any such transfer was not authorized under the Bankruptcy Code or by the Court.  In the alternative, any purported right to such transfer would have to be asserted as a claim through the normal claims procedures.

218.    The Noteholders are the initial transferees of LBSF's right to Senior Payment Priority.  To the extent that each of the Noteholders and/or the members of the Noteholder Class members received subsequent transfers of LBSF's Senior Payment Priority, and of LBSF's interest in the Collateral or its proceeds, each of the Noteholders and/or the members of the Noteholder Class constitutes an immediate and/or mediate transferee of the initial transferees within the meaning of Section 550(a)(2) of the Bankruptcy Code.  To the extent that each of the Noteholders and/or the members of the Noteholder Class received such subsequent transfers, none of the Noteholders and/or the members of the Noteholder Class took its interest in the transferred property for value, in good faith, and without knowledge of the voidability of the transfer within the meaning of Section 550(b)(1) of the Bankruptcy Code.

219.    The Payment Priority Exchange was an unauthorized postpetition transfer of property of LBSF's estate – its Senior Payment Priority – to or for the benefit of the Noteholders and/or the members of the Noteholder Class, which LBSF may avoid pursuant to Section 549 of the Bankruptcy Code and which LBSF may recover from the Noteholders and/or the members of the Noteholder Class, as the initial transferees of LBSF's said property interest, pursuant to Section 550(a)(1) of the Bankruptcy Code, and preserve for the benefit of its estate pursuant to Section 551 of the Bankruptcy Code.

220.    In this Count, LBSF asserts its right to avoid the Payment Priority Exchange and to recover and preserve, for the benefit of its estate, the Senior Payment Priority from all initial transferees and from all immediate and/or mediate transferees of such initial transferees.

### ALTERNATIVE COUNT IX
### Against the Trustees

(*Postpetition Collateral Transfers Constitute*
*Avoidable Transfer Under Section 549 of the Bankruptcy Code*)

221.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

222.    Section 549(a) of the Bankruptcy Code provides that any transfer of property of a debtor's estate that occurs (a) "after commencement of the case," and (b) without authorization under the Bankruptcy Code or by the Court, may be avoided.  11 U.S.C. § 549(a).

223.    To the extent that the Collateral Transfer was effected after the commencement of LBSF's bankruptcy case, it caused LBSF to transfer to or for the benefit of the Trustees, a property interest of LBSF's estate – its right to senior security interest in the Collateral and its proceeds.

224.    Any such transfer was not authorized under the Bankruptcy Code or by the Court.  In the alternative, any purported right to such transfer would have to be asserted as a claim through the normal claims procedures.

225.    The Collateral Transfers were an unauthorized postpetition transfer of property of LBSF's estate – its right to senior interest in the Collateral and its proceeds – to or for the benefit of the Trustees, which LBSF may avoid pursuant to Section 549 of the

Bankruptcy Code and which LBSF may recover from the Trustees as the initial transferees of

LBSF's said property interest, or its value, pursuant to Section 550(a)(1) of the Bankruptcy

Code, and preserve for the benefit of its estate pursuant to Section 551 of the Bankruptcy Code.

226.     In this alternative Count, LBSF asserts its right to avoid the Collateral

Transfers and to recover and preserve, for the benefit of its estate, its right to senior interest in

the Collateral and its proceeds from all initial transferees and from all immediate and/or mediate

transferees of such initial transferees.

## ALTERNATIVE COUNT X
### Against the Trustee, Noteholders and Noteholder Class

### (*Turnover under Section 542(a) of the Bankruptcy Code of Estate Property*)

227.     LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

228.     LBSF's right to Senior Payment Priority constituted property of the

LBSF estate on the Petition Date.  The Noteholders who received Priority Transfers prior to the

Petition Date were in possession, custody, or control of LBSF's right to Senior Payment Priority

on the Petition Date, and continued to hold such property interests, which LBSF could use or

sell, during the chapter 11 case.  Noteholders who received Priority Transfers after the Petition

Date obtained possession, custody, or control of property of LBSF's estate during the case.

These Noteholders remain in possession, custody, or control of LBSF's right to Senior Payment

Priority.

229.     Section 542(a) of the Bankruptcy Code provides that "an entity, . . . in

possession, custody, or control, during the case, of property that the trustee may use, sell, or lease

under section 363 of this title, . . . shall deliver to the trustee, and account for, such property or

61

the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

230.    As a result of the foregoing, LBSF is entitled to an accounting of the Senior Payment Priority that was transferred to the Noteholders, as well as an accounting for the value that property.  LBSF's rights to Senior Payment Priority were of substantial value to LBSF.

231.    LBSF is further entitled to turnover of the value of the property of the estate held by the Noteholders.

232.    Accordingly, pursuant to Section 542(a) of the Bankruptcy Code, LBSF requests an order compelling and directing Defendants to account for LBSF's property and to turn over the value of the above-described property to LBSF.

## ALTERNATIVE COUNT XI
### Against the Trustees, Noteholders, and Noteholder Class

### (*Turnover under Section 542(a) of the Bankruptcy Code of Estate Property*)

233.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

234.    LBSF's interests in the Collateral and its proceeds constituted property of the LBSF estate on the Petition Date.  The Noteholders who received Collateral Transfers prior to the Petition Date were in possession, custody, or control of LBSF's interests in the Collateral and its proceeds on the Petition Date, and continued to hold such property interests, which LBSF could use or sell, during the chapter 11 case.  Noteholders who received Collateral Transfers after the Petition Date obtained possession, custody, or control of property of LBSF's estate

during the case.  These Noteholders remain in possession, custody, or control of LBSF's interests in the Collateral and its proceeds.

235.    Section 542(a) of the Bankruptcy Code provides that "an entity, . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."  11 U.S.C. § 542(a).

236.    As a result of the foregoing, LBSF is entitled to an accounting of LBSF's interests in the Collateral and its proceeds that were transferred to the Noteholders, as well as an accounting for the value of that property.  LBSF's interests in the Collateral and its proceeds were of substantial value to LBSF.

237.    LBSF is further entitled to turnover of the value of the property of the estate held by the Noteholders.

238.    Accordingly, pursuant to section 542(a) of the Bankruptcy Code, LBSF requests an order compelling and directing Defendants to account for LBSF's property and to turn over the value of the above-described property to LBSF.

### ALTERNATIVE COUNT XII
### Against the Trustee, Noteholders and Noteholder Class

### (*Turnover under Section 542(b) of the Bankruptcy Code of Estate Property*)

239.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

240.    Section 542(b) of the Bankruptcy Code expressly provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable

on order, shall pay such debt to, or on the order of the trustee, except to the extent that such debt

may be offset under Section 553 of this title against a claim against the debtor." 11 U.S.C. §

542(b).  If the Payment Priority Exchange had not occurred in violation of the automatic stay in

the void and unenforceable *ipso facto* clauses, LBHI would have received its Senior Priority

Payment in the ordinary course.

241.    The Senior Priority Payment constitutes a debt that has matured and is

property of the estate pursuant to Section 541(a) of the Bankruptcy Code.  As a result of the

Payment Priority Exchange, certain Defendants are in possession, custody or control of assets

consisting of proceeds of LBSF's property in excess of a billion dollars, which is of substantial

value or benefit to LBSF's estate and is property belonging to LBSF (that may be used by it).

242.    Accordingly, pursuant to Section 542(b) of the Bankruptcy Code, LBSF

requests an order compelling and directing Defendants to turn over the above-described property

to LBSF as it constitutes property of the bankruptcy estate under 541(a) of the Bankruptcy Code.

## COUNT XIII
### Against the Noteholders and Noteholder Class

### (*Unjust Enrichment*)

243.    LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

244.    At the time of LBSF's filing of its voluntary petition for bankruptcy

protection, LBSF was heavily "in-the-money" on the Swap Agreements.  Correspondingly, the

Noteholders' positions had suffered a loss in value.  However, the Trustees' enforcement of the

Priority Modification Provision and distribution of the Collateral wiped away LBSF's "in-the-

money" position and funneled all the Collateral, including LBSF's share, to the Noteholders.

The Noteholders thereby received an unjust and staggering windfall, including LBSF's entire share of the Collateral, without providing any compensation whatsoever to LBSF. Transfers to the Noteholders in reliance on an unenforceable contractual provision were wrongful.

245.    Furthermore, each CDO owed LBSF an Early Termination Payment; however, each CDO lacked enough Collateral to pay both LBSF and Noteholders in full. In choosing to pay Noteholders, LBSF was denied the Early Termination Payment to which it was entitled, unjustly enriching Noteholders at LBSF's expense.

246.    As a result of the Transfers, the Noteholders have been improperly and unjustly enriched, at LBSF's expense. LBSF's entire interest in the Collateral, and the amount it should have received in the event of a distribution, were transferred to the Noteholders, and LBSF received nothing in return. Equity and good conscience require that the Noteholders return the portion of the Collateral and the distribution that was due to LBSF.

## COUNT XIV
### Against the Noteholders and Noteholder Class

### (*Constructive Trust*)

247.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

248.    LBSF has a security interest in the Collateral and/or proceeds of the Collateral. The Trustees have a confidential and/or fiduciary relationship with LBSF with respect to LBSF's interest in the Collateral and/or proceeds of the Collateral. By entering into the Swap Agreements and making payments thereunder, LBSF relied on the Trustees' implicit promise not to improperly transfer Collateral and/or proceeds of the Collateral in which LBSF has a security interest to other parties.

249.    As a result of the Distributions of the Collateral and/or proceeds of the Collateral in which LBSF holds a security interest, in reliance on an unenforceable contractual provision, the Noteholders were improperly and unjustly enriched at LBSF's expense.

250.    Furthermore, each CDO owed LBSF an Early Termination Payment; however, at the time each such Early Termination Payment was owed, each CDO lacked enough Collateral to pay both LBSF and Noteholders in full.  In choosing to pay Noteholders, LBSF was denied the Early Termination Payment to which it was entitled, unjustly enriching Noteholders at LBSF's expense.

251.    At the time of the Transfers, the Noteholders were on notice that LBHI had filed for chapter 11 bankruptcy, that the LBHI case concerned LBSF, within the meaning of section 363(l) of the Bankruptcy Code, and that there was a likelihood that LBSF would commence its own chapter 11 case.  Notwithstanding this knowledge, on information and belief the Noteholders directed the Trustees to make the Transfers and thereby deprived LBSF of valuable interests in property in reliance on unenforceable contractual provisions.  Accordingly, the Noteholders were not *bona fide* purchasers of the Collateral or its proceeds, and were unjustly enriched.

252.    Because of the unjust enrichment of the Noteholders, LBSF is entitled to the imposition of a constructive trust with respect to the Collateral and/or proceeds in which LBSF holds a security interest.

**COUNT XV**
**Against the Noteholders and Noteholder Class**

(*Money Had and Received*)

253.     LBSF repeats, realleges, and incorporates by reference the allegations
contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of
action.

254.     LBSF was substantially "in-the-money" on the Swap Agreements.
LBSF, therefore, had an interest in the Collateral and/or the proceeds of the Collateral.  As a
result of the Distributions, the Noteholders received funds that rightfully belonged to LBSF.

255.     Furthermore, each CDO owed LBSF an Early Termination Payment;
however, at the time each such Early Termination Payment was owed, each CDO lacked enough
Collateral to pay both LBSF and Noteholders in full.  In choosing to preferentially pay
Noteholders, each CDO was rendered insolvent, and LBSF was denied the Early Termination
Payment to which it was entitled, while the Noteholders received funds that rightfully belonged
to LBSF.

256.     Indeed, the Distributions resulted in an enormous windfall to the
Noteholders.  LBSF received nothing in return.  Equity and good conscience dictate that the
Noteholders not be permitted to retain the portion of the Collateral and/or the proceeds of the
Collateral that rightfully belong to LBSF.

257.     LBSF is entitled to the return of the Collateral and/or proceeds in which
LBSF holds a security interest.

## COUNT XVI
### Against the Noteholders and Noteholder Class

### (*Replevin*)

258.     LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

259.     Pursuant to the terms of Transaction Documents, LBSF was granted a senior lien on the Collateral and the proceeds thereof.  LBSF held such a senior lien at the time of the Collateral Transfers, since Payment Priority Exchange was unlawful and should be set aside.

260.     The Trustee, the Noteholders, and/or the Noteholder Class each have a more junior lien on the Collateral and the Collateral's subsequent proceeds.

261.     At the time of LBSF's filing of its voluntary petition for bankruptcy protection, LBSF was heavily "in-the-money" on the Swap Agreements.  The Trustees' enforcement of the Priority Modification Provision, however, and distribution of the Collateral's proceeds, divested LBSF of substantial value arising from its "in-the-money" positions and funneled all the Collateral's proceeds, including LBSF's share, to the Noteholders.

262.     Furthermore, each CDO owed LBSF an Early Termination Payment; however, at the time each such Early Termination Payment was owed, each CDO lacked enough Collateral to pay both LBSF and Noteholders in full.  In choosing to preferentially pay Noteholders, each CDO was rendered insolvent, and LBSF was denied the Early Termination Payment to which it was entitled, while the Noteholders received the Collateral's proceeds that rightfully belonged to LBSF.

263.    LBSF possesses and still retains a senior lien and interest in the

Collateral's proceeds and has the right to immediate possession of the Collateral's proceeds.

264.    Upon information and belief, all of the Collateral's proceeds wrongfully

remain in the possession of the Trustees, Noteholders, and/or the Noteholder Class subject to

LBSF's valid and superior lien.

265.    As of the date of this Complaint, the Trustees, Noteholders, and/or the

Noteholder Class have failed to comply with LBSF's demand for immediate possession of the

Collateral's proceeds.

266.    Therefore, as the direct and proximate result of the foregoing, LBSF is

entitled to an Order of Replevin ordering the Trustees, the Noteholders to immediately tender the

Collateral's proceeds to LBSF.

## COUNT XVII
## Against the Trustees

### (*Breach of Contract*)

267.    LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

268.    LBSF has standing to bring this claim because, among other reasons,

LBSF is a third party beneficiary of each Indenture entered into in connection with each

transaction at issue in this litigation.

269.    The provisions that modify LBSF's Senior Payment Priority constitute

unenforceable *ipso facto* clause.  Such unenforceable provisions should be severed from the

Indentures, or otherwise nullified, as permitted by each Indenture.  See Exhibit C.  In mistaken

reliance on these unenforceable provisions, each Trustee erroneously distributed funds to the

Noteholders that was owed to LBSF.  Each Indenture specified that, in the absence of the invalid

Priority Modification Provisions, disbursement of monies pursuant to the Indenture should have

been made in accordance with a Priority of Payments that, among other things, required

payments to LBSF ahead of Noteholders.  See Exhibit C.  Because the Payment Priority

Exchange was invalid, the Trustees should have enforced the remainder of the Indentures while

disregarding the invalid Priority Modification Provisions.

270.    LBSF was substantially "in-the-money" on the Swap Agreements.

LBSF, therefore, had an interest in the Collateral and/or the proceeds of the Collateral.  Each

Indenture specifies that the Trustee shall exercise reasonable care in the custody of the

Collateral.  By making the Collateral Transfers in reliance on unenforceable Priority

Modification Provisions, the Trustees violated the terms of each Indenture for each transaction at

issue in this litigation by failing to exercise reasonable care with respect to the Collateral.  The

applicable provisions of each Indenture are summarized at Exhibit C hereto.

271.    By giving effect to the invalid Priority Modification Provision and failing

to make required payments to LBSF, each Trustee also breached its duty in the event of a default

to "use the same degree of care and skill in its exercise, as a prudent person would exercise or

use under the circumstances in the conduct of such person's own affairs."  The applicable

provisions of each Indenture are summarized at Exhibit C hereto.  LBSF was a Secured Party

under the Indenture and, under Section 12.8 of the Standard Terms, entitled to the benefits of the

Indenture, including expectation that the Trustees would exercise due care in distributing the

proceeds from the liquidation of the Collateral and not to apply the proceeds in a manner

contrary to law by giving effect to unenforceable *ipso facto* provisions.

272.     By the conduct described above, the Trustee Defendants without justification or excuse, breached their implied obligation of good faith and fair dealing, owed to LBSF.

273.     The Trustee Defendants' breaches are material.

274.     As a result of said breaches, LBSF has suffered, and continues to suffer, damages in an amount to be proven at trial.

## COUNT XVIII
### Against all Trustees and Noteholders

### *(Fraudulent Conveyance By Issuers – New York Debtor and Creditor Law §§ 273, 274, 278, and 279)*

275.     LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

276.     LBSF is a creditor of the Issuer Defendants by virtue of its "in-the-money" position under the Swap Agreements.  LBSF's claims were secured by a senior lien on the assets of the Issuer Defendants.

277.     LBSF holds matured claims and/or unmatured claims against the Issuer Defendants.  If the Priority Modification Provisions are invalidated, LBSF's claims against the Issuers under the Swap Agreements have priority over the claims of the Noteholders against the Issuers.

278.     All or substantially all of the Issuers' assets, including the Collateral securing LBSF's claims against the Issuers, were transferred to the Trustee Defendants and thereafter to each of the Noteholders.

279.     By virtue of the subordination of the Notes to LBSF's Senior Payment

Priority, once the Priority Transfers are invalidated or avoided, the Notes were worth far less

than the amounts which were paid to the Noteholders by virtue of the Collateral Transfers.  As

such, the Issuers did not receive fair consideration for the Collateral Transfers.

280.     Each of the Collateral Transfers by the Issuers or their agents was made

without fair consideration.

281.     At the time each Issuer made the Collateral Transfers, the Issuer

Defendant was engaged or was about to engage in a business or transaction for which the

property remaining in its hands after the Collateral Transfers was an unreasonably small capital,

as thereafter each of the Issuers was unable to satisfy LBSF's claims against the Issuers under the

Swap Agreements.

282.     Further, as noted above, the Trustees controlled the Issuers' assets and

the Collateral, and the Trustees made the Collateral Transfers with intent to hinder, delay, or

defraud the other creditors of the Issuers, specifically LBSF.  The Trustees' intent should be

imputed to the Issuers.

283.     Each Trustee knew or should have known that (i) the commencement of

LBHI's and/or LBSF's chapter 11 case was the sole basis for the purported Event of Default;

(ii) LBSF had a security interest and other rights to the Collateral; (iii) the bankruptcy of LBHI

would inevitably lead to the bankruptcy of other significant operating subsidiaries of LBHI, such

as LBSF; and (iv) LBSF had a right in and to the collateral on the early termination of the Swap

Agreements was valuable to LBSF.  The Collateral Transfers were therefore designed to remove

those assets from the reach of the Issuers' creditors, specifically LBSF, and thereby hinder,

delay, or defraud the Issuers' creditors by depriving them of access to valuable property rights.

284.    The Collateral Transfers to Noteholders were therefore designed to remove those assets from the reach of the Issuers' other creditors and thereby hinder, delay, or defraud the Issuers' creditors' recovery on their senior claims against the Issuers that were secured by the senior secured interest in the Collateral or its proceeds.

285.    Such an intent to hinder, delay, or defraud can also be inferred from the badges of fraud surrounding each Trustee's Collateral Transfers.

286.    First, there was a close relationship between the Trustees and the Issuers. Indeed, under the granting clauses of the Indentures, the Issuers granted to the Trustees all of their rights under the Transaction Documents, as well as to the Collateral or its proceeds, thereby giving the Trustees control over the Issuers, and their assets for the benefit of, among others, LBSF and the Noteholders.

287.    Second, each Collateral Transfer was questionable, hasty and not in the ordinary course of business. The period during which the Collateral Transfers occurred was characterized by disruptions in the financial markets, restrictions on the availability of credit, massive liquidations of collateral, and an unprecedented need for government intervention to prevent a collapse of the worldwide banking system. The Noteholders and Trustees acted aggressively to gain an unfair advantage over other creditors of the Issuers, and such actions were in general designed to hinder, delay, or defraud other creditors of the Issuers from realizing on the Issuers' assets. On information and belief, in respect of Collateral Transfers, each of the Trustees was directed by one or more Noteholders in each CDO to enforce the *ipso facto* clauses as a result of the commencement of a chapter 11 case. On information and belief, the Trustees demanded indemnification from the respective Noteholders prior to carrying out such Noteholders' directives with respect to termination of the CDOs and application of the Priority

73

Modification Provisions.  Such demands for indemnification evidenced the questionable nature of the Transfers made in reliance on the Priority Modification Provisions.  The circumstances of LBHI's bankruptcy, and the drastic upheavals in world financial markets contemporaneous with the LBHI filing, made it readily apparent to the Trustees and the Noteholders who effected the Collateral Transfers, that they should act quickly and aggressively in their efforts to improve their positions at the expense of the Issuers' other creditors.

288.     The Trustees' activities in effecting the Collateral Transfers on multiple occasions constituted a pattern or series of transactions all of which had the same objective, to remove the Issuers' assets from the reach of the Issuers' other creditors, specifically LBSF.

289.     Each Trustee knew that LBSF held secured claims against the Issuers which the Issuers would be unable to satisfy once the Trustees effectuated the Transfers.

290.     Third, the Collateral Transfers were made at a time when the Issuers were engaged in business or transactions, or was about to engage in business or transactions, for which the balance of their remaining property constituted unreasonably small capital.  The Collateral Transfers prevented the Issuers from satisfying any portion of LBSF's claims arising under the Swap Agreements under virtually all of the Swaps.

291.     The Trustee as grantee of the Issuers' rights under the Transaction Documents, dominated and controlled the Issuers' interest in the Transaction Documents, the Collateral, and its proceeds.  Accordingly, the Trustees' intent to accomplish the Collateral Transfers, and thereby hinder, delay, or defraud creditors of the Issuers and prevent those creditors from recovering on interests in the Issuers' property which were the subject of the Collateral Transfers, should be imputed to the Issuers.

292.     Under the Transaction Documents, the Trustees had control over the Transaction Documents and the Collateral.  Under the Transaction Documents, certain Noteholders had the right to direct the Trustees to take certain actions, and on information and belief, the Noteholders often exercised that power to direct the Trustees to take action to effectuate the transfers of the Issuers' assets in an effort to hinder, delay, or defraud LBSF, as a creditor of the Issuers.  The Noteholders' intent should be imputed to their agents the Trustees, and such intent should in turn be imputed from the Trustees to the Issuers.  Because of the Trustees' dominion and control over the Collateral and its proceeds, the Trustees effectuated the Collateral Transfers without the Issuers' consent, and often at the direction and insistence of the Noteholders.

293.     Pursuant to the Transaction Documents, the Trustees controlled the movement and subsequent disposition of the Collateral and Collateral's proceeds, often in concert with, or at the direction of the Noteholders.

294.     The transfer of the Collateral and/or its proceeds – to or for the benefit of the Trustees and/or the Noteholders, was executed with the intent to hinder, delay, or defraud the Issuers' creditors.

295.     On information and belief, the Issuers have not commenced any action to recover the value of the Collateral Transfers.

296.     As a result of the foregoing, LBSF is entitled (a) to have the Collateral Transfers avoided to the extent necessary to satisfy its claims against the Issuers; (b) to disregard the Collateral Transfers and attach or levy execution upon the property conveyed; and/or (c) to recover money damages for the amount of the Collateral Transfers necessary to satisfy LBSF's claims under the Swap Agreements at the time of their termination, plus interest.

## COUNT XIX
### Against all Defendants

### (*Declaratory Judgment – The Priority Modification Provisions Operate as Unenforceable Penalties*)

297.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

298.    There is no rational relationship between the over one billion dollars paid to the Noteholder Defendants, on the one hand, and any damages they have suffered as a result of the LBSF's and LBHI's bankruptcy filings, on the other hand.  The contractual provisions which yield this result – the Priority Modification Provisions – do not represent even a pretextual attempt to approximate actual damages.  These provisions were intended solely to coerce performance.  Rather than fairly compensate for any resulting harm or loss, the priority Modification Provisions instead have produced what may fairly be described as the windfall of all windfalls for the Noteholders, and a punitive blow to LBSF of unprecedented proportion.

299.    Accordingly, the massive transfer of value from LBSF to the Noteholders constitutes an unenforceable penalty.

300.    There is an actual controversy between the parties on these issues because: (i) the Transaction Documents contain the Priority Modification Provisions; and (ii) Defendants have refused to acknowledge that these contractual provisions are unenforceable and pay LBSF what it is rightfully owed.

301.    Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests that the Court enter a declaratory judgment that the Priority Modification Provisions operate as unenforceable penalties.

## COUNT XX
### Against Pyxis Trustee and Pyxis Noteholders

### (*Declaratory Judgment – Premature Termination of the Pyxis Credit Default Swap Agreement*)

302.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

303.    There is an actual controversy between the Pyxis Trustee and the Pyxis Noteholder Defendants and granting the relief requested herein is within the Court's discretion.

304.    Pursuant to the terms of the Pyxis Schedule, LBSF was entitled to a period of ten (10) business days following the Ratings Event caused by LBHI's filing within which to assign its position under the Pyxis Credit Default Swap Agreement to an eligible counterparty.  The Pyxis Trustee's premature actions prevented LBSF from exercising this right and assigning its interests in the Pyxis Credit Default Swap Agreement for valuable consideration.

305.    Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests that this Court enter a declaratory judgment that the Pyxis Trustee's purported termination violated the terms of the Pyxis Credit Default Swap Agreement.

## COUNT XXI
### Against the Pyxis Trustee and Pyxis Noteholder

### (*Declaratory Judgment – Improper Termination of the Pyxis Swap and Violation of the Indenture*)

306.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

307.     There is an actual case and controversy between LBSF and the Pyxis Trustee and Pyxis Noteholder Defendants and granting the relief requested herein is within the Court's discretion.

308.     The actual case or controversy concerns the Pyxis Trustee's termination of the Pyxis Credit Default Swap Agreement and liquidation of the other Collateral in violation of the terms of the Pyxis Indenture.

309.     LBSF is an express third-party beneficiary of the Pyxis Indenture.

310.     The liquidation of the Collateral by the Pyxis Trustee at the Controlling Class's direction violated Section 5.5(a) of the Pyxis Indenture.

311.     Termination of the Pyxis Credit Default Swap Agreement violated Section 5.2(c) of the Pyxis Indenture.

312.     Termination of the the Pyxis Credit Default Swap Agreement violated Sections 7.8(a)(xi) and 7.5(f) of the Pyxis Indenture.

313.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests that this Court enter a declaratory judgment that the liquidation of the Collateral by the Trustee at the Controlling Class's direction, including the termination of the Pyxis Credit Default Swap Agreement, violated the terms of the Pyxis Indenture.

## COUNT XXII
### Against the Pyxis Trustee and Pyxis Noteholders

(*Breach of Contract – the Pyxis Credit Default Swap Agreement*)

314.     LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

315.    Pursuant to the terms of the Pyxis Schedule, LBSF was entitled to a period of ten (10) business days following the Ratings Event caused by LBHI's chapter 11 filing within which to assign its position under the Pyxis Credit Default Swap Agreement to an eligible counterparty.  The Pyxis Trustee's premature actions prevented LBSF from exercising this right and assigning its interests in the Pyxis Credit Default Swap Agreement for valuable consideration.

316.    LBSF has satisfied its obligations under the Pyxis Credit Default Swap Agreement and any conditions precedent to suit have been performed, have occurred, or have been waived.

317.    As a result, LBSF has been damaged in an amount to be determined at trial.

## COUNT XXIII
### Against the Pyxis Trustee and Pyxis Noteholders

### (*Breach of Contract – the Pyxis Indenture*)

318.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

319.    LBSF is an express third-party beneficiary of the Pyxis Indenture.

320.    The liquidation of the Collateral by the Pyxis Trustee at the Controlling Class's direction violated Section 5.5(a) of the Pyxis Indenture.

321.    Termination of the Pyxis Credit Default Swap Agreement violated Section 5.2(c) of the Indenture.

322.    Termination of the Pyxis Credit Default Swap Agreement violated Section 7.8(a)(xi) and 7.5(f) of the Pyxis Indenture.

323.   Pursuant to the Pyxis Indenture, the Pyxis Noteholders are contractually required to hold all amounts distributed to them postpetition in trust and to return to the Trustee amounts that were improperly distributed so they can be paid to the appropriate party.  See Section 13 of the Pyxis Indenture.

324.   As a result of the Payment Priority Exchange, amounts due to LBSF postpetition under the Pyxis Indenture were improperly distributed to the Pyxis Noteholders.

325.   By failing to return the improper distributions, the Pyxis Noteholders have breached their obligations under the Pyxis Indenture.

326.   LBSF has satisfied its obligations under the Pyxis Indenture and any conditions precedent to suit have been performed, have occurred, or have been waived.

327.   As a result of the breaches of the Pyxis Indenture, LBSF is entitled to an award of damages in an amount to be determined at trial.

**COUNT XXIV**
**Against the Federation Trustee and Federation Noteholders**

**(Declaratory Judgment – Improper Distribution of the**
**Federation Collateral in Violation of the Federation Indentures)**

328.   LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

329.   There is an actual case and controversy between LBSF and the Federation Trustee and Federation Noteholder Defendants and granting the relief requested herein is within the Court's discretion.

330.   The actual case or controversy concerns the Federation Trustee's distribution of the Collateral proceeds in violation of the terms of the Federation Indentures.

80

331.    LBSF is an express third-party beneficiary of the Federation Indentures.

332.    The distribution of the Collateral by the Federation Trustee violated Section 5 of the Federation Indentures.

333.    Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests that this Court enter a declaratory judgment that the distribution of the Collateral proceeds by the Trustee violated the terms of the Federation Indentures.

## COUNT XXV
### Against the Federation Trustee and Federation Noteholders

### (Breach of Contract – the Federation Indentures)

334.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

335.    LBSF is an express third-party beneficiary of the Federation Indentures.

336.    The distribution of the Collateral proceeds violated Section 5.2 of the Federation Indentures because the Trustee set the Early Termination Payment Date prior to the first Payment Date following the Enforcement Notice date.  Consequently, the payment of the Collateral proceeds to the Federation Noteholders pursuant to subsections 5(a)(iv)(C) and (D) was improper under the terms of the Federation Indentures.

337.    LBSF has satisfied its obligations under the Federation Indentures and any conditions precedent to suit have been performed, have occurred, or have been waived.

338.    As a result, LBSF has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, LBSF respectfully requests that the Court grant the following

relief against Defendants:

A.      Certification of the Noteholder Class under Rule 23 of the Federal

Rules of Civil Procedure;

B.      For declaratory judgment against all Defendants that the Priority

Modification Provisions constitute unenforceable *ipso facto*

clauses that violate 11 U.S.C. §§ 365(e)(1), 541(c)(1) and 363(l)

and LBSF is entitled to Senior Payment Priority;

C.      For declaratory judgment that post-Petition Date Priority Transfers

violated the automatic stay under 11 U.S.C. § 362(a) and are void

*ab initio*;

D.      For declaratory judgment that post-Petition Date Collateral

Transfers violated the automatic stay under 11 U.S.C. § 362(a) and

are void *ab initio*;

E.      Alternatively, for a judgment that the Payment Priority Exchange

was a preferential transfer to or for the benefit of the Trustees, the

Noteholders, and/or the members of the Noteholder Class that is

avoidable pursuant to Section 547 of the Bankruptcy Code, and

pursuant to Sections 550 and 551 of the Bankruptcy Code, LBSF is

entitled to recover and preserve Senior Payment Priority for the

benefit of its estate;

F.      In the further alternative, for a judgment that the pre-Petition Date

Priority Transfers were fraudulent transfers to or for the benefit of

the Noteholders that are avoidable pursuant to Section

548(a)(1)(A) of the Bankruptcy Code, and pursuant to Sections

550 and 551 of the Bankruptcy Code, LBSF is entitled to recover

and preserve the value of Senior Payment Priority for the benefit of

its estate;

G.    In the further alternative, for a judgment that the Collateral

Transfers were fraudulent transfers to or for the benefit of the

Trustees that are avoidable pursuant to Section 548(a)(1)(A) of the

Bankruptcy Code, and pursuant to Sections 550 and 551 of the

Bankruptcy Code, LBSF is entitled to recover and preserve the

value of the Collateral Transfers for the benefit of its estate;

H.    In the further alternative, for a judgment that the Priority Transfers

were constructive fraudulent transfers to or for the benefit of the

Trustees, the Noteholders, and/or the members of the Noteholder

Class that are avoidable pursuant to Section 548(a)(1)(B) of the

Bankruptcy Code, and pursuant to Sections 550 and 551 of the

Bankruptcy Code, LBSF is entitled to recover and preserve the

value of Senior Payment Priority for the benefit of its estate;

I.    In the further alternative, for a judgment that the Priority Transfers

were unauthorized post-petition transfers to or for the benefit of the

Trustees, the Noteholders, and/or the members of the Noteholder

Class that are avoidable pursuant to Section 549(a) of the

Bankruptcy Code, and pursuant to Sections 550 and 551 of the

Bankruptcy Code, LBSF is entitled to recover and preserve the value of Senior Payment Priority for the benefit of its estate;

J.    In the further alternative, for a judgment that the Collateral Transfers were unauthorized post-petition transfers to or for the benefit of the Trustees, the Noteholders, and/or the members of the Noteholder Class that is avoidable pursuant to Section 549(a) of the Bankruptcy Code, and pursuant to Sections 550 and 551 of the Bankruptcy Code, LBSF is entitled to recover and preserve the value of the Collateral Transfers for the benefit of its estate;

K.    In the further alternative, for an order requiring the Defendants account for and turn over the value of the property of the estate in their possession, custody, or control during the case;

L.    For an order requiring disgorgement of collateral or payments unjustly received;

M.    For an order imposing a constructive trust on proceeds received by the Noteholders as a result of the Distributions;

N.    For a judgment of Replevin;

O.    For damages against the Noteholders in an amount to be determined at trial;

P.    For damages against the Trustees in an amount to be proven at trial for breach of contract;

Q.    For a judgment that the Collateral Transfers were constructive fraudulent transfers by the Issuers to or for the benefit of Trustees

and Noteholders, that are avoidable pursuant to the NYDCL, and

that LBSF is entitled to recover the property transferred or its

value;

R.      For a judgment that the Collateral Transfers were actual fraudulent

transfers by the Issuers to or for the benefit of Trustees and

Noteholders, that are avoidable pursuant to the NYDCL, and that

LBSF is entitled to recover the property transferred or its value;

S.      For a declaratory judgment that the Priority Modification

Provisions are unenforceable penalties;

T.      For judgment undoing the enforcement of the penalty clauses and

directing the Trustees and Noteholders to pay LBSF the amounts it

would have received but for the application of such penalty clauses

in proportion to the amounts received by each Trustee or

Noteholder based on such penalty clause;

U.      For declaratory judgment that the liquidation of the Collateral was

improper in the Pyxis Transaction and violated Section 5.5(a) of

the Pyxis Credit Default Swap Agreement;

V.      For declaratory judgment that the termination of the Pyxis Credit

Default Swap Agreement was improper and violated the terms of

the Pyxis Indenture;

W.      For additional damages against the Pyxis Trustee and Pyxis

Noteholders for breach of contract;

85

X.    For declaratory judgment that the liquidation and distribution of the Federation Collateral was improper and violated the terms of the Federation Indentures;

Y.    For additional damages against the Federation Trustee and Federation Noteholders for breach of contract;

Z.    For an award of interest at the appropriate rate; and

AA.    Any such other and further relief as the Court deems just and proper, including costs and attorneys' fees.

Dated:    New York, New York
          October 13, 2015

Respectfully submitted,

By:    /s/ Paul R. DeFilippo
       Paul R. DeFilippo
       William A. Maher
       William F. Dahill
       James N. Lawlor
       Adam M. Bialek

       WOLLMUTH MAHER & DEUTSCH LLP
       500 Fifth Avenue
       New York, New York 10110
       Telephone: (212) 382-3300
       Facsimile: (212) 382-0050

       *Counsel for Lehman Brothers Special
       Financing Inc.* against all parties except
       AIG, Inc. and AIG Taiwan Insurance Co. Ltd.

By:    /s/ Thomas E. Hommel
       Thomas E. Hommel

       LEHMAN BROTHERS HOLDINGS INC.
       1271 Avenue of the Americas
       New York, New York 10020
       Telephone:  (646) 285-9000

       *Counsel for Lehman Brothers
       Special Financing Inc.* against AIG,
       Inc. and AIG Taiwan Insurance Co. Ltd.