UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS HOLDINGS INC. *et al.*,

Debtors.

Chapter 11

Case No. 08-13555 (SCC)

LEHMAN BROTHERS SPECIAL FINANCING INC.

Plaintiff,

v.

BANK OF AMERICA NATIONAL ASSOCIATION *et al.*,

Defendants.

Adversary Proceeding

No. 10-03547 (SCC)

**ORAL ARGUMENT REQUESTED**

## OMNIBUS MOTION OF THE NOTEHOLDER DEFENDANTS TO DISMISS THE FOURTH AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................ 4

ARGUMENT ...................................................................................................................... 11

I.   **THE PRIORITY PROVISIONS ARE VALID AND ENFORCEABLE AND THE CODE'S *IPSO FACTO* PROVISIONS DO NOT APPLY.  (COUNT I) ......................... 12**

    **A.  Termination of the Transactions and Distribution of Payments Pursuant to the Priority Provisions Did Not "Modify" LBSF's Rights Under Sections 365(e)(1), 541(c) or 363(*l*). (Count I)................................................................................. 13**

    **B.  The Timing of the Alleged "Modifications" Renders The *Ipso Facto* Provisions of Sections 365(e)(1), 541(c)(1) and 363(*l*) Inapplicable. (Count I)................................. 17**

        1. Sections 365(e)(1), 541(c)(1) and 363(l) Do Not Apply to Alleged "Modifications" that Occurred Before the LBSF Petition Date.................................................................... 17

        2. Perpetual's "Singular Event" Theory Is Contrary to Settled Authority and Should be Rejected. ........................................................................................................................ 21

    **C.  The Transaction Documents Were Not "Executory Contracts" of LBSF as of the LBSF Petition Date.  (Count I) ......................................................................... 24**

    **D.  Section 363(*l*) Does Not Apply to Protect Property That Is Not Already In LBSF's Possession. (Count I)..................................................................................... 25**

II.  **THE AUTOMATIC STAY DOES NOT APPLY TO ALLEGED "MODIFICATIONS" OR TRANSFERS OF COLLATERAL THAT OCCURRED BEFORE LBSF'S BANKRUPTCY CASE.  (COUNTS II AND III)................................................................. 26**

III. **THE BANKRUPTCY CODE'S SAFE HARBOR PROVISIONS AND SECTION 510 PRECLUDE LBSF'S CLAIMS AGAINST THE NOTEHOLDERS.  (ALL NOTEHOLDER RELEVANT COUNTS)........................................................................ 29**

    **A.  The Priority Provisions are Enforceable under Section 560 of the Bankruptcy Code. (Counts I–XII)..................................................................................................... 30**

        1. The Priority Provisions Are Contract Rights Under a Swap Agreement of a Swap Participant or Financial Participant. ............................................................................... 32

        2. The Application of the Priority Provisions is Part of the Contractual Right to Terminate and Liquidate a Swap Agreement. ................................................................................. 37

    **B.  The Distribution of Collateral Proceeds After the Petition Date is Protected by Section 362(b)(17) of the Bankruptcy Code. (Counts II and III) ............................... 43**

    **C.  The Safe Harbors of Sections 546(g) and 546(e) also Require the Dismissal of LBSF's Preference and Constructive Fraudulent Conveyance.  (Counts IV and VII) .................................................................................................................................. 44**

        1. LBSF's Claims Fail Under the Plain Language of Section 546(g)............................. 45

        2. LBSF's Claims Fail Under the Plain Language of Section 546(e)............................. 46

    **D.  The Safe Harbors Preclude LBSF's Claims Under Section 549 of the Bankruptcy Code. (Counts VIII and IX) ..................................................................................... 49**

    **E.  The Priority Provisions Are Enforceable Under Section 510(a) of the Bankruptcy Code.  (Count I)................................................................................................... 49**

IV. **CERTAIN OTHER COUNTS FAIL TO STATE CLAIMS UNDER THE BANKRUPTCY CODE.  (COUNTS IV – XII)** ............................................................. 51

  A.  **The Avoidance Claims Should Be Dismissed. (Counts IV–IX)** ................................. 52

  1. Certain Avoidance Claims Must Be Dismissed Because of the Timing of the Alleged Transfers.  (Counts IV–IX) ......................................................... 52

  2. LBSF's Avoidance Claims Fail Because There Was No Transfer. .............................. 52

  3. LBSF's Preferential Transfer Claim Fails Because LBSF Did Not Pay an Antecedent Debt to Any Creditor. ............................................................... 54

  4. LBSF's Constructive Fraudulent Transfer Claim Fails Because Any Alleged Transfers Are Defined as "For Value" Under the Bankruptcy Code. .......................................... 55

  5. LBSF's Intentional Fraudulent Transfer Claims Fail Due to Lack of Intent. (Counts V and VI). ................................................................ 56

  B.  **The Turnover Claims Should Be Dismissed. (Counts X-XII)** ..................................... 58

  1. LBSF's Turnover Claims All Fail Because LBSF's Claims to the Property Are Disputed. ........................................................................ 58

  2. LBSF's Section 542(a) Priority-Turnover Claim Fails Because No Defendant Ever Possessed or Controlled LBSF's Purported Priority. (Count X) ................................... 59

  3. LBSF's Section 542(a) Collateral-Turnover Claim Fails Because No Defendant Ever Possessed or Controlled LBSF's Interest in the Collateral. (Count XI) ...................... 60

  4. LBSF's Section 542(b) Claim Fails Because The Noteholders Never Owed a Debt to LBSF. (Count XII) ............................................................... 61

V.  **THE NEW YORK STATE LAW CLAIMS MUST BE DISMISSED.  (COUNTS XIII– XVI, XVIII AND XIX)** ....................................................................... 62

  A.  **LBSF's State Law Claims Are Preempted by the Bankruptcy Code's Safe Harbors.** ................................................................................ 63

  B.  **LBSF's Equitable Claims Are All Preempted by the Bankruptcy Code. (Counts XII–XVI and XVIII)** ....................................................................... 64

  C.  **LBSF's Equitable Claims Are All Barred Because a Contract Controls. (Counts XIII–XVI)** ................................................................................. 65

  D.  **Certain Equitable Claims Fail for Other Reasons.  (Counts XIV – XVI)** ................. 67

  1. LBSF's Constructive Trust "Claim" Fails For Lack of a Breached Promise. (Count XIV). ........................................................................ 68

  2. LBSF's Money Had and Received Claim Fails For Lack of an Ownership Interest. (Count XV). ........................................................................ 69

  3. LBSF's Replevin Claim Fails For Lack of Possession.  (Count XVI) ......................... 69

  E.  **The "Penalty" Claim Must Be Dismissed.  (Count XIX)** ........................................... 70

  F.  **The New York Fraudulent Conveyance Claims Must Be Dismissed.  (Count XVIII)** ................................................................................ 71

  1. All of the Claims Fail Because LBSF Was Not and Is Not a Creditor of the Issuers.... 71

  2. LBSF's Constructive Fraudulent Conveyance Claims Fail Because the Issuers Received Fair Consideration and Were Not Insolvent, Undercapitalized or Unable to Pay their Debts. ................................................................... 72

  3. LBSF's Intentional Fraudulent Conveyance Claims Fail Due to Lack of Intent to Defraud. .......................................................................... 73

**VI. THRESHOLD STATUTE OF LIMITATIONS ISSUES REQUIRE THE DISMISSAL OF NUMEROUS DEFENDANTS AS A MATTER OF LAW. (ALL NOTEHOLDER RELEVANT COUNTS)** ................................................................................ 75

    **A.** *American Pipe* **Tolling Cannot Extend the Limitations Period in a Defendant Class Action.** ..................................................................................... 76

    **B.** **The Declaratory Judgment Act Claims Are Subject to Two-Year Statutes of Limitations (Counts I–III).** ......................................................... 81

    **C.** **The Turnover Claims are Subject to Two-Year Statutes of Limitations. (Counts X–XII)** ............................................................................. 83

    **D.** **The State Law Claims Are Subject to the Bankruptcy Code's Two-Year Statute of Limitations. (Counts XIII–XIX)** ............................................ 84

**VII. CONCLUSION** ............................................................................. 85

<u>Appendices and Exhibits:</u>

Appendix A – Lists of Pre-Pre Transactions, Pre-Post Transactions, Post-Post Transactions
Appendix B – List of Late-Named Noteholders


Exhibit A –  Summaries of Credit Events and Issuer Events
Exhibit B –  Summaries and Examples of Priority Provisions
Exhibit C –  Summaries and Examples of Limited Recourse Provisions
Exhibit D –  Summaries and Examples of Granting Clauses
Exhibit E –  Example Transaction Documents for the Series 2006-1 Segregated Portfolio
                    of 801 Grand CDO SPC
Exhibit F –  Offering Memorandum for the Pyxis ABS CDO 2007-1 Transaction
Exhibit G –  Excerpts of Series Indenture for the Pyxis ABS CDO 2007-1 Transaction
Exhibit H –  Schedule to ISDA Master Agreement for the Pyxis ABS CO 2007-1
                    Transaction
Exhibit I –   Excerpts of Series Indenture for the Greystone CDO 2006-1 Transaction
Exhibit J –   Excerpts of Series Indenture for the ALTA CDO 2007-2 Transaction
Exhibit K –  Excerpts of Series Indenture for Securitized Product of Restructured
                    Collateral 2007-1 Federation A-1 Transaction
Exhibit L –  Excepts of Indenture for the Pebble Creek LCDO 2007-2 Transaction
Exhibit M – Excerpts of Series Indenture for Crown City CDO 2005-1 Transaction
Exhibit N –  Excerpts of Series Trust Agreement and Standard Terms for the
                    Restructuring Asset Certificates with Enhanced Returns Series 2005-21-C
                    Transaction
Exhibit O –  Schedule to ISDA Master Agreement for the Restructuring Asset
                    Certificates with Enhanced Returns Series 2005-21-C Transaction
Exhibit P –  Excerpts of Principal Trust Deed and Supplemental Trust Deed and
                    Drawdown Agreement for the Ruby Finance plc 2005-1 Transaction
Exhibit Q –  Schedule to ISDA Master Agreement for the Ruby Finance plc 2005-1
                    Transaction
Exhibit R –  Excerpts from Standard & Poor's and Moody's Publications
Exhibit S –  Transcript from May 4, 2015 Hearing before U.S. District Judge Failla

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*In re 1031 Tax Group, LLC,*
  420 B.R. 178 (Bankr. S.D.N.Y. 2009)..................................................................12

*118 East 60th Owners, Inc. v. Bonner Props., Inc.,*
  677 F.2d 200 (2d Cir. 1982)........................................................................81, 82

*Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC,*
  637 F.Supp. 2d 185 (S.D.N.Y. 2009)..................................................................11

*American Pipe & Construction Co. v. Utah,*
  414 U.S. 538 (1974)..........................................................................75, 76, 77

*Andrew Velez Constr., Inc. v. Consol. Edison Co. of New York, Inc. (In re Andrew
  Velez Constr., Inc.),*
  373 B.R. 262 (Bankr. S.D.N.Y. 2007)...........................................................56, 58

*AP Servs. LLP v. Silva,*
  483 B.R. 63 (S.D.N.Y. 2012)..........................................................................64

*Arizona v. United States,*
  132 S. Ct. 2492 (2012)..................................................................................63

*Arneil v. Ramsey,*
  550 F.2d 774 (2d Cir. 1977), *overruled on other grounds by Crown, Cork &
  Seal,* 462 U.S. 345...................................................................................78

*Astor Holdings, Inc. v. Roski,*
  325 F. Supp. 2d 251 (S.D.N.Y. 2003)................................................................84

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007)............................................................................11

*Bankers Sec. Life Ins. Soc'y v. Shakerdge,*
  406 N.E.2d 440 (N.Y. 1980)...........................................................................68

*Barkley v. West (In re West),*
  474 B.R. 191 (Bankr. N.D. Miss. 2012) .............................................................83

*Barr v. Charterhouse Grp. Int'l, Inc. (In re Everfresh Beverages, Inc.),*
  238 B.R. 558 (Bankr. S.D.N.Y. 1999)................................................................84

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)....................................................................................11

*Bellino Schwartz Padob Adver. v. Solaris Mktg. Grp., Inc.*,
    635 N.Y.S.2d 587 (App. Div. 1995) ................................................................. 66

*Belmont Park Invs. PTY Ltd. v. BNY Corp. Tr. Servs. Ltd. & LBSF*
    [2011] UKSC 38 .............................................................................................. 51

*In re Best Products, Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) ................................................................ 50

*Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n*,
    878 F.2d 742 (3d Cir. 1989) ............................................................................. 47

*Boston Trading Grp., Inc. v. Burnazos*,
    835 F.2d 1504 (1st Cir. 1987) .......................................................................... 74

*Bulova Watch Co. v. United States*,
    365 U.S. 753 (1961) .......................................................................................... 51

*Butler v. Loomer* (*In re Loomer*),
    222 B.R. 618 (Bankr. D. Neb. 1998) ........................................................... 58, 74

*Calpine Energy Services, L.P. v. Reliant Energy Elec. Solutions, L.L.C.* (*In re Calpine Corp.*),
    Case No. 05-60200, 2009 WL 1578282 (Bankr. S.D.N.Y. May 7, 2009) ............ 42

*Carcieri v. Salazar*,
    555 U.S. 379 (2009) .......................................................................................... 17

*Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A.* (*In re Casa de Cambio Majapara S.A. de C.V.*),
    390 B.R. 595 (Bankr. N.D. Ill. 2008) ............................................................... 45

*Cassirer v. Sterling Nat'l Bank & Tr. Co.* (*In re Schick*),
    246 B.R. 41 (Bankr. S.D.N.Y. 2000) ................................................................ 70

*In re Chateaugay Corp.*,
    102 B.R. 335 (Bankr. S.D.N.Y. 1989) ............................................................... 24

*Chevalier v. Baird Sav. Ass'n*,
    72 F.R.D. 140 (E.D. Pa. 1976) ..................................................................... 76, 80

*Chrysler Capital v. Century Power Corp.*,
    778 F. Supp. 1260 (S.D.N.Y. 1991) .................................................................. 65

*Chrysler Credit Corp. v. Kosal*,
    518 N.Y.S.2d 162 (App. Div. 1987) .................................................................. 67

*Comp III, Inc. v. Computerland Corp.* (*In re Comp III, Inc.*),
    136 B.R. 636 (Bankr. S.D.N.Y. 1992) ................................................................23

*Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. v. Brookville CDO I Ltd.*,
    No. 08 Civ. 9565, 2008 WL 5170178 (S.D.N.Y. Dec. 10, 2008) ...........................34

*COR Route 5 Co., LLC v. Penn Traffic Co.* (*In re Penn Traffic Co.*),
    524 F.3d 373 (2d Cir. 2008) .................................................................................24

*In re Credit Indus. Corp.*,
    366 F.2d 402 (2d Cir. 1966) .................................................................................50

*Creditors' Comm. for Jermoo's Inc. v. Jermoo's Inc.* (*In re Jermoo's Inc.*),
    38 B.R. 197 (Bankr. W.D. Wisc. 1984) ................................................................54

*Crescent Res. Litig. Tr. ex rel. Benisomon v. Duke Energy Corp.*,
    500 B.R. 464 (W.D. Tex. 2013) ............................................................................48

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983) .............................................................................................78

*Diamante v. Solomon & Solomon, P.C.*,
    No. 1:99-CV-1339, 2001 WL 1217226 (N.D.N.Y. Sept. 18, 2001) ..................64, 65

*DiCello v. United States* (*In re Ry. Reorganization Estate, Inc.*),
    133 B.R. 578 (Bankr. D. Del. 1991) .....................................................................83

*Drexel Burnham Lambert Prod. Corp. v. Midland Bank PLC*,
    92 Civ. 3098 (MP), 1992 WL 12633422 (S.D.N.Y. Nov. 10, 1992) .......................71

*E. Equip. Servs. Corp. v. Factory Point Nat'l Bank*,
    236 F.3d 117 (2d Cir. 2001) .................................................................................84

*Edwards v. Fed. Home Loan Mortg. Corp.* (*In re LiTenda Mortg. Corp.*),
    246 B.R. 185 (Bankr. D.N.J. 2000), *aff'd*, 276 F.3d 578 (3d Cir. 2001) ...............54

*Elway Co., LLP v. Miller* (*In re Elrod Holdings Corp.*),
    421 B.R. 700 (Bankr. D. Del. 2010) ................................................................57, 58

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
    651 F.3d 329 (2d Cir. 2011) ....................................................................... *passim*

*Equitable Life Assurance Soc'y of the U.S. v. Branch*,
    302 N.Y.S.2d 958 (App. Div. 1969) ......................................................................70

*Farina v. Bastianich*,
    984 N.Y.S.2d 46 (1st Dep't 2014) ........................................................................67

*FDIC v. Hirsch* (*In re Colonial Realty Co.*),
    980 F.2d 125 (2d Cir. 1992)...................................................................................59

*Flag Wharf, Inc. v. Merrill Lynch Capital Corp.*,
    836 N.Y.S.2d 406 (App. Div. 2007) ....................................................................67

*Fleckner v. Bank of the U.S.*,
    21 U.S. 338 (1823).............................................................................................39

*Frito-Lay v. LTC Steel Co.* (*In re Chateaugay Corp.*),
    10 F.3d 944 (2d Cir. 1993).......................................................................65, 66, 69

*Gabelli v. SEC*,
    133 S. Ct. 1216 (2013)........................................................................................77

*Gale v. First Franklin Loan Servs.*,
    701 F.3d 1240 (9th Cir. 2012) ............................................................................18

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000).............................................................................................63

*Geron v. Peebler* (*In re Pali Holdings, Inc.*),
    488 B.R. 841 (Bankr. S.D.N.Y. 2013)..................................................................59

*Gilbert v. City of Cambridge*,
    745 F. Supp. 42 (D. Mass. 1990) ...................................................................81, 82

*Giovanniello v. ALM Media, LLC*,
    726 F.3d 106 (2d Cir. 2013)................................................................................79

*In re Gold & Honey, Ltd.*,
    410 B.R. 357 (Bankr. E.D.N.Y. 2009).................................................................28

*Goldman v. Metro. Life Ins. Co.*,
    841 N.E.2d 742 (N.Y. 2005)........................................................................65, 66, 69

*Grain Traders, Inc. v. Citibank, N.A.*,
    960 F. Supp. 784 (S.D.N.Y. 1997), *aff'd*, 160 F.3d 97 (2d Cir. 1998) ...................69

*Grede v. FCStone, LLC*,
    746 F.3d 244 (7th Cir. 2014) .........................................................................30, 42

*Greenfield v. Phillies Records, Inc.*,
    780 N.E.2d 166 (N.Y. 2002)................................................................................68

*Gumport v. Sterling Press* (*In re Transcon Lines*),
    58 F.3d 1432 (9th Cir. 1995) .........................................................................16, 25

*Hassett v. Bancohio Nat'l Bank* (*In re CIS Corp.*),
    172 B.R. 748 (S.D.N.Y. 1994) .............................................................................59

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995) ..................................................................................73

*HSBC Bank USA v. Branch* (*In re Bank of New England Corp.*),
    364 F.3d 355 (1st Cir. 2004) ...............................................................................50

*Hutson v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distribs., LLC)*,
    556 F.3d 247 (4th Cir. 2009) ..........................................................................32, 45

*Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*,
    240 B.R. 195 (Bankr S.D.N.Y. 1999) .................................................................46

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
    263 B.R. 406 (S.D.N.Y. 2001) ............................................................................58

*Jenson v. Allison Williams Co.*,
    No. 98-CV-2229 TW (JWS), 1999 WL 35133748 (S.D. Cal. Aug. 23, 1999) .......76

*Jianjun Lou v. Trutex, Inc.*,
    872 F. Supp. 2d 344 (S.D.N.Y. 2012) .................................................................12

*Jonas v. Resolution Tr. Corp. (In re Comark)*,
    971 F.2d 322 (9th Cir. 1992) ...............................................................................47

*Kaiser Steel Corp. v. Charles Schwab & Co.*,
    913 F.2d 846 (10th Cir. 1990) .............................................................................47

*Kittay v. Landegger* (*In re Hagerstown Fiber Ltd. P'ship*),
    277 B.R. 181 (Bankr. S.D.N.Y 2002) ..................................................................15

*Knox v. Sunstar Acceptance Corp.* (*In re Knox*),
    237 B.R. 687 (Bankr. N.D. Ill. 1999) .............................................................64, 65

*In re Koreag, Controle et Revision S.A v. Refco F/X Assocs., Inc.* (*In re Koreag,
    Controle et Revision S.A.*),
    961 F.2d 341 (2d Cir. 1992) .................................................................................68

*Latham Sparrowbush Assocs. v. Cohoes Indus. Terminal, Inc. (In re Cohoes
    Indus. Terminal, Inc.)*,
    70 B.R. 214 (S.D.N.Y. 1986), *aff'd*, 831 F.2d 283 (2d Cir. 1987) .......................27

*Law Debenture v. Maverick Tube Corp.*,
    No. 06-cv-14320 (RJS), 2008 WL 4615896 (S.D.N.Y. Oct. 15, 2008), *aff'd*,
    595 F.3d 458 (2d Cir. 2010) ...........................................................................65, 66

*In re Lehman Bros. Holdings Inc.*,
  No. 08-13555, 2015 WL 5828216 (S.D.N.Y. Sept. 30, 2015) ...............................................57

*Lehman Bros. Holdings Inc. v. Intel Corp. (In re Lehman Bros. Holdings Inc.)*,
  502 B.R. 376 (Bankr. S.D.N.Y. 2013) ...............................................................................22, 26

*In re Lehman Bros. Holdings v. JPMorgan Chase Bank, N.A.*,
  No. 11-cv-6760 (RJS), 2015 U.S. Dist. LEXIS 137975 (S.D.N.Y. Sept. 30,
  2015) ...........................................................................................................................................68

*Lehman Bros. Special Fin. Inc. v. BNY Corp. Tr. Servs. Ltd. (In re Lehman Bros.
  Holdings Inc.)*,
  No. 08-13555 (JMP), 2010 WL 10078354 (S.D.N.Y. Sept. 23, 2010) ...................................23

*Lehman Bros. Special Financing Inc. v. Ballyrock ABS CDO 2007-1 Ltd.*,
  452 B.R. 31 (Bankr. S.D.N.Y. 2011)................................................................................15, 71

*Lehman Bros. Special Financing Inc. v. BNY Corporate Trustee Services, Ltd. (In
  re Lehman Bros. Holdings Inc.)*,
  422 B.R. 407 (Bankr. S.D.N.Y. 2010)........................................................................... *passim*

*Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*,
  417 F.3d 193 (1st Cir. 2005)....................................................................................................21

*Linsenbach v. Wells Fargo Bank (In re Linsenbach)*,
  482 B.R. 522 (Bankr. M.D. Pa. 2012) .....................................................................................64

*Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*,
  949 F.2d 585 (2d Cir. 1991).....................................................................................................15

*LJP, Inc. v. Royal Crown Cola Co. (In re LJP, Inc.)*,
  22 B.R. 556 (Bankr. S.D. Fla. 1982)........................................................................................17

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts, Inc.)*,
  181 F.3d 505 (3d Cir. 1999).....................................................................................................47

*In re Margulis*,
  323 B.R. 130 (Bankr. S.D.N.Y. 2005)......................................................................................28

*MBIA Ins. Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*,
  No. 09 Civ. 10093, 2011 WL 1197634 (S.D.N.Y. Mar. 25, 2011) .........................................34

*Meadows v. Pac. Inland Sec. Corp.*,
  36 F. Supp. 2d 1240 (S.D. Cal. 1999).......................................................................................76

*Messer v. TX Onshore, LLC (In re Madison Williams & Co.)*,
  509 B.R. 791 (Bankr. S.D.N.Y. 2014)......................................................................................59

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013), *cert. denied sub nom. Exxon Mobil Corp. v. City
   of New York*, 134 S. Ct. 1877 (2014) ....................................................................63

*Mia Shoes, Inc. v. Republic Factors Corp.*,
   No. 96 Civ. 7974 (TGP), 1997 WL 525401 (S.D.N.Y. 1997)................................69

*Michaels v. National Bank of Sussex County (In re E-Tron Corp.)*,
   141 B.R. 49 (Bankr. D.N.J. 1992) .........................................................................82

*Michigan State Housing Development Authority v. Lehman Bros. Derivative
   Products Inc. (In re Lehman Bros. Holdings Inc.)*,
   502 B.R. 383 (Bankr. S.D.N.Y. 2013).......................................................... *passim*

*Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In Re Mid-Island
   Hosp., Inc.)*,
   276, F.3d 123, 129 (2d Cir. 2002)...........................................................................66

*Miller's Apple Valley Chevrolet Olds-Geo, Inc. v. Goodwin*,
   177 F.3d 232 (4th Cir. 1999) .................................................................................20

*In re Moss*,
   270 B.R. 333 (Bankr. W.D.N.Y. 2001) ............................................................27, 28

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*,
   526 U.S. 344 (1999)..........................................................................................78, 80

*Naturally Beautiful Nails, Inc. v. Bay Area Capital, Inc. (In re Naturally Beautiful
   Nails, Inc.)*,
   243 B.R. 827 (Bankr. M.D. Fla. 1999) ...................................................................85

*Nemko, Inc. v. Motorola, Inc. (In re Nemko, Inc.)*,
   163 B.R. 927 (Bankr. E.D.N.Y. 1994).....................................................................23

*Official Comm. of Unsecured Creditors of CIC v. Frost (In re Contemporary
   Indus. Corp.)*,
   564 F.3d 981 (8th Cir. 2009) ...........................................................................47, 63

*In re Pelham Fence Co.*,
   65 B.R. 924 (Bankr. S.D.N.Y. 1986).......................................................................27

*Perrin v. United Sates*,
   444 U.S. 37 (1979)..................................................................................................39

*Peters v. Sotheby's Inc. (In re Peters)*,
   821 N.Y.S.2d 61 (App. Div. 2006).........................................................................70

*Peterson v. Imhof*,
    No. 2:13-cv-00537, 2013 WL 5567561 (D.N.J. Oct. 8, 2013) ...............................................82

*Picard v. Citibank, N.A. (In re Madoff Secs.)*,
    505 B.R. 135 (S.D.N.Y. 2013)......................................................................................30, 45

*Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Secs. LLC)*,
    773 F.3d 411 (2d. Cir. 2014).......................................................................................47, 48

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011).............................................................................................74

*Prewitt Enters., Inc. v. OPEC*,
    353 F.3d 916 (11th Cir. 2003) ..............................................................................................9

*Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency
    Holdings (Cayman), Inc.)*,
    216 B.R. 371 (Bankr. S.D.N.Y. 1998) ................................................................................21

*Rice v. Shoney's Inc. (In re Dean)*,
    174 B.R. 787 (Bankr. E.D. Ark. 1994) ...............................................................................13

*Robinson v. Fountainhead Title Grp. Corp.*,
    447 F. Supp. 2d 478 (D. Md. 2006) ....................................................................................76

*Rosen v. Dahan (In re Minh Vu Hoang)*,
    469 B.R. 606 (D. Md. 2012) .........................................................................................82, 84

*In re Saft*,
    No. 339363, 2009 WL 1957954 (N.Y. Sur. Ct. June 25, 2009) ...........................................70

*SEC v. KPMG LLP*,
    412 F. Supp. 2d 349 (S.D.N.Y. 2006).................................................................................18

*Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005)............................................................................................67, 74

*Sharp v. Kosmalski*,
    351 N.E. 2d 721 (N.Y. 1976).............................................................................................68

*Sherman v. FSC Realty LLC (In re Brentwood Lexford Partners, LLC)*,
    292 B.R. 255 (Bankr. N.D. Tex. 2003).........................................................................58, 74

*Smith v. Am. Founders Fin. Corp.*,
    365 B.R. 647 (S.D. Tex. 2007) ..........................................................................................84

*Smith v. Bayer Corp.*,
    131 S. Ct. 2368 (2011)......................................................................................................78

*State Bank of Hardinsburg v. Brown*,
    317 U.S. 135 (1942)................................................................................23

*Stone v. Williams*,
    970 F.2d 1043 (2d. Cir. 1992)................................................................81

*Sullivan v. Willcock* (*In re Wey*),
    854 F.2d 196 (7th Cir. 1988) ................................................52, 53, 54

*Superintendant of Ins. v. Ochs* (*In re First Cent. Fin. Corp.*),
    377 F.3d 209 (2d Cir. 2004).............................................................65, 66

*Teachers Ins. & Annuity Ass'n of Am. v. CRIIMI MAE Servs. Ltd. P'ship*,
    681 F. Supp. 2d 501 (S.D.N.Y. 2010), *aff'd*, 481 F. App'x 686 (2d Cir. 2002)......................66

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Assoc.*,
    322 F.3d 1039 (9th Cir. 2002) .............................................................30

*Tower Auto. Mexico, S. de R.L. de C.V. v. Grupo Proeze, S.A. de C.V.* (*In re Tower Auto., Inc.*),
    356 B.R. 598 (Bankr. S.D.N.Y. 2006)..................................................21

*Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*,
    361 N.E.2d 1015 (N.Y. 1977)...............................................................71

*U.S. Bank N.A. v. Verizon Commc'ns Inc.*,
    892 F. Supp. 2d 805 (N.D. Tex. 2012), *aff'd*, 761 F.3d 409 (5th Cir. 2014).........................64

*United Air Lines, Inc. v. Austin Travel Corp.*,
    867 F.2d 737 (2d Cir. 1989)..................................................................70

*United States v. Hawker Beechcraft Corp.* (*In re Hawker Beechcraft, Inc.*),
    515 B.R. 416 (S.D.N.Y. 2014)...............................................................18

*Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*,
    599 N.Y.S.2d 816, 819 (App. Div. 1993) ............................................74

*In re Village Rathskeller, Inc.*,
    147 B.R. 665 (Bankr. S.D.N.Y. 1992) .............................................50, 67

*Virgilio v. City of New York*,
    407 F.3d 105 (2d Cir. 2005)..................................................................17

*W.W.W. Assocs., Inc. v. Giancontieri*,
    655 N.E.2d 639 (N.Y. 1990)..................................................................68

*Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*,
    304 F.3d 200 (2d Cir. 2002)..................................................................15

*Whitaker v. Power Brake Supply, Inc.* (*In re Olympia Holding Corp.*),
    188 B.R. 287 (M.D. Fla. 1994), *aff'd* 68 F.3d 1304 (11th Cir. 1995) ..............................16, 26

*Whyte v. Barclays Bank PLC*,
    494 B.R. 196 (S.D.N.Y. 2013) ..............................................................................................64

*Wilson v. Nw. Mut. Ins. Co.*,
    625 F.3d 54 (2d Cir. 2010) ....................................................................................................14

*In re Winer*,
    158 B.R. 736 (N.D. Ill. 1993) ..........................................................................................21, 26

**Statutes**

11 U.S.C. § 101(5) ....................................................................................................................55

11 U.S.C. § 101(12) ..................................................................................................................55

11 U.S.C. § 101(22) ..................................................................................................................46

11 U.S.C. § 101(22A) ...............................................................................................................37

11 U.S.C. § 101(49)(A) ............................................................................................................47

11 U.S.C. § 101(53B) ...................................................................................................32, 33, 34

11 U.S.C. § 101(53C) ...............................................................................................................36

11 U.S.C. § 362(a)(3) ..........................................................................................................27, 28

11 U.S.C. § 362(b)(17) .............................................................................................................44

11 U.S.C. § 363(*l*) .............................................................................................................13, 20

11 U.S.C. § 365(e)(1) ........................................................................................................ *passim*

11 U.S.C. § 510(a) ..............................................................................................................50, 51

11 U.S.C. § 541(a)(1) ...............................................................................................13, 17, 19, 20

11 U.S.C. § 541(c)(1) ...........................................................................................................12, 13

11 U.S.C. § 542(a) ....................................................................................................................59

11 U.S.C. § 542(b) ...............................................................................................................61, 62

11 U.S.C. § 546(a)(1) .....................................................................................................49, 77, 82

11 U.S.C. § 546(e) ...............................................................................................................30, 46

11 U.S.C. § 546(g) ................................................................................................30, 45

11 U.S.C. § 547(b) ................................................................................................54, 55

11 U.S.C. § 548(d)(2)(D) ...........................................................................................55

11 U.S.C. § 549(a) ......................................................................................................49

11 U.S.C. § 549(d)(1) .................................................................................................82

11 U.S.C. § 560................................................................................................. *passim*

11 U.S.C. § 741(7)(A)(i), (vii), (xi) ...........................................................................48

11 U.S.C. § 741(8) ......................................................................................................46

28 U.S.C. § 2201-02 ...................................................................................................81

N.Y. Insurance Law § 3204(a)(3) ...............................................................................14

NY UFCA § 270 ..........................................................................................................72

NY UFCA § 272 ....................................................................................................72, 73

NY UFCA § 273 ..........................................................................................................72

NY UFCA § 274 ..........................................................................................................72

NY UFCA § 275 ..........................................................................................................72

NY UFCA § 276 ..........................................................................................................73

**Other Authorities**

136 Cong. Rec. 57535 (daily ed. June 6, 1990)..........................................................29

23 N.Y. Jur. 2d *Conversion, and Action for Recovery of a Chattel* § 89 (2d ed.
 2014) ...................................................................................................................69, 70

BLACK'S LAW DICTIONARY (4th ed. 1968) .................................................................39

BLACK'S LAW DICTIONARY (10th ed. 2014) ...............................................................39

Fed. R. Civ. P. 9(b) ...............................................................................................56, 73

Fed. R. Evid. 201(b)..............................................................................................37, 46

H.R. REP. 109-31 (2005)...........................................................................31, 32, 34, 39, 41

H.R. REP. NO. 109-648 (2006).....................................................................................44

Rudolph Bunja & William May, *Moody's Approach to Assessing Secondary Risks in Synthetic CDOs*, Moody's Investors Services ( Mar. 17, 2003)...........................................8

S. REP. NO. 101-285 (1990)....................................................................................................31, 39

Standard & Poor's*, Criteria for Rating Synthetic CDO Transactions* (Sept. 2003)........................8

Standard & Poor's, *Global Cash Flow and Synthetic CDO Criteria* (Mar. 21, 2002) .....................................................................................................................................8

The undersigned noteholder defendants (the "Noteholder Defendants" or "Noteholders") submit this Omnibus Motion to Dismiss (the "Motion") the Fourth Amended Complaint (the "Complaint" or "FAC," [Dkt. No. 1156]) pursuant to Fed. R. Civ. P. 12(b)(6) in accordance with paragraph 16 of the Second Scheduling Order [Dkt. No. 1138].

## INTRODUCTION

This Adversary Proceeding arises out of synthetic collateralized debt obligation ("CDO") transactions created by Plaintiff Lehman Brothers Special Financing, Inc. ("LBSF") and its affiliates.  LBSF structured these CDOs, established their terms and conditions, constructed the documents that governed both the swaps that each CDO's special purpose entity (the "Issuer") would enter into with LBSF and the notes that each Issuer would sell to investors, and presented them, in many instances, to credit rating agencies for assignment of favorable credit ratings that reflected the "de-linking" of the structures from the default risk of LBSF.  The Issuers' notes were principally marketed and sold to investors by LBSF's affiliates Lehman Brothers Inc. and Lehman Brothers International (Europe) (LBSF, together with its affiliates, is referred to herein as "Lehman"), and the investors, through their note purchases, funded the collateral held by each Issuer as security for its obligations to the Noteholders and LBSF.[1]

Each CDO's "Transaction Documents"[2] give the Noteholders the express right to have their notes repaid on a priority basis from the collateral proceeds if LBSF defaulted on its swaps

---

[1] The Noteholders or Noteholder Defendants include certain Defendants that intend to assert conduit defenses, including because they were mere custodians or otherwise were not beneficial noteholders, and that have disclosed this intention to LBSF in writing (the "Conduit Defendants").  See Second Scheduling Order ¶ 11.  Certain descriptions in this Motion of acts, investments and the possession or receipt of property by the Noteholders or Noteholder Defendants do not apply to the Conduit Defendants and nothing in this Motion should be construed as a factual concession or waiver of any defenses or rights held by the Conduit Defendants.

[2] The "Transaction Documents" refer collectively to (i) an ISDA Master Agreement (including the Schedule thereto and any Credit Support Annex to such Schedule) and one or more Confirmations under such ISDA Master Agreement (collectively, the "Swap Confirmation") for each CDO transaction, (ii) the relevant indenture(s), trust agreement(s), security agreement(s) or trust deed(s) entered into with respect to each CDO transaction, and (iii) other documents executed by the swap counterparty, credit support provider, Issuer, Trustee, or Noteholders to

with the Issuers.  LBSF defaulted, through the actions of its affiliate Lehman Brothers Holdings

Inc. ("LBHI"), and so the Noteholders were entitled to be and were paid back ahead of LBSF,

just as the Transaction Documents provided.

LBSF is now asking the Court to invalidate the provisions of the Transaction Documents

that gave the Noteholders priority to the proceeds of the liquidation of the collateral securing

their investments in the event of a LBSF default (the "Priority Provisions") and to provide LBSF

with rights in the collateral that it never bargained for or obtained.  LBSF is asking the Court to

restructure the transaction into one in which LBSF, by defaulting, could obtain that collateral

ahead of the Noteholders.  That deal – which is not the deal Lehman marketed and the

Noteholders purchased – makes no economic sense and creates a never-bargained-for windfall

for LBSF.

The passage of time since LBSF brought its action against BNY Corporate Trustee

Services in 2010 has allowed LBSF to concoct a hodge-podge of bankruptcy and state law

theories in its attempt to lay claim to the collateral proceeds distributed to the Noteholders,

resulting in a 24-count complaint.  But the multiplicity of claims and theories cannot make up for

the fundamental flaws of LBSF's assault upon its own structured transactions.  Although LBSF's

many claims fail for a variety of reasons, one allegation that pervades all of its claims is worth

highlighting.

The Complaint repeatedly characterizes LBSF's interest in the collateral securing the

Noteholders' investments as an LBSF entitlement to "payment priority," and it asserts that the

---

effectuate the terms of the CDO transaction.  A set of the Swap Confirmation, indentures and Offering
Memorandum for the Series 2006-1 Segregated Portfolio of 801 Grand CDO SPC Transaction is attached to the
Declaration of Bryan Krakauer in Support of the Noteholder Defendants' Omnibus Motion to Dismiss the Fourth
Amended Complaint (the "Krakauer Declaration," filed contemporaneously herewith) as a representative example of
the Transaction Documents.  *See* Ex. E (all references to Exhibits herein refer to Exhibits attached to the Krakauer
Declaration unless otherwise noted).

application of the Priority Provisions unfairly "deprived" LBSF of that entitlement.  *See, e.g.*, FAC ¶¶ 1–3, 61, 66, 70, 81–82.  The Transaction Documents themselves, however, make clear that there was no such entitlement.  They provide that LBSF was entitled to collateral distributions ahead of the Noteholders only in the following circumstances: (i) the occurrence of requisite "Credit Events" before the maturity or early termination of the CDO transaction; or (ii) an "Issuer Event," allowing LBSF to designate an Early Termination Date for the swap(s) in the event of (a) a specified "Event of Default" under the swap agreements with the Issuer as the "Defaulting Party," or (b) a specified "Termination Event" pertaining to the Issuer as the "Affected Party."  In the event of the occurrence of requisite Credit Event(s), the Transaction Documents further provided that LBSF was entitled to a resulting payment from the Collateral (a "Cash Settlement Amount") only if it elected to deliver specified written notices respecting the incidence of such Credit Event(s) and ascertained the appropriate quantum of such Cash Settlement Amount.  *See* Ex. A ("Conditions to Settlement" and "Cash Settlement Amount").  LBSF's Complaint does not allege that any of those events occurred, so on the record before the Court, LBSF was never entitled to any priority in the Collateral over the Noteholders and thus was never "deprived" of any right it held.  Unhappy with the bargain it struck, LBSF seeks to create an additional circumstance in which it is entitled to such priority when it has defaulted and precipitated the early termination of the swaps – but LBSF has no right to such a result and nothing in the Bankruptcy Code authorizes it.  The provisions in the Transaction Documents, as written, negotiated, and agreed to by Lehman, are valid, there is no reason in law or sound policy to create for LBSF a new right it never bargained for, and accordingly this action should at long last be dismissed with prejudice.

This Motion is directed at Counts I through XVI, XVIII, and XIX (the "Noteholder Relevant Counts")[3] of the Complaint.  Each fails to state a claim upon which relief can be granted and so should be dismissed.  The gravamen of the Complaint is the invalidation of the Priority Provisions as purported impermissible *ipso facto* clauses subject to Bankruptcy Code Sections 365(e)(1), 541(c)(1), or 363(*l*) (the "*ipso facto* provisions").  This Motion shows *first*, that the Priority Provisions are not *ipso facto* clauses because they do not modify any rights as a result of the filing of a bankruptcy case, and in any event, for a majority of the transactions, any putative modifications occurred before the *ipso facto* provisions of the Bankruptcy Code or the automatic stay could even apply to invalidate them.  *Second*, the Safe Harbors in Sections 560, 362(b)(17), 546(g), and 546(e) preserve the enforceability of the Priority Provisions and preempt LBSF's causes of action regardless of whether they are construed as *ipso facto* clauses.  *Third*, LBSF's preference, constructive fraudulent conveyance, and turnover claims, as well as LBSF's state law intentional fraudulent conveyance and other claims, do not allege the elements necessary to state valid causes of action.  *Fourth*, LBSF's claims against many of the Noteholders are barred by the applicable statutes of limitation.

## FACTUAL BACKGROUND

The Transactions.  Each transaction at issue in this Adversary Proceeding (collectively, the "Transactions") was designed by Lehman as a synthetic CDO transaction.  The Transactions were marketed to institutional or offshore investors principally by Lehman over an extended

---

[3] Pursuant to the Second Scheduling Order, this Motion solely addresses certain issues common to a majority of Noteholder Defendants.  Second Scheduling Order ¶ 16.  Accordingly, Counts XX through XXIII relating to the Pyxis Transaction and Counts XXIV and XXV relating to the Federation Transaction, as well as Count XVII against the Trustee Defendants, are not addressed here.  All rights with respect to such claims are reserved.  The Noteholders reserve any applicable right with respect to any constitutional issues (including *Stern v. Marshall*), or any subject-matter or personal jurisdiction issues in connection with this Action, and nothing in this Motion should be construed as a waiver of any defenses or rights not raised in this Motion nor as a submission to the Court's jurisdiction.  Second Scheduling Order ¶ 33.

period of time in multiple locations worldwide. *See, e.g.*, Series 2006-1 Segregated Portfolio of

801 Grand Series CDO SPC Offering Memorandum (the "<u>801 Grand CDO 2006-1 O.M.</u>"), Ex.

E-1, at Cover Page.

    <u>The Transaction Documents.</u>  Although the Transactions varied from one to the next, the

general structure of the Transactions is similar.[4]  Each Transaction involved three interrelated

components.  First, the "Issuer" issued one or more series of notes (or, in certain circumstances,

trust certificates) to investors (the Noteholders), whose investment funded the Issuer's purchase

of the collateral described below.  Second, the Issuer and LBSF entered into one or more credit

default swaps ("<u>CDS</u>"), whereby the Issuer sold synthetic credit protection on certain reference

entities to LBSF, and LBSF's periodic fixed premium payments pursuant to the CDS were used

by the Issuer to enhance the interest payments that were to be made to the Noteholders.  Third,

the Issuer used cash proceeds received from the Noteholders to purchase one or more liquid

investments to provide an investment income and to serve as collateral (the "<u>Collateral</u>") to

secure or support the Issuer's obligations to the Noteholders and to LBSF as swap counterparty.

*See, e.g.*, 801 Grand CDO 2006-1 O.M., Ex. E-1, at Cover Page.  The Collateral was held in

custody by a trustee or similar financial agent (the "<u>Trustee</u>") pursuant to an indenture, a trust

deed, or a trust agreement.  *See, e.g.*, Exs. D, E-2.  Each Trustee held a lien on the Collateral for

---

[4] Of the 44 Transactions that are the subject of this Adversary Proceeding, (a) 39 involved the issuance of secured notes in connection with an indenture governed by New York law, (b) two involved the issuance of secured notes in connection with an English law trust deed (Quartz Finance Plc 2004-1 and Ruby Finance plc 2005-1 ), and (c) three involved the issuance of trust certificates in connection with a trust agreement (the "<u>RACER Series Transactions</u>"). An example of a representative transaction is the Series 2006-1 Segregated Portfolio for 801 Grand CDO SPC Transaction.  Copies of the Transaction Documents for the other Transactions are available in a document repository, principally provided by LBSF, pursuant to the First Scheduling Order [Dkt. No. 794].  First Scheduling Order, ¶ 29.  To the extent the Court would like to review the Transaction Documents for other Transactions, the Noteholder Defendants will promptly provide copies to the Court.

the benefit of all Secured Parties[5] under each Transaction.  *Id.*

In each Transaction, LBSF's ultimate parent, LBHI, guaranteed LBSF's obligations under each CDS pursuant to a standard form guaranty and consequently was assigned the status of "Credit Support Provider" for LBSF in relation to the CDS.  LBHI's role as guarantor was one of the primary factors affecting the credit ratings assigned to the Notes marketed to investors, and thus an important component of the Transactions.  *See, e.g.*, Pyxis Offering Memorandum, Ex. F, at 125, 199 ("LBSF benefits from a full guarantee by LBHI").

Substantially all of the CDS were documented using industry-standard credit derivative transaction terms: principally the 2003 ISDA Credit Derivatives Definitions.[6]  *See, e.g.*, 801 Grand CDO 2006-1 O.M., Ex. E-1, at page 31.  The majority of the CDS referenced underlying commercial, industrial, and financial obligations (*i.e.*, "corporates"), and the remaining handful of CDS referenced other CDOs or asset-backed securities.  In order for "Cash Settlement Amounts" to become due and payable to LBSF, one or more "Credit Events" (*e.g.*, a "Bankruptcy," a "Failure to Pay" or a distressed "Restructuring") must have occurred and, for each such "Credit Event", "Conditions to Settlement" or similar requirements had to be met by LBSF, and the amount payable to LBSF in respect of one or more Credit Events would be reflective of the number and nature of Credit Events that occurred.  *See, e.g.*, 801 Grand CDO 2006-1 O.M., Ex. E-1, at 51-53 (*Credit Events*); 79 (*Credit Protection Payment Amount*).

The ISDA Master Agreements that comprised part of the Transaction Documents for each of the CDS also reflected industry-standard norms (the 1992 ISDA Master Agreement), *see*

---

[5] In addition to the Noteholder investors and LBSF, as mentioned above, "Secured Parties" for a Transaction typically included the trustees themselves, as well as any specified providers of administrative, custodial, or similar services.  For the three RACER Series Transactions, however, no security interests were involved; instead, the applicable trust agreements provided for contract rights, benefits and obligations to like effect.  *See* Ex. D.

[6] The CDS for one Transaction, for Issuer Kings River Limited, executed in 2003, incorporated the earlier, 1999, ISDA credit derivatives definitions book, but the differences are not relevant to the present Motion.

801 Grand Series 2006-1 Class F Confirmation, Ex. E-5, at 1, with certain notable modifications designed specifically with rating agency credit criteria in mind. In particular, generally all but two of the ISDA-standard "Events of Default" normally made applicable to customers in dealer-to-customer master derivative agreements were *excluded* as against the Issuers, with the remaining two "Issuer Defaults" being (a) an Issuer "Failure to Pay or Deliver" under the master agreement and (b) Issuer insolvency or bankruptcy. *See, e.g.*, Ex. A; Schedule to ISDA Master Agreement for the Series 2006-1 Segregated Portfolio of 801 Grand CDO SPC (the "<u>801 Grand CDO 2006-1 Schedule</u>"), Part 1(e), Ex. E-4.

Similarly, the only "Termination Events" applicable to the Issuers under the Transaction Documents (the occurrence of which could accordingly result in LBSF obtaining priority over the Noteholders) were (i) the payment or performance by the Issuer of obligations under the CDS becoming (a) illegal (for example, as a result of currency exchange controls or similar public policy interventions), or (b) subject to certain withholding or similar taxes and (ii) an "Additional Termination Event" in relation to the Issuer (*e.g.*, the occurrence of an indenture event of default and the irrevocable acceleration of the Issuer's indebtedness to investors such as the Noteholders under circumstances where the Issuer was either the sole defaulting party or among the defaulting parties). *See* Ex. A; 801 Grand CDO 2006-1 Schedule, Part 1(e), Ex. E-4.

<u>The Priority Provisions.</u> The Noteholders had a right to payments from the Issuer and the Collateral on regularly scheduled payment dates. For LBSF, however, the right to payment arose only upon the occurrence of certain events. The Priority Provisions that are included in the Transaction Documents specified the payment priority to be applied for amounts owed in connection with the swap agreement, depending on the circumstances that occurred and to whom payment was to be made. *See* Exs. B, C. In each Transaction, LBSF had *no* right to payment

prior to the Noteholders being paid in full where there was an early termination of the swap agreement due to a default solely by LBSF or its affiliate and no invoked Credit Events existed.[7] The Priority Provisions were material components of the Transaction Documents, as they mitigated the Transactions' counterparty default risk by confirming the Noteholders' rights to the Collateral in the event of LBSF's or its affiliate guarantor's default.  *See* Standard & Poor's, *Global Cash Flow and Synthetic CDO Criteria,* Mar. 21, 2002, at 22 ("Standard & Poor's has *required* that mitigation of the counterparty risk be addressed ….  Typically, solutions include subordinating the termination [payment] in the waterfall to the rated noteholders…." (emphasis added)); Standard & Poor's, *Criteria for Rating Synthetic CDO Transactions*, Sept. 2003, at 33 ("The termination payment *must* therefore either be sized or subordinated to the rated noteholders in the priority of payments unless termination is caused due to default of the [CDO] …." (emphasis added)); Rudolph Bunja & William May, *Moody's Approach to Assessing Secondary Risks in Synthetic CDOs*, Moody's Investors Service, Mar. 17, 2003, at 3 (assumption in evaluating synthetic CDOs is that "any termination payments due to the counterparty are *either waived or subordinated* as a result" (emphasis added)) (*see* Ex. R).  Accordingly, consistent with industry standards, the Transaction Documents for each Transaction provided that LBSF had no right to payment of the Collateral ahead of Noteholders unless and until either of certain events occurred, giving LBSF priority over the Noteholders, *see* Section I.A below, or the Noteholders had been paid in full.[8]

---

[7] In certain Transactions, such as the RACER Series Transactions, the relevant Transaction Documents provided that LBSF did not have any right to a termination payment in the event of an early termination date caused by LBSF's default.  *See* Ex. B.

[8] The two Transactions governed by English law (Quartz Finance Plc Series 2004-1 and Ruby Finance plc Series 2005-1) (the "Underlined Transactions"), to the knowledge of the undersigned, pertain only to a single Noteholder Defendant, UniCredit Bank, AG (London Branch) ("UniCredit") and contain particularized provisions which differ in certain respects from the foregoing description.  As is permitted by paragraph 23 of the Second Scheduling Order [Dkt. 1138, ¶ 23], UniCredit will address its particularized issues and grounds for relief by separate motion at a

**The Bankruptcy Cases and Termination and Liquidation of the Transactions**

LBHI filed its bankruptcy petition on September 15, 2008 (the "LBHI Petition Date"),

triggering an "Event of Default" in relation to LBSF as the "Defaulting Party" under the CDS for

each Transaction, because LBHI was a guarantor of LBSF's payment obligations under the

CDSs and accordingly was specified as a "Credit Support Provider" to LBSF in the Transaction

Documents.  FAC ¶¶ 1-2.  The Complaint does not allege that there were any payments due to

LBSF in respect of Credit Events or of the occurrence of any relevant Issuer Events with respect

to any of the Transactions.  *See, e.g.*, FAC ¶ 6 (attributing the Event of Default to the bankruptcy

filings of LBHI and LBSF).  LBSF filed its own bankruptcy petition eighteen days later, on

October 3, 2008 (the "LBSF Petition Date").  FAC ¶ 1.

In each of the Transactions, the Issuer through the Trustee (or another agent of the Issuer)

duly designated an early termination date under the CDS based on LBSF's default (the "Early

Termination").[9]  FAC ¶ 6.  Of the 44 Transactions at issue in this Adversary Proceeding, at least

36 Transactions were terminated prior to the LBSF Petition Date, and seven after the LBSF

Petition Date.[10]  A business rationale permitting the termination of the CDS upon LBSF's default

is plain.  LBSF had ongoing premium payment obligations to the Issuers, and after the LBHI

Petition Date, the continuation of these premium payments was at risk.  Following the Early

Termination of the Transactions, the Trustees monetized the Collateral and distributed the

---

subsequent stage of the briefing with respect to the arguments made in Section I.A, I.B.1 and I.C (footnote 23) of
this Motion and accompanying Motion, and does not join in these Sections for that reason. UniCredit further
specifically reserves all rights and defenses specific to its English Transactions.  UniCredit does join in the relief
sought in Sections I.B.2, I.C (only as to footnote 23), I.D, II through VII of this Motion.

[9] LBSF does not allege that the Transactions were terminated for any reason other than an Event of Default under
the CDS for which LBSF was the defaulting party.  FAC ¶ 6.  Indeed, LBSF confirmed before U.S. District Judge
Failla that LBSF does not contest that the Issuers and Trustees had the right to terminate the swap transactions and
accelerate the notes.  *See* Hr'g Tr. May 4, 2015 at 57:16─58:1, Ex. S.

[10] The Noteholder Defendants do not have sufficient information to determine when the Kings River Limited
Transaction was terminated.

proceeds, or in some cases distributed the Collateral itself, in accordance with the terms of the

Priority Provisions for each of the Transactions.[11]  In at least 20 of the Transactions terminated

prior to the LBSF Petition Date, not only was the Collateral liquidation process initiated prior to

the LBSF Petition Date, payments were also distributed to the relevant Noteholder(s) prior to the

LBSF Petition Date (the "Pre-Pre Transactions").[12]  In other cases, the liquidation process was

initiated prior to the LBSF Petition Date, but the payments were distributed after the LBSF

Petition Date (the "Pre-Post Transactions").  With respect to the seven Transactions terminated

after the LBSF Petition Date, the payment distributions occurred after the LBSF Petition Date

(the "Post-Post Transactions").

Because the Early Terminations were initiated as a result of an Event of Default

associated with LBSF as "Defaulting Party" under the Swap Confirmations, and no Issuer Event

or invoked Credit Event had occurred, LBSF was not entitled to payments from the proceeds of

the Collateral prior to the Noteholders.  Rather, the terms of the Priority Provisions for each

Transaction required that the relevant Trustee distribute Collateral proceeds or Collateral to the

Noteholders.  Lehman structured these Transactions such that the Collateral was only sufficient

to satisfy noteholder repayment claims. Accordingly, in the event that (i) insufficient applicable

Credit Events occurred, or (ii) no Issuer Event occurred, LBSF would not receive any payment

from the Collateral on account of its junior position.  LBSF does not dispute that the

Transactions were terminated as a result of an Event of Default under the CDS for which LBSF

was the defaulting party (FAC ¶ 6) and nowhere alleges that any applicable Credit Events or

---

[11] The Priority Provisions are described in greater detail in Exhibit B.

[12] Appendix A sets forth the timing of the termination and distribution for each of the Transactions, and classifies each Transaction in one of three categories: "Pre-Pre Transactions", "Pre-Post Transactions" and "Post-Post Transactions"), as described in the text of this Motion.  As indicated in Appendix A, the Noteholder Defendants do not have sufficient information to determine whether three of the Transactions terminated prior to the LBSF Petition Date fall into the category of "Pre-Pre Transactions" or "Pre-Post Transactions."

Issuer Events occurred.

**The Adversary Proceeding**

On September 14, 2010, two years (minus one calendar day) after the LBHI Petition

Date, LBSF commenced this proceeding as a putative defendant class action seeking to recover

unspecified portions of the payments that were made to the Noteholders.  The named Defendants

included various Noteholders, each of the indenture trustees or owner trustees for the

Transactions, and each of the Cayman Islands and Delaware-organized companies formed by

Lehman to act as security-issuing special purpose entities under the Transactions as Issuer

Defendants.  A number of other Noteholders and investors in trust certificates were subsequently

joined as Defendants in the Adversary Proceeding at various dates subsequent to the expiration

of the two-year period from the LBSF filing.

## ARGUMENT

A complaint should be dismissed if a plaintiff fails to allege an entitlement to relief

beyond a "formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007).  To survive a motion to dismiss, a complaint must "offer factual

allegations sufficient to render the asserted claim plausible on its face."  *Air Atlanta Aero Eng'g*

*Ltd. v. SP Aircraft Owner I, LLC*, 637 F.Supp.2d 185, 189 (S.D.N.Y. 2009).  On a motion to

dismiss, while a court will accept factual allegations in a complaint as true and draw reasonable

inferences in the plaintiff's favor, "allegations that are no more than legal conclusions are 'not

entitled to the assumption of truth.'"  *Id.* at 189-90 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664

(2009)).  The court "may consider any written instrument attached to the complaint, statements

or documents incorporated into the complaint by reference, legally required public disclosure

documents filed with the SEC, and documents possessed by or known to the plaintiff and upon

which it relied in bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98

(2d Cir. 2007).  In the Complaint, LBSF cited to and quoted portions of the Transaction

Documents.  FAC, Ex. B.  Thus, the Court may consider the Transaction Documents supplied as

examples and attached as exhibits to the Krakauer Declaration, together with the other

Transaction Documents in the document repository established by LBSF in accordance with the

First Scheduling Order.  First Scheduling Order, ¶ 29.  To the extent there is an inconsistency

between the allegations and the incorporated Transaction Documents, the terms of the latter

control.  *See, e.g.*, *In re 1031 Tax Group, LLC*, 420 B.R. 178, 189 (Bankr. S.D.N.Y. 2009).  The

Court also "may take judicial notice of prior pleadings . . . and other related documents that

appear in the court records."  *Jianjun Lou v. Trutex, Inc.*, 872 F. Supp. 2d 344, 349 n.6 (S.D.N.Y.

2012).  Here, the Complaint fails to state a plausible or valid claim for a multiplicity of reasons.

I.     **The Priority Provisions Are Valid And Enforceable and the Code's *Ipso Facto* Provisions Do Not Apply.  (Count I)**

The majority of the Noteholder Relevant Counts should be dismissed because they are

predicated upon LBSF's assertion that the Priority Provisions are invalid *ipso facto* clauses that

modify LBSF's pre-existing rights.[13]  LBSF claims that the Priority Provisions are unenforceable

under Sections 365(e)(1), 541(c)(1) and 363(*l*) of the Bankruptcy Code, which render *ipso facto*

clauses unenforceable in specified circumstances.  FAC ¶¶ 122–30; Count I.  Section 365(e)(1)

provides:

> [n]otwithstanding a provision in an executory contract … an *executory contract … of the debtor* may not be … *modified*, and any right or obligation under such contract … may not be … *modified*, at any time *after* the commencement of *the case* solely because of a provision in such contract … that is conditioned on … the commencement of a case under this title … .

11 U.S.C. § 365(e)(1) (emphasis added).

---

[13] Only Counts IV through IX and XIX of the Noteholder Relevant Counts are not predicated upon this assertion, and those counts should be dismissed for the reasons set forth in Sections III, IV and V of this Motion.

Section 541(c)(1) similarly provides that the debtor's interest in property:

> becomes property of the estate *under subsection (a)(1)* … of this
> section notwithstanding any provision in an agreement … that is
> conditioned …. on the commencement of a case under this title, …
> and that effects or gives an option to effect a … *modification … of
> the debtor's* interest in property.

11 U.S.C. § 541(c)(1) (emphasis added).  Section 541(a)(1), in turn, defines "property of the

estate" as the "legal or equitable interest *of the debtor* in property *as of* the commencement of *the

case*."  11 U.S.C. § 541(a)(1) (emphasis added).

Section 363(*l*) also similarly provides that the debtor:

> may use, sell, or lease property *under subsection (b) or (c)* of this
> section, … notwithstanding any provision in a contract … that is
> conditioned … on the insolvency … *of the debtor*, on the
> commencement of a case under this title *concerning the debtor*, …
> and that effects, or gives an option to effect, a … *modification …
> of the debtor's* interest in such property.

11 U.S.C. § 363(*l*) (emphasis added).

None of these provisions applies because (i) there was never a "modification" of LBSF's

rights under the Transaction Documents, (ii) the purported "modification" occurred *before* LBSF

commenced its bankruptcy case for the majority of the Transactions at issue, and (iii) at the time

of LBSF's bankruptcy, the Transaction Documents were not *executory contracts* and LBSF had

no property interest under those agreements.

**A.    Termination of the Transactions and Distribution of Payments Pursuant to
the Priority Provisions Did Not "Modify" LBSF's Rights Under Sections
365(e)(1), 541(c) or 363(*l*). (Count I)**

Where a contractual right, obligation, or restriction, which "exist[ed] pre-bankruptcy

ha[s] not been forfeited, modified or terminated . . . by the filing of the bankruptcy," such that

the parties are "merely bound by the *original terms* of the agreement," it is not a "modification"

and the *ipso facto* provisions do not apply.  *Rice v. Shoney's Inc.* (*In re Dean*), 174 B.R. 787, 790

13

(Bankr. E.D. Ark. 1994) (emphasis added) (citing *In re N.S. Garrott & Sons*, 772 F.2d 462, 466

(8th Cir. 1985) ("[T]he definition [of 'property of the estate'] was not designed to enlarge the

debtor's rights against others beyond those existing at the commencement of the case.")); *see*

*also Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 61 (2d Cir. 2010) (holding no "modification" of

executory contract under N.Y. Insurance Law § 3204(a)(3) where there was no change to any

contractual terms).

Here, the Priority Provisions (*see* Ex. B) did not "modify" any rights of LBSF because

the Transaction Documents did not vest LBSF with a right to receive swap termination payments

ahead of Noteholders.  Rather, LBSF's right to payment ahead of the Noteholders only came into

being if there was an invoked Credit Event or an Issuer Event; LBSF remained junior to the

Noteholders if the CDS terminated by reason of LBSF's default.[14]  *See* Exs. A, B.  In short,

LBSF did not have a senior priority right by virtue of any circumstance that existed prior to its

default, and its own default did not alter that fact.  To the extent that LBSF had a contingent right

to senior priority, such right was not "modified"; the contingency was simply never fulfilled.

Thus, LBHI's bankruptcy filing (which triggered the Event of Default and Early Termination)

did not "modify" LBSF's contractual rights.  To the contrary, it is LBSF that seeks to modify the

fundamental economics and provisions of the deals that it structured, marketed and sold to the

Noteholders.

In *Lehman Bros. Special Financing Inc. v. BNY Corporate Trustee Services, Ltd. (In re*

*Lehman Bros. Holdings Inc.) (Perpetual)*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010), Judge Peck

considered a related, but not identical, CDO structure.[15]  There, the court concluded that a

---

[14] *See* Ex. A and example Transaction Documents referenced therein.

[15] For several reasons, this Court is not bound by, and should not treat as law of this case, Judge Peck's 2010 decision in *Perpetual.*  First, *Perpetual* does not constitute law of the case (which in any event, even if applicable,

"modification" occurred upon LBSF's default because LBSF had a right of senior payment

priority over the Noteholders with respect to *all* claims, unless and until it defaulted, in which

event the Noteholders moved into the senior position. *See id.* at 413 ("Pursuant to the terms of

the Transaction Documents, the rights of LBSF in the Collateral ordinarily take priority … over

those of [noteholder].  However, if an event of default occurs on the part of LBSF … the

Transaction Documents call for a *reversal* of priorities so that [noteholders] would then be

entitled to priority over amounts otherwise payable to LBSF … ." (emphasis added)).  Even

presuming that Judge Peck construed the transaction documents in *Perpetual* correctly (which

the Noteholders do not concede), here, unlike in *Perpetual*, LBSF *never* had a senior right to

payment out of the Collateral.  *See*, Exs. A, B.[16]  Instead, the Transaction Documents provided

LBSF with a senior right to payment from the Collateral only in two limited circumstances—(1)

---

"is a discretionary rule of practice and generally does not limit a court's power to reconsider an issue," *Liona Corp. v. PCH Assocs.* (*In re PCH Assocs.*), 949 F.2d 585, 592 (2d Cir. 1991)), because the defendants in this case did not have a "'full and fair' opportunity to litigate the initial determination."  *See Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 219 (2d Cir. 2002) (quoting *People v. Bilsky*, 95 N.Y.2d 172, 175 (2000)).  And significantly, the issues for these Noteholders are not identical to those presented in *Perpetual,* as the Transaction Documents differ in ways that were dispositive in *Perpetual*.  *See also* Sections I.B, III.A.1.  Moreover, it is highly likely that *Perpetual* would be decided differently today in light of the intervening decision in *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,* 651 F.3d 329 (2d Cir. 2011), that application of the Safe Harbors should not be dependent on case-by-case factual determinations, but rather should be construed broadly based upon their "plain language."  Indeed in *Michigan State Housing Development Authority v. Lehman Bros. Derivative Products Inc.* (*In re Lehman Bros. Holdings Inc.*), 502 B.R. 383 (Bankr. S.D.N.Y. 2013) ("*Michigan Housing*"), decided subsequently to *Enron*, Judge Peck took a significantly broader approach to the meaning of "termination, liquidation or acceleration" in 11 U.S.C. § 560, holding that "to liquidate is to calculate the Settlement Amount under the terms of the Swap Agreement."  *Id.* at 395.  And in the final analysis, to the extent that *Perpetual* was wrongly decided, law of the case is inapplicable.  *See Kittay v. Landegger* (*In re Hagerstown Fiber Ltd. P'ship*), 277 B.R. 181, 204 (Bankr. S.D.N.Y 2002).  For similar reasons, and also because it was not a final decision on the merits as to any issue, Judge Peck's decision in *Lehman Bros. Special Financing Inc. v. Ballyrock ABS CDO 2007-1 Ltd. (In re Lehman Bros Holdings Inc.)*, 452 B.R. 31 (Bankr. S.D.N.Y. 2011), which denied a motion to dismiss and repeated many of *Perpetual's*  holdings, is not binding and should not be treated as the law of the case.

[16] *See, e.g.*, Greystone CDO Series 2006-1 Series Indenture, § 5(a)(iii) (providing payment structure where Noteholders are entitled to termination payments senior to LBSF, and carving out a separate payment structure where LBSF is entitled to senior termination payments only in the limited circumstances where it is not the defaulting party).  The specific language of the Priority Provisions varies among the Transactions, but the Greystone Priority Provision is substantially similar to the majority of the Transactions.  *See* Ex. B.  As noted in footnote 8 above, arguments with respect to the structure of the English Transactions are not addressed in Sections I.A. and I.B.1 of this Motion, and such arguments are reserved for a later stage of the proceeding.

the occurrence of certain invoked "Credit Events" such that "Cash Settlement Amounts" were due and payable by the Issuer, or (2) early termination as a result of an "Issuer Event"—<u>neither</u> of which LBSF alleges, or can allege, occurred.  *See* Ex. A.

LBSF is thus not asking this Court to invalidate a "modification" of the agreements or its rights.  Rather, LBSF is asking this Court to *create* a "modification" of the agreements in order to expand the circumstances under which LBSF has a right to payment which is secured by a senior interest in the Collateral, *viz.*, termination of the swap as a result of an LBSF default.  Put another way, while LBSF complains it "lost" the value attributable to its in-the-money position in the swaps, the Transaction Documents did not grant LBSF a right to cash out that position by being paid from the Collateral ahead of (and thus to the detriment of) the Noteholders' being repaid on their Notes.  Rather, in the normal course, the swap would stay in place, and LBSF would have a right to payment from the Collateral securing its in-the-money position only if requisite Credit Events or Issuer Events occurred.  *See* Ex. A.  The *ipso facto* provisions do not authorize a court to "*create* any property rights," and "the bankruptcy code does not provide the trustee any greater interest in property than the debtor would have outside the bankruptcy context."  *Whitaker v. Power Brake Supply, Inc.* (*In re Olympia Holding Corp.*), 188 B.R. 287, 295 (M.D. Fla. 1994) (emphasis added), *aff'd* 68 F.3d 1304 (11th Cir. 1995); *see also Gumport v. Sterling Press* (*In re Transcon Lines*), 58 F.3d 1432, 1438 (9th Cir. 1995) ("[N]onbankruptcy law defines the nature of property rights …. [S]ection 541(c)(1) does not increase a debtor's property rights, but merely preserves them.").

**B.     The Timing of the Alleged "Modifications" Renders The *Ipso Facto* Provisions of Sections 365(e)(1), 541(c)(1) and 363(*l*) Inapplicable. (Count I)**

1.    Sections 365(e)(1), 541(c)(1) and 363(*l*) Do Not Apply to Alleged "Modifications" that Occurred Before the LBSF Petition Date.

Even if the application of the Priority Provisions effected a "modification" of LBSF's contractual rights, LBSF's position separately fails with respect to all or at least the majority of the Transactions because the *ipso facto* provisions of Sections 365(e)(1), 541(c)(1) and 363(*l*) do not apply, by their plain language, to alleged "modifications" that occurred *before* LBSF commenced its bankruptcy case. Where "statutory text is plain and unambiguous," the Court "must apply the statute according to its terms." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009); *see also Virgilio v. City of New York*, 407 F.3d 105, 112 (2d Cir. 2005) ("[T]he plainness … of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))).

The lead-in language to Section 365(e)(1) explicitly provides that only "modifications" that occurred "*after* the commencement of *the* case" – here, LBSF's Chapter 11 proceeding – may be invalidated. 11 U.S.C. § 365(e)(1) (emphasis added); *see LJP, Inc. v. Royal Crown Cola Co.* (*In re LJP, Inc.*), 22 B.R. 556, 558 (Bankr. S.D. Fla. 1982) ("Section 365(e)(1) expressly prohibits the termination or modification of any contract 'at any time after the commencement of the case'…. [T]here is no legislative intent to invalidate the pre-petition termination of a contract on the sole ground of insolvency." (quoting 11 U.S.C. § 365(e)(1))). Similarly, both Sections 541(c)(1) and 363(*l*) incorporate Section 541(a)(1)'s definition of "property of the estate" as the "legal or equitable interest of the debtor in property *as of* the commencement of *the* case." 11 U.S.C. § 541(a)(1) (emphasis added).

17

The phrase "*the* case" in Sections 365(e)(1) and 541(a)(1) refers to the specific bankruptcy case filed by the corporate entity that is a party to the contracts at issue: here, LBSF, not LBHI. The presence and importance of the timing requirements of "after" and "as of the commencement of *the* case" in Sections 365(e)(1) and 541(a)(1) was not addressed by Judge Peck in *Perpetual*, but he separately recognized in his opinion the consequence of using "*the*" instead of "a" to refer to the specific debtor counterparty. *See Perpetual*, 422 B.R. at 419 (Judge Peck observing the word "the" instead of "a" in section 365(e)(1) serves to "expressly restrict[] . . . application to the bankruptcy case *of the debtor counterparty*" (emphasis added)). Indeed, "[i]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. . . . [U]se of the definite article 'the,' as opposed to the indefinite 'a,' 'an,' or 'any,' indicates that Congress intended the term modified to have a *singular* referent." *United States v. Hawker Beechcraft Corp.* (*In re Hawker Beechcraft, Inc.*), 515 B.R. 416, 428 (S.D.N.Y. 2014) (emphasis added) (internal citations omitted); *see Gale v. First Franklin Loan Servs.*, 701 F.3d 1240, 1246 (9th Cir. 2012) ("In construing a statute, the definite article 'the' particularizes the subject which it precedes and is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" (quoting *Onink v. Cardelucci* (*In re Cardelucci*), 285 F.3d 1231, 1234 (9th Cir. 2002))).[17]

Here, the alleged modification of LBSF's rights occurred at the latest when the Trustees issued notices of an Event of Default and Early Termination based on an LBSF event of default, which for at least 36 of the Transactions (*see* the Pre-Pre Transactions and Pre-Post Transactions

---

[17] The use of the definite article "the" to connote a singular, specific referent has consistently been applied in other contexts as well. *See, e.g.*, *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 387-88 (S.D.N.Y. 2006) (ruling in section 10A of the Securities Act, "use of the definite article 'the,' as opposed to the indefinite 'a,' 'an,' or 'any,'" means that the section refers to the specific, single independent public accountant firm that certified the issuer's financial statements).

listed in Appendix A) was *before* the LBSF Petition Date – *i.e.*, before commencement of "*the*

*case*." LBSF does not (and cannot) allege that it had a senior right to payment prior to its

petition date. To the contrary, LBSF asserts that "LBSF's rights under the Transaction

Documents … became property of LBSF's estate *on the date* LBSF's chapter 11 petition was

filed." FAC ¶ 4 (emphasis added). But for Pre-Pre and Pre-Post Transactions, the termination,

and hence the alleged "modification," occurred *before* LBSF commenced its bankruptcy case.

For these transactions, LBSF's rights on its petition date had already been determined because

the swaps had already been terminated, and at that time LBSF had only a right to payment in the

event any Collateral proceeds were available after the Noteholders were repaid their investments.

Indeed, in the case of the Pre-Pre Transactions, literally all of the actions of which LBSF

complains occurred before the LBSF Petition Date and no Collateral property event existed at all

for LBSF to claim as property of its estate.[18]

In *Perpetual*, by contrast, the Trustee did not provide notice of an Event of Default and

Early Termination until December 1, 2008, well *after* LBSF commenced its bankruptcy case.

*Perpetual*, 422 B.R. at 413-414. There, Judge Peck determined that some post-petition

affirmative acts still had to be taken under the documents at issue in order for there to be a

"modification" of LBSF's payment priority. *Perpetual*, 422 B.R. at 418 ("As of the LBSF

Petition Date, the Transaction Documents required certain affirmative acts be taken prior to the

effectiveness of any modification of payment priority …."). Here, no post-petition affirmative

---

[18] For such transactions, there is no affirmative act under the Transaction Documents that even took place after LBSF filed for bankruptcy, and thus there can be no argument that the alleged "modifications" occurred "*after* the commencement of *the* case" by LBSF. 11 U.S.C. § 365(e)(1) (emphasis added). Likewise, there was no existing property that could even plausibly be deemed "property of the estate" "*as of* the commencement of *the* case" by LBSF. 11 U.S.C. § 541(a)(1) (emphasis added). For the "Pre-Post Transactions" listed in Appendix A, the notices of an Event of Default and Early Termination occurred before LBSF commenced its bankruptcy case, and the process of liquidating the Collateral to make the relevant payments began before the LBSF Petition Date. The parties' rights under the Transaction Documents were irrevocably established before the LBSF Petition Date, and thus no "modifications" of rights occurred "*after* the commencement of *the* case" by LBSF.

act occurred or was necessary for LBSF's payment claim to continue to rank junior to the

Noteholders' claims, nor does LBSF plead the existence of any such specific act.  To the extent

LBSF's alleged rights were "modified", such modification occurred *before* the commencement

of its bankruptcy case.[19]

In addition, Section 365(e)(1) unambiguously states that it applies to invalidate only

provisions to an "executory contract … *of the debtor*."  11 U.S.C. § 365(e)(1) (emphasis added).

Section 541(a)(1) similarly states that "property of the estate" includes only "legal or equitable

interests *of the debtor*."  And Section 363(*l*) likewise provides that it applies to invalidate only

provisions that are conditioned on the commencement of a case "*concerning the debtor*" and that

"modif[y] … *the debtor's* interest in … property."  11 U.S.C. § 363(*l*) (emphasis added).  LBSF,

and not LBHI, is the contractual party to the Transaction Documents with an interest in those

contracts, including specifically the ISDA Master Agreements whose Schedules incorporate the

Priority Provisions.  Thus, only LBSF can qualify here as "*the* debtor" with respect to these

sections of the Bankruptcy Code.[20]

However, at the time of the alleged payment priority "modification," LBSF was not "*the*

debtor" because it had not yet commenced its bankruptcy case.  Accordingly, the protections of

Sections 365(e)(1), 541(c)(1) and 363(*l*) were not triggered when the alleged modification

---

[19] Even if, *arguendo*, Judge Peck was correct in *Perpetual* when he stated in *dicta* that the phrase "a case" means
that LBHI's bankruptcy filing can be the relevant event that triggers application of Section 365(e)(1), *see Perpetual*,
422 B.R. at  419-20, this cannot trump the lead-in language to Section 365(e)(1) or the language of Section
541(a)(1), which impose a separate element—*when* the modification must be triggered—and provide that the
modification must occur "after" or "as of the commencement of *the* case."  11 U.S.C. §§ 365(e)(1), 541(a)(1)
(emphasis added).  Judge Peck's reading of "a case" would still require the dismissal of the claims predicated on the
Priority Provisions being invalid *ipso facto* clauses for the Noteholders in the Pre-Pre and Pre-Post Transactions,
because the alleged modification based on "a case" (*i.e.*, LBHI's case) did not occur as of or after the filing of "*the*
case" (*i.e.*, LBSF's case).

[20] That LBSF is "*the* debtor" and that its bankruptcy filing is also "*the* case," is an internally consistent interpretation
of the *ipso facto* provisions.  *Cf. Miller's Apple Valley Chevrolet Olds-Geo, Inc. v. Goodwin*, 177 F.3d 232, 234-35
(4th Cir. 1999) (holding the definite article "the" before "person" in the second sentence of 49 U.S.C. § 32710(b)
means that it refers to the same particular person described in the first sentence of the subsection).

occurred.  *See Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*, 417 F.3d 193, 198 (1st Cir. 2005)

("[Section 365(e)(1)] says that what may not be terminated or modified by bankruptcy is 'an

executory contract or unexpired lease *of the debtor*' … .  This is strong linguistic evidence that

Congress was concerned with clauses diluting the bankrupt's interests - not interests of a third

party.").

> 2.     *Perpetual*'s "Singular Event" Theory Is Contrary to Settled Authority and
>        Should be Rejected.

LBSF will likely invoke the ruling in *Perpetual* to argue that its bankruptcy petition on

October 3, 2008 should be treated as a "singular event" with LBHI's earlier petition on

September 15, 2008 for purposes of applying the Bankruptcy Code's *ipso facto* provisions.  *See*

FAC ¶ 126 (alleging Priority Provisions that became operative after either LBHI's or LBSF's

bankruptcy petition are unenforceable *ipso facto* clauses).  This "singular event" theory should

be rejected.

*First*, it is established law that the Bankruptcy Code does not protect interests of

nondebtor affiliates, and the bankruptcy estate does not include property of nondebtor affiliates.

*See Tower Auto. Mexico, S. de R.L. de C.V. v. Grupo Proeze, S.A. de C.V.* (*In re Tower Auto.,

Inc.*), 356 B.R. 598, 603 (Bankr. S.D.N.Y. 2006) ("It is a basic principle of bankruptcy law that

each separate individual or corporate entity must file a separate bankruptcy petition and that each

entity is treated separately unless grounds for substantive consolidation are demonstrated.")

(citing *FDIC v. Colonial Realty Co.*, 966 F.2d 57, 58 (2d Cir. 1992)); *Regency Holdings

(Cayman), Inc. v. Microcap Fund, Inc.* (I*n re Regency Holdings (Cayman), Inc.*), 216 B.R. 371,

375-77 (Bankr. S.D.N.Y. 1998) (bankrupt parent could not employ trustee avoiding powers to

recover transfers of assets by nondebtor subsidiary); *In re Winer*, 158 B.R. 736, 743 (N.D. Ill.

1993) ("[T]he debtor's presence in the bankruptcy court cannot block actions implicating the

nondebtor subsidiary….T]hat concept has consistently been confirmed and applied in a host of cases everywhere." (internal citations omitted)).  Until LBSF filed for bankruptcy on October 3, 2008, it was a nondebtor affiliate of LBHI, and so any protections afforded to LBHI under the Bankruptcy Code on *its* Petition Date could not apply to LBSF three weeks before it filed its own petition.

The singular event theory stated in *dicta* in *Perpetual*[21] is not only unprecedented, it is also inconsistent with Judge Peck's subsequent decision in *Lehman Bros. Holdings Inc. v. Intel Corp.* (*In re Lehman Bros. Holdings Inc.*), 502 B.R. 376 (Bankr. S.D.N.Y. 2013), in which Judge Peck considered whether Lehman Brothers OTC Derivatives Inc. ("LOTC"), another LBHI subsidiary which filed for bankruptcy on the same day as LBSF, had the benefit of the automatic stay and the "property of the estate" definition under Section 541(a) (and, in turn, the ability to seek turnover of that property under Section 542(a)) as a result of LBHI's September 15 filing. Intel had exercised its right of setoff against collateral posted by LOTC during the period between LBHI's and LOTC's bankruptcy filings.  Judge Peck ruled that this was an "undisputed *prepetition* setoff by Intel conclusively foreclos[ing] all property interests of LOTC in the collateral." *Id.* at 379 (emphasis added).  The Court acknowledged the tension with *Perpetual*, and tried to resolve it by limiting the theory to only the *ipso facto* language at issue in *Perpetual*. *See Id.* at 380 n.1.  But no more statutory basis exists for LBSF to rely upon LBHI's bankruptcy filing as a "singular event" to nullify a prepetition "modification" in its contract rights than for LOTC to rely on LBHI's bankruptcy filing to nullify Intel's prepetition possession of LOTC's property rights.

---

[21] In *Perpetual*, Judge Peck held that the relevant events that modified LBSF's rights all occurred after the LBSF Petition Date, and thus his "singular event" comments are *dicta*.  422 B.R. at 418.

*Second*, the decision in *Perpetual*, including the "singular event" theory stated in that decision, was without precedent, as Judge Peck himself recognized, *see Perpetual*, 422 B.R. at 422, was without evidentiary support, and no court has followed the decision.  Rather, the decision has been subject to widespread criticism and the District Court, in granting an interlocutory appeal, recognized that (i) there was "genuine doubt as to whether the Bankruptcy Court applied the correct standard," (ii) legal and other commentaries had universally questioned the reasoning of the *Perpetual* ruling, and (iii) *Perpetual* had wholly upended market expectations and caused great uncertainty throughout the financial community.  *Lehman Bros. Special Fin. Inc. v. BNY Corp. Tr. Servs. Ltd.* (*In re Lehman Bros. Holdings Inc.*), No. 08-13555 (JMP), 2010 WL 10078354, at *6-8 (S.D.N.Y. Sept. 23, 2010); *id.* at *7 (acknowledging and citing criticisms of the *Perpetual* decision).

*Third*, treating LBHI's and LBSF's bankruptcy petitions as a "singular event" and extending the Bankruptcy Code's protections to LBSF's alleged prepetition interests would, in effect, create an avoidance action that is not authorized under any section of the Bankruptcy Code.  Were a debtor intended to be able to revive interests modified or extinguished prepetition on grounds other than those enumerated for preferential or fraudulent transfers in the Bankruptcy Code, Congress would have explicitly said so.  *See State Bank of Hardinsburg v. Brown*, 317 U.S. 135, 138-39 (1942) ("We think that if Congress intended that a bankrupt might reach back into the past and bring under the court's jurisdiction a former interest in property, which, under state law, had irrevocably passed to a third person, it would have so stated in terms too clear to leave any doubt.").  Nothing in the Bankruptcy Code provides LBSF with the broad-reaching power to avoid interests contractually "modified" prepetition.

**C.** **The Transaction Documents Were Not "Executory Contracts" of LBSF as of the LBSF Petition Date.  (Count I)**

For Section 365(e)(1) to be applicable, it "mandates the existence of an executory contract on the day the debtor files its petition for relief."  *Nemko, Inc. v. Motorola, Inc.* (*In re Nemko, Inc.*), 163 B.R. 927, 935 (Bankr. E.D.N.Y. 1994); *see Comp III, Inc. v. Computerland Corp.* (*In re Comp III, Inc.*), 136 B.R. 636, 639 (Bankr. S.D.N.Y. 1992).  The Bankruptcy Code does not define the term "executory contract," but the Second Circuit has ruled that "an executory contract is one 'under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'"  *COR Route 5 Co., LLC v. Penn Traffic Co.* (*In re Penn Traffic Co.*), 524 F.3d 373, 379-80 (2d Cir. 2008) (quoting Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973)).

With respect to the at least 36 Transactions that were terminated before the LBSF Petition Date – the vast majority of the Transactions at issue here – the Transaction Documents were not executory contracts of LBSF as of the LBSF Petition Date because both parties did not have material unperformed obligations.  By the LBSF Petition Date, there were clearly no further obligations of LBSF.  For the Pre-Pre Transactions, there were no unperformed obligations of either party whatsoever.  For the Pre-Post Transactions, all that remained pursuant to the contracts were the obligations of Trustees to complete liquidation (which was initiated before the LBSF Petition Date), and distribute the Collateral proceeds, and no material obligations of LBSF remained.[22]  As numerous courts have held, including this Court in *In re Chateaugay Corp.*, 102

---

[22] The Transaction Documents here are distinguishable from those in *Perpetual* where Judge Peck found LBSF and the trustee had unsatisfied material contractual obligations, as he concluded that the priority provision only became effective "after the sale or realisation of the Collateral."  *Perpetual*, 422 B.R. at 418 (internal quotation marks omitted).  The Transaction Documents here do not have any such requirement, nor has LBSF alleged in the Complaint that they do.  Rather, the Priority Provisions here were immediately enforceable upon notice of an Event

B.R. 335 (Bankr. S.D.N.Y. 1989), "where one party to a contract has no post-petition obligation (*or no such obligation other than payment of money*), the contract will not be found to be executory." 102 B.R. at 348 (emphasis in original); *see id.* at 347 (obligations for only the payment of money are insufficient to make a contract executory) (citing H.R. REP. NO. 595, 95th Cong., 1st Sess. 347 (1977); *In re Unishops, Inc.*, 422 F. Supp. 75. 78-80 (S.D.N.Y.1975), *aff'd*, 543 F.2d 1017 (2d Cir. 1976)). Accordingly, Section 365(e)(1) cannot apply to invalidate the Priority Provisions because at the time LBSF filed for bankruptcy the Transaction Documents were not executory.[23]

### D.    Section 363(*l*) Does Not Apply to Protect Property That Is Not Already In LBSF's Possession. (Count I)

Count I of the Complaint alleges a violation of Section 363(*l*) of the Bankruptcy Code, which authorizes the debtor to "use, sell, or lease property [of the estate]." As Section 363(*l*) is only applicable to property in the debtor's possession, and LBSF had no property right to senior priority in its possession, its contorted efforts to invoke the section here should be rejected. *See Transcon Lines*, 58 F.3d at 1438 ("[S]ection 541(c)(1)(B) acts to ensure that all property of the debtor becomes property of the bankruptcy estate upon the filing of the bankruptcy case . . .

---

of Default and Early Termination, which occurred before the LBSF Petition Date for the Pre-Pre and Pre-Post Transactions.

[23] LBSF's contention that its rights under an executory contract were modified for the purposes of the *ipso facto* protections of Section 365(e)(1) also is in fundamental tension with its reliance on *Perpetual*. As discussed in Section III below, *Perpetual* rests in part on the premise that the agreement containing the priority provisions "d[id] not comprise part of the swap agreement[]," and thus the priority provisions governing the liquidation were separate from the applicable swap agreement. 422 B.R at 421. If LBSF continues to rely solely on that logic, it must explain how it can claim the *ipso facto* protections of Section 365(e)(1) at all. That section provides that "an executory contract … of the debtor" may not be modified "solely because of a provision *in such contract*." 11 U.S.C. § 365(e)(1) (emphasis added). But LBSF was *not* a signatory party to the indentures containing the Priority Provisions that purportedly modified its rights, and accordingly "such contract[s]" were not "executory contract[s] … of the debtor." To the extent that LBSF relies on the terms of the indentures being incorporated by reference into the swap agreements to which LBSF was a party, it is in agreement with the Noteholder Defendants on this point, and that is fatal to LBSF's attempts to escape the protections of the Safe Harbors as set forth above in Section III. Either way, LBSF's *ipso facto* claims must fail.

[and] section 363(*l*) protects the 'use' of such property *once it is in the hands* of the bankruptcy

estate." (emphasis added)); *Olympia Holding Corp.*, 188 B.R. at 295 ("[S]ection 363(*l*) is

similar, if not more limited than section 541(c)(1). Section 363(*l*) merely protects a [bankruptcy]

trustee's rights in the use or transfer of estate property; it does not begin to define the scope of

the estate's interest in that property.").

## II.    The Automatic Stay Does Not Apply to Alleged "Modifications" or Transfers of Collateral That Occurred Before LBSF's Bankruptcy Case.  (Counts II and III)

Counts II and III charge the Noteholders and the Trustees with violations of the automatic

stay.  But at the time that the early termination notices were sent with respect to the Pre-Pre

Transactions and Pre-Post Transactions, LBSF did not have the benefit of the automatic stay, and

there is no authority for LBSF's theory that a party taking action against property of one debtor

(LBSF) can be liable to that same debtor for violation of the automatic stay applicable only to a

different debtor (LBHI).  *See Intel*, 502 B.R. at 380-81 (rejecting similar automatic stay claims

where LOTC had not yet filed for bankruptcy, even though LBHI had, and therefore "[t]he

disputed portion of the collateral [was] not property of the estate."); *Winer*, 158 B.R. at 743

("Section 362(a) does not proscribe actions brought against nondebtor entities, even where there

is a close nexus between those nondebtors and their bankrupt affiliates.  That concept has

consistently been confirmed and applied in a host of cases everywhere … .  And the doctrine

applies with equal force even where the nondebtor is a corporation wholly owned by the debtor

(citing *Pitts v. Unarco Indus., Inc.*, 698 F.2d 313, 314 (7th Cir. 1983) (per curiam); *In re James

Wilson Assoc.*, 965 F.2d 160, 170 (7th Cir. 1992); *Funding Sys. Railcars, Inc. v. Pullman

Standard, Inc.*, 34 B.R. 706, 709 (N.D. Ill. 1983))).[24]  The automatic stay could not enjoin

---

[24] Notably, LBHI never requested an order expanding the protections of the automatic stay to nondebtor affiliates.
*See In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 15 & 16, 2008), Dkt. Nos. 3, 48

actions with respect to LBSF before the automatic stay came into existence upon the

commencement of LBSF's chapter 11 case on October 3, 2008.

There also was no property of the LBSF estate in existence on its filing date which the

automatic stay could protect. Section 362(a)(3) states, in relevant part, "a petition filed under . . .

this title … operates as a stay … of … any act to obtain possession of *property of the estate* or of

*property from the estate* or to exercise control over *property of the estate*." 11 U.S.C. §

362(a)(3) (emphasis added). As discussed above in Section I.B and defined in Section 541(a),

"property of the estate" includes only legal or equitable interests of LBSF *as of* the

commencement of LBSF's bankruptcy case. Because on the date of LBSF's bankruptcy filing,

with respect to the Pre-Pre Transactions and the Pre-Post Transactions, the swaps had already

been terminated as a result of LBSF's default, LBSF's only asset in those Transactions was its

right to be paid after the Noteholders were fully repaid. Moreover, as LBSF never actually had a

right to "Senior Payment Priority," as it claims, FAC ¶ 4, such right could not have been

"property of the estate." *See Latham Sparrowbush Assocs. v. Cohoes Indus. Terminal, Inc. (In re*

*Cohoes Indus. Terminal, Inc.)*, 70 B.R. 214, 218 (S.D.N.Y. 1986), *aff'd*, 831 F.2d 283 (2d Cir.

1987) ("Section 362(a) does not operate to enjoin actions respecting property in which the debtor

no longer has an interest at the time of the filing of the petition."); *In re Pelham Fence Co.*, 65

B.R. 924, 928-29 (Bankr. S.D.N.Y. 1986) (where debtor lost conditional interest in funds held by

third party prior to bankruptcy filing, funds did not constitute property of the estate); *In re Moss*,

270 B.R. 333, 343 (Bankr. W.D.N.Y. 2001) ("Any right of the Debtor to … be compensated …

was fully and completely terminated pre-petition …. [A]t the time of the filing of the petition,

---

(requesting and obtaining an order seeking to enforce the protections of section 362(a), but only with respect to
LBHI and its property).

there were no property rights or interests of the Debtor or the bankruptcy estate … that the

[section 362(a)(3)] Stay could protect.").

Moreover, the automatic stay of Section 362(a)

> does not stop a contract from terminating by its own terms as long
> as the termination does not depend on a post-petition "act." . . .
> Where the debtor defaults under a contract prior to bankruptcy, and
> the non-debtor party serves a termination notice that takes effect
> without further action at a future date, the filing of a bankruptcy
> petition between the giving of notice and termination date does not
> toll or stay the termination.

*In re Margulis*, 323 B.R. 130, 133 (Bankr. S.D.N.Y. 2005).  Here, for the at least 36 Pre-Pre and

Pre-Post Transactions, the Event of Default occurred and the notices of an Event of Default and

Early Termination were served *before* LBSF filed its bankruptcy petition.  For the Pre-Pre

Transactions, there was no activity after the LBSF Petition Date whatsoever.  For the Pre-Post

Transactions, there were no post-petition acts necessary to trigger the termination of LBSF's

allegedly senior "priority" or "lien" as to the Collateral; such interests, if any, were extinguished

prepetition.  Thus, for these Transactions as well, there were not and could not have been any

acts after the LBSF Petition Date "to obtain possession of property of the estate."  11 U.S.C. §

362(a)(3).

LBSF also claims that, should the Court find that the Priority Provisions or the Collateral

transfers to Noteholders violated the automatic stay, the Priority Provisions or Collateral

transfers are void *ab initio*.  However, the automatic stay of Section 362(a) is only "designed to

effect an immediate freeze of the status quo at the outset of the chapter 11 proceedings."  *In re

Gold & Honey, Ltd.*, 410 B.R. 357, 369 (Bankr. E.D.N.Y. 2009) (emphasis added) (quoting

*Interstate Commerce Comm'n v. Holmes Transp.*, Inc., 931 F.2d 984, 988 (1st Cir. 1991)); *see

also Moss*, 270 B.R. at 341-42 ("The automatic stay [of section 362(a)] is 'designed to effect an

immediate freeze of the status quo by precluding and nullifying post-petition actions … .'"

(quoting *Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n*, 997 F.2d 581, 585 (9th Cir. 1993))).

Section 362(a) does not give LBSF rights that it did not have under the Transactions Documents,

and thus does not entitle LBSF to receive the Collateral proceeds before the Noteholders, even if

the purported transfers are void due to the stay (which they are not).

The automatic stay of Section 362(a)(3) cannot apply to protect prepetition interests that

were not property of LBSF's estate and cannot be used to grant LBSF new contractual rights.

Counts II and III should be dismissed.

**III.    The Bankruptcy Code's Safe Harbor Provisions and Section 510 Preclude LBSF's
         Claims Against the Noteholders. (All Noteholder Relevant Counts)**

Even assuming the Priority Provisions are construed as *ipso facto* clauses, the Noteholder

Relevant Counts should be dismissed because the termination of the swaps, including the

distribution of the Collateral proceeds to the Noteholders pursuant to the Priority Provisions, is

protected by the Bankruptcy Code's safe harbor provisions.  Specifically, Sections 560,

362(b)(17), 546(g) and 546(e) (collectively, the "Safe Harbors") protect the validity and

enforceability of both the Priority Provisions that provide Noteholders with senior priority in the

Collateral and the Trustees' distribution of the Collateral to the Noteholders.[25]

Congress's purpose in enacting these Safe Harbors was "to provide certainty for swap

transactions and thereby stabilize domestic markets by allowing the terms of the swap

agreements to apply notwithstanding the bankruptcy filing."  136 Cong. Rec. 57535 at 10 (daily

ed. June 6, 1990).  As the Seventh Circuit recently observed, "Congress chose finality over

equity," placing the interests of markets and market participants ahead of the interests of debtors,

---

[25]   The Complaint refers to the Priority Provisions as the "Priority Transfers" or "Payment Priority Exchange."
These are mischaracterizations of the Priority Provisions. For the reasons set forth in Sections I and IV.A.2 of this
Motion, there was no "transfer" or "exchange" of any LBSF priority position or property interest in the Collateral.
For the reasons discussed in Section V.A. above, the Safe Harbors also serve to preempt LBSF's otherwise deficient
state law claims (Counts XIII through XVI, XVIII and XIX).

as a "policy judgment." *Grede v. FCStone, LLC*, 746 F.3d 244, 253-54 (7th Cir. 2014) (Section 546(e)). For that reason, courts should apply a "broad and literal interpretation" of the Safe Harbors. *See Picard v. Citibank, N.A. (In re Madoff Secs.)*, 505 B.R. 135, 142-43 (S.D.N.Y. 2013) ("*Citibank*") (Section 546(e)) (citing *Enron*, 651 F.3d at 334); *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Assoc.*, 322 F.3d 1039, 1050-51 (9th Cir. 2002) (courts should avoid interpreting provisions of Bankruptcy Code "in a way that would either (1) needlessly discourage the innovation and flexibility that has made interest rate swaps such a valuable risk management and financial tool, or (2) inject unnecessary legal uncertainty into the swap market").

The mechanics of the Safe Harbors are straightforward and supersede an array of bankruptcy provisions that might otherwise invalidate the financial transactions within their ambit. With respect to swap agreements, notwithstanding other provisions of the Bankruptcy Code, the Safe Harbors (i) permit swap participants and financial participants to terminate and liquidate swap agreements according to their terms in the event of the bankruptcy of a counterparty, *see* Section 560, (ii) permit swap participants and financial participants to exercise contractual rights under security agreements relating to swap agreements despite the automatic stay, *see* Section 362(b)(17), and (iii) bar the avoidance of prepetition transfers made in connection with a swap agreement, *see* Section 546(g); *see also* Section 546(e) (similar protections with respect to settlement payments). The Safe Harbors were designed to protect the very actions that LBSF challenges in this Adversary Proceeding, and bar LBSF's claims.

### A.     The Priority Provisions are Enforceable under Section 560 of the Bankruptcy Code.  (Counts I–XII)

Section 560 requires dismissal of the majority of the Noteholder Relevant Counts.

Section 560 provides, in relevant part:

> The exercise of any contractual right of any swap participant or
> financial participant to cause the liquidation, termination, or

> acceleration of one or more swap agreements because of a
> condition of the kind specified in section 365(e)(1) of this title or
> to offset or net out any termination values or payment amounts
> arising under or in connection with the termination, liquidation, or
> acceleration of one or more swap agreements shall not be stayed,
> avoided, or otherwise limited by operation of any provision of this
> title or by order of a court or administrative agency in any
> proceeding under this title.

11 U.S.C. § 560.

By its plain terms, Section 560 protects the exercise of the Priority Provisions,

notwithstanding *any* other provision of the Bankruptcy Code, because they constitute: (1) the

"contractual right of a swap participant or financial participant," and (2) "cause the liquidation,

termination, or acceleration of one or more swap agreements" "because of," as alleged by LBSF,

an *ipso facto* condition.  The statute was always intended to protect the non-defaulting party's

contractual rights *both* to cause immediate termination of all transactions under the swap

agreement *and* to "determine … upon default, which party is owed how much."  S. REP. NO.

101-285, at 9 (1990).  This scope was clarified and expanded when Congress amended the

statute in 2005 to expressly include (a) acceleration and liquidation, in addition to termination, as

protected acts under a swap agreement, and (b) security agreements or arrangements or other

credit enhancements as protected components of a swap agreement.  *See* H.R. REP. NO. 109-31,

at 128 (2005).

Assuming, *arguendo*, that the Priority Provisions are *ipso facto* clauses – which they are

not, for the reasons described in Section I above – they fall squarely within the unambiguous

language of Section 560.  Therefore, Counts I through XII of the Complaint, alleging that the

application of the Priority Provisions violated the *ipso facto* provisions of the Bankruptcy Code

(Count I) and automatic stay (Counts II and III) and/or should be avoided as preferential,

fraudulent or unauthorized transfers (Counts IV through IX),[26] and that property distributed to the Noteholders pursuant to the application of the Priority Provisions should be turned over to the estate (Counts X through XII), must be dismissed.  LBSF's common-law claims (Counts XIII through XVI, XVIII, and XIX) likewise should be dismissed because they are all premised upon the alleged invalidity of the Priority Provisions that the Safe Harbors validate.  Further, as discussed in Section V.A below, the Safe Harbors, including Section 560, preempt those state law claims.

      1.    <u>The Priority Provisions Are Contract Rights Under a Swap Agreement of a Swap Participant or Financial Participant.</u>

The Priority Provisions plainly (a) are contractual rights pursuant to a "swap agreement" and (b) were exercised by a swap participant and a financial participant.

      a.    *The Priority Provisions are contractual rights under a swap agreement.*

Bankruptcy Code Section 101(53B) defines the term "swap agreement" to include: (i) the ISDA master agreement and its related schedules and confirmations, (ii) all terms and conditions incorporated into a swap agreement by reference, (iii) all security agreements, security arrangements and other credit enhancements, (iv) a master agreement that provides for a swap agreement or swap transaction and all supplements to any such master agreement, or (v) other similar agreements or combination of such agreements.  11 U.S.C. § 101(53B)(A)(i), (ii), (iii), (v), (vi).  The breadth of this definition ensures flexibility and accommodates the evolving nature and uses of swap transactions.  *See, e.g.*, *Hutson v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distribs., LLC)*, 556 F.3d 247, 253 (4th Cir. 2009); H.R. Rep No. 109-31 at p. 127.  The

---

[26] Count IX is asserted solely against the Trustees.  The Noteholder Defendants are joining the Trustees in seeking dismissal of Count IX, for the reasons set forth herein.

Priority Provisions plainly fall within the definition of a "swap agreement" for at least three reasons.

*First*, in each of the 44 Transactions, the Priority Provisions are either expressly included in the Schedules to the ISDA master agreements or are set forth in the indentures[27] and expressly incorporated into the Schedules to the ISDA master agreements.[28]  *See* Ex. C.; *see also* ISDA Master Agreement, Preamble, Ex. E-6 (master agreement includes the schedule and confirmations).   In 41 of the Transactions, any and all payments to LBSF under the Swap Confirmation must be made through the Priority Provisions.[29]  Indeed, absent application of the Priority Provisions, because LBSF limited its recourse under the Transaction Documents to the Collateral, there is no provision in any swap document for LBSF to ever receive any payment on account of its swap claims from the Collateral, from the Issuer, or from any other person.  This alone establishes that the Priority Provisions are "terms and conditions incorporated by reference in" the swap agreement under the Bankruptcy Code.  11 U.S.C. § 101(53B)(A)(i)–(ii).

*Second*, each indenture is a security agreement or arrangement, because it provides for disposition of the Collateral pledged for the benefit of the swap counterparties and the Noteholders as Secured Parties.  Indeed, each indenture specifically recites that it is intended to

---

[27] For purposes of this Section of the Motion, references to "indenture" include the applicable indenture, trust deed, supplemental trust deed, and/or standard terms for indentures that govern the issuance of the Notes and the disposition of the Collateral securing the Issuer's obligations to the swap counterparty and Noteholders with respect to each Transaction.

[28] For all of the Transactions other than the three RACER Series Transactions, the Priority Provisions are set forth in the relevant indenture.  For the three RACER Series Transactions, the applicable provisions are included in the Schedules to the ISDA master agreements.  *See* Ex. B.

[29] *See* Ex. C, describing the "Limited Recourse" provisions for each of the CDO Transactions.  Specifically, the Schedules to the ISDA Master Agreement for each of the CDO Transactions (other than the three RACER Series Transactions) specifically provide that LBSF's recourse for payments owed by the Issuer is limited to the Collateral, and that LBSF's rights to the Collateral is subject to or limited by the Priority Provisions set forth in the relevant indenture or trust deed.  *Id.*  The Schedules for the RACER Series Transactions do not contain such a limited recourse provision, but the Schedule for each of those Transactions directly provide that LBSF is not entitled to any termination payment in the event it is the defaulting party.  *Id.*

be "a security agreement…for the benefit of the Secured Parties," or otherwise describes itself as

a "Security Document" or "security arrangement."[30]  In particular, the terms of the Priority

Provisions define whether and when LBSF can obtain rights to the Collateral – *i.e.*, the extent of

its "credit enhancement" – on account of its swap agreement claims.  *Id.*  Thus, each indenture,

at least to the extent of its Priority Provisions, is unquestionably a "security agreement or

arrangement or other credit enhancement related to any [swap] agreements or transactions,"

which Section 101(53B) defines as part of a "swap agreement."  11 U.S.C. § 101(53B)(A)(vi).

Notably, this clause was added to the definition of "swap agreement" in 2005 to "ensure[-] that

any such agreement, arrangement or enhancement *is itself deemed to be a swap agreement and*

*therefore eligible for treatment as such* for purposes of termination, liquidation, acceleration,

offset and netting under the Bankruptcy Code ... ."  *See* H.R. Rep. No. 109-31 at 129 (2005)

(emphasis added).  Even if the indentures had not been specifically incorporated into the Swap

Confirmation for purposes of § 101(53B)(a)(i), the Priority Provisions in the indentures plainly

fall within § 101(53)(B)(a)(vi).

     *Third*, the Bankruptcy Code recognizes "any combination of agreements or transactions

referred to" as a "swap agreement."  *See* 11 U.S.C. § 101(53B)(A)(iii).  Accordingly, the

combination of the ISDA master agreement, the ISDA schedules and confirmations, and the

indenture, including the Priority Provisions, collectively constitute a "swap agreement" protected

under Section 560.  Thus, regardless of where the Priority Provisions appear in the Transaction

Documents, those provisions are defined to be part of the swap agreement.

     This conclusion is reinforced by the fact that the Transaction Documents meet the

standard for a single, integrated swap agreement.  *See, e.g.*, *MBIA Ins. Corp. v. Cooperatieve*

---

[30] *See* Ex. D (providing examples of the granting clauses describing the relevant indenture or trust deed as a
"security agreement" or "security arrangement").

*Centrale Raiffeisen-Boerenleenbank B.A.*, No. 09 Civ. 10093, 2011 WL 1197634, at \*6

(S.D.N.Y. Mar. 25, 2011) (reviewing transaction documents in similar CDO transactions and

concluding that they "were part of a single, integrated transaction, and along with the parties, the

Court reads them together."); *Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. v.

Brookville CDO I Ltd.*, No. 08 Civ. 9565, 2008 WL 5170178, at \*9-10 (S.D.N.Y. Dec. 10, 2008)

(reading an indenture and hedge agreement together in the context of a CDO transaction, even

though they were not between the same parties).

    In *Perpetual*, Judge Peck ruled that the ISDA master agreement, schedules and written

confirmation in that transaction contained "*no reference at all*" to the indenture or the collateral

priority provisions.  422 B.R. at 421 (emphasis added).  The Transaction Documents at issue

here undisputedly reference the Priority Provisions.[31]  *See* Ex. C.  And Judge Peck did not

consider the explicit language of Section 101(53B) or address New York contract law applicable

to the facts present here, which each separately compel the conclusion that the Priority

Provisions are part of the applicable swap agreements. 422 B.R. at 421.

> b.    *The application of the Priority Provisions and distribution of
>        collateral proceeds pursuant to such provisions constitute a
>        contractual right of a "swap participant" or "financial
>        participant."*

    The termination and liquidation of the swap agreements, including the application of the

Priority Provisions, are plainly "contractual rights" that belonged to both Issuers and Trustees,

each of which were "swap participants" as defined by the Safe Harbor.  Each Issuer was a

counterparty to the applicable Swap Confirmations, and so by definition was "an entity that, at

any time before the filing of the petition, has an outstanding swap agreement with the debtor."

---

[31] UniCredit, whose English Transactions are governed by English law, will address the incorporation of the Priority
Provisions into its swap agreements by its own supplemental pleading, as is permitted pursuant to the Second
Scheduling Order.  Second Scheduling Order, ¶ 18.

11 U.S.C. § 101(53C); FAC ¶ 55.  The Trustees acted on behalf of the Issuers[32] and were "swap participants" for two additional reasons.  *First*, the Transaction Documents granted the Trustees the rights of the Issuers, and the authority to act on their behalf.  As the assignees of swap participants, the Trustees were acting as swap participants in connection with the termination and liquidation of the Transactions.  *See* Ex. D.[33]  *Second*, the Trustees were also direct parties to the indentures, including the security arrangements and credit enhancements related to the Swap Confirmations, which, as established above, are included within the definition of a "swap agreement" under the Bankruptcy Code.

The Issuers were required to pay competing obligations, and the Trustees, acting on behalf of the Issuers, had the right and the obligation to terminate the swap transactions upon the swap counterparty's default, liquidate the collateral, and make distributions to the Secured Parties to fulfill the Issuer's obligations in accordance with the terms of the Transaction Documents, including the Priority Provisions.[34]  That the Noteholders were the beneficiaries of the Priority Provisions does not change the fact that the contractual rights and obligations belonged to and were exercised by the Issuers and Trustees.  Further, to the extent the Court considers the application of the Priority Provisions to be a right of the Noteholders, the Noteholders would likewise be considered "swap participants" based on the integrated nature of the CDO Transactions that included both the credit swap and the indentures, and the

---

[32] Regardless of whether the Trustees acted unilaterally or at the instruction of Noteholders, the Trustees acted pursuant to rights provided to them by the Issuers and were exercising the Issuers' contractual rights.  *See* Ex. D.

[33] With respect to the three RACER Series Transactions, the Trustee entered into the swap agreement on behalf of the RACER Series Trust.  *See id.*

[34] *See, e.g.*, Greystone Series 2006-1, Series Indenture Section 5(a): "Notwithstanding anything to the contrary in this Indenture and subject to this Section 5, *the Trustee shall* disburse amounts from the Interest Collections Payment Account and the Principal Collections Payment Account as follows and for application *by the Trustee* in accordance with the following priorities (the 'Priority of Payments')" (emphasis added)).  *See* Exs. B, I.

Noteholders' participation and investment in the Transactions, which provided the source of the

Collateral securing the credit swap.

The Trustees also qualify as "financial participants"[35] protected by Section 560.  The

Court can take judicial notice that the particular Trustees present here – Bank of America, The

Bank of New York Mellon, Citibank, U.S. Bank, and Wells Fargo Bank – are indisputably

trustees or otherwise participants in transactions involving many multiples of the amounts

required for an entity to qualify as a "financial participant" under the Bankruptcy Code.  *See* Fed.

R. Evid. 201(b) (Courts may take judicial notice of facts "not subject to reasonable dispute

because [they are] … generally known within the trial court's territorial jurisdiction").

> 2.    The Application of the Priority Provisions is Part of the Contractual Right
> to Terminate and Liquidate a Swap Agreement.

Section 560 protects the right "to cause the liquidation, termination or acceleration" of a

swap agreement "because of" an alleged *ipso facto* clause.  11 U.S.C. § 560.  The application of

the Priority Provisions qualifies for protection under Section 560 under this provision.

The Early Termination of the swap agreements automatically accelerated the Notes and

obligated the Issuers and Trustees to distribute the Collateral proceeds in accordance with the

Priority Provisions to the Noteholders and LBSF.[36]  The Indentures and the Swap Confirmations

for 41 of the Transactions expressly provide that the *exclusive* means for settling up was the

---

[35] The Bankruptcy Code defines a "financial participant" as a entity with protected financial contracts in an aggregate amount of either over $100 million in mark-to-market exposure and/or over $1 billion in notional market exposure.  11 U.S.C. § 101(22A)(A).

[36] *See, e.g.*, Amended & Restated Standard Terms for Indentures for Series 2006-1 Segregated Portfolio of 801 Grand Series CDO SPC, Ex. E-3, at Sections 5.1 (Events of Default), 5.2 (Acceleration of Maturity, Rescission and Annulment), 5.3 (Collection of Indebtedness and Suits for Enforcement by Trustee), 5.4 (Remedies), 5.7 (Application of Money Collected), 5.13 (Control by the Noteholders) and 5.17 (Sale of Collateral); Amended & Restated Series Indenture for Series 2006-1 Segregated Portfolio of 801 Grand Series CDO SPC, Ex. E-2, at Section 5 (Disbursement of Monies from Payment Account).

liquidation of the Collateral and the distribution of the proceeds pursuant to the Priority

Provisions, as follows:

> Notwithstanding anything in this Agreement or any Confirmation hereunder to the contrary, *all amounts, payable or expressed to be payable by [the Issuer]* on, under or in respect of its obligations and liabilities under this Agreement and any Confirmation hereunder *shall be recoverable only from and to the extent of sums in respect of, or calculated by reference to, the Collateral*[37] that are received by [the Issuer] pursuant to the terms and conditions thereof and the proceeds of any realization of enforcement of any Collateral, *subject in any case to the Priority of Payments set out in the Indenture*.

*See* Ex. C.  That is, the Priority Provisions are the exclusive mechanism for liquidating the

obligations arising under the Swap Confirmations.

Section 560 permits the liquidation, termination and acceleration of swap agreements.

Here, LBSF does not dispute that the terminations of the swap agreements were protected by

Section 560.[38]  Nor does LBSF dispute that those terminations contractually required the

liquidation of the Collateral and distribution of the proceeds thereof.  Nor does LBSF dispute that

the Priority Provisions contractually governed this distribution of the proceeds.  LBSF asserts,

nonetheless, that the application of the Priority Provisions is not protected by Section 560.  This

inconsistent assertion is incorrect as a matter of law.

Because the application of the Priority Provisions was a necessary component of the

termination of the swaps, the entire process is protected by Section 560.  This is clear from the

statutory history:  from 1990 to 2005, Section 560 expressly protected only the "termination" of

swap agreements, but there is no dispute that the right to terminate included the right to

---

[37] *See* Ex. D (defining "Collateral").

[38] LBSF's allegations that the terminations of the Pyxis and Federation Transactions were performed improperly are the subject of separate counts in the FAC that will be separately addressed by the Pyxis and Federation Trustees and Noteholder Defendants in accordance with the Second Scheduling Order.  The Noteholders reserve all rights with respect to any arguments regarding the propriety of the Transaction terminations.

"determine … upon default, which party is owed how much."  S. REP. NO. 101-285, at 9

(1990).[39]  Thus, application of the Priority Provisions effects a process that has always been

considered part and parcel of a "termination" of a swap agreement.  Because LBSF *concedes* that

the terminations of the swap agreements were protected by Section 560, *see* footnote 9 above,

the Safe Harbor requires dismissal of the Noteholder Relevant Claims.

Even if this Court should find that the application of the Priority Provisions is not

protected as the termination of a swap agreement under section 560, the application of the

Priority Provisions is clearly protected as the liquidation of a swap agreement under section 560,

based on plain meaning, industry practice, economic reality, and the statute's purpose.

Termination of the swap agreements triggered the liquidation of the Collateral, and such

liquidation required distribution of the Collateral in accordance with the Priority Provisions.  The

Bankruptcy Code does not define the term "liquidation," and thus the term must be interpreted

based on its "ordinary, contemporary, common meaning."  *See Perrin v. United Sates*, 444 U.S.

37, 42 (1979); *Enron*, 651 F.3d at 334 (Safe Harbor should be constructed in accordance with its

"plain" meaning).  The common meaning of "liquidate" includes both "determining" and

"paying" the amount due, as well as turning any assets into cash.  *See, e.g.*, *Liquidate*, BLACK'S

LAW DICTIONARY (10th ed. 2014) (liquidate: "1. To settle (an obligation) by payment or other

adjustment; to extinguish (a debt)… 3. To determine the liabilities and distribute the assets…");

*see also Fleckner v. Bank of the U.S.*, 21 U.S. 338, 362 (1823) (holding that the word "liquidate"

meant not only the ascertainment of the debt, but the payment of such debt).  Naturally, the

determination and payment of amounts requires consideration of contractual rights.  *Black's Law*

---

[39] By amending the statute in 2005 to include "liquidation" of a swap agreement, Congress made clear that Section
560 today protects  "determin[ing] … upon default, which party is owed how much."  *See* S. REP. NO. 101-285 at 9
(1990); H.R. REP. 109-31 at 132-34 (2005).

Dictionary defines "liquidate" as "to gather in the assets, convert them into cash and *distribute them according to the legal rights of the parties interested.*" *Liquidate*, BLACK'S LAW DICTIONARY (4th ed. 1968) (citing *Browne v. Hammett*, 133 S.C. 446, 131 S.E. 612, 614 (1926) (emphasis added)).

Judge Peck, in *Michigan Housing*, also found that "the ordinary meaning of 'liquidation' leads to the conclusion that the right to cause the termination and liquidation of a swap must mean the right to determine the exact amount due and payable under the swap agreement," 502 B.R. at 393, and that "the plain meaning of this safe harbor protects both the act of liquidating and the manner for carrying it out," *id.* at 395.

Applying this definition here, "liquidation" of a swap agreement necessarily includes (i) monetizing the collateral and (ii) determining the amounts owed and making payments in accordance with the parties' legal rights. Again, as Judge Peck recognized in *Michigan Housing*, the "right of the non-defaulting party to rely upon contractual norms for disposing of collateral is an integrated aspect of what it means to cause the liquidation of a swap agreement and necessarily is protected by the language of Section 560 … To rule otherwise … would strip away the defining characteristics of a contractual right to liquidation that by statute may not be limited in any manner." *Id.* at 386. Here, the very purpose of the Priority Provisions is to effect "contractual norms for disposing of collateral." *See id.* And the Priority Provisions here are not only contractually "integrated" into the liquidation of the Swap Confirmations, they are essential: without determining the legal entitlements of each party, which is what the Priority Provisions do, the Swap Confirmations cannot be liquidated. *See id.*

Under the plain meaning of the term, there can be no "liquidation" of the swap agreements at issue here without the application of the Priority Provisions, which dictate what

amount should be paid to each party.  This plain meaning is supported by "normal business practice," which is critical in interpreting and applying the Safe Harbors.  *See, e.g.*, H.R. REP. NO. 109-31 at 133 ("For purposes of Bankruptcy Code section[ ] … 560 … it is intended that the normal business practice in the event of default of a party based on bankruptcy or insolvency is to terminate, liquidate or accelerate … swap agreements"); 11 U.S.C. § 560 (defining "contractual rights" as including those set forth by reason of normal business practice).  The financial industry has made clear its view that the right to "liquidate" a swap agreement incorporates both determining the final net payments owed to the parties and the act of making such a payment.  The International Swaps & Derivatives Association and the Securities Industry and Financial Markets Association both explained, as *amici* in the *Perpetual* appeal, that the swap market views "liquidation" as meaning "to settle by payment or other adjustment, which necessarily includes priority provisions dictating the "amount, priority, and source of payments to be made."  *Brief of Amicus Curiae Int'l Swaps & Derivatives Ass'n* at 20-24 and *Brief of Amicus Curiae Sec. Indus. And Fin. Markets Ass'n in Support of Appellant and in Favor of Reversal* at 16-18 in *Lehman Bros. Special Fin. Inc. v. BNY Corp. Tr. Servs. Ltd. (In re Lehman Bros. Holdings Inc.)*, No. 09-01242 M47 (S.D.N.Y. 2010).  Again, dictating the "amount, priority, and source of payments to be made" is the very function of the Priority Provisions.  *See id.*

The Priority Provisions are also essential to any liquidation of the swap agreement as a matter of economic reality.  The Transaction Documents provide that LBSF's only recourse in the event of a termination is "subject in any case to the [Priority Provisions] set out in the Indenture."[40]  The payment priority set forth in the Priority Provisions, by the express terms of

---

[40] *See* Ex. C; *see also* n. 29 above.

the Swap Confirmations, is the exclusive mechanism of liquidating the swap agreements. Without these provisions, liquidation of these swap agreements – *i.e.*, payments to the parties – would be *impossible*, leaving the transaction in limbo.  Judge Peck recognized this economic reality in *Michigan Housing*, explaining that the "protected right to cause the liquidation of a swap agreement must extend beyond the mere capacity to commence a liquidation in a vacuum and must embrace those related terms of the swap agreement that explain the liquidation protocol to be followed when one party goes into bankruptcy."  *Michigan Housing*, 502 B.R. at 386.

Finally, the Priority Provisions directly fulfill a central purpose of the Safe Harbor provisions – to allow swap transactions and accompanying collateral to be promptly terminated and settled *with finality*, despite the filing of a bankruptcy case.  *See, e.g.*, *Enron*, 651 F.3d at 336 (rejecting debtor's narrow interpretation of Section 546(e) that "would result in commercial uncertainty and unpredictability at odds with the safe harbor's purpose and in an area of law where certainty and predictability are at a premium"); *see also Grede*, 746 F.3d at 254 (in enacting the Safe Harbors, Congress chose finality over other bankruptcy policy considerations).[41]  Judge Peck recognized this in *Michigan Housing*, explaining that "allowing a non-debtor counterparty to use the contractual method of liquidation promotes the systemic goals of the Safe Harbor – to provide stability and certainty to the markets upon the insolvency of a counterparty and to enable the parties themselves to liquidate collateral in a contractually

---

[41] The fact that the Priority Provisions here are central to the applicable swap agreements also distinguishes this case from *Calpine Energy Services, L.P. v. Reliant Energy Elec. Solutions, L.L.C. (In re Calpine Corp.)*, Case No. 05-60200, 2009 WL 1578282 at *6 (Bankr. S.D.N.Y. May 7, 2009) ("contractual rights that are merely ancillary or incidental to an *ipso facto* clause are not enforceable under section 556 of the Code" and therefore non-debtor counterparty could not use section 556 as a basis for arguing that the debtor's claim against the counterparty was barred due to the debtor's post-petition failure to provide a detailed written explanation for the basis for its dispute with the counterparty within the time prescribed by the contract).

prescribed manner." 502 B.R. at 394. [42]

Judge Peck's decision in *Perpetual* addressed what he termed "flip clause" transactions and found that a clause that modified LBSF's collateral priority rights as a result of a bankruptcy filing was not part of a "liquidation" that is protected by Section 560. But in *Perpetual* Judge Peck had concluded that the particular provision at issue there "did not comprise part of the swap agreement," and thus the provisions governing the liquidation were separate from the applicable swap agreement. 422 B.R at 421. As set forth in Section III.A.1 above, that is not true here.[43] And to the extent that *Perpetual* is inconsistent with Judge Peck's later decision in *Michigan Housing* or other applicable law, it was incorrectly decided and should not be followed for all the reasons set forth herein. *See* footnote 15 above.

**B.    The Distribution of Collateral Proceeds After the Petition Date is Protected by Section 362(b)(17) of the Bankruptcy Code. (Counts II and III)**

Counts II and III, alleging that distribution of the Collateral proceeds in accordance with the Priority Provisions violated the automatic stay, should also be dismissed under Section 362(b)(17), independently of Section 560. Section 362(b)(17) provides that the filing of a bankruptcy case does not stay

> the exercise by a swap participant … of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement *forming part of or related to* any swap agreement, or of any contractual right to offset or net out any termination value, payment amount or other transfer

---

[42] Section 560 also protects the exercise of a contractual right "to offset or net out any termination values or payment amounts arising under or in connection with" the termination of a swap agreement. Because the Priority Provisions dictate whether the Issuer shall pay LBSF, net of payments to the Noteholders, or shall pay the Noteholders, net of payment to LBSF, the Priority Provisions are protected for a second reason pursuant to Section 560. *See* 11 U.S.C. § 560; *see also, e.g.*, RACER Series 2005-21-C Trust, Schedule to ISDA Master Agreement, Part 5(f), Ex. O ("Each of Party A and Party B hereby acknowledges and agrees…that the rights granted to each party under Section 6 include a contractual right to terminate a 'swap agreement' and to offset and net out termination values and payments in conjunction therewith.").

[43] As noted in footnote 31, UniCredit will address the incorporation of the Priority Provisions in the English Transactions into its swap agreements in a supplemental pleading.

> obligation arising *under or in connection with* 1 or more such
> agreements.

11 U.S.C. § 362(b)(17) (emphasis added).  Section 362(b)(17) thus applies broadly to any

contractual right under any security agreement or arrangement that is *either* part of *or* related to a

swap agreement. *Id.*; *see* H.R. REP. NO. 109-648, at 7 (2006) (Section 362(b)(17) is intended "to

protect enforcement, free from the automatic stay, of collateral, setoff or netting provisions in …

swap agreements and security agreements or arrangements … related to one or more swap

agreements").  LBSF cannot reasonably dispute that the Priority Provisions are a "security

agreement or arrangement" that is "related to" the Swap Confirmations.  Because the statute

requires nothing more, the application of the Priority Provisions is exempted from the automatic

stay pursuant to the plain language of Section 362(b)(17).

### C.    The Safe Harbors of Sections 546(g) and 546(e) also Require the Dismissal of LBSF's Preference and Constructive Fraudulent Conveyance.  (Counts IV and VII)

The Safe Harbors of Sections 546(g) and 546(e) further require dismissal of LBSF's

preference (Count IV) and constructive fraudulent transfer (Count VII) claims.  Where, as here,

the complaint's allegations on their face establish that the alleged transfers were made (i) "in

connection" with a swap agreement by swap participants and/or (ii) as part of a "settlement

payment" or a transfer in connection with a securities contract made by a financial participant or

financial institution, any related avoidance claims must be dismissed.  *See Citibank*, 505 B.R. at

142 (dismissing preference, constructive fraudulent conveyance and state law fraudulent

conveyance theories as barred by Section 546(g)); *Enron*, 651 F.3d at 339 (dismissing

preferential transfer claims under the plain language of Section 546(e)).

1.    <u>LBSF's Claims Fail Under the Plain Language of Section 546(g).</u>

A debtor "may not avoid a transfer, made by or to (or for the benefit of) a swap

participant … in connection with any swap agreement … . " 11 U.S.C. § 546(g); *see Citibank*,

505 B.R. at 142 (concluding that section 546(g) eliminates avoidance claims brought under

sections 544, 547, 548(a)(1)(B)); *Nat'l Gas Distribs.*, 556 F.3d at 254.

The Complaint expressly states that each of the Issuers "were parties to one or more

Swap Agreements" with LBSF.  FAC ¶ 55.  LBSF and the Issuers were thus "swap participants."

Further, the Trustees were also "swap participants."  *See* Section I.A.1.b above.  The Complaint

alleges that the challenged transfers of priority and collateral were made by the Trustees on

behalf of the Issuers in order to satisfy the *Issuers'* obligations to the Noteholders.  FAC ¶ 57.[44]

Thus, the alleged transfers were made by and on behalf of a swap participant.

Finally, the alleged transfers[45] at issue here clearly were made "in connection" with a

swap agreement.  *See Citibank*, 505 B.R. at 144 (phrase "in connection with" suggests "a

considerable breadth of coverage," and thus the "requirement that a transfer be made 'in

connection with any swap agreement' simply means that the transfer must be related to such an

agreement"); *Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de

Cambio Majapara S.A. de C.V.)*, 390 B.R. 595, 599 (Bankr. N.D. Ill. 2008) (prejudgment

attachments "in connection with" swap agreements fell within safe harbor).  Specifically, the

alleged transfers were triggered by the termination of a swap agreement.  *See Citibank*, 505 B.R.

---

[44] To the extent LBSF alleges that the Trustees were the initial transferees of the alleged "Collateral Transfers", Section 546(g) also applies to preclude avoidance because the transfers would therefore be to or for the benefit of the Trustees as swap participants and financial participants.  *See* Section III.A.1 above.

[45] As explained below in Section IV, the Priority Provisions did not effectuate a "transfer" of any right or property interest of LBSF and are therefore not subject to the Section 547, 548, or 549 avoidance provisions.  For purposes of applying the Section 546(g) and Section 546(e) Safe Harbors only, the Noteholders will assume, *arguendo*, that the application of the Priority Provisions and distribution of collateral may be considered a "transfer."

at 147 (transfer triggered by action under swap agreement satisfies safe harbor's "in connection

with" requirement); *cf. Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 B.R.

195, 202 (Bankr S.D.N.Y. 1999) (interpreting prior version of Section 546(g), but stating that

"[a] natural reading of 'in connection with' suggests a broader meaning [than 'under'] similar to

'related to'").

Because the alleged transfers fall squarely within the protections of Section 546(g),

Counts IV and VII should be dismissed.

2.    LBSF's Claims Fail Under the Plain Language of Section 546(e).

LBSF's preference and constructive fraudulent transfer claims are also barred by the Safe

Harbor of Section 546(e), which provides that the debtor "may not avoid a transfer that is a

settlement payment ... made by or to (or for the benefit of) … a financial institution [or] financial

participant, … or that is a transfer made by or to (or for the benefit of) … a financial institution

[or] financial participant … in connection with a securities contract, as defined in section 741(7)

… ."  11 U.S.C. § 546(e); *see, e.g.*, *Enron*, 651 F.3d at 329.

As an initial matter, LBSF alleges that the purported transfers of its priority rights were

made to the Trustees or through the Trustees to the Noteholders.  FAC ¶¶ 6, 157, 208.  The

Trustees qualify under Section 546(e) as financial participants, *see* Section II.A.1 above, and

further qualify as financial institutions under the Bankruptcy Code, *see* 11 U.S.C. § 101(22)(A)

(defining "financial institution" as including "a Federal reserve bank or an entity that is a

commercial or savings bank, industrial savings bank, savings and loan association, [or] trust

company").  *See* FAC, ¶¶ 12-19; Fed. R. Evid. 201(b).

The Bankruptcy Code defines a "settlement payment" as a "preliminary settlement

payment, a partial settlement payment, an interim settlement payment on account, a final

settlement payment, or any other similar payment commonly used in the securities trade."  11

46

U.S.C. § 741(8).  The Second Circuit and other Circuit Courts have consistently concluded that

the term "settlement payment" should be construed broadly, and encompasses most payments

made "to complete securities transactions."  *See Enron*, 651 F.3d at 334, 336-337; *Picard v. Ida*

*Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Secs. LLC)*, 773 F.3d 411, 422-423 (2d.

Cir. 2014) ("*Picard v. Ida Fishman*"); *accord Official Comm. of Unsecured Creditors of CIC v.*

*Frost (In re Contemporary Indus. Corp.),* 564 F.3d 981, 986 (8th Cir. 2009); *Lowenschuss v.*

*Resorts Int'l, Inc. (In re Resorts, Inc.)*, 181 F.3d 505, 514-15 (3d Cir. 1999); *Kaiser Steel Corp.*

*v. Charles Schwab & Co.*, 913 F.2d 846, 848 (10th Cir. 1990).  A note is defined as a "security"

for these purposes under the Bankruptcy Code, 11 U.S.C. § 101(49)(A)(i), as is a collateral trust

certificate, *id.* at § 101(49)(A)(vi).  The payment of Collateral proceeds to the Noteholders

pursuant to the Priority Provisions to settle outstanding obligations under the Notes thus

constitutes payments to complete a securities transaction for purposes of the Bankruptcy Code.

*See Enron*, 651 F.3d at 336-338 (holding that redemption of commercial paper is a protected

settlement payment under Section 546(e) and declining to read a purchase or sale requirement

into Section 741(8)).

LBSF cannot alter this outcome by limiting its challenge to the alleged transfer of its

senior priority interest, as distinct from the transfer of money.  Assuming there were such a

transfer, it was made – indeed, it was necessary – in order to effectuate the protected settlement

payment to the Noteholders.  *See, e.g.*, *Jonas v. Resolution Tr. Corp. (In re Comark)*, 971 F.2d

322, 326 (9th Cir. 1992) (A settlement payment … clearly includes a transfer of securities that

completes a securities transaction … [which] includes any transfers that occur during the

settlement process"); *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan*

*Ass'n*, 878 F.2d 742, 752 (3d Cir. 1989) ("settlement payment" for repo contract included  all

transfers that were part of the settlement process for the particular type of transaction, regardless of whether transfers occurred on the "settlement date"); *see also Crescent Res. Litig. Tr. ex rel. Benisomon v. Duke Energy Corp.*, 500 B.R. 464, 473-74 (W.D. Tex. 2013) (concluding that distribution must be viewed in the context of the entire transaction, and necessary transfer in completion of securities transaction was entitled to protection under Section 546(e) as part of a settlement payment).  Moreover, while the preference and constructive fraudulent transfer claims purport to seek to recover LBSF's alleged senior priority (FAC ¶¶ 157, 211), what LBSF actually seeks to recover is the money paid to Noteholders as a result of the application of the Priority Provisions.  LBSF's attempt to isolate an essential component of the settlement payment process cannot undermine the broad protection for settlement payments under Section 546(e).  *See id.*

Further, the supposed transfer of LBSF's senior priority position was in furtherance of the Issuers' and Trustees' obligations to liquidate the Collateral and pay the Notes in accordance with the terms of the Indentures, and thus constitutes a transfer made in connection with a securities contract for purposes of the Bankruptcy Code.  11 U.S.C. § 741(7)(A)(i), (vii), (xi) (defining "securities contract" to include a contract for the purchase, sale or loan of a security, any agreement or transaction that is similar to the agreements specified as securities contracts under the Bankruptcy Code, and any security agreement or arrangement or other credit enhancement related to any agreement specified as a securities contract); *see also Picard v. Ida Fishman*, 773 F.3d at 418, 422 (noting the expansive definition of "securities contract" and observing that "Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided").  For this additional reason, Section 546(e) precludes the avoidance of the purported transfer of LBSF's priority rights.

D.     **The Safe Harbors Preclude LBSF's Claims Under Section 549 of the Bankruptcy Code. (Counts VIII and IX)**

In Counts VIII and IX, LBSF alleges that to the extent the Priority Provisions that establish the Noteholders' senior priority position took effect *after* the LBSF Petition Date and to the extent the Trustees liquidated the collateral for distribution to the Noteholders *after* the LBSF Petition Date, such "transfers" are avoidable as unauthorized post-petition transfers under Section 549(a) of the Bankruptcy Code.  FAC ¶¶ 214-226.  This argument fails as well.  Section 549(a) provides, in relevant part, that "the trustee may avoid a transfer of property of the estate – (1) that occurs after the commencement of the case; and … (B) that is not authorized under [the Bankruptcy Code] or by the court."  11 U.S.C. § 549(a).  However, for all the reasons discussed above, any post-petition application of the Priority Provisions and the subsequent distribution of the Collateral proceeds were authorized under the Safe Harbor provisions of the Bankruptcy Code, and thus these alternative counts must be dismissed.[46]

E.     **The Priority Provisions Are Enforceable Under Section 510(a) of the Bankruptcy Code.  (Count I)**

The Transaction Documents disprove LBSF's assertion (FAC ¶¶ 276-77) that it is a creditor of the Issuer.[47]  However, if and to the extent LBSF may be considered a creditor by reason of its assertion of claims against the Collateral, the Priority Provisions are also enforceable as subordination agreements under Section 510(a).  Section 510(a) provides that "[a]

---

[46] While LBSF alleges that the right of the Noteholders to the senior priority position should have been asserted as a claim through the normal claims procedures (FAC ¶ 217), the Safe Harbors make clear that there is no need for prior court approval to exercise rights under protected agreements.  *See, e.g.*, *Michigan Housing*, 502 B.R. at 386.  In any event, the claims process is for creditors of the debtor, and the Noteholders were not creditors of LBSF, but instead were creditors of the Issuers.

[47] As explained in more detail in Section V.F below, LBSF was not a creditor of the Issuers, as its only recourse was to the pool of Collateral held by the Issuers.  But even if LBSF's nonrecourse claims against the Issuers gave it creditor status, it ceased being a creditor once the swap was terminated and the Collateral distributed, which discharged LBSF's claims.

subordination agreement is enforceable in a case under this title to the same extent that such

agreement is enforceable under applicable nonbankruptcy law."  11 U.S.C. § 510(a).  In other

words, as long as a subordination agreement is enforceable under state contract law, the

agreement is also enforceable under the Bankruptcy Code and must be enforced according to its

terms.  *See, e.g.*, *HSBC Bank USA v. Branch* (*In re Bank of New England Corp.*), 364 F.3d 355,

361 (1st Cir. 2004).  Enforcement under state law is mandatory; courts do not have discretion to

decline to enforce subordination agreements based on principles of equity.  *Id.* at 362-63; *In re

Credit Indus. Corp.*, 366 F.2d 402, 410 (2d Cir. 1966).

        Although the term is not defined in the Bankruptcy Code, "[a] contractual subordination

agreement is simply a contractual arrangement whereby one creditor agrees to subordinate its

claim against a debtor in favor of the claim of another."  *In re Best Products, Co.*, 168 B.R. 35,

69 (Bankr. S.D.N.Y. 1994).  The Priority Provisions are a contractual arrangement by which

LBSF agreed that its claim against the Collateral would be subordinate to the Noteholders unless

certain specified circumstances occurred.  *See* Ex. B.  Specifically, LBSF expressly agreed to

hold a subordinate position vis-à-vis the Noteholders with respect to claims against the Collateral

in the event LBSF was the defaulting party under the terms of the swap.  *See* Ex. C.

        The vast majority of the swap agreements and indentures applicable to the Transactions

are governed by New York law,[48] under which subordination agreements are enforceable.  *See,

e.g.*, *Best Products*, 168 B.R. at 69 ("Thus, under New York law, when a contractual

subordination agreement is unambiguous, the parties' rights are governed exclusively by that

agreement and the words of that agreement are given their plain ordinary and usual meaning."

footnote omitted)); *see also In re Village Rathskeller, Inc.*, 147 B.R. 665, 672 (Bankr. S.D.N.Y.

---

[48] The English Transactions are the only Transactions not governed by New York law.

1992) ("In New York, subordination clauses in mortgages and leases and subordination agreements are valid and enforceable.").  With respect to the two Transactions governed by English law, English law likewise enforces subordination agreements in accordance with their terms, and thus such Priority Provisions are also enforceable under the Bankruptcy Code.  *See Belmont Park Invs. PTY Ltd. v. BNY Corp. Tr. Servs. Ltd. & LBSF* [2011] UKSC 38.

Finally, the Priority Provisions are enforceable pursuant to Section 510(a) regardless of whether they are construed as *ipso facto* clauses.  Section 510(a) contains no language even suggesting that it is limited by the *ipso facto* provisions of the Bankruptcy Code.  Rather, Section 510(a) provides that "a subordination agreement is enforceable *to the same extent* that such agreement is enforceable under applicable nonbankruptcy law."  11 U.S.C. § 510(a) (emphasis added).  The *ipso facto* provisions of the Bankruptcy Code are plainly not part of "applicable nonbankruptcy law."

In *Perpetual*, Judge Peck found that the payment priority provision at issue was otherwise an enforceable subordination agreement, but determined that Section 510(a) is limited by Sections 365 and 541 of the Bankruptcy Code.  422 B.R. at 422.  This conclusion lacks any basis in the statutory language, is without precedent, and is also at odds with settled law holding that a specific statute controls over a general one.  *See, e.g.*, *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) ("[I]t is familiar law that a specific statute controls over a general one 'without regard to the priority of enactment.'" (quoting *Townsend v. Little*, 109 U.S. 504, 512 (1883))).  The specific provision in Section 510(a) making subordination agreements enforceable thus controls over the general prohibition on *ipso facto* clauses in Sections 365(e) and 541(c).

## IV.  Certain Other Counts Fail to State Claims Under the Bankruptcy Code.  (Counts IV – XII)

While Counts IV–XII are barred for the reasons discussed, they should also be dismissed

51

for the additional and independent reason that they fail to state a claim as a matter of law.

### A.    The Avoidance Claims Should Be Dismissed. (Counts IV–IX)

#### 1.    Certain Avoidance Claims Must Be Dismissed Because of the Timing of the Alleged Transfers.  (Counts IV–IX)

Counts IV through IX, seeking avoidance and recovery of "transfers" under Sections 547, 548, 549, 550 and/or 551 (collectively, the "Avoidance Claims"), indisputably cannot apply to certain Transactions and Noteholders, due to the timing of the purported subject transfers.

Sections 547 and 548 apply only to transfers made "before the date of the filing of the petition."  Here, with respect to Noteholders that received the purported transfers of LBSF's "priority" or the transfers of the Collateral proceeds on or after the LBSF Petition Date, the claims necessarily fail.  Accordingly, Count VI should be dismissed as against Noteholders in the Pre-Post Transactions, and Counts IV, V, VI and VII should be dismissed as against the Noteholders in the Post-Post Transactions.  *See* Appendix A.

Section 549 applies only to transfers made "after the commencement of the case."  Here, with respect to Noteholders that received the purported transfers of LBSF's "priority" or the transfers of the collateral proceeds before the LBSF Petition Date, the claims fail.  Accordingly, Counts VIII and IX must be dismissed as against the Noteholders in the Pre-Pre Transactions, and Count VIII must be dismissed as against the Noteholders in the Pre-Post Transactions.  *See* Appendix A.

#### 2.    LBSF's Avoidance Claims Fail Because There Was No Transfer.

The quintessential element of any avoidance claim is a *transfer* by the debtor of its property to another person.  *See, e.g.*, *Sullivan v. Willcock* (*In re Wey*)*,* 854 F.2d 196, 198 (7th Cir. 1988).  LBSF repeatedly portrays its purported "priority" as if it were property that LBSF held and then gave to the Noteholders.  But, as explained in Section I, LBSF never had

"priority," and in any event LBSF certainly never transferred *its* "priority" to payment of

termination payments under the swaps to the Noteholders.  The Noteholders had their own

priority to repayment of their Notes all along.  For the same reason, LBSF's limited interests in

the Collateral were never transferred to the Noteholders, which always had their own limited

interests in the Collateral.  All of the Avoidance Claims, intentional or nonintentional, prepetition

or postpetition, must be dismissed for the simple reason that *LBSF never transferred anything to*

*anyone*.

As was demonstrated in Section I above, LBSF never actually was "senior" and never

actually held a "priority" position, and it never held an enforceable lien on the Collateral; rather

the Collateral was held by the Trustees for the benefit of all Secured Parties.  LBSF never had an

existing right to senior payment from the Issuers because neither a sufficient number of Credit

Events nor any Issuer Events that would give LBSF a right to senior payment from the Collateral

ever occurred.  And LBSF had no "priority" – no right to payment first – because *the relevant*

*Priority Provisions did not apply at all prior to swap termination or maturity*.  *See* Section I.A.

Simply put, LBSF's priority never existed, so it could not have been transferred.  *See Wey*, 854

F.2d at 199 (dismissing preference claim, where debtor "possessed *no rights* which he could

transfer" (emphasis in original)).

Even assuming *arguendo* that LBSF had a *conditional* "priority" if certain events

occurred, there was no interest in property transferred to the Noteholders.  LBSF's conditional

priority never became non-contingent because the prerequisite conditions irrevocably failed.

One party's forfeiture of a right under a contract does not constitute a transfer *to the other party*,

and thus a failed condition or termination of contract is not a "transfer" from one party to the

other.  *See, e.g.*, *id.* ("When a termination is pursuant to the terms of a contract, there is no

53

transfer.").  On the contrary, "a pre-petition termination of a contract pursuant to its terms and the consequent *cessation of a debtor's rights under a contract does not constitute a transfer within the meaning of [the] Code*."  *Edwards v. Fed. Home Loan Mortg. Corp.* (*In re LiTenda Mortg. Corp.*)*,* 246 B.R. 185, 191 (Bankr. D.N.J. 2000) (emphasis added), *aff'd*, 276 F.3d 578 (3d Cir. 2001); *Creditors' Comm. for Jermoo's Inc. v. Jermoo's Inc.* (*In re Jermoo's Inc.*), 38 B.R. 197, 204 (Bankr. W.D. Wisc. 1984) (holding that termination of a contract right in a franchise agreement does not constitute a "transfer" under the Bankruptcy Code).

Finally, *LBSF*'s conditional priority indisputably was never transferred to the Noteholders.  The Noteholders were *not* paid ahead of LBSF by virtue of standing in LBSF's shoes and holding LBSF's priority right to termination payments under the swaps.  The Noteholders were paid ahead of LBSF because the conditions to *their own* priority right to repayment of their Notes were satisfied.  *See Wey*, 854 F.2d at 199 (dismissing preference claim, where defendants "did not receive any right at the default that they did not already have at the time of the signing of the contract" (quoting lower court's ruling)).

Labeling the application of the Priority Provisions as a "transfer" does not change that there was never an actual transfer as a matter of law and accordingly all of the Avoidance Claims (Counts IV-IX) should be dismissed.

3.    LBSF's Preferential Transfer Claim Fails Because LBSF Did Not Pay an Antecedent Debt to Any Creditor.

An avoidable transfer under Section 547(b) must be (among other things) to or for the benefit of a *creditor* for or on account of an *antecedent debt* owed by the debtor.  *See* 11 U.S.C. § 547(b).  LBSF's preferential transfer claim fails because LBSF did not owe, much less pay, a debt to the Trustees or the Noteholders before or after the Priority Provisions were triggered.

LBSF cannot escape this fundamental and fatal flaw in its claim by rewriting Section 547(b) to replace the term "antecedent debt" with the term "contractual obligation." FAC ¶ 154. Not every promise to be bound by a contract, including its conditions, is a debt. A debt is a "liability on a claim," and a claim is the "right to payment" or a "right to an equitable remedy for breach of performance." *See* 11 U.S.C. § 101(5), (12). Here, LBSF agreed to a priority junior to Noteholders under the Priority Provisions in certain circumstances. An agreement to a junior priority is not a debt, because it is not a liability – it is not a promise to pay or to provide an equitable remedy for breach. *See id.*

Even assuming that LBSF's "transfer" of its "Senior Payment Priority" was on account of "contractual obligations" that somehow constituted antecedent debt, the claim would only be viable against a *creditor* that received or benefited from the disputed transfer. *See* 11 U.S.C. §547(b). LBSF had "contractual obligations" only to its contractual counterparties, the Issuers; and LBSF does not allege that it made any preferential transfer to the Issuers. FAC ¶ 151. LBSF had no privity with the Trustees or the Noteholders; LBSF did not owe the Trustees or the Noteholders any "contractual obligation," debt or other payment, as a matter of law.

In short, because the Trustees and the Noteholders were not paid as LBSF's creditors, LBSF's preferential transfer claim (Count IV) fails as a matter of law and should be dismissed.

4.    <u>LBSF's Constructive Fraudulent Transfer Claim Fails Because Any Alleged Transfers Are Defined as "For Value" Under the Bankruptcy Code.</u>

LBSF's constructive fraudulent transfer claims fail for the independent reason that "a swap participant or financial participant that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer." 11 U.S.C. § 548(d)(2)(D). The supposed "transfers" of LBSF's senior priority position, if they happened at all, were plainly made in connection with a swap agreement. *See* Section III.A.2 above. The alleged transfers

55

were also for the benefit of the Issuers, plainly swap participants, as they enabled the Issuers to

repay the Noteholders.  *See* Section III.A.1.b above.  LBSF cannot avoid this conclusion by

ignoring the Issuers and alleging only that the transfers were made to or for the benefit of the

Trustees and/or the Noteholders (FAC ¶¶ 151, 165, 201, 211, 216, 273).  In any event, to the

extent that the transfers were made to or for the benefit of the Trustees, the Trustees qualify as

swap participants and/or financial participants. *See* Section III.A.1.b above.  Because the Issuers

and the Trustees took for value as a matter of law under Section 548(d), LBSF cannot establish

the elements of a constructive fraudulent transfer claim under Section 548(a)(1)(B) of the

Bankruptcy Code.[49]

> ### 5.    LBSF's Intentional Fraudulent Transfer Claims Fail Due to Lack of Intent. (Counts V and VI)

It is well settled that a claim for intentional fraudulent transfer "must satisfy the

requirements of Rule 9(b) of the Federal Rules of Civil Procedure."  *E.g., Andrew Velez Constr.,*

*Inc. v. Consol. Edison Co. of New York, Inc.* (*In re Andrew Velez Constr., Inc.*)*,* 373 B.R. 262,

269 (Bankr. S.D.N.Y. 2007) (quoting *Official Comm. of Unsecured Creditors v. Am. Tower*

*Corp.* (*In re Verestar, Inc.*)*,* 343 B.R. 444, 459-60 (Bankr. S.D.N.Y. 2006)).  Rule 9(b) requires

the claimant to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P.

9(b).  It is the debtor-transferor's intent to defraud that must be pled; the defendant-transferee's

state of mind is "irrelevant."  *E.g., Andrew Velez*, 373 B.R. at 269 (quoting *Bayou Superfund,*

*LLC v. WAM Long/Short Fund II, L.P.* (*In re Bayou Group, LLC*), 362 B.R. 624, 632 (Bankr.

S.D.N.Y. 2007)).

---

[49] To the extent the transfers are also asserted to be made to or for the benefit of the Noteholders, the claim fails to satisfy the predicate elements of a fraudulent transfer as against the initial transferees, who statutorily took "for value."  Moreover, many of the Noteholder Defendants can show they qualify as financial participants and thus are equally statutorily defined as having given value to the extent of the transaction under Section 548(d).

LBSF does not allege at all, much less with particularity, that it acted with intent to defraud its creditors by purportedly transferring its "priority" to the Noteholders or its "interest" in the Collateral to the Noteholders or the Trustees.

LBSF tries to solve this deficiency by pleading that Defendants' intent should be imputed to LBSF.  But the theory of imputation has no place here; a defendant transferee's intent may be imputed to the debtor "only in the extraordinary circumstances where the transferee controls the transferor."  *E.g., Andrew Velez,* 373 B.R. at 269; *In re Lehman Bros. Holdings Inc.*, No. 08-13555 , 2015 WL 5828216, at *17 (S.D.N.Y. Sept. 30, 2015) (citing *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406, 448-49 (S.D.N.Y. 2001)); *see also Elway Co., LLP v. Miller* (*In re Elrod Holdings Corp.*), 421 B.R. 700, 711 (Bankr. D. Del. 2010) (imputation requires "extreme situation that is dependent upon nearly total control of a debtor by a transferee" (quoting *Armstrong v. United Bank of Bismarck (In re Bob's Sea Ray Boats, Inc.)*, 144 B.R. 451, 459 (Bankr. N.D. 1992))).  This exception was created to counter "misuse of the corporate form and insider status as instruments to commit fraud."  *See, e.g.*, *Andrew Velez,* 373 B.R. at 270.

None of LBSF's purported badges of fraud and allegations of bad behavior comes close to a plausible allegation that either Trustees or the Noteholders controlled LBSF or were the kind of insiders to which the exception applies.  FAC ¶¶ 168–179, 190–201.  LBSF does not and cannot plead that any Defendant controlled or made decisions for *LBSF* – only that the Trustees controlled "LBSF's Interest in the Transaction Documents, the Collateral, and its proceeds."  *See, e.g.*, FAC ¶¶ 176.  That is not enough to state a claim of intentional fraudulent transfer.  The Trustees "controlled" the Collateral, if at all, pursuant to a longstanding, arm's-length contractual relationship with LBSF (and with the Noteholders that allegedly in some instances directed the

Trustees).  *See Adler*, 263 B.R. at 448-49; *see also Andrew Velez,* 373 B.R. at 269; *Elrod Holdings,* 421 B.R. at 711.

Moreover, even if LBSF could impute the Defendants' intent to itself, LBSF cannot plead that the Defendants had any fraudulent intent.  It is undisputed that the Issuers and the Trustees were bound to, and did, enforce the governing contracts that Lehman had drafted in order to repay debts due and owing from the Issuers (*not* LBSF) to the Noteholders.  The allegation that the Noteholders wanted to enforce the Priority Provisions or to be repaid is not a "badge of fraud," as a matter of law.  "The transfer of funds to accomplish contractual obligations … does not constitute a transfer made with the intent to hinder or delay creditors."  *Sherman v. FSC Realty LLC* (*In re Brentwood Lexford Partners*, *LLC*), 292 B.R. 255, 265 (Bankr. N.D. Tex. 2003); *see, e.g.*, *Butler v. Loomer* (*In re Loomer*), 222 B.R. 618, 623 (Bankr. D. Neb. 1998) ("[T]he inference of fraudulent intent is rebutted by the fact that these transfers were simply payments on a bona fide preexisting loan … formulated in a bona fide transaction prior to the time the debtor experienced financial difficulties.").

Because LBSF (a) cannot plausibly allege any Defendant's fraudulent intent and (b) in any event, has not pled facts sufficient to impute any Defendant's intent to itself, LBSF's intentional fraudulent transfer claims (Counts V-VI) fail as a matter of law.

**B.**    **The Turnover Claims Should Be Dismissed. (Counts X-XII)**

Even if they were not preempted by the Safe Harbors, LBSF's turnover claims under Section 542 are deficient as a matter of law and should be dismissed.

1.    <u>LBSF's Turnover Claims All Fail Because LBSF's Claims to the Property Are Disputed.</u>

As a threshold matter, LBSF's turnover claims must be dismissed because LBSF's claimed property interests and rights are disputed.  "It is settled law that the debtor cannot use the

turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute." *See Messer v. TX Onshore, LLC* (*In re Madison Williams & Co.*), 509 B.R. 791, 799 (Bankr. S.D.N.Y. 2014) (quoting *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1991)).  Likewise, turnover claims may not be used in an attempt to collect disputed debts. *See, e.g.*, *Geron v. Peebler* (*In re Pali Holdings, Inc.*), 488 B.R. 841, 851-52 (Bankr. S.D.N.Y. 2013) (turnover available "only when there is no legitimate dispute over what is owed to the debtor" (quoting *Savage & Assocs., P.C. v. Mandl* (*In re Teligent, Inc.*), 325 B.R. 134, 138 (Bankr. S.D.N.Y. 2005))); *Hassett v. Bancohio Nat'l Bank* (*In re CIS Corp.*), 172 B.R. 748, 760 (S.D.N.Y. 1994) ("The terms 'matured, payable on demand, or payable on order' create a strong textual inference that an action should be regarded as a turnover only when there is no legitimate dispute over what is owed to the debtor.").  The rule is consistent with the well-established bankruptcy law that property claimed by a debtor becomes property of the estate only if the debtor obtains a judgment on the merits in its favor. *E.g.*, *FDIC v. Hirsch* (*In re Colonial Realty Co.*), 980 F.2d 125, 131 (2d Cir. 1992).  Because LBSF's alleged rights to the purported property are unquestionably disputed, LBSF's turnover claims (Counts X-XII) should be dismissed.

> ###### 2.    LBSF's Section 542(a) Priority-Turnover Claim Fails Because No Defendant Ever Possessed or Controlled LBSF's Purported Priority. (Count X)

Section 542(a) requires that "an entity … in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title," to deliver such property or its value to the debtor.  11 U.S.C. § 542(a).  LBSF's turnover claim based on its "right to Senior Payment Priority" (FAC ¶ 228) fails on several additional grounds.

As a threshold matter, where the Transaction terminations occurred prior to the LBSF Petition Date, the statute cannot apply, because (a) the statute applies only "during *the* case" (*not* "during *a* case"), meaning during LBSF's case, as demonstrated in Section I.B, and (b) LBSF

irrevocably was consigned to a "priority" junior to Noteholders before the commencement of its

case.  For this reason, Claim X must be dismissed as against the Noteholders in the Pre-Pre

Transactions and the Noteholders in the Pre-Post Transactions.

In any event, as shown above in Section III.A, LBSF's "Senior Payment Priority" is not

property that LBSF itself ever held nor property that any other person ever had in its possession,

custody, or control.  In the event of an Early Termination, LBSF had the right to priority

payment only if certain designated circumstances occurred and LBSF was not the defaulting

party.  Those circumstances never occurred, and certainly no Defendant ever had LBSF's limited

"priority" in its possession, custody, or control.

Thus, even where the Transaction terminations (which were undisputedly safe harbored)

occurred after the LBSF Petition Date, LBSF's "priority"-related turnover claim (Count X) fails

as a matter of law and must be dismissed.

    3.    <u>LBSF's Section 542(a) Collateral-Turnover Claim Fails Because No
Defendant Ever Possessed or Controlled LBSF's Interest in the Collateral.
(Count XI)</u>

LBSF's turnover claim based on the theory that its "interests in the Collateral and its

proceeds constituted property of the LBSF estate on the Petition Date" (FAC ¶ 234) fails as well.

Where the distribution of the Collateral proceeds occurred prior to the LBSF Petition Date, the

statute cannot apply, because (a) the statute applies only "during *the* case" (*not* "during a case"),

and (b) any alleged right LBSF had to the Collateral or the Collateral proceeds was satisfied in

full when the Priority Provisions were enforced prior to the commencement of its case.  *See*

Section I.B above.  For this reason, Claim XI must be dismissed as against the Noteholders

involved in the Pre-Pre and Pre-Post Transactions.  *See* Appendix A.  In fact, for the Pre-Pre

Transactions, there was not existing property that could even plausibly be turned over as

"property of the estate" as of the LBSF Petition Date; the Collateral was completely liquidated and distributed before that date.

Even where the distributions of Collateral proceeds occurred after the LBSF Petition Date, LBSF cannot state a turnover claim.  Between the LBSF Petition Date and the distribution dates, to the extent LBSF had a security interest in the Collateral, it could not use, sell or lease the Collateral, because LBSF had no right to foreclose upon the Collateral, and LBSF could not use, sell, or lease its Collateral proceeds, because there were none.  Upon the termination of the Transactions, LBSF did not assign its security interest to the Noteholders (or the Trustees); rather, the Noteholders received payments by virtue of the same security interest they had always held against the Collateral.  No Noteholder Defendant ever interfered with, much less possessed or controlled, LBSF's separate security interest in the Collateral.  In addition, this claim fails against the Trustees because they undisputedly are not in possession, custody or control of any Collateral proceeds, and therefore cannot be compelled to turn over the same.  *See* 11 U.S.C. § 542(b).

For these reasons, LBSF's Collateral-related turnover claim (Count XI) fails as a matter of law and must be dismissed.

> 4.    LBSF's Section 542(b) Claim Fails Because The Noteholders Never
>        Owed a Debt to LBSF. (Count XII)

LBSF's turnover claim based on the theory that the "Senior Priority Payment constitutes a debt that has matured and is property of the estate" (FAC ¶ 241) is entirely circular and conclusory and should be dismissed.

Section 542(b) requires that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee …."  11 U.S.C. § 542(b).  The Noteholders did not and could not owe a "debt,"

61

matured or otherwise, to LBSF.  Although LBSF is a third party beneficiary of the Indentures

between the Trustees and the Noteholders, nothing in the Indentures requires the Noteholders to

make a payment to LBSF for any reason, and (except as to aspects of the Pyxis Transaction

which are not the subject of the Motion) LBSF points to no such provision.

As for the Trustees, to the extent their obligation to distribute the Collateral pursuant to

the Priority Provisions could constitute a "debt," such debt was limited to the Collateral value

and they have paid that "debt" to the Noteholders as the contracts provided.  And in any event,

this claim, like the prior turnover claim, fails against the Trustees because they indisputably are

not in possession, custody or control of any Collateral proceeds, and therefore cannot be

compelled to turn over the same.  *See* 11 U.S.C. § 542(b).

For these reasons, LBSF's payment-related turnover claim (Count XII) fails as a matter

of law and must be dismissed.

## V.    **The New York State Law Claims Must Be Dismissed.  (Counts XIII–XVI, XVIII and XIX)**

The New York state law claims, set forth in Counts XIII through XVI, XVIII and XIX

(collectively, the "State Law Claims"), are all, with the exception of Count XIX, predicated upon

the assertion that the Priority Provisions are unenforceable *ipso facto* modifications under the

Bankruptcy Code, and for the reasons described above, that contention is without merit.  Further,

the State Law Claims – like LBSF's claims based on bankruptcy law – are barred by the

Bankruptcy Code's Safe Harbors and accordingly should be dismissed.  Finally, even if they are

not preempted by the Safe Harbors, LBSF's equitable claims under New York law are deficient

as a matter of law and should be dismissed.

Lehman was a sophisticated financial institution that structured and marketed these

Transactions, and drafted their governing documents with the assistance of counsel.  LBSF's

series of equitable claims under New York law are all attempts to spin the termination of the

Transactions, in accordance with the terms *drafted by Lehman*, as an improper and unjust

"windfall" for the Noteholders. Because LBSF cannot evade the terms of the Transaction

Documents it drafted, and for further reasons set forth below, its equitable claims fail as a matter

of law.

### A.    LBSF's State Law Claims Are Preempted by the Bankruptcy Code's Safe Harbors.

LBSF's State Law Claims should be dismissed because they are barred by the Safe

Harbors. The Safe Harbors sharply limit the circumstances in which transfers made in

connection with swap transactions can be unwound—precisely what LBSF tries to do here by

invoking a grab bag of state law claims. Accordingly, the Safe Harbors preempt all of LBSF's

State Law Claims. Where, as here, state law "stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress," it is preempted as a matter of U.S.

constitutional law. *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012) (quoting *Hines v.

Davidowitz*, 312 U.S. 52, 67 (1941))); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861,

873 (2000) (state law causes of action that obstruct or interfere with Congress's purpose must

yield to conflicting federal law); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,

725 F.3d 65, 96 (2d Cir. 2013) ("Congress has the power to preempt state law." (quoting

*Arizona*, 132 S.Ct. at 2500)), *cert. denied sub nom. Exxon Mobil Corp. v. City of New York*, 134

S. Ct. 1877 (2014).

LBSF's State Law Claims create the precise uncertainty in the settlement of swap

transactions after a bankruptcy that Congress sought to eliminate. That uncertainty is why

numerous courts have held that the Safe Harbors preempt state law claims like those asserted

here. *See Contemporary Indus. Corp.*, 564 F.3d at 988 ("Allowing recovery on [state law]

claims would render the [safe harbors] meaningless, and would wholly frustrate the purpose

behind" the safe harbors); *Whyte v. Barclays Bank PLC*, 494 B.R. 196, 199 (S.D.N.Y. 2013)

("The trouble with [permitting state law claims] is that it would, in effect, render [the safe

harbors] a nullity."); *AP Servs. LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (permitting unjust

enrichment claim would frustrate the purpose of the safe harbors); *U.S. Bank N.A. v. Verizon

Commc'ns Inc.*, 892 F. Supp. 2d 805, 824-25 (N.D. Tex. 2012), *aff'd*, 761 F.3d 409 (5th Cir.

2014).

    The Safe Harbors would be a dead letter if a plaintiff could achieve through state law

what Congress specifically chose to prohibit as a matter of federal bankruptcy law and policy,

and therefore the Court should dismiss the State Law Claims.

    **B.**    **LBSF's Equitable Claims Are All Preempted by the Bankruptcy Code.
              (Counts XII–XVI and XVIII)**

    In addition to being an impermissible end-run around the Safe Harbors, LBSF's equitable

state law claims are also preempted by the Bankruptcy Code as a whole.  The "vast majority of

courts that have addressed the issue have held that the Bankruptcy Code preempts state law

claims that are based upon allegations that the defendant violated the Bankruptcy Code."  *See,

e.g.*, *Diamante v. Solomon & Solomon, P.C.*, No. 1:99-CV-1339, 2001 WL 1217226, at *2

(N.D.N.Y. Sept. 18, 2001); *Linsenbach v. Wells Fargo Bank (In re Linsenbach)*, 482 B.R. 522,

528-29 (Bankr. M.D. Pa. 2012) (holding that state law claims derived from actions also alleged

to have violated the Bankruptcy Code "must be dismissed because they are preempted by the

Bankruptcy Code").  This rule applies to equitable claims.  *See, e.g.*, *Knox v. Sunstar Acceptance

Corp. (In re Knox)*, 237 B.R. 687, 702 (Bankr. N.D. Ill. 1999) (holding state law unjust

enrichment claim based on "violations of the Bankruptcy Code for which the Code itself and

Rules provide other remedies" to be preempted).

Boiled down to their essence, all of LBSF's equitable claims amount to a complaint that application of the Priority Provisions was unfair to LBSF as a bankruptcy debtor and its creditors. For example, in support of its state law fraudulent conveyance claim, LBSF alleges that "*[i]f the Priority Modification Provisions are invalidated*, LBSF's claims against the Issuers under the Swap Agreements have priority over the claims of the Noteholders against the Issuers." FAC ¶ 277 (emphasis added). LBSF's other State Law Claims similarly depend on a determination that the Priority Provisions are unenforceable under the Bankruptcy Code. *See, e.g.*, FAC ¶ 244 (unjust enrichment); FAC ¶ 249 (constructive trust); FAC ¶ (money had and received); FAC ¶ 261 (replevin). But remedies for such an alleged injury are available to LBSF, if at all, under the Bankruptcy Code. Because LBSF's equitable claims under New York law seek remedies for alleged violations of the Bankruptcy Code, those claims are preempted, and should be dismissed. *See Diamante*, 2001 WL 1217226, at *2; *Knox*, 237 B.R. at 702.

### C.   LBSF's Equitable Claims Are All Barred Because a Contract Controls. (Counts XIII–XVI)

If this Court should reach them, LBSF's equitable claims also fail because a valid contract governs the conduct at issue.

Because LBSF's equitable claims are "obligation[s] the law creates in the absence of any agreement," *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005), the existence of "a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Frito-Lay v. LTC Steel Co.* (*In re Chateaugay Corp.*), 10 F.3d 944, 958 (2d Cir. 1993) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987)); *see, e.g.*, *Superintendent of Ins. v. Ochs* (*In re First Cent. Fin. Corp.*), 377 F.3d 209, 213 (2d Cir. 2004); *Chrysler Capital v. Century Power Corp.*, 778 F. Supp. 1260, 1272 (S.D.N.Y. 1991); *Law*

*Debenture v. Maverick Tube Corp.,* No. 06-cv-14320 (RJS), 2008 WL 4615896, at *12

(S.D.N.Y. Oct. 15, 2008), *aff'd,* 595 F.3d 458 (2d Cir. 2010) (collecting cases). This rule

"preclude[s] a claim for unjust enrichment even against a third party non-signatory to the

agreement." *E.g., Law Debenture,* 2008 WL 4615896, at *12; *Teachers Ins. & Annuity Ass'n of*

*Am. v. CRIIMI MAE Servs. Ltd. P'ship,* 681 F. Supp. 2d 501, 511-12 (S.D.N.Y. 2010), *aff'd,* 481

F. App'x 686 (2d Cir. 2002); *Bellino Schwartz Padob Adver. v. Solaris Mktg. Grp., Inc.,* 635

N.Y.S.2d 587, 588 (App. Div. 1995) ("The existence of an express contract … bars any quasi-

contractual claims … against … a third party nonsignatory to the valid and enforceable contract

….").

Here, the subject matter of LBSF's equitable claims, *i.e.*, the distribution of the Collateral

proceeds pursuant to the Priority Provisions, is plainly governed by written contracts. LBSF

cannot state an equitable claim based on the allegation that the Noteholders "wrongfully" did

what their contracts expressly permitted them to do, *i.e.*, receive payments on account of the

Issuers' obligations to repay them.[50] *See Goldman*, 841 N.E.2d at 746; *Chateaugay Corp.*, 10

F.3d at 958; *First Cent.*, 377 F.3d at 213; *Law Debenture,* 2008 WL 4615896, at *12.

Accordingly, LBSF's unjust enrichment claim cannot lie as a matter of law against any

Defendant. *See Goldman*, 841 N.E.2d at 746; *Chateaugay Corp.*, 10 F.3d at 958; *First Cent.*,

377 F.3d at 213; *Law Debenture,* 2008 WL 4615896, at *12.

The governing contracts are fatal to LBSF's unjust enrichment claim (Count XIII) on the

merits as well. "To prevail on a claim for unjust enrichment in New York, a plaintiff must

establish: (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and

good conscience require restitution." *E.g., Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue*

---

[50] Even in the case of the Pyxis and Federation Transactions, where LBSF alleges that the respective contracts were breached, LBSF's equitable claims are foreclosed by the governing contracts.

*Shield* (*In Re Mid-Island Hosp., Inc.*), 276 F.3d 123, 129 (2d Cir. 2002) (citations and internal

quotation marks omitted); *Farina v. Bastianich*, 984 N.Y.S.2d 46, 49 (1st Dep't 2014).  Here,

despite LBSF's protestations of mistreatment, LBSF has not pled anything that makes it remotely

plausible that "equity" or "good conscience" as conceived by New York courts could compel the

Noteholders to disgorge the repayment of their own money, pursuant to contracts that LBSF

drafted, after LBSF's default collapsed the investment structures that Lehman had created and

sold to them.  *See, e.g.*, *Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.),*

403 F.3d 43, 54-55 (2d Cir. 2005) ("[A] conveyance which satisfies an antecedent debt made the

debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one

creditor over another." (quoting *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 599

N.Y.S.2d 816, 819 (App. Div. 1993))); *Chrysler Credit Corp. v. Kosal,* 518 N.Y.S.2d 162, 164

(App. Div. 1987) ("[T]his is a commercial transaction by business people in a commercial

setting, under terms that are standard in the trade, which factual predicate gives rise to a

presumption of lack of unconscionability.").  Specifically, New York courts routinely enforce

contracts providing for subordination of rights.  *See, e.g.*, *Village Rathskeller*, 147 B.R. at 672.

As a matter of law, LBSF cannot seek to "rewrite contracts that have been negotiated between

sophisticated, counseled commercial entities."  *E.g., Flag Wharf, Inc. v. Merrill Lynch Capital

Corp.,* 836 N.Y.S.2d 406, 406 (App. Div. 2007) (mem.).

Accordingly, all of LBSF's equitable state law claims (Counts XIII-XVI) must be

dismissed.

### D.    Certain Equitable Claims Fail for Other Reasons.  (Counts XIV – XVI)

LBSF's other equitable claims suffer from additional deficiencies that independently

require dismissal.

1.    LBSF's Constructive Trust "Claim" Fails For Lack of a Breached
Promise. (Count XIV)

Under New York law, constructive trust is not a cause of action; it is one of the remedies

for unjust enrichment.  *E.g., Sharp v. Kosmalski,* 351 N.E. 2d 721, 721-23 (N.Y. 1976); *see First*

*Cent.*, 377 F.3d at 212 ("the purpose of the constructive trust is prevention of unjust

enrichment"); *In re Koreag, Controle et Revision S.A v. Refco F/X Assocs., Inc.* (*In re Koreag,*

*Controle et Revision S.A.*), 961 F.2d 341, 352-54 (2d Cir. 1992).  Because LBSF does not have a

viable unjust enrichment claim for the reasons explained in Section V.C above, LBSF is likewise

not entitled to the remedy of a constructive trust.  *See, e.g., In re Lehman Bros. Holdings v.*

*JPMorgan Chase Bank, N.A.*, No. 11-cv-6760 (RJS), 2015 U.S. Dist. LEXIS 137975 at * 68-69

(S.D.N.Y. Sept. 30, 2015) (citing *First Cent.*, 377 F.3d at 212; *David v. Rabuffetti*, No. 08-CV-

5647 (RJS), 2011 WL 1346997, at *6 (S.D.N.Y. Mar. 30, 2011)).

Moreover, the remedy of a constructive trust requires a showing that the plaintiff relied

on the defendant's promise.  *E.g., Koreag,* 961 F.2d at 352; *Bankers Sec. Life Ins. Soc'y v.*

*Shakerdge*, 406 N.E.2d 440, 440-41 (N.Y. 1980).  Here, the parties' promises to each other are

set forth in the governing contracts, and LBSF does not allege that any Defendant breached any

of those promises.[51]  And LBSF is foreclosed from relying on purported "implicit" promises that

do not appear within the four corners of the contracts.  *See, e.g.*, *Greenfield v. Phillies Records,*

*Inc.*, 780 N.E.2d 166, 170-71 (N.Y. 2002); *W.W.W. Assocs., Inc. v. Giancontieri,* 655 N.E.2d

639, 641-43 (N.Y. 1990).  To ignore this fundamental rule of law here would be especially

absurd, where LBSF essentially alleges that the Trustees "implicitly" promised LBSF to breach

their *explicit* promises to the Noteholders to enforce the Priority Provisions.

---

[51] As previously noted, the separate contractual claims asserted with respect to the Pyxis and Federation
Transactions are not the subject of the Motion.

2.      LBSF's Money Had and Received Claim Fails For Lack of an Ownership
Interest.  (Count XV)

LBSF's claim for money had and received is a redundant combination of its claims for

alleged preference, insolvency, and "windfall."  *See* FAC ¶ 255–56.  This claim fails because,

under New York law, money had and received, like unjust enrichment, is not viable where the

parties' rights were governed by a valid contract.  *Cf. Goldman*, 841 N.E.2d at 746; *Chateaugay

Corp.*, 10 F.3d at 958; *First Cent.*, 377 F.3d at 213.

Moreover, a claim for money had and received requires that the defendant possess *money*

in which the plaintiff has a tangible "ownership interest."  *E.g., Mia Shoes, Inc. v. Republic

Factors Corp.*, No. 96 Civ. 7974 (TGP), 1997 WL 525401, at *3 (S.D.N.Y. 1997).  Any interest

that LBSF had in the Collateral was duly satisfied by the distribution of the Collateral in

accordance with the Priority Provisions; but in any event, LBSF does not and cannot allege that

it "owned" the Collateral (which was not money, in any event), much less the Collateral

proceeds.  For this second reason, LBSF's money had and received claim fails as a matter of

law.  *See id.* (dismissing claim, where plaintiff had no ownership interest, but "retained a

contractual right to receive funds … and nothing more"); *Grain Traders, Inc. v. Citibank, N.A.*,

960 F. Supp. 784, 793 (S.D.N.Y. 1997) (dismissing claim, where money was kept in general

account and plaintiff therefore "did not have possession [or title] … at the time" of alleged

misappropriation), *aff'd*, 160 F.3d 97 (2d Cir. 1998).

3.      LBSF's Replevin Claim Fails For Lack of Possession.  (Count XVI)

LBSF's replevin claim is based on the Defendants' alleged failure to honor its "senior

lien" and to "comply with LBSF's demand for immediate possession of the Collateral's

proceeds."  FAC ¶¶ 259–65.  Under New York law, the function of replevin is "to *restore

possession* of a chattel to the person from whom it was *wrongfully taken*."  23 N.Y. Jur. 2d

*Conversion, and Action for Recovery of a Chattel* § 89 (2d ed. 2014) (emphasis added); *see*

*Peters v. Sotheby's Inc.* (*In re Peters*)*,* 821 N.Y.S.2d 61, 65 (App. Div. 2006). LBSF does not

and cannot allege that it ever had "possession" of the Collateral or the Collateral proceeds; it

necessarily follows that these things could not have been "taken" from (and could not be

"restored" to) LBSF. *See* 23 N.Y. Jur. 2d *Conversion* § 89. Accordingly, LBSF's replevin claim

fails as a matter of law.

Moreover, the property sought in replevin must be "specifically identifiable." *Equitable*

*Life Assurance Soc'y of the U.S. v. Branch,* 302 N.Y.S.2d 958, 960 (App. Div. 1969) (replevin

only available for "currency [that] can be specifically identified, for example, where particular

bills are sought to be recovered," and not funds generally); *Cassirer v. Sterling Nat'l Bank & Tr.*

*Co.* (*In re Schick*)*,* 246 B.R. 41, 45 n.7 (Bankr. S.D.N.Y. 2000) ("Since money is fungible,

replevin is not an available remedy [to recover money]."); *In re Saft,* No. 339363, 2009 WL

1957954, *10 (N.Y. Sur. Ct. June 25, 2009) (same). Because LBSF here demands the "tender"

and "immediate possession" of the Collateral proceeds (*i.e.*, money), its replevin claim fails.

### E.  The "Penalty" Claim Must Be Dismissed.  (Count XIX)

LBSF asserts that the application of the Priority Provisions constitutes an unenforceable

"penalty" under New York law. The judicially created penalty doctrine applies only to a

liquidated damages clause – that is, "a provision which requires, in the event of contractual

breach, the payment of a [pre-agreed] sum of money." *Truck Rent-A-Ctr., Inc. v. Puritan Farms*

*2nd, Inc.,* 361 N.E.2d 1015, 1018 (N.Y. 1977); *see, e.g.*, *United Air Lines, Inc. v. Austin Travel*

*Corp.*, 867 F.2d 737, 740 (2d Cir. 1989) (liquidated damages clause pre-determines "the amount

of compensation due in the case of a breach of contract"). The penalty doctrine provides that a

liquidated damages clause that requires "the payment of a sum of money grossly

disproportionate to the amount of actual damages provides for a penalty and is unenforceable."

*Truck Rent-A-Ctr.,* 361 N.E.2d at 1018 (collecting cases).

The Priority Provisions *neither* (a) dictate that LBSF shall pay anything, much less an

amount fixed at the time of contracting, *see id., nor* (b) address a breach of contract by LBSF,

since a default under the swap agreements is not a breach, *see* ISDA Master Agreement § 5(a)

("Breach of Agreement" is only one of eight Events of Default).  The Priority Provisions are not

liquidated damages provisions, and therefore the "penalty" doctrine does not apply to them.

Judge Peck recognized this point, stating in his *Ballyrock* decision, without deciding the issue,

that the priority provision at issue there "does not appear to be an impermissible penalty *because*

*it does not fix damages*, but instead eliminates the right to receive funds that would have been

distributed to LBSF absent a default."  *Ballyrock*, 452 B.R. at 38 n.21 (emphasis added).

Finally, even if the Priority Provisions were liquidated damages clauses, they do not

impose a "penalty" on LBSF as a matter of law.  Judge Pollack squarely addressed and rejected

the very argument that LBSF makes here in the context of another swap counterparty that was in

the money and in default.  *See Drexel Burnham Lambert Prod. Corp. v. Midland Bank PLC,* 92

Civ. 3098 (MP), 1992 WL 12633422, at *2 (S.D.N.Y. Nov. 10, 1992) (walkaway provision was

"neither a penalty, a forfeiture, nor an unjust enrichment" because it merely "[r]equir[ed]

[defaulting party] to forego an unrealized investment gain").

## F.   The New York Fraudulent Conveyance Claims Must Be Dismissed.  (Count XVIII)

LBSF's contrived claims under the New York Uniform Fraudulent Conveyance Act

("NY UFCA") fail as a matter of law on several independent grounds, and should be dismissed.

### 1.   All of the Claims Fail Because LBSF Was Not and Is Not a Creditor of the Issuers.

LBSF alleges that it "is a creditor of the [Issuers] by virtue of its 'in-the-money' position

under the Swap Agreements," and that it "holds matured claims and/or unmatured claims against the [Issuers]." FAC ¶¶ 276-77. These conclusory allegations are incorrect, as a matter of law.

Only a creditor of the defendant at the time of the disputed transfer (or a future creditor) has standing to assert a claim under the NY UFCA. A creditor is "a person having any claim." NY UFCA § 270. Any alleged claim that LBSF had against the Issuers (a) was contingent, and not realized, prior to the Transaction terminations, and (b) upon the Transaction terminations, became a fixed nonrecourse claim entitled to junior priority, which was satisfied when the Collateral proceeds were distributed pursuant to the Priority Provisions (which Priority Provisions are enforceable under New York law). Thus, under New York law, the Issuers have paid LBSF whatever it was owed – LBSF holds no claim (matured or unmatured) against the Issuers, if it ever did. A party that does not have a claim is not a creditor and thus has no standing (and no damages) under the NY UFCA. *See id.*

Because LBSF is not a creditor of the Issuer pursuant to New York law, LBSF has no standing to assert a claim under the NY UFCA, and Count XVIII fails as a matters of law.

2.   LBSF's Constructive Fraudulent Conveyance Claims Fail Because the Issuers Received Fair Consideration and Were Not Insolvent, Undercapitalized or Unable to Pay their Debts.

To prevail on a constructive fraudulent conveyance claim under the NY UFCA, a creditor plaintiff must prove that the defendant (a) did not receive fair consideration, NY UFCA § 272, and (b) either (i) was insolvent, *id.* § 273, (ii) was undercapitalized, *id.* § 274, or (iii) intended to be unable to pay its debts, *id.* § 275. Not one of these conditions applies to the Issuers, before or after the dates when the respective Transactions were terminated.

*First*, LBSF cannot show that the Issuers did not receive "fair consideration" for the disputed transfer. Under the NY UFCA, fair consideration exists, as a matter of law, where in exchange for the disputed transfer "an antecedent debt is satisfied." *Id.* § 272(a). Here, because

72

the Issuers indisputably transferred the Collateral proceeds to the Noteholders to repay the

antecedent debt evidenced by the Notes, the Issuers received fair consideration as a matter of

law.  *See id.*; *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 633 (2d Cir. 1995).  Although LBSF

alleges that the Notes were worth far less than the amount repaid (*see* FAC ¶ 279), this is

immaterial because every dollar paid cancelled a dollar of debt.

        *Second*, LBSF cannot show, as it must, that the Issuers were or were rendered insolvent,

undercapitalized or intended to be unable to pay their debts, for the simple reason that no creditor

had recourse to the Issuers.  It is undisputed that LBSF and the Noteholders both had recourse

only to the Collateral, secured by the lien held by the Trustees for the benefit of the Secured

Parties.  Beyond enforcing the liens and recovering the Collateral proceeds pursuant to the

Priority Provisions, LBSF and the Noteholders had no potential claim against the Issuers.  Upon

the Transaction termination, the Issuers had no individual debts, and the value of the Collateral

was by definition the same as the value of LBSF's and the Noteholders' collective claims.

Accordingly, the Issuers were not insolvent or undercapitalized nor did they intend to be unable

to pay their debts.

        For each of these reasons, LBSF's constructive fraudulent transfer claim under the NY

UFCA (Count XVIII) fails as a matter of law.

        3.        LBSF's Intentional Fraudulent Conveyance Claims Fail Due to Lack of
                  Intent to Defraud.

        The fact that the distribution of Collateral proceeds repaid the Issuers' legitimate debt to

an arms-length counterparty pursuant to the governing contract is also fatal to LBSF's intentional

fraudulent transfer claim under NY UFCA § 276.  For this reason, LBSF also cannot and does

not allege the requisite fraudulent intent under Rule 9(b).  *See* Fed R. Civ. P. 9(b) (requiring

claimant to "state with particularity the circumstances constituting fraud").

The "badges of fraud" alleged by LBSF in this context amount to nothing more than allegations that the Issuers and Trustees intended (as the Transaction Documents required) to repay the Noteholders instead of paying LBSF.  *See* FAC ¶¶ 282-94.  But courts have held that such an allegation is insufficient to state a claim under the NY UFCA.  *Sharp,* 403 F.3d at 54-55, 56 (dismissing constructive and intentional fraudulent transfer claims where transfer merely satisfied preexisting debt); *accord Boston Trading Grp., Inc. v. Burnazos,* 835 F.2d 1504, 1510-11 (1st Cir. 1987) (interpreting Massachusetts version of UFCA then in effect).  This principle has only been called into question in cases involving insider dealing or Ponzi schemes, neither of which is at issue here.  *See, e.g.*, *Picard v. Katz,* 462 B.R. 447, 453-54 (S.D.N.Y. 2011).

LBSF does not allege that the Issuers acted with fraudulent intent.  Instead, LBSF argues for a two-step imputation of the Noteholders' intent from the Noteholders to the Trustee to the Issuers.  FAC ¶ 292.  Even if the Noteholders' intent is considered relevant, they cannot be said to have "controlled" the Issuers any more than they can be said to have "controlled" the Transaction Documents that gave them every right to seek repayment.  Thus, the Noteholders' receipt of payments in accordance with their contractual rights cannot support an actual intent to defraud anyone under the NY UFCA.  *See, e.g.*, *Sharp,* 403 F.3d at 54-55; *Ultramar,* 599 N.Y.S.2d at 819; *Boston Trading,* 835 F.2d at 1510-11; *cf. Brentwood Lexford Partners*, 292 B.R. at 265  ("The transfer of funds to accomplish contractual obligations … does not constitute a transfer made with the intent to hinder or delay creditors."); *Loomer*, 222 B.R. at 623 ("[T]he inference of fraudulent intent is rebutted by the fact that these transfers were simply payments on a bona fide preexisting loan.").

Accordingly, LBSF does not allege *any* intent to defraud, much less with particularity, and also fails to satisfy Rule 9(b).  The Issuers, Trustees and Noteholders all merely followed

and enforced the governing contracts that Lehman drafted.  *See* Section IV.A.5 above.

For each of these independent reasons, LBSF's intentional fraudulent transfer claims under the NY UFCA (Count XVIII) fail as a matter of law and must be dismissed.

## VI.    Threshold Statute of Limitations Issues Require the Dismissal of Numerous Defendants as a Matter of Law.  (All Noteholder Relevant Counts)

LBSF filed this purported class action on September 14, 2010, nearly two years after each of LBHI's and LBSF's petition dates and the various distributions that LBSF now seeks to recover.  However, LBSF neither named nor served a large number of Noteholder Defendants until it filed its Second Amended Complaint on July 23, 2012, and named even more Defendants for the first time in the subsequent Third and Fourth Amended Complaints.[52]  These Noteholder Defendants were not sued until well after the expiration of the two-year limitations period embodied in Sections 546(a) and 549(d) of the Bankruptcy Code that is applicable to all of LBSF's claims.  Accordingly, many of the Noteholder Defendants have statute of limitations-based defenses that turn on pure questions of law, the resolution of which will finally dispose of (or, at a minimum, streamline the resolution of) LBSF's claims.[53]

LBSF relies upon three devices in an effort to avoid the clear applicability of the Bankruptcy Code's two-year limitations periods.  First, LBSF has filed the case as a putative class action under Fed. R. Civ. P. 23 in an effort to apply *American Pipe* tolling to this defendant class action and extend the limitations period indefinitely.  Second, LBSF employs the artifice of asserting unsustainable state law equitable causes of action in an effort to benefit from the six-year limitations period that LBSF argues applies to those claims.  The State Law Claims are pre-

---

[52] Appendix B to this Motion lists the "Late-Named Noteholders" that are currently named as noteholder defendants in the Complaint.

[53]  Many of the Noteholder Defendants also have fact-based statutes of limitations defenses and reserve the right to raise them, if necessary, at a later appropriate stage in these proceedings as contemplated by the Second Scheduling Order.  Second Scheduling Order, ¶ 22.

empted by the Bankruptcy Code and cannot withstand the primacy of the purely contractual

relationship between the parties.  Third, LBSF asserts duplicative avoidance claims in the guise

of a claim for a declaratory judgment, attempting to assert these time-barred claims without

reference to their statutes of limitations.  Each of these attempts at sleight of hand fails as a

matter of law.

A. ***American Pipe* Tolling Cannot Extend the Limitations Period in a Defendant Class Action.**

LBSF seeks an extension of the class-action tolling doctrine announced in *American Pipe*

*& Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), to this purported defendant class action.

FAC ¶¶ 31, 88.  *American Pipe* involved a *plaintiff* class action; neither the Supreme Court nor

the Second Circuit has ever extended *American Pipe* to toll the statute of limitations as to the

members of a defendant class, and  numerous courts have recognized that *American Pipe* tolling

cannot reflexively apply to members of a putative defendant class.[54]

The argument that the filing of a putative class action complaint should toll the statute of

limitations otherwise protecting absent defendant class members reflects a fundamental

misunderstanding both of *American Pipe* and of the purposes of a statute of limitations.  A

---

[54] *Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140, 155 (E.D. Pa. 1976) (*American Pipe* "tolling doctrine can only be applied to defendants as of the time they were added as party defendants in one of the complaints filed by plaintiffs"); *Meadows v. Pac. Inland Sec. Corp.*, 36 F. Supp. 2d 1240, 1249 (S.D. Cal. 1999) (dismissing as untimely claims against class defendants that were not provided actual notice of the claims until after expiration of the limitations period); *Jenson v. Allison Williams Co*., No. 98-CV-2229 TW (JWS), 1999 WL 35133748, at *5 (S.D. Cal. Aug. 23, 1999) (considering decisions applying *American Pipe* to defendant classes, and concluding that "the court will suspend the statute of limitations against an unnamed class defendant ultimately added as a defendant on the date the defendant knew it was included [as] a class defendant in the class action"); *Robinson v. Fountainhead Title Grp. Corp*., 447 F. Supp. 2d 478, 484 (D. Md. 2006) (refusing to apply *American Pipe* tolling and dismissing plaintiff's complaint against a new defendant putatively of the class, where new defendant did not receive notice of action until after one-year statute of limitations expired).  Although, as set forth in this section, the Noteholder Defendants maintain that the statute of limitations in a defendant class action may be satisfied as to individual defendants only by naming them and serving them with process or by obtaining class certification and providing class notice under the Federal Rules within the limitations period, should the Court rule that some other form of "actual notice" is sufficient, the Noteholder Defendants reserve their rights to raise this and other such defenses individually or as a smaller group as contemplated by the Second Scheduling Order.

76

statute of limitations requires a plaintiff who has a grievance to actually bring suit – and not just

to provide notice of a potential claim – within the limitations period.  *See, e.g.*, 11 U.S.C. §

546(a)(1) (requiring that an action under the relevant sections "be commenced" within the

limitations period).  It is designed to ensure peace and stability in legal relations – either suit is

brought within the limitations period and the defendant has the opportunity to defend itself or, if

suit is not brought, the parties' rights are deemed established.  *Gabelli v. SEC*, 133 S. Ct. 1216,

1221 (2013) (statutes of limitations embody a purpose of repose that is "vital to the welfare of

society" and provides "security and stability to human affairs" quoting *Wood v. Carpenter*, 101

U.S. 135, 139 (1879)); *see also id.* (describing "the basic policies of all limitations provisions:

repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and

a defendant's potential liabilities" (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)).

In the context of a plaintiff class action, however, the Supreme Court in *American Pipe*

recognized that the statute of limitations could place putative class members in a dilemma,

forcing class members who were concerned that class certification would be denied to file

individual actions in order to avoid the running of the statute of limitations.  414 U.S. at 553-54.

In holding that the filing of a timely class action complaint "suspends the applicable statute of

limitations as to all asserted members of the class," the Supreme Court reconciled the competing

demands of a plaintiff class action with the rights of defendants in a manner that did not run

afoul of the defendant's right to be free of "stale claims" and "surprises through the revival of

claims that have been allowed to slumber until evidence has been lost, memories have faded, and

witnesses have disappeared."  *Id.* at 544 (quoting *Order of R.R. Telegraphers v. Ry. Express

Agency*, 321 U.S. 342, 348-49 (1944)).

In *American Pipe*, tolling did not prejudice the interests of any of the putative class

members – they were given the benefit of either having the named plaintiffs timely prosecute the

action for them or the option of filing their own action.  Nor did the Supreme Court's ruling

abridge the rights of any defendants under the statute of limitations because they were still

afforded the right that the statute of limitations protects – to be sued within the limitations period

and to have an opportunity to defend the allegations against them.  *Id.* at 555.  As explained by

the Court in a later decision:

> Limitations periods are intended to put defendants on notice of
> adverse claims and to prevent plaintiffs from sleeping on their
> rights, but these ends are met when a [plaintiff] class action is
> commenced… .  [A] class complaint "notifies the defendants not
> only of the substantive claims being brought against them, but also
> of the number and generic identities of the potential plaintiffs who
> may participate in the judgment."

C*rown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 352-53 (1983) (citations omitted) (quoting

*American Pipe*, 414 U.S. at 555).  If not named in a complaint, the defendants' rights were

considered settled.  *See Arneil v. Ramsey*, 550 F.2d 774, 782 n.10 (2d Cir. 1977) ("[N]othing in

American Pipe suggests that the statute be suspended from running in favor of a person *not

named as a defendant* in the class suit, and we decline to extend the rule." (emphasis added)),

*overruled on other grounds by Crown, Cork & Seal*, 462 U.S. 345.

By contrast, the extension of *American Pipe* sought by LBSF – tolling in the context of a

defendant class action – would not address the same concerns or correspond with the rationale

that underlies *American Pipe*, and it would abridge rather than preserve the rights of the

Defendants.  First, unlike a defendant in a plaintiff class action, an unnamed defendant in an

uncertified defendant class action does *not* have "notice" of the claims against it in the manner

held to be constitutionally sufficient notice from time immemorial – through formal service of

process.  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 351 (1999)

78

("[T]he summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forego procedural or substantive rights."); *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2379 (2011) (agreeing that it would be "surely erroneous" to assert "that a nonnamed class member is a party to the class-action litigation before the class is certified" (emphasis omitted)).[55]

Second, to leave a defendant's rights undetermined for an indefinite period of time as long as the plaintiff deferred class certification would frustrate the purposes of a statute of limitations. In essence, a plaintiff could manufacture its own statute of limitations by filing a defendant class action and deferring its motion for class certification, as it appears LBSF is attempting to do here. The Second Circuit has rejected similar efforts to extend *American Pipe* tolling in a fashion that could leave defendants' rights unsettled "for years." *See Giovanniello v. ALM Media, LLC*, 726 F.3d 106, 118-119 (2d Cir. 2013) (rejecting plaintiff's argument for tolling during pendency of appeal from denial of class certification, "emphasiz[ing] the need for a bright-line rule in this area of law," given that "*American Pipe* tolling is an exception to the operation of an applicable statute of limitations" that "represent[s] a careful balancing of the interest of plaintiffs, defendants, and the court system," and noting that "[s]ome members of the Supreme Court have expressed concern that *American Pipe* tolling might be abused" (internal quotations omitted)).

The extension of *American Pipe* to defendant class actions also is not necessary to preserve Rule 23 or the concept of a defendant class action, as the Supreme Court determined

---

[55] *See also Prewitt Enters., Inc. v. OPEC*, 353 F.3d 916, 924-225 (11th Cir. 2003) ("Due process under the United States Constitution requires that 'before a court may exercise personal jurisdiction over a defendant, *there must be more than notice to the defendant … .*' In other words, *an individual or entity 'is not obliged to engage in litigation unless [officially] notified of the action … under a court's authority, by formal process.'*" (emphasis added) (alterations in original) (quoting *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987); *Murphy Bros.*, 526 U.S. at 347)).

was appropriate in the context of a plaintiff class action.  There is no concern here about the

filing of many individual actions by multiple plaintiffs seeking to preserve their claims from the

running of the statute of limitations.  Under Rule 23, a plaintiff with a grievance against a group

of defendants can potentially satisfy the statute of limitations in two different ways:  it can do so

in the conventional manner, naming and serving all of the defendants in a lawsuit and giving

them an opportunity to defend themselves within that limitations period; or it can file a defendant

class action, obtain certification and provide class notice under Rule 23(c)(2) within the

limitations period to make them formal "class members."  What a plaintiff such as LBSF cannot

do is *neither* name and serve the defendants, *nor* obtain class certification and provide class

notice within the limitations period, leaving open the limitations period beyond that set by

statute.  *See Chevalier,* 72 F.R.D. at 155 & n.45  (holding that tolling "can only be applied to

defendants as of the time they were added as party defendants in one of the complaints filed by

plaintiffs," and finding it irrelevant that the unnamed defendants might have been aware that they

were members of a putative class, since "[i]t is not until a class is certified and notice sent that

members are expected to be aware of the action or exercise any of the attendant rights or

duties"); *see also Murphy Bros.*, 526 U.S. at 350 ("[O]ne becomes a party officially, and is

required to take action in that capacity, *only upon service of a summons or other authority

asserting measure* stating the time in which the party served must appear and defend." (emphasis

added)).

       Thus, *American Pipe* tolling cannot apply in a defendant class action.  The need to avoid

multiple filings by plaintiffs concerned with preserving their claims does not exist, and the

application of tolling would violate the rights of defendants to receive notice and a full

opportunity to defend the claims against them within the statute of limitations period.

**B.**     **The Declaratory Judgment Act Claims Are Subject to Two-Year Statutes of Limitations (Counts I–III)**

LBSF argues that its claims under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02

(the "DJA"), seeking a determination that the Priority Provisions are unenforceable *ipso facto*

clauses and/or that those clauses or the transfers of Collateral to the Noteholder Defendants

violate the automatic stay (Counts I–III), are not subject to any statute of limitations at all.  This

argument should fail; the DJA claims are disguised avoidance claims, which are substantively

governed by Sections 546 and 549 and are therefore bound by the statutes' two-year limitations

period.

Because a declaratory judgment action is a procedural device used to vindicate

substantive rights, it is time-barred if relief on a direct claim based on such rights also would be

barred.  *Stone v. Williams*, 970 F.2d 1043, 1048 (2d. Cir. 1992).  The limitations period for

claims under the DJA is determined by "the basic nature of the suit in which the issues involved

would have been litigated if the [DJA] had not been adopted."  *118 East 60th Owners, Inc. v.

Bonner Props., Inc.*, 677 F.2d 200, 202 (2d Cir. 1982) (quoting *Romer v. Leary*, 425 F.2d 186,

188 (2d Cir. 1970).  As explained by the Second Circuit:  "When the declaratory judgment

sought by a plaintiff would declare his entitlement to some affirmative relief, *his suit is time-

barred if the applicable limitations period has run on a direct claim to obtain such relief*."  *Id.*

(emphasis added); *see Gilbert v. City of Cambridge*, 745 F. Supp. 42, 47 (D. Mass. 1990) ("The

statute of limitations … may not be sidestepped simply by labelling an action one for declaratory

or injunctive relief, rather than one for damages.  Instead, courts look to the 'substance of a

claim' and '[i]f this examination reveals that a claim for declaratory relief could have been

resolved through another form of action which has a specific limitations period, the specific

period of time will govern.'" (alteration in original) (quoting *Town of Orangetown v. Gorsuch*, 718 F.2d 29, 42 (2d Cir. 1983))).

Here, the substance of LBSF's declaratory-judgment claims is an effort to collect funds allegedly improperly transferred to the Noteholders – relief that Congress has expressly provided for in the Bankruptcy Code, either under Sections 547 and 548 (for prepetition transfers) or Section 549 (for postpetition transfers). It is immaterial that LBSF has asserted such claims in the "alternative" in Counts IV through IX, or that in those counts LBSF purports to seek to avoid the transfer of its "right to Senior Payment Priority." FAC ¶¶ 151, 153–54, 167, 189, 207, 216. What matters is that the declaratory judgments that LBSF seeks are simply a means to avoid the disputed transfers and recover the money transferred. Such avoidance claims are barred against the Late-Named Noteholders by the two-year statute of limitations. *See* 11 U.S.C. §§ 546(a)(1), 549(d)(1); *118 East 60th Owners,* 677 F.2d at 202; *Gilbert,* 745 F. Supp. at 47.

The Bankruptcy Code's two-year statutes of limitations for avoidance claims apply to bankruptcy-related claims to recover funds of the debtor, however designated or pled. *See* 11 U.S.C. §§ 546(a), 549(d). In *Michaels v. National Bank of Sussex County (In re E-Tron Corp.)*, 141 B.R. 49 (Bankr. D.N.J. 1992), the court held that a claim for money transferred in violation of the automatic stay (which has no express limitations period in the Bankruptcy Code) was subject to the two-year statute of limitations period under Section 549; otherwise, Congress's intent to limit the time in which the debtor may recover disputed postpetition transfers would be frustrated. *Id.* at 55; *see also Peterson v. Imhof*, No. 2:13-cv-00537, 2013 WL 5567561, at *3 (D.N.J. Oct. 8, 2013) (applying two-year statute of limitations under Section 549 to claim that defendants violated the automatic stay by transferring plaintiff's property interest); *Rosen v. Dahan (In re Minh Vu Hoang)*, 469 B.R. 606, 616-21 (D. Md. 2012) ("[A]lthough § 542 does

not include a statute of limitations, it is effectively subject to the limitations period provided in §

549(d) with respect to property transferred post-petition that might have otherwise been drawn

back into the estate.").[56]

Thus, the Court must look to the *substance* of LBSF's *ipso facto* and automatic stay

claims, which are at their core avoidance actions under bankruptcy law, and apply the two-year

limitations period provided for under Bankruptcy Code Sections 547, 548, and 549.

Recognizing the weakness of its argument, LBSF also has suggested that its claims

should be "governed by the local time limitation most analogous to the case at hand," and so this

Court should apply the six-year limitation period for claims without an explicit limitations period

under New York law.  *See* Dkt. No. 948 at 2 (citing N.Y. C.P.L.R. 213(1)).  But no case supports

applying a miscellaneous state law statute of limitations to causes of action that wholly rely upon

the Bankruptcy Code to invalidate otherwise enforceable contract provisions.

**C.      The Turnover Claims are Subject to Two-Year Statutes of Limitations.
            (Counts X–XII)**

As discussed in Section IV.B above, LBSF's turnover claims under Section 542 (Counts

X-XII) are also essentially claims to avoid alleged transfers of LBSF's priority interests or the

Collateral.  Accordingly, those claims are likewise subject to the two-year limitations period for

---

[56] The only decision that LBSF has previously identified in which the court held that a declaratory judgment claim to invalidate a contractual provision under the *ipso facto* statutes was not subject to the two-year limitation period is inapplicable.  *See* Dkt. No. 948 (citing *DiCello v. United States* (*In re Ry. Reorganization Estate, Inc.*), 133 B.R. 578 (Bankr. D. Del. 1991)).  *DiCello* did not involve an effort to avoid a transfer and recover funds.  In *DiCello*, the bankruptcy trustee sought a declaratory judgment that the defendant's attempt to enforce "springing liens" against property of the bankruptcy estate was invalid under the *ipso facto* provisions of Sections 363(*l*) and 541(c)(1)(B).  The court rejected the defendant's claim that the proceeding was time-barred under the two-year statute of limitations provided by Section 546(a), holding that the case was not "a disguised avoidance action."  *Id.* at 582.  Rather, the trustee in that case was only seeking a determination that cash *already in possession of the estate* could not be encumbered by a defendant's lien that was triggered solely by the debtor's bankruptcy filing.  *See id.* at 583.  In a word, the debtor in *DiCello* was using the Bankruptcy Code provisions that invalidate *ipso facto* clauses as a shield.  *See id.*  In contrast, LBSF is not seeking to block a creditor's collection efforts; LBSF is seeking itself to recover funds that it asserts were improperly transferred to the noteholders – which is for all intents and purposes an avoidance claim and hence is subject to the two-year look-back period.

avoidance claims under section 546. *See, e.g., Barkley v. West (In re West)*, 474 B.R. 191, 202

(Bankr. N.D. Miss. 2012) (applying the two-year statute of limitations to the turnover provisions

of section 542); *Rosen*, 469 B.R. at 616-21 ("[A]lthough § 542 does not include a statute of

limitations, it is effectively subject to the limitations period provided in § 549(d) with respect to

property transferred post-petition that might have otherwise been drawn back into the estate.").

> **D.    The State Law Claims Are Subject to the Bankruptcy Code's Two-Year Statute of Limitations. (Counts XIII–XIX)**

LBSF's assertion of purported state law causes of action as a device for clawing back

payments made to the Noteholders is a further attempt to avoid the two-year look-back period for

avoidance actions.  That artifice should fail.

The Second Circuit has recognized that "[t]he United States Bankruptcy Code provides a

comprehensive federal system of penalties and protections to govern the orderly conduct of

debtors' affairs and creditors' rights," and has held that state law claims alleging non-compliance

with the automatic stay – much like LBSF's claims in this case – are preempted by bankruptcy

law. *See E. Equip. Servs. Corp. v. Factory Point Nat'l Bank*, 236 F.3d 117, 120 (2d Cir. 2001).

Subsequent decisions acknowledge that the "broad scope of bankruptcy preemption" recognized

in *Eastern Equipment* "relate[s] to all aspects of the bankruptcy process, not just the automatic

stay provision." *Astor Holdings, Inc. v. Roski*, 325 F. Supp. 2d 251, 262 (S.D.N.Y. 2003).

Virtually all of LBSF's State Law Claims are premised on alleged violations of federal

bankruptcy law because they all allege conduct that was undisputedly consistent with the

governing contracts and could only be considered "unlawful" or "unjust" to the extent provisions

in those contracts either violated, or were rendered unenforceable by, the Bankruptcy Code. *See*

Section V.B above.  Thus, because LBSF's State Law Claims are premised on Bankruptcy Code

violations, the Bankruptcy Code's remedies *and* limitations period apply. *See, e.g., Barr v.*

*Charterhouse Grp. Int'l, Inc.* (*In re Everfresh Beverages, Inc.*), 238 B.R. 558, 573 (Bankr.

S.D.N.Y. 1999) (holding that a New York fraudulent conveyance claim was time-barred based

on the two-year statute of limitations applicable under Section 546(a), which preempted the six-

year limitations period available under state law); *Smith v. Am. Founders Fin. Corp.*, 365 B.R.

647, 677-79 (S.D. Tex. 2007) (four-year statute of repose on Texas fraudulent transfer avoidance

claims was preempted by the two-year limit of Section 546(a)); *Naturally Beautiful Nails, Inc. v.*

*Bay Area Capital, Inc.* (*In re Naturally Beautiful Nails, Inc.*), 243 B.R. 827, 828-29 (Bankr.

M.D. Fla. 1999) (two-year limitations period in the Bankruptcy Code governed and barred claim

filed under Florida's Uniform Fraudulent Transfer Act, which had a four-year limitation period).

Accordingly, like LBSF's Bankruptcy Code claims, its State Law Claims based on those same

violations are preempted and also time-barred by the Bankruptcy Code's two-year statute of

limitations.[57]

## VII.   **Conclusion**

For the reasons set forth herein, the Court should grant the Motion and dismiss the

Noteholder Relevant Counts in the Complaint with respect to the Noteholder Defendants and all

other party Defendants.

---

[57] As noted elsewhere in this Motion, LBSF also has filed declaratory judgment and state law contract claims in respect of the Pyxis and Federation Transactions, alleging that those Transactions were not properly terminated in accordance with the terms of their indentures.  FAC ¶¶ 306–13, 318–27, 328–38.  However, the claims relating to the Federation Transactions were added for the first time in the Fourth Amended Complaint filed on October 13, 2015, nearly seven years after the distributions in the Federation Transactions were made on October 30, 2008. Accordingly, the Federation-specific counts (Count XXIV and XXV), each of which sounds in contract, were filed after the expiration of the six-year statute of limitations and are untimely.  Although those claims apply to only a small number of defendants, and the Motion otherwise addresses only defenses common to a majority of the Noteholder Defendants, the Noteholder Defendants raise this issue now in the interest of judicial efficiency.

Dated: December 14, 2015                          Respectfully Submitted,

| ALLEN & OVERY LLP | BALLARD SPAHR LLP |
|---|---|
| By: _/s/ Laura R. Hall_____<br>Laura R. Hall<br>laura.hall@allenovery.com<br>1221 Avenue of the Americas<br>New York, New York 10020<br>(212) 610-6300 (phone)<br>(212) 610-6399 (fax)<br><br><br>*Attorneys for HSBC Issuer Services Common Depository Nominee (UK) Limited* | By: _/s/ William A. Slaughter_____<br>William A. Slaughter<br>slaughter@ballardspahr.com<br>Jon T. Pearson<br>pearsonj@ballardspahr.com<br>1735 Market Street, 51st Floor<br>Philadelphia, PA 19103<br>(215) 864-8114 (phone)<br>(215) 864-8999 (fax)<br><br>*Attorneys for First Northern Bank & Trust Co.* |
| CHADBOURNE & PARKE LLP | CHAFFETZ LINDSEY LLP |
| By: _/s/ David LeMay_____<br>David M. LeMay<br>dlemay@chadbourne.com<br>Christy Rivera<br>crivera@chadbourne.com<br>1301 Avenue of the Americas<br>New York, New York 10019-6022<br>(212) 408-5100 (phone)<br>(212) 541-5369 (fax)<br><br>*Attorneys for AIG, Inc.* | By: _/s/ Scott W. Reynolds_____<br>Scott W. Reynolds<br>scott.reynolds@chaffetzlindsey.com<br>1700 Broadway<br>33rd Floor<br>New York, New York 10019<br>(212) 257-6925 (phone)<br>(212) 257-6950 (fax)<br><br>*Attorneys for Natixis Financial Products LLC* |

| | |
|---|---|
| CHAPMAN AND CUTLER LLP<br><br>By: /s/ Franklin H. Top III_____<br>Franklin H. Top III<br>top@chapman.com<br>111 West Monroe Street<br>Chicago, Illinois 60603<br>(312) 845-3824 (phone)<br>(312) 516-1824 (fax)<br>top@chapman.com<br><br>*Attorneys for U.S. Bank National Association, not individually but solely as successor Trustee under trust agreements for certain notes or certificates issued by Class V Funding III, Ltd., Klio II Funding, Ltd., Klio III Funding, Ltd., Whitehawk CDO Funding, Ltd., Diversey Harbor ABS CDO, Ltd., Montrose Harbor CDO I, Ltd., Pinnacle Point Funding Ltd.* | CLEARY GOTTLIEB STEEN & HAMILTON LLP<br><br>By: /s/ Carmine D. Boccuzzi, Jr. __<br>Carmine D. Boccuzzi, Jr.<br>cboccuzzi@cgsh.com<br>Brent Tunis<br>btunis@cgsh.com<br>Emily Balter<br>ebalter@cgsh.com<br>One Liberty Plaza<br>New York, New York 10006<br>(212) 225-2000 (phone)<br>(212) 225-3999 (fax)<br><br>*Attorneys for Goldman, Sachs & Co. and Goldman Sachs International* |
| CLEARY GOTTLIEB STEEN & HAMILTON LLP<br><br>By: /s/ Lewis J. Liman ___<br>Lewis J. Liman<br>lliman@cgsh.com<br>Matthew Gurgel<br>mgurgel@cgsh.com<br>One Liberty Plaza<br>New York, New York 10006<br>(212) 225-2000 (phone)<br>(212) 225-3999 (fax)<br><br>*Attorneys for ANZ Nominees Limited and Morgans Financial Limited* | CLEARY GOTTLIEB STEEN & HAMILTON LLP<br><br>By: /s/ Jeffrey A. Rosenthal___<br>Jeffrey A. Rosenthal<br>jrosenthal@cgsh.com<br>One Liberty Plaza<br>New York, New York 10006<br>(212) 225-2000 (phone)<br>(212) 225-3999 (fax)<br><br>*Attorneys for Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch International* |

| | |
|---|---|
| CRAVATH, SWAINE & MOORE LLP<br><br>By: /s/ Michael A. Paskin_____<br>Richard W. Clary<br>rclary@cravath.com<br>Michael A. Paskin<br>mpaskin@cravath.com<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019<br>(212) 474-1000 (phone)<br>(212) 474-3700 (fax)<br><br>*Attorneys for Credit Suisse Securities (USA)*<br>*LLC and Credit Suisse Securities (Europe) Ltd.* | DEBEVOISE & PLIMPTON LLP<br><br>By: /s/ Shannon Rose Selden____<br>Shannon Rose Selden<br>srselden@debevoise.com<br>Christopher K. Tahbaz<br>cktahbaz@debevoise.com<br>Zheng Wang<br>zwang@debevoise.com<br>919 Third Ave.<br>New York, NY 10022<br>(212) 909-6000 (phone)<br>(212) 909-6836 (fax)<br><br>*Attorneys for AIA International Ltd.* |
| FROST BROWN TODD LLC<br><br>By: /s/ Nelson Alexander_____<br>Nelson Alexander<br>nalexander@fbtlaw.com<br>201 North Illinois Street<br>Suite 1900<br>Indianapolis, IN 46204<br>317-237-3800 (phone)<br>317-237-3900 (fax)<br><br>Arron M. Bernay<br>abernay@fbtlaw.com<br>Ronald Eric Gold<br>rgold@fbtlaw.com<br>3300 Great American Tower<br>301 East Fourth Street<br>Cincinnati, OH 45202<br>(513) 651-6800 (phone)<br>(513) 651-6981 (fax)<br><br>*Attorneys for Ohio Public Employee*<br>*Retirement System* | GRAY, PLANT, MOOTY, MOOTY &<br>BENNETT, P.A.<br><br>By: /s/ Phillip Bohl_____<br>Phillip Bohl<br>Phillip.Bohl@gpmlaw.com<br>Kathryn J. Bergstrom<br>kathryn.bergstrom@gpmlaw.com<br>Brian A. Dillon<br>brian.dillon@gpmlaw.com<br>500 IDS Center<br>80 South 8th Street<br>Minneapolis, MN 55402<br>(612) 632-3000 (phone)<br>(612) 632-4444 (fax)<br><br>*Attorneys for MoneyGram Securities, LLC and*<br>*its successors in interest* |

| | |
|---|---|
| HOGAN LOVELLS US LLP<br><br>By: /s/ Peter Ivanick<br>Peter Ivanick<br>peter.ivanick@hoganlovells.com<br>Daniel Lanigan<br>daniel.lanigan@hoganlovells.com<br>875 Third Avenue<br>New York, New York 10022<br>(212) 918-5560 (phone)<br>(212) 918-3100 (fax)<br><br>CHAFFETZ LINDSEY LLP<br><br>By: /s/ Scott W. Reynolds<br>Scott W. Reynolds<br>scott.reynolds@chaffetzlindsey.com<br>1700 Broadway<br>33rd Floor<br>New York, New York 10019<br>(212) 257-6925 (phone)<br>(212) 257-6950 (fax)<br><br><br>*Attorneys for SCOR Reinsurance Company*<br>*and General Security National Insurance*<br>*Company* | HUNTON & WILLIAMS LLP<br><br>By: /s/ Joseph J. Saltarelli<br>Joseph J. Saltarelli<br>jsaltarelli@hunton.com<br>200 Park Avenue<br>New York, NY 10166<br>(212) 309-1091 (phone)<br>(212) 309-1100 (fax)<br><br>-and-<br><br>Shannon E. Daily<br>sdaily@hunton.com<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, VA 23219<br>(804) 788-8200 (phone)<br>(807) 788-8218 (fax)<br><br>*Attorneys for Shenandoah Life Insurance Co.* |
| JACKSON WALKER LLP<br><br>By: /s/ Patricia B. Tomasco<br>Patricia B. Tomasco<br>ptomasco@jw.com<br>Emilio B. Nicolas<br>enicolas@jw.com<br>100 Congress Avenue, Suite 1100<br>Austin, Texas 78701<br>(512) 236-2000 (phone)<br>(512) 236-2001 (fax)<br><br><br>*Attorneys for RGA Reinsurance Company, Inc.* | K & L GATES LLP<br><br>By: /s/ John A. Bicks<br>John A. Bicks<br>john.bicks@klgates.com<br>Brian D. Koosed<br>brian.koosed@klgates.com<br>Priya Chadha<br>priya.chadha@klgates.com<br>599 Lexington Avenue<br>New York, NY 10022-6030<br>(212) 536-3900 (phone)<br>(212) 536-3901 (fax)<br><br>*Attorneys for The Daegu Bank, Ltd., Nonghyup*<br>*Bank and Shinhan Bank* |

| | |
|---|---|
| KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.<br><br>By: /s/ Matthew J. Gold<br>Marc R. Rosen<br>mrosen@kkwc.com<br>Matthew J. Gold<br>mgold@kkwc.com<br>551 Fifth Avenue, 18th Floor<br>New York, New York 10176<br>(212) 986-6000 (phone)<br>(212) 986-8866 (fax)<br><br>*Attorneys for Elliott International, L.P. and The Liverpool Limited Partnership* | MAYER BROWN LLP<br><br>By: /s/ Christopher J. Houpt<br>Christopher J. Houpt<br>choupt@mayerbrown.com<br>1221 Avenue of the Americas<br>New York, NY 10020-1001<br>(212) 506-2380 (phone)<br>(212) 849-5830 (fax)<br><br><br>*Attorneys for Société Générale Investment Corp.* |
| McCARTER & ENGLISH, LLP<br><br>By: /s/ David Adler<br>David Adler<br>dadler@mccarter.com<br>245 Park Avenue, 27th Floor<br>New York, New York 10167<br>(212) 609-6800 (phone)<br>(212) 609-6921 (fax)<br><br>-And-<br><br>Katharine L. Mayer<br>kmayer@mccarter.com<br>McCarter & English, LLP<br>Renaissance Centre<br>405 N. King Street, Suite 800<br>Wilmington, Delaware 19801<br>(302) 984-6300 (phone)<br>(302) 984-6399 (fax)<br><br>*Attorneys for Security Benefit Life Insurance Company* | MCGUIRE WOODS LLP<br><br>By: /s/ John H. Thompson<br>John H. Thompson<br>jthompson@mcguirewoods.com<br>McGuireWoods LLP<br>2001 K Street N.W.<br>Suite 400<br>Washington, DC 20006-1040<br>(202) 983-2474 (phone)<br>(202) 828-2976 (fax)<br><br><br><br><br><br><br><br><br><br>*Attorneys for Garadex Inc., Gatex Properties Inc., and Morgan Stanley & Co. Incorp. n/k/a Morgan Stanley & Co. LLC* |

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Joshua Dorchak_____
Joshua Dorchak
joshua.dorchak@morganlewis.com
399 Park Avenue
New York, New York 10022
(212) 705-7784 (phone)
(212) 702-3667 (fax)

*Attorneys for Continental Insurance Co. of Brentwood Tennessee, Marsh & McLennan Master Retirement Trust, Marsh & McLennan Companies, Inc. Stock Investment Plan, Modern Woodmen of America, Inc., PHL Variable Insurance Co., Phoenix Life Insurance Co., Putnam Dynamic Asset Allocation Funds – Growth Portfolio, Putnam Intermediate Domestic Investment Grade Trust and Putnam Stable Value Fund*

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Kevin J. Biron_____
Kevin J. Biron
kevin.biron@morganlewis.com
101 Park Avenue
New York, New York 10178
(212) 309-6000 (phone)
(212) 309-6001 (fax)

*Attorneys for MBIA Inc.*

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ J. Gordon Cooney, Jr._____
John C. Goodchild
jgcooney@morganlewis.com
Rachel Mauceri
rmauceri@morganlewis.com
Erza D. Church
echurch@morganlewis.com
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-5710 (phone)
(215) 963-5001 (fax)

*Attorneys for The Lincoln National Life Insurance Co., Country Life Insurance Co., Susquehanna Bank, and SBSI, Inc.*

OLSHAN FROME WOLOSKY LLP

By: /s/ Thomas J. Fleming_____
Thomas J. Fleming
tfleming@olshanlaw.com
Opportunities Fund II,L.P.
Park Avenue Tower
65 East 55th Street
New York, New York 10022
(212) 451-2300 (phone)
(212) 451-2222 (fax)

*Attorneys for Mariner LDC, Tricadia Credit Strategies Master Fund Ltd., and Structured Credit Opportunities Fund II, L.P.*

| | |
|---|---|
| PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP<br><br>By: /s/ Stephen J. Shimshak<br>Brad S. Karp<br>bkarp@paulweiss.com<br>Theodore V. Wells, Jr.<br>twells@paulweiss.com<br>Stephen J. Shimshak<br>sshimshak@paulweiss.com<br>Claudia L. Hammerman<br>chammerman@paulweiss.com<br>1285 Avenue of the Americas<br>New York, New York 10019<br>(212) 373-3133 (phone)<br>(212) 757-3990 (fax)<br><br>*Attorneys for Citigroup Global Markets Inc. and Citicorp Nominees Pty Ltd.* | SCHULTE ROTH & ZABEL LLP<br><br>By: /s/ Lawrence V. Gelber<br>Lawrence V. Gelber<br>lawrence.gelber@srz.com<br>919 Third Avenue<br>New York, New York 10022<br>(212) 756-2000 (phone)<br>(212) 593-5955 (fax)<br><br><br><br><br><br><br><br>*Attorneys for Prebon Financial Products Inc.* |
| SEWARD & KISSEL LLP<br><br>By: /s/ Jack Yoskowitz<br>Jack Yoskowitz<br>yoskowitz@sewkis.com<br>One Battery Park Plaza<br>New York, New York 10004<br>(212) 574-1200 (phone)<br>(212) 480-8421 (fax)<br><br><br><br>*Attorneys for Mulberry Street CDO, Ltd.* | SIDLEY AUSTIN LLP<br><br>By: /s/ Bryan Krakauer<br>Bryan Krakauer<br>bkrakauer@sidley.com<br>Mark B. Blocker<br>mblocker@sidley.com<br>Allison Ross Stromberg<br>astromberg@sidley.com<br>One South Dearborn<br>Chicago, Illinois 60603<br>(312) 853-7000 (phone)<br>(312) 853-7036 (fax)<br><br>*Attorneys for Principal Life Insurance Co.* |

| SIDLEY AUSTIN LLP | SIDLEY AUSTIN LLP |
|---|---|
| By: /s/ Bryan Krakauer_____<br>Bryan Krakauer<br>One South Dearborn<br>Chicago, Illinois 60603<br>(312) 853-7000 (phone)<br>(312) 853-7036 (fax)<br>bkrakauer@sidley.com<br><br>Nicholas P. Crowell<br>ncrowell@sidley.com<br>Jon W. Muenz<br>jmuenz@sidley.com<br>787 Seventh Avenue<br>New York, New York 10019<br>(212) 839-5300 (phone)<br>(212) 839-5599 (fax)<br><br>*Attorneys for PCA Life Assurance Co. Ltd.* | By: /s/ Nicholas P. Crowell_____<br>Nicholas P. Crowell<br>ncrowell@sidley.com<br>Alex J. Kaplan<br>ajkaplan@sidley.com<br>Alex R. Rovira<br>arovira@sidley.com<br>Andrew P. Propps<br>apropps@sidley.com<br>787 Seventh Ave.<br>New York, New York 10019<br>212-839-5300 (phone)<br>212-839-5599 (fax)<br><br>*Attorneys for Genworth Life & Annuity Insurance Co., Magnetar Constellation Master Fund, Ltd, Magnetar Constellation Fund II, Ltd, Magnetar Constellation Master Fund III, Ltd and UniCredit Bank, AG (London Branch)* |
| WACHTELL, LIPTON, ROSEN & KATZ | WUERSCH & GERING LLP |
| By: /s/ Ian Boczko_____<br>Ian Boczko, Esq.<br>IBoczko@wlrk.com<br>51 West 52nd Street<br>New York, NY  10019-6150<br>(212) 403-1249 (phone)<br>(212) 403-2249 (fax)<br><br>*Attorneys for JPMorgan Chase Bank, N.A. and J.P. Morgan Securities PLC* | By: /s/ Gregory F. Hauser_____<br>Gregory F. Hauser<br>gregory.hauser@wg-law.com<br>100 Wall Street, 10th Floor<br>New York, New York 10005<br>(212) 509-4717 (phone)<br>(212) 509-9559 (fax)<br><br>*Attorneys for LGT Bank Ltd. f/k/a LGT Bank in Liechtenstein Ltd.* |