**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————————————x

In re:                                                      Chapter 11
                                                            Case No. 08-13555 (SCC)

LEHMAN BROTHERS HOLDINGS INC., *et al.*,
                                Debtors.

——————————————————————————————x

LEHMAN BROTHERS SPECIAL FINANCING INC.,
                                Plaintiff,

-against-                                                   Adversary Proceeding
                                                            No. 10-03547 (SCC)

BANK OF AMERICA NATIONAL ASSOCIATION,
*et al.*,
                                Defendants.

——————————————————————————————x

**MEMORANDUM DECISION**

A P P E A R A N C E S :

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110
By:    Paul R. DeFilippo, Esq.
       William F. Dahill, Esq.
       Joanna Schorr, Esq.
*Attorneys for Lehman Brothers Special Financing Inc.*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
By:    Matthew Gurgel, Esq.
       Lewis J. Liman, Esq.
*Attorneys for ANZ Nominees Limited*

## TABLE OF CONTENTS

BACKGROUND ................................................................................................1

    A. The Terms of the Federation Notes and the Portfolio Swap.........................3

        1. Economic Terms ...............................................................................3

        2. Unwinding the Federation Notes
           Upon Early Termination of the Portfolio Swap................................5

        3. Applicable Law.................................................................................6

    B. The Custodian Business of ANZ Bank and ANZ Nominees
       and Their Involvement as Custodian for Certain Federation Notes .............7

        1. The Custodian Business.....................................................................7

        2. The Involvement of ANZ Bank and ANZ Nominees
           with the Federation Notes ..................................................................8

    C. The Distribution to ANZ Nominees ..........................................................10

    D. Proofs of Claim Filed by ANZ Nominees and ANZ Bank..........................11

    E. Procedural History ...................................................................................12

STANDARD OF REVIEW ...............................................................................13

DISCUSSION...................................................................................................14

    A. *In Personam* Jurisdiction ..........................................................................14

        1. ANZ Nominees Has Not Willingly Submitted to the Court's Jurisdiction ....15

        2. Mere Department Analysis ..............................................................16

        3. *In Personam* Jurisdiction Over ANZ Bank .....................................20

           a. The Court Does Not Have General Jurisdiction
              Over ANZ Bank .............................................................20

           b. ANZ Bank Has Not Consented
               to the Court's Jurisdiction in this Matter ..........................21

c. The Court Does Not Otherwise
Have Specific Jurisdiction Over ANZ Bank .....................................25

i. The Mere Department Test
is Applicable to a Specific Jurisdiction Analysis ....................26

ii. ANZ Bank Does Not Have Minimum Contacts
with the United States ..............................................................28

B. *In Rem* Jurisdiction .....................................................................................32

1. LBSF Has a Property Interest in the Transaction Documents
Governing the Federation Notes ....................................................34

2. LBSF Has a Property Interest in Its Security Interest
on the Investment Agreements and Other Collateral ......................36

CONCLUSION.....................................................................................................37

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion to dismiss (the "Motion") filed by ANZ Nominees Limited

("ANZ Nominees") in the above-captioned adversary proceeding brought by Lehman Brothers

Special Financing Inc. ("LBSF"). ANZ Nominees takes the position that this Court has neither

*in personam* jurisdiction nor *in rem* jurisdiction to resolve this adversary proceeding as it relates

to ANZ Nominees, an Australian entity doing business solely in Australia and New Zealand.

LBSF responds with three arguments for denying the Motion. First, LBSF contends that ANZ

Nominees voluntarily submitted itself to the jurisdiction of this Court by filing a proof of claim

in the chapter 11 case of Lehman Brothers Holdings Inc. ("LBHI"). Second, LBSF asserts that

ANZ Nominees is a mere department of ANZ Bank Limited ("ANZ Bank") and that ANZ

Nominees should be treated as equivalent to ANZ Bank for purposes of the jurisdictional

analysis. LBSF asserts that ANZ Bank undertook actions outside the United States, including

filing proofs of claim in the LBHI case, that provide the requisite "minimum contacts" necessary

to support *in personam* jurisdiction over ANZ Bank and therefore ANZ Nominees. Third, and in

the alternative, LBSF takes the position that this Court has *in rem* jurisdiction to resolve this

adversary proceeding as it relates to ANZ Nominees because this adversary proceeding concerns

a dispute over property of the LBSF estate. For the reasons set forth below, the Court grants

ANZ Nominees' motion to dismiss for lack of personal jurisdiction. The Court further holds that

it has *in rem* jurisdiction over the property that is the subject of this adversary proceeding as it

relates to ANZ Nominees.

## BACKGROUND

LBSF, a wholly-owned subsidiary of Lehman Brothers Inc. and an indirect subsidiary of LBHI, initiated this adversary proceeding on September 14, 2010 against various investment vehicles, trustees, and noteholders who had participated in certain transactions involving credit default swap agreements. In each of these transactions, LBSF (as the credit default swap counterparty) and the noteholder held competing interests in collateral securing an issuer's obligations to (i) LBSF under a credit default swap and (ii) a noteholder under a credit-linked synthetic portfolio note. The transaction documents for these transactions include provisions that govern the priority of payment from the liquidation of such collateral. Those so-called priority of payment provisions entitle the relevant noteholder or noteholders, under certain circumstances, to receive distributions from the liquidation of the collateral prior to LBSF. In each transaction subject to this adversary proceeding, LBSF alleges that the noteholders received such distributions. Among other reasons, LBSF brings this action to obtain a declaratory judgment that the priority of payment provisions are unenforceable *ipso facto* clauses and to avoid distributions made to noteholders pursuant to those provisions.

As between LBSF and movant ANZ Nominees, this adversary proceeding concerns certain notes issued by Series 2007-1 Federation A-1 Segregated Portfolio and Series 2007-1 Federation A-2 Segregated Portfolio (together, the "Federation Notes"). Each of Series 2007-1 Federation A-1 Segregated Portfolio and Series 2007-1 Federation A-2 Segregated Portfolio was a segregated portfolio of Securitized Product of Restructured Collateral Limited SPC, itself a segregated portfolio company incorporated in the Cayman Islands.[1] After the bankruptcy filings of LBHI and LBSF, ANZ Nominees, as sub-custodian for certain beneficial holders of the

---

[1] *See* Declaration of Kate Apostolova [ECF No. 842] (the "Apostolova Decl.") Ex. 1 (Series 2007-1 Federation A-1 Segregated Portfolio Offering Memorandum) at cover page; Apostolova Decl. Ex. 2 (Series 2007-1 Federation A-2 Segregated Portfolio Offering Memorandum) at cover page.

Federation Notes, received an AUD 17,166,240.17 distribution from BNY Mellon Australia Pty Limited, an Australian affiliate of BNY Mellon, the trustee of the Federation Notes (the "Trustee").  ANZ Nominees subsequently forwarded the distribution to those certain beneficial holders of the Federation Notes for whom it acted as sub-custodian.  LBSF now seeks to recover the distribution from the Trustee to ANZ Nominees.

**A. The Terms of the Federation Notes and the Portfolio Swap**

*1. Economic Terms*

The Federation Notes were issued by (i) Series 2007-1 Federation A-1 Segregated Portfolio in a principal amount of AUD 50,000,000 and (ii) Series 2007-1 Federation A-2 Segregated Portfolio in a principal amount of AUD 14,450,000.  The terms of the Federation Notes provided for annual interest payments at a rate of the three-month Bank Bill Swap Reference Rate for Australian dollars plus 1.00%.

Payment to the holders of the Federation Notes was to be derived from two sources. First, each of the issuers would invest all or substantially all of the proceeds from the sale of the Federation Notes with Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A. ("Rabobank") pursuant to an investment agreement (each, an "Investment Agreement")[2] that would serve as the primary collateral for the Federation Notes.[3]  Each Investment Agreement provided that Rabobank would pay the relevant issuer quarterly interest on the proceeds of the Federation Notes in an amount approximately equal to the average Bank Bill Swap Reference Rate for

---

[2] *See* Declaration of Matthew Gurgel in Further Support of ANZ Nominees Limited's Motion to Dismiss the Third Amended Complaint of Lehman Brothers Special Financing Inc. [ECF No. 1111] (the "Gurgel Decl.") Ex. 11 (Investment Agreement between Rabobank and the Series 2007-1 Federation A-1 Segregated Portfolio); Gurgel Decl. Ex. 12 (Investment Agreement between Rabobank and the Series 2007-1 Federation A-2 Segregated Portfolio).
[3] *See* Apostolova Decl. Ex. 1 at p. 23 (Use of Proceeds); Apostolova Decl. Ex. 2 at 23 (Use of Proceeds).

Australian dollars during the quarter, less 0.06%.[4]  Thus, the first source of payment, and the primary collateral securing the Federation Notes, was insufficient to meet each issuer's interest payment obligations with respect to the Federation Notes.

Second, each issuer of the Federation Notes would enter into a portfolio credit default swap with LBSF (the "Portfolio Swap").  The Portfolio Swap provided for LBSF to make payments to the applicable issuer equal to the product of a fixed rate of interest and the initial notional amount (equal to the initial principal amount of the Federation Notes issued by each issuer) of a reference portfolio of securities (the "Reference Portfolio").[5]  The Portfolio Swap further provided that each issuer would pay LBSF an amount generally equivalent to the Australian dollar equivalent of the losses experienced by the Reference Portfolio over the applicable period (the "AUD Tranche Loss Amount").[6]  To pay LBSF the AUD Tranche Loss Amount, each issuer was required to withdraw the AUD Tranche Loss Amount from the funds invested in the Investment Agreements.[7]  Thus, the Investment Agreements served first as the source of payment for AUD Tranche Loss Amounts and second as a source of payment for the Federation Notes.  Moreover, LBSF enjoyed a security interest in the Investment Agreements and other issuer collateral to secure its contractual right to repayment.[8]

Functionally then, the "deal" embedded in the Federation Notes was that the holders of the Federation Notes were to provide credit default protection to LBSF with respect to the Reference Portfolio in exchange for fixed payments from LBSF and that such protection would

---

[4] *See* Gurgel Decl. Ex. 11 at § 2.4(a); Gurgel Decl. Ex. 12 at § 2.4(a).
[5] *See* Apostolova Decl. Ex. 1 at 9, 18-19 (describing terms of Portfolio Swap and Reference Obligations);
Apostolova Decl. Ex. 2 at 9, 18-19 (describing terms of Portfolio Swap and Reference Obligations).
[6] *See* Apostolova Decl. Ex. 1 at 9, Appendix D (describing terms of Portfolio Swap); Apostolova Decl. Ex. 2 at 9,
Appendix D (describing terms of Portfolio Swap).
[7] *See* Apostolova Decl. Ex. 1 at 2; Apostolova Decl. Ex. 2 at 2.
[8] Apostolova Decl. Ex. 1 at 16 ("Moreover, the security interest of the Trustee under the Indenture is not only for the
benefit of the holders of the [Federation Notes] but is also for the benefit of [LBSF]."); Apostolova Decl. Ex. 2 at 16
(same).

be backed by each issuer's Investment Agreement.[9]  The Reference Portfolio consisted of home equity loans secured by residential property located in the United States.[10]  The Federation Notes offering materials noted that some of the securities comprising the Reference Portfolio may have been of sub-prime credit quality[11] and the Reference Portfolio was described in an April 2007 marketing presentation of the Federation Notes as "40 US Non-Prime RMBS Bonds."[12]  The offering materials further disclosed that "[r]ecently, the sub-prime mortgage loan market has experienced increasing levels of delinquencies and defaults;"[13] the April 2007 marketing presentation included a report prepared by Moody's Investor Services entitled "Challenging Times for the US Subprime Mortgage Market."[14]  In other words, holders of the Federation Notes wagered that the fixed payments to be made by LBSF would exceed the losses experienced by the Reference Portfolio (*i.e.*, home equity loans of questionable quality) in an amount sufficient to meet interest and principal payments on the Federation Notes.

As a condition to issuance of the Federation Notes, the Federation Notes issued by the Series 2007-1 Federation A-1 Segregated Portfolio were required to receive Standard & Poors' highest rating of "AAA" and the Federation Notes issued by the Series 2007-1 Federation A-2 Segregated Portfolio were required to receive a rating of "A+" from Standard & Poor's.[15]  Each condition was apparently met, despite the risks disclosed in the offering materials and the marketing of the Federation Notes.

---

[9] *See* Apostolova Decl. Ex. 1 at 20 ("The Issuer is exposed to the credit default risk of the Reference Portfolio.  The holders of the Notes will bear such credit default risk and, as a consequence, may lose some or all of their investment."); Apostolova Decl. Ex. 2 at 20 (same).

[10] *See* Opposition ¶ 10.

[11] *See* Apostolova Decl. Ex. 1 at 19; Apostolova Decl. Ex. 2 at 19.

[12] *See* Opposition ¶ 16.

[13] Apostolova Decl. Ex. 1 at 19; Apostolova Decl. Ex. 2 at 19.

[14] Opposition ¶ 16.

[15] *See* Apostolova Decl. Ex. 1 at cover page ("It is a condition to the issuance of the Notes that the Notes be rated "AAA" by Standard & Poor's."); Apostolova Decl. Ex. 2 at cover page ("It is a condition to the issuance of the Notes that the Notes be rated "A+" by Standard & Poor's.").

### 2.   Unwinding the Federation Notes Upon Early Termination of the Portfolio Swap

Declaration of an Early Termination Date with respect to the Portfolio Swap constituted an Event of Default with respect to the Federation Notes that resulted in automatic acceleration of unpaid principal and interest.[16]   In the event of such an acceleration, each Investment Agreement would be deemed to have matured and become payable to the Federation Notes issuers.[17]   Then, such amounts, along with all other proceeds collected by the issuers, would become payable to the holders of the Federation Notes by the "Paying Agent"[18] or the issuer's custodian[19] in accordance with "Final Scheduled Payment Date Priority of Payments."[20]

Under that scheme, and consistent with the structure of the transaction, all AUD Tranche Loss Amounts owed to LBSF were to be paid first in all instances.   If LBSF was not the defaulting party pursuant to the terms of the Portfolio Swap, LBSF was to be paid all termination payments owed to it pursuant to the terms of the Portfolio Swap second.   However, if LBSF was the defaulting party pursuant to the terms of the Portfolio Swap, it was to be paid all termination payments owed to it pursuant to the terms of the Portfolio Swap only *after* payments of interest and principal to the holders of the Federation Notes.[21]

### 3.   Applicable Law

The Federation Notes, the indentures governing the Federation Notes, and the Portfolio Swap Agreements were each governed by New York law.[22]   The custodian is a party to each of

---

[16] *See* Apostolova Decl. Ex. 1 at 29; Apostolova Decl. Ex. 2 at 29.
[17] *See* Apostolova Decl. Ex. 1 at 2 ("The [Investment Agreement] will mature on or before the Business Day immediately preceding the Final Scheduled Payment Date"); Apostolova Decl. Ex. 2 at 3 (same).
[18] BTA Institutional Services Australia Limited.
[19] Bank of New York, London Branch.
[20] *See* Apostolova Decl. Ex. 1 at 29; Apostolova Decl. Ex. 2 at 29.
[21] *See* Apostolova Decl. Ex. 1 at 8; Apostolova Decl. Ex. 2 at 8-9.
[22] Apostolova Decl. Ex. 1 at 36; Apostolova Decl. Ex. 2 at 36.

the indentures governed by New York law.[23]  The "Agency Agreements," pursuant to which

BTA Institutional Services Australia Limited provided services as Paying Agent to each issuer,

were governed by Australian law.[24]

## B. The Custodian Business of ANZ Bank and ANZ Nominees and Their Involvement as Custodian for Certain Federation Notes

### 1. The Custodian Business

ANZ Bank, a company organized under the laws of Australia, has a worldwide presence,

including a branch office in New York.[25]  As part of its product offerings during the relevant

times, ANZ Bank offered clients "ANZ Custodian Services."  A brochure for ANZ Custodian

Services described it as "part of Australia and New Zealand Banking Group Limited (ANZ)."[26]

The brochure further stated that "ANZ offers domestic and sub-custody covering a broad client

base in our home markets of Australia and New Zealand.  We provide custody of all asset classes

in Australia and New Zealand."[27]  ANZ Custodian Services was contained within ANZ Bank's

Transaction Banking business.[28]

Paul Garry, a director of ANZ Nominees, testified that ANZ Nominees itself had no

employees and that employees of ANZ Bank, and specifically ANZ Custodian Services,

provided all services on behalf of ANZ Nominees.[29]  Mr. Garry described the business of ANZ

Nominees as "act[ing] as a sub – as the sub-custodian for ANZ [Bank]"[30] and confirmed that

---

[23] *Id.*
[24] *Id.*
[25] *See* Opposition ¶ 11 (quoting ANZ Bank's website).
[26] *See* Declaration of William F. Dahill in Opposition to ANZ Nominees Ltd.'s Motion to Dismiss [ECF No. 1092] (the "Dahill Decl.") Ex. 5.
[27] *Id.*
[28] Declaration of Paul Garry in Further Support of ANZ Nominees' Motion to Dismiss, dated June 11, 2015 [ECF No. 1110] ("Garry Supp. Decl.") ¶ 6.
[29] *See* Dahill Decl. Ex. 2 (Mr. Garry Dep. Tr.) at 8:19-9:7.  *See also* Garry Supp. Decl. ¶ 6.
[30] Dahill Decl. Ex. 2 (Mr. Garry Dep. Tr.) at 17:23-18:7.

ANZ Nominees ceased taking on new accounts as a result of ANZ Bank's determination that it intended to sell its custody business.[31]

ANZ Nominees' role as sub-custodian for ANZ Bank was formalized in that certain Sub-Custody Agreement, dated November 25, 2004 between ANZ Nominees and ANZ Bank (the "Sub-Custody Agreement").[32]    The Sub-Custody Agreement provided that all fees ANZ Nominees charged for its sub-custodial services would be paid by the client directly to ANZ Bank, with ANZ Nominees charging ANZ Bank only expenses incurred in providing the sub-custody services (excluding day-to-day overhead such as salaries, rents, and office expenses).[33]

### 2. *The Involvement of ANZ Bank and ANZ Nominees With the Federation Notes*

The Federation Notes were offered "outside the United States, to persons who are not U.S. Persons or U.S. residents, in reliance on Regulation S [of the Securities Act]."[34]    The Federation Notes were registered, lodged, and traded in the Australian securities registry, Austraclear.[35]    An Australian entity affiliated with Lehman Brothers, Grange Securities Limited ("Grange"), marketed the Federation Notes to Australian investors.[36]    Separately, certain Australian entities (the "Australian Holders") became beneficial holders of the Federation Notes and delivered their beneficial interests in the Federation Notes to Citi Australia or UBS AG Australia to hold such interests as custodian.[37]

From May 9, 2007 through December 3, 2007, ANZ Nominees held Federation Notes as custodian for Grange, which ANZ Nominees understood was acting as custodian for certain

---

[31] *See* Dahill Decl. Ex. 2 (Mr. Garry Dep. Tr.) at 17:4-22.
[32] Gurgel Decl. Ex. 2.
[33] *See* Sub-Custody Agreement ¶ 11.1(a); 11.2; Definition of "Expenses and Outlays."
[34] *See* Apostolova Decl. Ex. 1 at 2; Apostolova Decl. Ex. 2 at 14.
[35] *See* Apostolova Decl. Ex. 1 at 27; Apostolova Decl. Ex. 2 at 27.
[36] *See* Opposition ¶ 16; Memorandum in Support at 2.
[37] *See* Declaration of Paul Garry in Support of ANZ Nominees' Motion to Dismiss [ECF No. 843] (the "Garry Decl.") ¶ 4.

8

beneficial holders of Federation Notes.[38]  In connection with this role, on May 17, 2007, the

Trustee sent a copy of the offering materials to an ANZ Bank e-mail address entitled "Corporate

Actions 3"[39]; ANZ Nominees acknowledges that it received a copy of the offering materials for

the Federation Notes on or about May 17, 2007 as a result of this e-mail.[40]  In August 2007, ANZ

Bank received an e-mail from a client requesting advice on limiting its losses in connection with

the Federation Notes.[41]  In February 2008, ANZ Bank employee Angus Graham forwarded a

presentation from Lehman Brothers offering investors in the Federation Notes restructuring

options and exhorted his internal ANZ Bank team to devise similar options and take them to

ANZ Bank clients.[42]

Between August and October 2008, nineteen of the Australian Holders requested that

ANZ Bank take custody of their beneficial interests in the Federation Notes from Citi Australia

or UBS AG Australia; ANZ Bank fulfilled those requests pursuant to custody agreements with

each beneficial holder and took custody of such entities' beneficial interests in the Federation

Notes.[43]

Although the record is not entirely clear,[44] presumably ANZ Bank appointed ANZ

Nominees as sub-custodian with respect to the beneficial interests in the Federation Notes

pursuant to the Sub-Custody Agreement.  Pursuant to the various custody agreements, ANZ

---

[38] Dahill Decl. Ex. 13.
[39] Dahill Decl. Ex. 1.
[40] *Id.*
[41] Dahill Decl. Ex. 6.
[42] *See* Dahill Decl. Ex. 11.
[43] *See Id.  See also* Gurgel Decl. Exs. 4-7 (custody agreements between ANZ Bank and certain beneficial holders of the Federation Notes).
[44] Each of the custody agreements speaks generically of "Assets" or "Property" to be specified by schedules or acknowledgements between the parties.  The Court was not provided with any such schedules or acknowledgements specifying the property subject to the various custody agreements.  It is nonetheless undisputed between the parties that ANZ Nominees came to hold certain beneficial interests in the Federation Notes as custodian.  Accordingly, for purposes of this decision, the Court assumes that ANZ Nominees came to hold certain beneficial interests in the Federation Notes as custodian.

Nominees, as ANZ Bank's sub-custodian, was responsible for, among other things, collecting income from the Federation Notes in its custody and distributing it to the beneficial holders of such Federation Notes.[45]  Each of the various custody agreements is governed by the laws of Victoria, Australia.[46]  Neither ANZ Nominees nor ANZ Bank is party to the indenture governing the Federation Notes nor any of the agreements related to the issuance of the Federation Notes.

## C.  The Distribution to ANZ Nominees

On October 8, 2008, the Australian affiliate of the Trustee forwarded to an ANZ Bank e-mail address entitled "Fixed Interest Operations" a letter the Trustee had sent to all holders of the Federation Notes notifying such holders of a default under the Portfolio Swap on account of LBHI and LBSF's bankruptcy filings (the "October 8 Notice").[47]  The October 8 Notice further requested written direction to (and indemnification of) the Trustee from the holders of a majority of the Federation Notes (the "Controlling Class") as to whether the Trustee should declare an early termination date with respect to the Swap Portfolio and, in so doing, accelerate the Federation Notes.[48]  Finally, the October 8 Notice attached a direction letter and indemnity to be signed and returned to the Trustee by a Controlling Class.[49]  ANZ Nominees states that it never responded to the October 8 Notice[50] and discovery between the parties has not produced any response from ANZ Bank or ANZ Nominees to the October 8 Notice.[51]

In late October 2008, ANZ Nominees, as registered holder of certain of the Federation Notes, received a "Notice of Designation of Early Termination Date"[52] and a "Notice of

---

[45] *See* Gurgel Decl. Exs. 2-7 (custody agreements).
[46] *Id.*
[47] Dahill Decl. Ex. 17.
[48] *See id.*
[49] *See id.*
[50] *See* Gurgel Decl. Ex. 1 (Mr. Garry Dep. Tr.) at 129:10-17; Garry Supp. Decl. ¶ 9.
[51] Opposition ¶ 21.
[52] Dahill Decl. Ex. 18.

Distribution of Principal and Interest"[53] from the Trustee.[54]  The two notices informed holders of the Federation Notes that (i) the Trustee had designated October 30, 2008 as the early termination date of the Portfolio Swap; (ii) termination of the Portfolio Swap resulted in the acceleration of all unpaid principal and accrued and unpaid interest owing on the Federation Notes; and (iii) all principal and accrued and unpaid interest owing on the Federation Notes would be paid to the registered holder on October 30, 2008.[55]  On October 30, 2008, ANZ Nominees received a transfer of AUD 17,166,217.40 (the "Distributed Funds") and distributed the entirety of such amount to the accounts of the holders whose beneficial interests in the Federation Notes it held in its custody.[56]

### D.  Proofs of Claim Filed by ANZ Nominees and ANZ Bank

Proof of claim number 50672 in the LBHI case ("Claim No. 50672") was filed by "ANZ Nominees Ltd in trust for Tasmanian Perpetual Trustees Ltd."[57]  Claim No. 50672 is signed by an individual identifying himself or herself as "duly authorised officer of Tasmanian Perpetual Trustees Ltd."[58]  Mr. Garry represents that Tasmanian Perpetual Trustees Ltd. is not an affiliate of ANZ Nominees and that ANZ Nominees did not authorize or have any involvement in the filing of Claim No. 50672.[59]

ANZ Bank filed proof of claim number 29532 in the LBSF case[60] and proofs of claim numbers 21493 and 26192 in the LBHI case.[61]  Claim number 29532 in the LBSF case was

---

[53] Dahill Decl. Ex. 19.
[54] *See* Garry Decl. ¶ 8.
[55] *See* Dahill Decl. Exs. 18-19.
[56] *See* Garry Decl. ¶¶ 8-9.
[57] Dahill Decl. Ex. 22.
[58] *Id.*
[59] *See* Garry Supp. Decl. ¶ 11.
[60] Dahill Decl. Ex. 23.
[61] Gurgel Decl. Exs. 16, 17.

expunged by order of this Court, with the consent of ANZ Bank, on August 25, 2011.[62]  ANZ

Bank voluntarily withdrew claim numbers 21493 and 26192 in the LBHI case on March 2,

2010.[63]  Notably, each of the three proofs of claim filed by ANZ Bank was withdrawn or

expunged prior to the commencement of LBSF's proceeding against ANZ Nominees on July 23,

2012.[64]

## E.  Procedural History

This adversary proceeding was commenced on September 14, 2010 [ECF No. 1].  LBSF

filed an amended complaint (the "First Amended Complaint") on October 1, 2010 [ECF No. 8].

On July 23, 2012, LBSF filed a second amended complaint [ECF No. 303].  The second

amended complaint added ANZ Nominees as a defendant for the first time.  On September 15,

2014, LBSF filed a third amended complaint [ECF No. 831] and on October 13, 2015, LBSF

filed a fourth amended complaint [ECF No. 1156].

Beginning on October 20, 2010, litigation in this action was stayed by a series of orders

[Case No. 08-13555, ECF Nos. 12199, 17763, 24198, 29506, 33970, 34697, 38806, 42081].  On

January 31, 2014, this Court entered a bridge order extending the litigation stay until the later of

May 20, 2014 or thirty days after the date on which the Court entered a scheduling order

governing this adversary proceeding [Case No. 08-13555, ECF No. 42417].  On July 14, 2014,

this Court entered such a scheduling order, which, among other things, permitted defendants to

submit letter requests seeking the Court's permission to raise individualized defenses [ECF No.

794].

---

[62] Gurgel Decl. Ex. 15 (Order Granting Debtors' One Hundred Sixty-First Omnibus Objection to Claims (Settled
    Derivatives Claims)).
[63] Gurgel Decl. Ex. 18 (Amended Withdrawal of Proofs of Claim Nos. 21493, 21494, 26192, and 30048).
[64] *See* Reply at 26 n.26.

ANZ Nominees submitted such a letter request on July 31, 2014, seeking to file a motion to dismiss for lack of personal jurisdiction [ECF No. 801]. LBSF filed a letter opposing ANZ Nominees' request [ECF No. 807]. On October 6, 2014, this Court granted ANZ Nominees' request and permitted limited jurisdictional discovery [ECF No. 837]. ANZ Nominees filed its motion to dismiss on October 15, 2014 [ECF Nos. 841], together with declarations and a memorandum of law in support thereof [ECF Nos. 842, 843, 844]. ANZ Nominees and LBSF agreed to briefing and discovery schedules on November 3, 2014 [ECF No. 876]. After completing jurisdictional discovery, LBSF filed its opposition to ANZ Nominees' motion to dismiss on April 30, 2015 [ECF No. 1091] (the "Opposition") and a declaration in support thereof [ECF No. 1092]. On June 11, 2015, ANZ Nominees filed its reply [ECF No. 1109] (the "Reply"), an appendix to the Reply [ECF No. 1112], and supplemental declarations in support thereof [ECF Nos. 1110, 1111]. The Court heard argument on the Motion on November 24, 2015 (the "Hearing").

## **STANDARD OF REVIEW**

Rule 12(b)(2) of the Federal Rules of Civil Procedure, incorporated into Rule 7012(b) of the Bankruptcy Rules, provides that a case may be dismissed for lack of personal jurisdiction. *See* Fed. R. Bankr. P. 7012(b). To survive a Rule 12(b)(2) motion, the plaintiff bears the burden to make a *prima facie* showing that jurisdiction exists. *See O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001)*, 714 F.3d 659, 673 (2d Cir. 2013) (citing *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)). The plaintiff's *prima facie* showing must include an averment of facts, which, if credited, would suffice to establish jurisdiction over the defendant. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (citing *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir. 1994)) (internal

13

quotation marks omitted).    However, "[w]hen a defendant rebuts plaintiffs' unsupported allegations with direct, highly specific testimonial evidence regarding a fact essential to jurisdiction – and plaintiffs do not counter that evidence – the allegation may be deemed refuted."  *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, No. 1:00-1898, MDL No. 1358, 2014 WL 1778984, at *1 (S.D.N.Y. May 5, 2014).

## DISCUSSION

LBSF argues that the Court has *in personam* jurisdiction over ANZ Nominees and, in the alternative, that the Court has *in rem* jurisdiction over (i) the Distributed Funds and (ii) "LBSF's property interest in senior payment priority."[65]  The Court finds that it does not have *in personam* jurisdiction over ANZ Nominees, but that it has (and will exercise) *in rem* jurisdiction over LBSF's property interests in the transaction documents underlying the Federation Notes and LBSF's security interest in the collateral securing the Federation Notes.

### A.  *In Personam* Jurisdiction

Rule 7004(d) of the Bankruptcy Rules permits nationwide service of process.  *See* Fed. R. Bankr. P. 7004(d).  A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States."  Fed. R. Bankr. P. 7004(f).  Because valid service of process under Rule 7004(d) "is sufficient to establish personal jurisdiction, state long-arm statutes are inapplicable, and the only remaining inquiry for a bankruptcy court is whether exercising personal jurisdiction over the defendant would be consistent with the Due Process Clause of the Fifth Amendment."  *Bickerton v. Bozel S.A. (In re Bozel S.A.)*, 434 B.R. 86, 97 (Bankr. S.D.N.Y. 2010) (citing *In re Enron Corp.,* 316 B.R. 434, 440, 444–45 (Bankr. S.D.N.Y. 2004)).  The

---

[65] Opposition ¶¶ 61, 66.

"forum state" is the United States as a whole, and "a court should consider the defendant's contacts throughout the United States." *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 527 (S.D.N.Y. 2008).

LBSF argues that this Court has *in personam* jurisdiction over ANZ Nominees because (i) ANZ Nominees willingly submitted to the jurisdiction of this Court by filing Claim No. 56072 in the LBHI case and (ii) ANZ Nominees is a mere department, for jurisdictional purposes, of ANZ Bank, which is itself subject to specific *in personam* jurisdiction as a result of its involvement with the Federation Notes and because it filed proofs of claim in the bankruptcy cases of both LBSF and LBHI. LBSF concedes that this Court does not have general or specific *in personam* jurisdiction over ANZ Nominees in the event that ANZ Nominees did not willingly submit to the Court's jurisdiction or ANZ Nominees is not found to be a mere department of ANZ Bank.

If ANZ Nominees willingly submitted to the Court's jurisdiction, as LBSF contends, the Court need not conduct further jurisdictional inquiry. Similarly, if ANZ Nominees did not willingly submit to the Court's jurisdiction and ANZ Nominees is not a mere department of ANZ Bank, the Court cannot have *in personam* jurisdiction over ANZ Nominees. Accordingly, the Court will first address LBSF's argument that ANZ Nominees has submitted to the Court's jurisdiction, followed by analyzing whether ANZ Nominees is a mere department of ANZ Bank for jurisdictional purposes. If (i) ANZ Nominees has not willingly submitted to the Court's jurisdiction and (ii) ANZ Nominees is a mere department of ANZ Bank for jurisdictional purposes, the Court will address LBSF's argument that ANZ Bank and its departments are subject to *in personam* jurisdiction.

## 1. ANZ Nominees Has Not Willingly Submitted to the Court's Jurisdiction

LBSF cites to *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990) and *Cent. Vt. Pub. Serv. Comm. v. Herbert*, 341 F.3d 186, 191-92 (2d Cir. 2003) for the proposition that a party that files a proof of claim subjects itself to the broad equitable powers of a bankruptcy court; LBSF also cites to *Kline v. ED Zueblin, AG (In re Am. Exp. Grp. Int'l Servs., Inc.)*, 167 B.R. 311, 313 (Bankr. D. D.C. 1994) for the proposition that filing a proof of claim is akin to filing a complaint in this Court, which vests the Court with jurisdiction over the filing party for all purposes. Applying this law, LBSF contends that Claim No. 50672 represents ANZ Nominees' submission to the Court's jurisdiction.[66]  ANZ Nominees contends that ANZ Nominees did not file Claim No. 56072.

The Court has examined Claim No. 56072 and notes that it was signed by an individual identifying himself or herself as "duly authorised officer of Tasmanian Perpetual Trustees Ltd."[67] LBSF has not challenged Mr. Garry's representation that (i) Tasmanian Perpetual Trustees Ltd. is not affiliated with ANZ Nominees and (ii) ANZ Nominees did not authorize the filing of Claim No. 56072.   The record does not contain anything that contradicts Mr. Garry's representation.  Accordingly, the Court cannot conclude that ANZ Nominees filed or authorized the filing of Claim No. 56072.  Thus, the Court finds that Claim No. 56072 does not reflect ANZ Nominees' submission to the Court's jurisdiction.

### 2. **Mere Department Analysis**

---

[66] Opposition ¶ 28.
[67] *Id.*

As ANZ Nominees did not willingly submit to the Court's jurisdiction and LBSF concedes that ANZ Nominees is not otherwise subject to the Court's jurisdiction except as a mere department of ANZ Bank, the Court must now determine, for purposes of its jurisdictional analysis, whether ANZ Nominees is properly regarded as a department of ANZ Bank.

A court may exercise jurisdiction over a defendant not otherwise subject to the court's jurisdiction where the defendant is a "mere department" of an entity over which the court has personal jurisdiction. *See GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009). The question under the mere department analysis is "whether the allegedly controlled entity was a shell for the allegedly controlling party," *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 475 F. Supp. 2d 456, 458 (S.D.N.Y. 2007) (internal quotation marks omitted); it is not necessary that the entity was used to commit fraud, a showing normally required to pierce the corporate veil under U.S. law. *See GEM Advisors*, 667 F. Supp. 2d at 319. To determine whether a party is a mere department of a controlling entity, courts consider four factors set forth by the Second Circuit in *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120–22 (2d Cir. 1984):

(1)  Whether there exists common ownership and the presence of an interlocking directorate and executive staff,
(2)  The degree of financial dependency of the subsidiary on the parent,
(3)  The degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities, and
(4)  The degree of the parent's control of the subsidiary's marketing and operational policies.

*Id.*; *see also GEM Advisors*, 667 F. Supp. 2d at 319. A court may assert jurisdiction where there is a subsidiary amenable to jurisdiction that is a mere department of the parent-defendant, *see Storm LLC v. Telenor Mobile Commc'ns AS*, No. 06 Civ. 13157, 2006 WL 3735657, at *13 (S.D.N.Y. Dec. 15, 2006), or where there is a subsidiary-defendant that is a "mere department"

17

of a parent amenable to jurisdiction, *see Int'l Equity Invs.*, 475 F. Supp. 2d at 458.  The Court will assess each of the *Beech* factors in turn.

With respect to the first *Beech* factor, ANZ Nominees concedes that it is wholly owned by ANZ Bank and that ANZ Nominees and ANZ Bank have interlocking directors and staff.[68] Accordingly, the first *Beech* factor, common ownership and the presence of an interlocking directorate, weighs in favor of a finding that ANZ Nominees is a mere department of ANZ Bank.

To establish the second *Beech* factor, "a plaintiff must show that the subsidiary 'cannot run its business without the financial backing of its parent.'"    *Williamson v. Verizon Communications Inc.*, No. 11 Civ. 4948(LTS)(HBP), 2013 WL 227691 at *1 (S.D.N.Y. Jan. 22, 2013) (quoting *In re Ski Train Fire in Kaprun Austria on Nov. 11, 2000*, 230 F. Supp. 2d 403, 410 (S.D.N.Y. 2002)). LBSF argues that the second *Beech* factor is established because ANZ Nominees conducts limited business operations and because ANZ Bank reports ANZ Nominees' profits on its consolidated financial statements.[69]  ANZ Nominees contends that these allegations are insufficient and cites to *Williamson* for the proposition that an allegation of consolidated earnings reports is insufficient to satisfy the second *Beech* factor.[70]

While the Court agrees with ANZ Nominees and the *Williamson* court that an allegation of consolidated earnings reports, by itself, is insufficient to establish ANZ Nominees' financial dependence on ANZ Bank, the record here is sufficient to support a finding that ANZ Nominees is financially dependent on ANZ Bank.  First, as LBSF notes, ANZ Nominees conducted limited business operations, which operations were dependent on ANZ Bank.  In fact, Mr. Garry described ANZ Nominees' business as acting as a sub-custodian for ANZ Bank.  There is

---

[68] *See* Reply at 32-33 (acknowledging that ANZ Nominees is wholly owned by ANZ Bank and that ANZ Nominees' directors are employed by ANZ Bank).
[69] Opposition ¶ 44.
[70] Reply at 32-33 (citing *Williamson*, 2013 WL 227691 at *2 ("This allegation of consolidated earnings reports is insufficient to show that [subsidiaries] are financially dependent on [parent].")

nothing in the record suggesting that ANZ Nominees solicited its own clients, and Mr. Garry confirmed that the "vast majority" of ANZ Nominees' custodial account holders would have first been clients of ANZ Bank.[71]  In addition, ANZ Nominees stopped accepting new customers when ANZ Bank determined to sell its custody business and, as Mr. Garry confirmed, remains inactive today.  Accordingly, the record demonstrates that ANZ Nominees could not generate business without the support of ANZ Bank.

Further, the Sub-Custody Agreement demonstrates that ANZ Nominees did not earn fees on its sub-custody business; rather, account holders paid ANZ Bank directly and ANZ Nominees was only eligible for reimbursement of expenses incurred in providing the sub-custody services (excluding day-to-day overhead such as salaries, rents, and office expenses).  Thus, ANZ Nominees generated no revenue on the Sub-Custody Agreement, which formed the "vast majority" of its business, and was not entitled to reimbursement of its day-to-day overhead expenses.  ANZ Nominees was also dependent on employees who were paid by ANZ Bank to provide its services.  Accordingly, there can be no doubt that ANZ Nominees could not run its business without the financial backing of ANZ Bank.

The third and fourth *Beech* factors also weigh in favor of a mere department finding. Although it is uncontested that ANZ Nominees observed corporate formalities and had its own directors who owed ANZ Nominees fiduciary duties,[72] it is clear that ANZ Bank exercised complete control over (i) the assignment and selection of ANZ Nominees' executive personnel and (ii) ANZ Nominees' marketing and operational policies.  Indeed, ANZ Nominees had no employees of its own and was wholly reliant on ANZ Bank employees to provide services.

---

[71] *See* Dahill Ex. 2 at 18:10-18 (Mr. Garry Dep. Tr.) ("Q: Did [ANZ Nominees] hold assets in custody for any third party who was not also a client of [ANZ Bank]?  A: I can't say for certain that there were not some customers who purely came to custody, but I think the vast majority would also have had a relationship with ANZ [Bank] in some form of bank account at the very least.").

[72] *See* Garry Supp. Decl. ¶¶ 3-4.

There is also nothing in the record indicating that ANZ Nominees had a marketing or operational policy independent of ANZ Bank's ANZ Custodian Services business. Indeed, as Mr. Garry confirmed, when ANZ Bank decided to sell the ANZ Custodian Services business, ANZ Nominees essentially ceased operations.

In accordance with the foregoing, the Court finds that, for purposes of its jurisdictional analysis, the *Beech* factors overwhelmingly support treating ANZ Nominees as a department of ANZ Bank.

### 3. *In Personam* Jurisdiction Over ANZ Bank

To exercise personal jurisdiction over a corporation, such entity must have sufficient "minimum contacts" with the forum such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945). To satisfy the minimum contacts requirement, there must be "some act [of the entity] by which the [entity] purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). A court can exercise two categories of personal jurisdiction: general jurisdiction and specific jurisdiction. *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014). "General, all-purpose jurisdiction permits a court to hear 'any and all claims' against an entity." *Gucci Am., Inc. v. Li*, 768 F.3d 122, 134 (2d Cir. 2014) (citations omitted). "Specific jurisdiction, on the other hand, permits adjudicatory authority only over issues that 'arise[e] out of or relat[e] to the [entity]'s contacts with the forum." *Gucci*, 768 F.3d at 134 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). If insufficient contacts exist for a court to exercise general personal jurisdiction, it may still exercise specific jurisdiction. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985).

### a. *The Court Does Not Have General Jurisdiction Over ANZ Bank*

LBSF concedes in its papers that ANZ Bank and ANZ Nominees are not subject to this Court's general jurisdiction.[73]

### b. *ANZ Bank Has Not Consented to the Court's Jurisdiction in this Matter*

LBSF contends that this Court has specific jurisdiction over ANZ Bank (and thus ANZ Nominees as a department of ANZ Bank) for purposes of this adversary proceeding by virtue of ANZ Bank's filing proofs of claim in the LBSF and LBHI cases.[74]  In response, ANZ Nominees argues that, because each of the claims was withdrawn or "voluntarily" expunged before ANZ Nominees became a defendant in this adversary proceeding, each claim should be regarded as a nullity, insufficient to establish consent to jurisdiction.[75]

In support of its argument, ANZ Nominees cites to *Cruisephone Inc. v. Cruise Ships Catering and Servs. N.V. (In re Cruisephone)*, 278 B.R. 325 (Bankr. E.D.N.Y. 2002).  There, the plaintiff initiated an adversary proceeding against a creditor who had filed a proof of claim but had withdrawn the claim subsequent to the commencement of an adversary proceeding.  The creditor moved to dismiss the adversary proceeding for lack of personal jurisdiction.  While the court found that a proof of claim "is a submission to the bankruptcy court's jurisdiction to establish that creditor's right to participate in the distribution of the bankruptcy estate," it agreed with the creditor that a proof of claim withdrawn as of right prior to the commencement of the adversary proceeding was irrelevant to the personal jurisdiction analysis.  *See Cruisephone Inc.*,

---

[73] Opposition ¶ 38 ("LBSF does not contend that ANZ is subject to this Court's general jurisdiction; rather LBSF contends that the activities ANZ undertook with respect to its receipt and transfer of property of the LBSF bankruptcy estate in violation of the automatic stay, which caused significant harm to LBSF in the United States, provide the requisite contacts to support specific jurisdiction over ANZ in an action related to those activities.").

[74] *See* Opposition ¶ 25 ("Finally, ANZ Nominees, ANZ Bank and its affiliates filed proofs of claim in the LBHI and LBSF Chapter 11 cases.  ANZ Nominees thereby consented to this Court's jurisdiction over it for purposes of the adjudication of this adversary proceeding.").

[75] *See* Reply at 26.

525 B.R. at 330.  The Court agrees with the analysis of *Cruisephone Inc.*  Accordingly, proofs of

claim numbers 21493 and 26192 filed by ANZ Bank in LBHI's case, each of which was

withdrawn before LBSF commenced proceedings against ANZ Nominees, cannot serve as the

basis for submission to this Court's jurisdiction by ANZ Bank (or ANZ Nominees as a

department of ANZ Bank) for purposes of adjudicating this adversary proceeding.[76]

Claim number 29532, filed by ANZ Bank against LBSF, does not fit neatly into the

holding of *Cruisephone Inc.* inasmuch as, unlike the withdrawn claims in *Cruisephone Inc.*,

claim number 29532 was expunged, albeit with the consent of ANZ Bank, by order of this Court.

Thus the Court must determine whether a proof of claim that is expunged prior to the debtor's

filing of an adversary proceeding is properly viewed as the creditor's submission to the court's

jurisdiction in that adversary proceeding.  Although this question was the subject of thoughtful

discussion by counsel at the Hearing, neither party addressed the question squarely in its papers

and neither party was able to refer the Court to any law on point at the Hearing.  Research

subsequent to the Hearing uncovered the decision in *Picard v. The Estate of Doris Igoin,*

*Laurence Apfelbaum, and Emilie Apfelbaum (In re Bernard L. Madoff Investment Securities*

*LLC)*, 525 B.R. 871 (Bankr. S.D.N.Y. 2015) ("*Apfelbaum*"), in which Judge Bernstein provided

a thoughtful and well-reasoned analysis of just this question.

In *Apfelbaum*, the SIPA Trustee for the debtor commenced an adversary proceeding

against certain French defendants to avoid and recover allegedly fraudulent transfers.  The

French defendants filed a motion to dismiss the adversary proceeding for lack of personal

jurisdiction.  The Trustee opposed the motion, arguing, among other things, that the court had

---

[76] ANZ Nominees also argues that claim numbers 21493 and 26192 are insufficient to establish consent to
jurisdiction for purposes of this adversary proceeding because such claims were filed against LBHI, not LBSF, the
plaintiff in this adversary proceeding.  *See* Reply at 27.  While the Court does not need to reach this argument for the
reasons above, this too is a compelling argument.

jurisdiction based on the defendants' filing SIPA customer claims in the debtor's SIPA proceeding. The SIPA customer claims were denied by the Trustee without objection and finally disallowed by the court prior to the adjudication of the motion to dismiss; accordingly, the outcome of the adversary proceeding had no impact on the allowance of the SIPA customer claims. *Apfelbaum*, 525 B.R. at 880.

In analyzing the Trustee's argument that the court had jurisdiction over the French defendants by virtue of the SIPA customer claims, Judge Bernstein first stated the law as follows: "As a rule, filing a claim subjects the creditor to the equitable power of the bankruptcy court because it triggers the process of allowance and disallowance of claims. Consistent [with] the rule's rationale, the submission to personal jurisdiction is limited to litigation concerning the claims allowance process." 525 B.R. at 887. Judge Bernstein cited to *Germain v. Connecticut Nat'l Bank*, 988 F.2d 1323 (2d Cir. 1993) as illustrative of that principle. In *Germain*, a chapter 7 trustee sought a jury trial on his claims state law claims seeking money damages against a creditor of the debtor. The creditor argued that the trustee did not have a right to a jury trial because, in the creditor's view, (1) a creditor who submits a proof of claim loses its right to a jury trial and (2) there was no reason for the debtor or the debtor's estate to be treated differently from a creditor. *See Germain*, 988 F.2d at 1330; *Apfelbaum*, 525 B.R. at 887. The Second Circuit rejected the creditor's argument, finding that "[t]he argument collapses at the first step." 988 F.2d at 1330. The Second Circuit reasoned:

> It is reasonable to assume that a creditor or debtor who submits to the equity jurisdiction of the bankruptcy court thereby waives any right to a jury trial for the resolution of disputes vital to the bankruptcy process, such as those involving the determination of who is a valid creditor and which creditors are senior in the creditor hierarchy. We will not presume that the same creditor or debtor has knowingly surrendered its constitutional right to a jury trial for resolution of disputes that are only incidentally related to the bankruptcy process.

*Id.*

23

The Second Circuit further determined that for a dispute to be vital to the bankruptcy process such that filing a proof of claim would result in a waiver, "the dispute must be part of the claims-allowance process or affect the hierarchical reordering of creditors' claims." *Id.* Judge Bernstein observed that the Second Circuit found that the trustee's claims in *Germain* were not part of the claims-allowance process and did not affect the hierarchical reordering of creditors' claims. *Apfelbaum*, 525 B.R. at 887. The Second Circuit drew the distinction because:

> The Trustee asks for money damages to compensate the estate for the destruction of the debtor's business. If he wins, the estate is enlarged, and this may effect the *amount* the [creditor] and its fellow creditors ultimately recover on their claims, but it has no effect whatever on the *allowance* of the [creditor]'s claims. . . . Therefore suits like the Trustee's action in this case which would augment the estate but which have no effect on the allowance of a creditor's claim simply cannot be part of the claims-allowance process.

*Germain*, 988 F.2d at 1327.

Applying the principle illustrated in *Germain*, Judge Bernstein held that the SIPA trustee's adversary proceeding did not affect the claims allowance process and, therefore, the court did not have personal jurisdiction over the French defendants on the basis of their disallowed proofs of claim:

> Here, [defendants'] customer claims have been finally denied by the Trustee, and the disposition of the adversary proceeding will not affect their disallowed claims. Hence, the adversary proceeding does not implicate the claims allowance process. Instead, the Trustee is seeking legal relief in the form of the recovery of money damages, and [defendants] did not submit themselves to personal jurisdiction with respect to the Trustee's fraudulent transfer action by filing SIPA claims.

*Apfelbaum*, 525 B.R. at 888.[77]

The principles illustrated in *Germain* and applied by Judge Bernstein in *Apfelbaum* are equally applicable here. As in in *Apfelbaum*, ANZ Bank's filing of proof of claim number 29532

---

[77] Judge Bernstein did find, however, that the court had personal jurisdiction over the French defendants on other grounds. *See Apfelbaum*, 525 B.R. at 882-887.

against LBSF here represents its (and its departments, including ANZ Nominees) submission to the jurisdiction of the Court only with respect to litigation concerning the claims allowance process.  As LBSF's adversary proceeding seeks money damages from ANZ Nominees so as to enlarge the estate, and will have no affect on the allowance or priority of claim number 29532, which was disallowed prior to LBSF commencing proceedings against ANZ Nominees, this adversary proceeding does not concern the claims allowance process.  Accordingly, ANZ Bank did not subject itself and its departments to jurisdiction with respect to this adversary proceeding by filing claim number 29532 against LBSF.

### c.  *The Court Does Not Otherwise Have Specific Jurisdiction Over ANZ Bank*

To establish specific *in personam* jurisdiction, the defendant's "suit-related conduct" must create the necessary connection to the forum state.  *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014).  The defendant's connection to the forum must arise out of contacts the "defendant *himself* creates," and those contacts must be between the defendant and "the forum [s]tate itself, not . . . persons who reside there."  *Id.* at 1122 (emphasis in original).  To show minimum contacts with the United States, the plaintiff must demonstrate that the defendant "purposefully availed" itself of the privilege of doing business in the forum and "could foresee being haled into court there."  *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002).  However, the foreseeability of causing harm in the forum state, without more, is not enough to establish minimum contacts.  *See Walden*, 134 S. Ct. at 1125.  This is to ensure "that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the unilateral activity of another party or a third person."  *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770 (1984)).

25

Even if a court finds that the defendant has the requisite minimum contacts, it can refuse to exercise jurisdiction if the exercise of jurisdiction would not be reasonable. *MTBE*, 2014 WL 1778984, at *2. The reasonableness inquiry "asks whether it is reasonable under the circumstances of the particular case to assert personal jurisdiction." *Amaranth*, 587 F. Supp. 2d at 527.

### i.    The Mere Department Test is Applicable to a Specific Jurisdiction Analysis

As an initial matter, ANZ Nominees argues that application of the mere department is inapplicable in the context of a specific jurisdiction analysis.[78] ANZ Nominees concedes that the court in *GEM Advisors* applied the mere department test in the context of the New York long-arm statute but contends that the court did not offer any specific jurisdiction analysis.[79] ANZ Nominees contends that the mere department test is inapplicable to a specific jurisdiction analysis because it is an outgrowth of the test for general jurisdiction, asserting that the court in *Refco Group Ltd., LLC v. Cantor Fitzgerald, L.P.*, No. 13 Civ. 1654 (RA) 2014 WL 2610608 (S.D.N.Y. June 10, 2014), "refus[ed] to apply the test before analyzing specific personal jurisdiction" and citing to footnote 10 of the *Refco* decision as the basis for such assertion.[80] The Court finds that the *GEM Advisors* court did apply the mere department test in the context of a specific jurisdiction analysis; nothing in the *Refco* decision, or any other decision submitted to the Court, suggests that such application is no longer appropriate.

In *GEM Advisors*, the court considered whether a foreign corporation could be subject to the court's personal jurisdiction under N.Y. C.P.L.R. § 302(a), including section 302(a)(1). *GEM Advisors*, 667 F. Supp. 2d at 318. Section 302(a)(1) is a means of asserting specific

---

[78] *See* Reply at 28-29.
[79] *See* Reply at 29.
[80] Reply at 29.

jurisdiction over a non-domiciliary defendant for a cause of action "arising from . . . transact[ion] [of] any business within the state . . ." N.Y. C.P.L.R. § 302(a)(1); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (describing an analysis under section 302(a)(1) as an evaluation of specific jurisdiction); *Levitin v. Sony Music Entertainment*, No. 14 Civ. 4461(PAC) 2015 WL 1849900 at *8 (S.D.N.Y. Apr. 22, 2015) (plaintiffs made prima facie showing of specific jurisdiction over defendants by showing defendants transacted business in New York under section 302(a)(1)). The plaintiffs in *GEM Advisors* alleged that the foreign corporation, IFN, was subject to jurisdiction under N.Y. C.P.L.R. § 302(a)(1) because its subsidiary, Sidenor, was an agent or mere department of IFN and had transacted business in New York. After finding that Sidenor was an agent and mere department of IFN and that Sidenor had transacted business in New York, 667 F. Supp. 2d at 319-320, the *GEM Advisors* court then concluded that personal jurisdiction over IFN existed under N.Y. C.P.L.R. § 302(a)(1) because "[plaintiff] has made an adequate prima facie showing that IFN is amenable to personal jurisdiction because of its relationship with Sidenor, which . . . transacted business in New York . . . ." *Id.* at 321. Accordingly, the *GEM Advisors* court employed the mere department test in the context of a specific jurisdiction analysis.

In *Refco*, the plaintiff attempted to establish the court's general jurisdiction over foreign entities under the theory that such entities were mere departments of "a parent corporation which has a presence in New York." *Refco*, 2014 WL 2610608 at *8 n.10. The *Refco* court observed, with a citation to a footnote in the Second Circuit's decision in *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221 (2d Cir. 2014), that constitutionality of the mere department test as a means of establishing general jurisdiction "may not be fully consistent with the constitutional principles articulated in *Daimler*." *Id.* After noting this tension, the *Refco* court applied the

27

mere department test and determined that, in any event, the allegations in the complaint were insufficient to establish that the foreign entities were mere departments of the New York parent. *Id.* In other words, the *Refco* court in footnote 10 expressed doubt over the constitutionality of finding general jurisdiction over a foreign entity based on a mere department theory prior to determining that the issue was moot because the foreign entities were not mere departments in any event. There is nothing in footnote 10 of the *Refco* decision that suggests a refusal to apply the mere department test to a specific jurisdiction analysis.

Further, the constitutional tension referred to in *Refco* is not related to the mere department test and its applicability to a specific jurisdiction analysis. In the *Sonera Holding* footnote cited in *Refco*, the Second Circuit stated:

> [W]e note some tension between *Daimler*'s "at home" requirement and New York's "doing business" test for corporate "presence," which subjects a corporation to general jurisdiction if it does business there "not occasionally or casually, but with a fair measure of permanence and continuity." (citations omitted). Not every company that regularly "does business" in New York is "at home" there. *Daimler*'s gloss on due process may lead New York courts to revisit Judge Cardozo's well-known and oft-repeated jurisdictional incantation.

*Sonera Holding*, 750 F.3d at 225 n.2.

Accordingly, while the Second Circuit and the *Refco* court both expressed concern over whether it was constitutional to establish *general* jurisdiction over a foreign defendant through the actions of its mere department in the forum, neither court issued a ruling or expressed an opinion as to the propriety of establishing *specific* jurisdiction over a foreign defendant through the actions of its mere department in the forum.[81]

### ii.    ANZ Bank Does Not Have Minimum Contacts with the United States

---

[81] Subsequent to *Sonera Holding*, the Second Circuit further addressed the question in *Gucci America Inc. v. Li*, 768 F.3d 122 (2d Cir. 2014), holding that general jurisdiction could not be established over a foreign bank solely on the basis of its having branches in New York.

LBSF argues that ANZ Bank has minimum contacts with the United Stated because "ANZ [Bank] took affirmative action to cause the transfer to it of property of the LBSF estate after the petition date, with knowledge of the bankruptcy and in violation of the stay, which caused serious harm to LBSF, and the underlying causes of action against ANZ [Bank] arise out of those activities."[82]

LBSF's argument is largely premised on the notion that ANZ Bank must have directed the Trustee to terminate the Portfolio Swap, thereby setting in motion the chain of events that led to ANZ Nominees receiving and distributing the Distributed Funds.[83]  This alleged action, contends LBSF, is sufficient to establish (i) the "minimum contacts" of ANZ Bank and ANZ Nominees with the United States and (ii) that ANZ Nominees and ANZ Bank violated the automatic stay, which, LBSF asserts, is itself a basis for specific jurisdiction.[84]  Although ANZ Nominees received a request for direction with regard to terminating the Portfolio Swap from the Trustee in connection with the October 8 Notice, LBSF concedes that ANZ Bank and ANZ Nominees did not produce an executed direction letter in discovery.[85]  Nevertheless, LBSF contends that, because the Trustee did in fact take action and terminate the Portfolio Swap, "there is a compelling inference that ANZ executed and returned the 'response document' directing the Trustee to designate an early termination date and distribute the funds[.]"[86] However, ANZ Nominees denies sending any direction to the Trustee and the record simply does not support drawing the inference LBSF urges.

In his supplemental declaration, Mr. Garry explains that ANZ Nominees did not provide direction to the Trustee because "ANZ Nominees never received instructions from the beneficial

---

[82] Opposition ¶ 32.
[83] *See* Opposition ¶ 34.
[84] *See* Opposition ¶¶ 32-38.
[85] Opposition ¶ 21.
[86] Opposition ¶ 21.

holders on whose behalf it held the Federation Notes to provide any such instructions to the Trustee."[87]   This explanation is consistent with the Sub-Custody Agreement and with ANZ Bank's custody agreements with the Australian Beneficial Holders.  Those documents provide that the custodian or sub-custodian, as the case may be, is permitted to take only limited actions without evidence of authority from the client or custodian, respectively.[88]   ANZ Nominees, as sub-custodian, and ANZ Bank, as custodian were not authorized to pay out moneys from the custodial account except upon receipt of "Proper Instructions" (*i.e.*, express authorization from the custodian or client, as the case may be).[89]   Accordingly, it is fully consistent with such agreements that ANZ Nominees and ANZ Bank would only have directed the Trustee, and thereby committed the Australian Beneficial Holders to pay out moneys to indemnify the Trustee, upon receipt of such "Proper Instructions."  There is nothing in the record indicating ANZ Nominees or ANZ Bank received such Proper Instructions from the Australian Beneficial Holders.  Thus, to make the inference urged by LBSF, the Court would have to (a) infer, despite Mr. Garry's undisputed representation to the contrary, that ANZ Nominees and ANZ Bank received Proper Instructions and acted upon them or (b) infer that ANZ Nominees and ANZ Bank acted to direct the Trustee without Proper Instructions, even though such direction would perhaps have constituted a violation of the Sub-Custody Agreement and custody agreements, respectively.  The Court declines to make either inference.

Moreover, the October 8 Notice stated that the Trustee required direction only from the Controlling Class, *i.e.*, a majority of the holders of Federation Notes.  In other words, the Trustee could have acted on direction from the Controlling Class, without any response to the October 8

---

[87] Garry Supp. Decl. ¶ 9.
[88] *See* Sub-Custody Agreement ¶ 2.11; *see also e.g.*, Gurgel Decl. Ex. 4 (Custody Agreement between ANZ Bank and FIIG Securities Ltd.) ¶ 2.9.
[89] *See* Sub-Custody Agreement ¶ 2.9; *see also e.g.*, Gurgel Decl. Ex. 4 (Custody Agreement between ANZ Bank and FIIG Securities Ltd.) ¶ 2.7.

Notice from ANZ Nominees, unless the holdings of the Australian Beneficial Holders were such that the Australian Beneficial Owners constituted the Controlling Class. LBSF has not alleged that the holdings of the Australian Beneficial Holders were sufficient to constitute the Controlling Class.[90] Accordingly, it is at least as valid, and simpler, to infer that the Trustee acted on direction from a Controlling Class that did not include the Australian Beneficial Holders as to make the inference urged by LBSF, that the Australian Beneficial Holders constituted a Controlling Class on whose behalf the Trustee was directed to terminate the Portfolio Swap.

In accordance with the foregoing, the Court rejects LBSF's argument that ANZ Bank or ANZ Nominees has sufficient minimum contacts with the United States by virtue of its allegedly having directed the Trustee to terminate the Portfolio Swap.[91]

In the absence of an inference that ANZ Nominees or ANZ Bank affirmatively directed the Trustee to terminate the Portfolio Swap, LBSF is left with arguments that (i) the Court has specific jurisdiction over ANZ Bank because ANZ Bank knew at the time it took on its roles as custodian on behalf of the Australian Beneficial Holders that the Federation Notes had a connection to the United States and the LBSF estate and that it knew that its receipt of the Distributed Funds would cause harm to the LBSF estate[92] and (ii) the Court has specific jurisdiction over ANZ Bank by virtue of the New York long-arm statute.[93] Neither of these arguments is meritorious.

---

[90] In fact, LBSF alleges that the Australian Beneficial Holders received a 100% recovery on the principal value of their Federation Notes in the amount of AUD 17,166,217.40. *See* Opposition ¶¶ 23-24. This indicates that the Australian Beneficial Holders held less than a majority of the value of the AUD 64,500,000 principal Federation Notes and perhaps could not have constituted a Controlling Class.

[91] As the Court explained in *Shield* (defined below), even if the Court were to find that ANZ Bank or ANZ Nominees had violated the automatic stay, such violation, by itself, would not confer specific jurisdiction; rather, the Court would still have to find that ANZ Bank or ANZ Nominees, as the case may be, had sufficient contacts with the United States. *See Shield*, 535 B.R. at 623.

[92] *See* Opposition ¶¶ 38-41.

[93] *See* Opposition ¶¶ 47-52.

31

First, as this Court explained in *Lehman Brothers Special Financing Inc. v. Bank of America National Association, et al. (In re Lehman Brothers Holdings Inc.)*, 535 B.R. 608 (Bankr. S.D.N.Y. 2015) ("*Shield*"), the foreseeability of harm being felt in the forum state and, relatedly, of being haled into court in the forum state, is not sufficient to meet the minimum contacts test articulated by the Supreme Court in *Walden*. *See Shield*, 535 B.R. at 623. Accordingly, the Court finds that ANZ Bank does not have the requisite minimum contacts with the United States to justify asserting specific jurisdiction over it in this adversary proceeding.

Second, and also as this Court explained in *Shield*, even if ANZ Bank could be reached under the New York long-arm statute, to assert specific jurisdiction, the Court would still need to find that ANZ Bank had established minimum contacts with the United States. *See Shield*, 535 B.R. at 624 ("even if [defendant] can be reached under the New York long-arm statute, that conclusion would not invalidate the minimum contacts analysis performed above, nor would it eliminate this Court's obligation to engage in it."). As the Court finds that ANZ Bank does not have the requisite minimum contacts with the United States to justify asserting specific jurisdiction, it cannot assert jurisdiction under the New York long-arm statute.

### B.  *In Rem* Jurisdiction

The court in which a bankruptcy proceeding is pending has "exclusive jurisdiction of all the property, wherever located, of the debtor *as of the commencement of such case*, and of property of the estate." 28 U.S.C. § 1334(e) (emphasis supplied); *see also Sinatra v. Gucci (In re Gucci)*, 306 B.R. 679, 681 (S.D.N.Y. 2004). Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), and includes "even strictly contingent interests," *Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In re Mid-Island Hosp., Inc.)*, 276 F.3d 123, 128 (2d Cir. 2002). A

debtor's security interest in collateral or a debtor's interest in an executory contract as of the commencement of the case comprises property of the estate.  *See Lehman Bros. Special Financing Inc. v. BNY Corp. Tr. Servs. Ltd.*, 422 B.R. 407, 411, 418 (Bankr. S.D.N.Y. 2010).  A contract is executory if "termination requires the non-debtor party to undertake some post-petition affirmative act."  *In re Margulis*, 323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005) (citations omitted).

The bankruptcy court's *in rem* jurisdiction is broad and reaches property wherever located.  *See* 28 U.S.C. § 1334(e).  In other contexts, a court may only exercise *in rem* jurisdiction over property physically within the court's jurisdiction at the time of the suit.  *See* 4A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 107 (3d ed.). However, in the bankruptcy context, Congress explicitly gave bankruptcy courts global reach over the debtor's property via section 541(a) of the Bankruptcy Code and section 1334(e) of title 28 of the United States Code.  *See Hong Kong & Shanghai Banking Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 996 (9th Cir.1998), *cert. denied*, 525 U.S. 1141 (1999) ("Congress intended extraterritorial application of the Bankruptcy Code as it applies to property of the estate."); *Gucci*, 309 B.R. at 683 (declaring that "[s]ection 1334(e) . . . embodies a Congressional determination that bankruptcy courts should determine rights in property of bankrupt estates regardless of where that property may be found"); *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) (exercising *in rem* jurisdiction to enforce automatic stay against foreign receiver related to foreign assets of foreign debtor).

Despite the bankruptcy court's broad reach to assert jurisdiction over foreign property, the bankruptcy court's *in rem* jurisdiction cannot be enforced extraterritorially without *in personam* jurisdiction over the defendant.  *See Found. for Research v. Globo Communicacoes e*

33

*Participacoes S.A. (In re Globo Comunicacoes e Partipacoes S.A.)*, 317 B.R. 235, 251–52 (S.D.N.Y. 2004). In other words, "the bankruptcy court is precluded from exercising control over property of the estate located in a foreign country without the assistance of the foreign courts." *In re Int'l Admin. Servs., Inc.*, 211 B.R. 88, 93 (Bankr. M.D. Fla. 1997).

LBSF asserts that the Court can assert *in rem* jurisdiction on the basis of the LBSF estate's purported property interests in (i) the Distributed Funds and (ii) LBSF's purported senior right to priority.[94] As ANZ Nominees correctly points out, LBSF concedes that the both the Distributed Funds and the purported senior payment priority are not property of the estate until the purportedly unenforceable flip clause is rendered unenforceable.[95] These purported property interests, the Distributed Funds, and LBSF's purported "senior" right to priority, are therefore the subject of this dispute and thus constitute property claimed by the Debtor. Accordingly, these interests cannot form the basis for the Court's exercise of *in rem* jurisdiction. *See In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992).

This Court has previously held, however, that it can exercise its *in rem* jurisdiction on the basis of the estate's property interests in transaction documents and collateral. *Shield*, 535 B.R. at 629; *see also Lehman Bros. Special Financing Inc. v. BNY Corp. Tr. Servs. Ltd.*, 422 B.R. 407, 411, 418 (Bankr. S.D.N.Y. 2010). Accordingly, it is necessary to consider whether LBSF's estate has a property interest in either (i) the transaction documents governing the Federation Notes or (ii) in the Investment Agreements and other collateral securing the Federation Notes.

1.    **LBSF Has a Property Interest in the Transaction Documents Governing the Federation Notes**

---

[94] *See* Opposition ¶¶ 65-66.
[95] *See* Reply at 23 (quoting Opposition ¶ 65 ("[o]nce the flip clause is rendered unenforceable, section 542(a) required both the Trustee and ANZ to deliver to LBSF, not to Noteholders, such property.")); Reply at 25 (quoting Opposition ¶ 69 ("[A]s of the petition date, and assuming the unenforceable nature of the flip clause, the Court has worldwide jurisdiction over the property of the Estate, including LBSF's senior payment priority and lien in and to the funds.").

The bankruptcy estate is composed of, *inter alia*, "all legal or equitable interests of the debtor in property *as of the commencement of the case*." *Lehman Bros. Special Financing Inc. v. BNY Corp. Tr. Servs. Ltd.*, 422 B.R. 407, 418 (Bankr. S.D.N.Y. 2010) (emphasis in original) ("*BNY*"). In *BNY*, the Court found that LBSF had a property interest in the transaction documents there at issue. *BNY*, 422 B.R. at 418. The trustee took the position that the so-called "flip clause" that purportedly altered the payment priorities in favor of the noteholders and against LBSF was self-executing and triggered by LBHI's bankruptcy filing on September 15, 2008 such that LBSF had no property interest in the transaction documents as of the commencement of its own case, on October 3, 2008. *See id.* Judge Peck found that the transaction documents were executory contracts and analyzed them in accordance with the principle that executory contracts are property of the estate where, as of the commencement of the case, "termination requires the non-debtor party to undertake some post-petition affirmative act." *See id.* Judge Peck found that, as of the LBSF petition date, the transaction documents at issue in *BNY* "required certain affirmative acts be taken prior to the effectiveness of any modification of payment priority." *BNY*, 422 B.R. at 418. Among other affirmative acts, Judge Peck found that "payments required by [the transaction documents] cannot be calculated until after termination of the relevant Swap Agreement" and "[t]he relevant termination events took place after commencement of the LBSF case." *Id.* Accordingly, Judge Peck held that "LBSF held a valuable interest in the Transaction Documents as of the LBSF Petition Date and, therefore, such interest is entitled to protection as part of the bankruptcy estate." *Id.*

The Federation Notes and the transaction documents governing them, like the transaction documents in *BNY*, were executory contracts as of the commencement of the LBSF case. Thus, for the LBSF estate to have a property interest in the transaction documents governing the

Federation Notes, termination of such transaction documents must have "require[d] the non-debtor party to undertake some post-petition affirmative act" *as of the commencement of the case* on October 3, 2015. *BNY*, 422 B.R. at 418 (citations omitted). Here, as with the transaction documents at issue in *BNY*, the transaction documents governing the Federation Notes could not be terminated until the Trustee took the affirmative action of terminating the Portfolio Swap. Accordingly, the LBSF estate has a property interest in the transaction documents governing the Federation Notes.[96]

> **2.    LBSF Has a Property Interest in Its Security Interest on the Investment Agreements and Other Collateral**

The offering memorandum states (and ANZ Nominees has not disputed) that LBSF has a security interest in the Investment Agreements.[97] Consistent with *BNY* and *Shield*, such a security interest is a sufficient basis for the Court to exercise its *in rem* jurisdiction.

In accordance with the above, the Court finds that it has *in rem* jurisdiction over LBSF's property interest in the transaction documents associated with the Federation Notes and in LBSF's security interest in the collateral securing the Federation Notes. The Court's finding that neither ANZ Nominees nor ANZ Bank has minimum contacts for the purposes of the assertion of specific personal jurisdiction does not preclude the Court's exercise of *in rem* jurisdiction. *See Shield*, 535 B.R. at 629.

---

[96] It follows that the scope of LBSF's property interest in the transaction documents as of the commencement date of the LBSF case is limited to the rights it enjoyed pursuant to the transaction documents *as of the commencement date* of the LBSF case. For example, LBSF could not have had a right to a termination payment in connection with the termination of the Portfolio Swap as of the commencement date of the LBSF case on October 3, 2008 because the Portfolio Swap was not terminated until October 30, 2008. As of the commencement date of its case, LBSF at least had a property interest in payment of the AUD Tranche Loss Amounts pursuant to the transaction documents governing the Federation Notes. *See* Apostolova Decl. Ex. 1 at 29 (detailing "Final Scheduled Payment Date Priority of Payments").

[97] Apostolova Decl. Ex. 1 at 16 ("Moreover, the security interest of the Trustee under the Indenture is not only for the benefit of the holders of the [Federation Notes] but is also for the benefit of [LBSF].").

## <u>CONCLUSION</u>

For all of the foregoing reasons, ANZ Nominees' motion to dismiss for lack of personal jurisdiction is granted. Notwithstanding the Court's lack of personal jurisdiction over ANZ Nominees, the Court has *in rem* jurisdiction and concomitant adjudicatory authority over the property at issue in this dispute and shall exercise such jurisdiction. The parties are directed to settle an order consistent with this decision.

Dated: December 28, 2015
New York, New York

/S/ Shelley C. Chapman
UNITED STATES BANKRUPTCY JUDGE
