<u>**FOR PUBLICATION**</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------------------------x
                                        :
In re                                   :        Chapter 11
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :        Case No. 08-13555 (SCC)
                                        :
                Debtors.                :        (Jointly Administered)
--------------------------------------------------------------------x
                                        :
LEHMAN BROTHERS SPECIAL FINANCING INC., :
                                        :
                Plaintiff,              :
                                        :
        − against −                     :        Adversary Proceeding
                                        :        No. 10-03547 (SCC)
BANK OF AMERICA NATIONAL                :
ASSOCIATION, et al.,                    :
                                        :
                Defendants.             :
--------------------------------------------------------------------x
```

**MEMORANDUM DECISION ON OMNIBUS MOTION OF THE NOTEHOLDER**
**DEFENDANTS TO DISMISS THE FOURTH AMENDED COMPLAINT**

A P P E A R A N C E S:[1]

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110

By:     William A. Maher, Esq.
        Paul R. DeFilippo, Esq. *(argued)*
        William F. Dahill, Esq. *(argued)*
        Vincent T. Chang, Esq. *(argued)*
        Jason E. Glass, Esq.
        Mara R. Lieber, Esq.

*Counsel for Plaintiff Lehman Brothers Special Financing Inc.*

---

[1] Due to the large number of defendants named in this adversary proceeding, the Court lists the appearances only of those counsel who argued at the hearing held on the Omnibus Motion to Dismiss on May 4, 2016.

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006

By:     Carmine D. Boccuzzi, Jr., Esq. *(argued)*
        Brent Tunis, Esq.
        Emily Balter, Esq.

*Counsel for Goldman, Sachs & Co. and Goldman Sachs International*

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603

By:     Bryan Krakauer, Esq. *(argued)*
        Mark B. Blocker, Esq.
        Allison Ross Stromberg, Esq.

*Counsel for Principal Life Insurance Co.*

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603

By:     Bryan Krakauer, Esq. *(argued)*

787 Seventh Avenue
New York, New York 10019

By:     Nicholas P. Crowell, Esq.
        Jon W. Muenz, Esq.

*Counsel for PCA Life Assurance Co. Ltd.*

MORGAN, LEWIS & BOCKIUS LLP
399 Park Avenue
New York, New York 10022

By:     Joshua Dorchak, Esq. *(argued)*

*Counsel for Continental Insurance Co. of Brentwood Tennessee,*
*Marsh & McLennan Master Retirement Trust, Marsh & McLennan*
*Companies, Inc. Stock Investment Plan, Modern Woodmen of America,*

*Inc., PHL Variable Insurance Co., Phoenix Life Insurance Co., Putnam
Dynamic Asset Allocation Funds – Growth Portfolio, Putnam
Intermediate Domestic Investment Grade Trust, and Putnam Stable Value Fund*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006

By:    Jeffrey A. Rosenthal, Esq. *(argued)*

*Counsel for Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill
Lynch International*

CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603

By:    Franklin H. Top III, Esq. *(argued)*

*Counsel for U.S. Bank National Association, as Successor Trustee*

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019

By:    Nicholas P. Crowell, Esq. *(argued)*
       Alex J. Kaplan, Esq.
       Alex R. Rovira, Esq.
       Andrew P. Propps, Esq.

*Counsel for Genworth Life & Annuity Insurance Co., Magnetar
Constellation Master Fund, Ltd, Magnetar Constellation Fund II,
Ltd, Magnetar Constellation Master Fund III, Ltd, and UniCredit
Bank, AG (London Branch)*

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 2

   A.   Structure of the Transactions .................................................................................. 4

   B.   The Transaction Documents and the Priority Provisions .................................... 6

   C.   The Bankruptcy Cases and Termination of the Transactions ............................. 9

   D.   The *BNY* and *Ballyrock* Decisions....................................................................... 11

   E.   The Adversary Proceeding .................................................................................... 15

DISCUSSION .................................................................................................................. 16

   A.   Motion to Dismiss Standard ................................................................................. 16

   B.   Analysis of the Priority Provisions ...................................................................... 18

      1.   The Priority Provisions in Type 1 Transactions Modify LBSF's Rights and Therefore Are *Ipso Facto* Clauses............................................................................................... 24

      2.   Even If the Priority Provisions in Type 2 Transactions *Ipso Facto* Modified LBSF's Rights, Any Such Modifications In Pre-Pre Transactions or Pre-Post Transactions Occurred Before the LBSF Petition Date and Thus Do Not Violate Sections 365(e)(1), 541(e)(1), or 363(l) of the Code ............................................................................................... 26

      3.   The Section 560 Safe Harbor Protects The Distributions ..................................... 35

   C.   LBSF's State Law Claims Fail to State a Cause of Action ................................. 46

      1.   Counts XIII - XVI .................................................................................................. 46

      2.   Count XVII ............................................................................................................. 48

      3.   Count XVIII ............................................................................................................ 49

      4.   Count XIX............................................................................................................... 50

CONCLUSION ................................................................................................................ 51

APPENDIX A .................................................................................................................. 52

APPENDIX B .................................................................................................................. 54

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Plaintiff Lehman Brothers Special Financing Inc. ("LBSF") has brought this adversary proceeding against some 250 defendant noteholders, note issuers, and indenture trustees seeking to recover approximately $1 billion that was distributed to the defendant noteholders following the commencement of the Lehman Brothers chapter 11 proceedings in September 2008. The distributions were made in connection with the early termination of hundreds of swap transactions to which LBSF was a counter-party; the early terminations were solely triggered by LBSF's default, which occurred when Lehman Brothers Holdings Inc. ("LBHI") filed its chapter 11 petition on September 15, 2008. The question at the core of this matter is the enforceability of an alleged *ipso facto* clause in the applicable transaction documents. If the clause is not enforceable (and the distributions not protected by any applicable "safe harbor"), LBSF will be entitled to recover the distributions. Imbedded in that simple question lie a number of vexing and intriguing issues, including:

- Were LBSF's priority rights modified by application of the alleged *ipso facto* clauses?
- Was a modification of LBSF's rights, if any, effective upon LBSF's receipt of a valid termination notice or not until distributions with respect to such termination were made?
- Is it the chapter 11 filing date of LBHI or the subsequent filing date of LBSF that is the relevant point in time for purposes of the analysis of the enforceability of the alleged *ipso facto* clause?
- To what extent do the safe harbor provisions of the Bankruptcy Code protect some or all of the distributions from clawback?

1

Although it has been six years since the Court first addressed similar issues in the context of certain credit-linked synthetic portfolio notes issued under the multi-issuer secured obligation program known as the "Dante Program,"[2] no other court has addressed the precise issues presented by the forty-four transactions at issue here.

Against that backdrop, and for the reasons that follow, the Court concludes that Counts I through XIX of the adversary complaint fail to state a cause of action upon which relief can be granted and therefore grants the Motion (as defined below). The Court's analysis is as follows.[3]

## **BACKGROUND**

The Omnibus Motion to Dismiss (the "Motion")[4] before the Court filed by certain noteholder and trust certificate holder defendants (the "Noteholders") in the above-captioned adversary proceeding relates to Counts I through XVI, XVIII, and XIX of LBSF's Fourth Amended Complaint.[5] The Motion was joined by certain other defendants in the adversary proceeding, each in its capacity as an indenture trustee for one or more of the transactions that are the subject of the adversary proceeding (such defendants, the "Trustees" and together with

---

[2] *Lehman Bros. Special Fin. Inc. v. BNY Corp. Trustee Servs. Ltd.*, 422 B.R. 407, 420 (Bankr. S.D.N.Y. 2010) (JMP) ("*BNY*"); *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd. (In re Lehman Bros. Holdings Inc.)*, 452 B.R. 31 (Bankr. S.D.N.Y. 2011) (JMP) ("*Ballyrock*"); *see also Perpetual Trustee Company Limited and others v. BNY Corporate Trustee Services Limited and others* [2009] EWCA Civ 1160 ("*Perpetual*").

[3] Familiarity with *BNY*, *Ballyrock*, *Perpetual*, and the briefing submitted by the parties will assist the reader in following the analysis set forth in this Decision. Incorporating every detail here would yield an unreasonably unwieldy opinion.

[4] ECF No. 1195.

[5] The Fourth Amended Complaint, dated October 13, 2015 [ECF No. 1156], is referred to herein as the "Complaint." By Count I of the Complaint, LBSF seeks a declaratory judgment that the Priority Provisions constitute unenforceable *ipso facto* clauses. By Counts II and III of the Complaint, LBSF asserts claims for violation of the automatic stay pursuant to section 362 of the Code. By Counts IV-IX, LBSF asserts various avoidance claims under sections 547, 548, and 549 of the Code. Finally, by Counts X through XII, LBSF asserts claims for turnover of property under section 542 of the Code.

the Noteholders, the "Movants").[6]  In addition to joining the Motion, certain of the Trustees also

moved to dismiss Count XVII of the Complaint, which is asserted solely against the Trustees.

By the Motion and the Joinders, the Movants seek dismissal of Counts I through XIX of

the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).[7]  The Movants argue that LBSF has failed to

state a claim upon which relief can be granted because, among other things, (i) the contractual

provisions at issue are not unenforceable *ipso facto* clauses because they did not modify LBSF's

rights after LBSF's bankruptcy petition date and (ii) even if such provisions were unenforceable

*ipso facto* clauses, the distributions at issue are protected by certain safe harbor provisions of the

Bankruptcy Code (the "Code").  LBSF argues that the provisions at issue are unenforceable *ipso*

*facto* clauses and are not protected by the safe harbor provisions identified by the Movants.

LBSF has also asserted a variety of other bankruptcy and state law claims against the Movants.

The relevant facts before the Court, while complex, are largely undisputed.  LBSF, an

indirect subsidiary of LBHI, initiated this adversary proceeding on September 14, 2010.  The

dispute arises out of a multitude of financial transactions involving certain credit default swap

agreements (the "Swaps") to which LBSF was a party.  Pursuant to each Swap, among other

things, LBSF purchased credit protection from certain special-purpose entities (the "Issuers") in

connection with forty-four synthetic collateralized debt obligation transactions (the "CDOs")

---

[6] ECF Nos. 1198 and 1199 (together, the "Joinders").
[7] Pursuant to the Second Scheduling Order [ECF No. 1138], the Motion and Joinders do not seek dismissal of
Counts XX through XXIII, which relate to the Pyxis Transactions, or Counts XXIV and XXV, which relate to the
Federation Transactions, and therefore the Court does not address those Counts here.

between and among LBSF and its affiliates, on the one hand, and the Issuers, on the other.[8]  In

each of these transactions, LBSF and the Noteholders held competing interests in collateral

securing each Issuer's obligations to LBSF under the Swap and to the Noteholders under their

notes.  The transaction documents include provisions that govern the priority of payment upon a

distribution of proceeds from the liquidation of such collateral after termination of the Swap (the

"Priority Provisions").  In each transaction at issue in this adversary proceeding, LBSF alleges

that the Noteholders improperly received distributions as a result of the enforcement of the

Priority Provisions.

### A.  Structure of the Transactions

Each Swap was one of three components of a larger transaction between and among

LBSF, an Issuer, a Trustee, and certain Noteholders.  Although the general structures of the

Transactions[9] are similar, each was entered into pursuant to its own set of transaction documents

(the "Transaction Documents"), the terms of which vary to some extent and govern the rights of

the Issuers, Trustees, the Noteholders, and LBSF between and among themselves.

First, in connection with each CDO, each Issuer issued one or more series of Notes (or, in

certain circumstances, trust certificates)[10] pursuant to indenture or trust agreements (or, with

respect to the trust certificates, trust documentation, and with such indentures and trust

---

[8] The Complaint identifies forty-seven collateralized debt obligation transactions as the subject of LBSF's
allegations; the parties to three of those transactions have reached a settlement.  As a result, those transactions are
not addressed in this Decision.

[9] The Court uses the defined term "Transaction" or "Transactions" to refer to the three component transactions as a
whole.

[10] The Court uses the defined term "Notes" to refer collectively to the series of notes and trust certificates issued in
connection with the Transactions at issue.

agreements, the "Indentures") to a group of Noteholders (the "Issuances"), and used the proceeds

from the Issuances to fund the Issuer's purchase of certain liquid investments to serve as

collateral.[11]  Second, each Issuer and LBSF entered into one or more Swaps whereby the Issuer

sold synthetic credit protection on certain reference entities to LBSF.[12]  The Issuer then applied

LBSF's periodic fixed premium payments pursuant to the Swaps to enhance the interest

payments to be made to the Noteholders.[13]  Finally, upon the closing date of each CDO, each

Issuer used cash proceeds received from the Noteholders to purchase one or more liquid

investments to provide investment income and to serve as collateral (the "Collateral") to secure

or support the Issuer's obligations to the Noteholders and to LBSF as the swap counterparty.[14]

The Collateral was held in trust by a Trustee or similar financial agent pursuant to an

indenture, a trust deed, or a trust agreement.  The Trustee held a lien on the Collateral for the

benefit of all Secured Parties[15] under each Transaction; the Trustee also held and controlled

certain of the Issuers' rights under the Transaction Documents.  LBSF and the Noteholders had

recourse for payment of each Issuer's obligations against only the Collateral and any other assets

---

[11] *See generally* Def. Br. [ECF No. 1195] at 5.

[12] *Id.*

[13] *Id.*

[14] Of the forty-four Transactions that are the subject of this Adversary Proceeding, (a) thirty-nine involved the issuance of secured notes pursuant to an indenture governed by New York law; (b) two involved the issuance of secured notes pursuant to an English law trust deed (the Quartz Finance Plc 2004-1 and Ruby Finance plc 2005-1 Transactions); and (c) three involved the issuance of trust certificates in connection with a trust agreement governed by New York law (the Restructured Asset Certificates with Enhanced Returns ("RACER") Series Transactions).  *See* Def. Br. at 5 n. 4.

[15] In addition to the Noteholders and LBSF, "Secured Parties" for a Transaction typically included the Trustees themselves, as well as any specified providers of administrative, custodial, or similar services.  For the RACER Series Transactions, however, there was no grant of security interests in the relevant Collateral, but the Transaction Documents created certain contract rights and obligations that the parties agree achieved a similar effect.  *See* Def. Br. at 6 n. 5.

of the Issuers related to the respective Transaction.  For each Swap, LBHI guaranteed LBSF's

obligations pursuant to a standard form guaranty and served as credit support provider for LBSF

in relation to the Swap in each Transaction.

## B.  The Transaction Documents and the Priority Provisions

As described above, the Swaps and the Issuances were documented separately, although

each Swap and Indenture makes reference to the other.  All of the Transactions are governed by

New York law, with the exception of the Quartz Finance PLC Series 2004-1 Transaction and

Ruby Finance plc Series 2005-1 Transaction, which are governed by English law.[16]  For each

Issuance, the Indentures generally consist of a set of Standard Terms[17] and a Series Indenture.[18]

If an event of default occurs under an Indenture, the Trustees are entitled to issue an enforcement

notice ("Termination Notice"), which accelerates payment due and owing on the Notes and

triggers an early termination of the Swaps.  Although the issuance of a Termination Notice

terminates the Swap, it does not terminate the Indenture.[19]  After issuing a Termination Notice,

the Trustees are permitted, but not required, to take additional actions pursuant to Section 5.4 of

the Standard Terms, including liquidating the Collateral.[20]  To the extent that the Trustees

liquidate the Collateral and determine to distribute the proceeds, the Trustees are obligated to

make distributions in accordance with the payment priority order (the "Waterfall") applicable

under the circumstances pursuant to the Priority Provisions.  Although the Trustees are not

---

[16] Def. Br. at 50 n. 48.
[17] *See* Declaration of Paul R. DeFilippo ("DeFilippo Declaration"), Ex. J (the "Standard Terms").
[18] *See* DeFilippo Declaration, Ex. K.
[19] Article IV of the Standard Terms addresses the manner in which the Indentures were to be discharged.  *See* DeFilippo Declaration, Ex. J.
[20] *See* DeFilippo Declaration, Ex. J.

obligated to make a distribution to any Secured Party upon liquidating the Collateral, any proceeds that *are* distributed must be distributed pursuant to the applicable Waterfall.

Each Swap was documented with an ISDA[21] Master Agreement, schedules, and a confirmation. Substantially all of the Swaps were documented using industry-standard credit derivative transaction terms – principally, the 2003 ISDA Credit Derivatives Definitions.[22] The schedule to the ISDA Master Agreement provides the method for calculating any termination payment due following the designation of an early termination date (an "Early Termination Date") upon the occurrence of an "Event of Default" (as defined in the Swap) by either LBSF or the Issuer.[23] Under section 6(e) of the ISDA, the parties to the Swap are entitled to elect one of two payment methods – either "First Method" or "Second Method" – and one of two payment calculation measures – either "Market Quotation" or "Loss."

By way of background, generally speaking, First Method contemplates an "Early Termination Payment" (as defined in the Swap) to be made by the defaulting party to the non-defaulting party.[24] Under Second Method, on the other hand, if the termination payment amount calculated using Market Quotation or Loss is a positive number, then the defaulting party must

---

[21] "ISDA" is an acronym for the International Swaps and Derivatives Association, Inc., a global trade association that has pioneered efforts to standardize documentation for derivatives, including the development of the ISDA Master Agreement, which serves as the contractual foundation for more than 90% of derivatives transactions globally. Market participants also use "the ISDA" as a shorthand reference to the ISDA Master Agreement. *See In re Lehman Bros. Holdings Inc.*, No. 08-13555 SCC, 2015 WL 7194609, at *1 n.1 (Bankr. S.D.N.Y. Sept. 16, 2015) ("*Intel II*").

[22] The majority of the Swaps referenced underlying commercial, industrial, and financial obligations, and the remaining Swaps referenced other Swaps or asset-backed securities (the so-called "CDO-squareds").

[23] Although the Swaps enumerate several potential Events of Default for both LBSF and the Issuers, for purposes of this Decision, the only one relevant here is that LBHI's filing for bankruptcy was listed as an Event of Default that would render LBSF a "Defaulting Party" (as defined in the Swap). There is no allegation that the Issuers defaulted on the Swap or any other Transaction Document.

[24] *See Intel II*, at *6 (S.D.N.Y. Sept. 16, 2015).

7

pay the non-defaulting party; if that number is negative, then the non-defaulting party must pay

the absolute value of that number to the defaulting party.[25]  To calculate the amount of an Early

Termination Payment using Market Quotation, the non-defaulting party generally calculates the

arithmetic mean of four or more price quotes offered by "Reference Market-makers" (leading

dealers in the market) to replace the defaulting party in a transaction that would preserve the

economic equivalent of the Terminated Transaction.[26]  In contrast, when using Loss to calculate

the amount of an Early Termination Payment, a non-defaulting party must determine in good

faith its total losses and costs (or gain, in which case the amount is expressed as a negative

number) incurred in connection with the termination of the transaction.[27]

Here, Part 1(c) of the schedule to the Swap provides that following an Early Termination

Date, a termination payment is calculated using the mark-to-market value of the parties' swap

positions, as calculated under Loss and using Second Method,[28] meaning that a termination

payment would be calculated based on the value of the Swap parties' positions at the time of the

Early Termination Date.  For instance, if, at the time of the Early Termination, the reference

obligations underlying a Swap had decreased in value over the lifetime of the Swap, LBSF

would be entitled to a termination payment on account of its interest in that Swap.  A party

whose Swap position has value at the time of a termination is considered "in-the-money."

---

[25] ISDA Master Agreement §§ 6(e)(i)((3) and (4).
[26] *See Intel II*, at *11 n.67 (citing ISDA Master § 14, "Market Quotation").
[27] *See Intel II*, at *10 (citing ISDA Master § 14, "Loss").
[28] In fourteen of the Swaps, Market Quotation was the calculation method instead of Loss, but the method of calculation has no material effect on the dispute here.

8

The Transaction Documents provided that any distributions made by the Trustees to LBSF, the Noteholders, and other parties owed distributions under the Transaction Documents were to be made pursuant to the Waterfall and in accordance with the Priority Provisions. Pursuant to the Priority Provisions, LBSF held payment priority for a termination payment owing to LBSF ahead of payments to the Noteholders under certain circumstances (such Waterfall, "LBSF Priority"), while in other circumstances, the Noteholders held payment priority ahead of the payment to LBSF of such a termination payment (such Waterfall, "Noteholder Priority"). The Priority Provisions contemplate different Waterfalls depending on (i) the circumstances of the Early Termination (*e.g.*, an Event of Default) and, importantly, (ii) the party causing the Early Termination (*i.e.*, the identity of the Defaulting Party).

## C.  The Bankruptcy Cases and Termination of the Transactions

The background and context of the bankruptcy filings of LBHI and its affiliates are now part of financial history.  The filings of the Lehman entities are considered one of the most complex, multi-faceted, and largest business bankruptcy filings in history.[29]  When round-the-clock negotiations to effect an out-of-court solution for Lehman failed over the weekend of September 13, 2008, LBHI filed for bankruptcy protection with little advance preparation.  Like the circumstances leading to LBHI's filing, many of the issues that have arisen in the context of the Lehman bankruptcy cases have been unprecedented and are indeed unique.  This Decision addresses a few such issues.

---

[29] *BNY*, 422 B.R. at 420.

LBHI filed its bankruptcy petition on September 15, 2008 (the "LBHI Petition Date"). Because LBHI was a guarantor of LBSF's payment obligations under the Swaps and served as credit support provider to LBSF pursuant to the Transaction Documents, LBHI's bankruptcy filing triggered an Event of Default whereby LBSF became the Defaulting Party under the Swap for each Transaction.  LBSF filed its bankruptcy petition eighteen days later, on October 3, 2008 (the "LBSF Petition Date").

In each of the Transactions, the Issuer, through the Trustee (or another agent of the Issuer), duly designated an Early Termination Date under the Swaps based on LBSF's default (the "Early Termination")[30] and delivered the Termination Notices which terminated the Swaps and accelerated the amount due on the Notes.  The designation of the Early Termination Date also triggered the calculation of a termination payment owed under the Swaps.

Of the forty-four Transactions at issue in this adversary proceeding, thirty-six Swaps were terminated prior to the LBSF Petition Date and seven were terminated after the LBSF Petition Date.[31]  Following the Early Termination of the Swaps, the Trustees monetized the Collateral and distributed the proceeds (or in some cases, distributed the Collateral itself) in accordance with the Priority Provisions for each of the Transactions.  The parties have grouped the Transactions into three categories based on the timing of the Early Termination and the

---

[30] LBSF does not allege that the Transactions were terminated for any reason other than an Event of Default under the Swaps for which LBSF was the Defaulting Party and does not contest that the Issuers and Trustees held the right to terminate the Swaps and accelerate the Notes.  *See* Tr. of May 4, 2016 Hr'g at 57:16-58:1 [ECF No. 1342].

[31] The Court has not been provided information as to when one of the Transactions, the Kings River Limited Transaction, was terminated.

10

distribution of proceeds, as reflected in Appendix A hereto.[32]  For the majority of the Swaps terminated prior to the LBSF Petition Date, the Collateral was liquidated and payments were distributed prior to the LBSF Petition Date (the "Pre-Pre Transactions").  For certain others, the Swaps were terminated prior to the LBSF Petition Date but distributions to the Noteholders were not made until after the LBSF Petition Date (the "Pre-Post Transactions").  Finally, with respect to certain other Swaps, the termination of the Swaps, liquidation of the Collateral, and distribution of proceeds all occurred after the LBSF Petition Date (the "Post-Post Transactions").

Upon providing notice of an Event of Default under the Swaps and the Indentures, the Trustees liquidated the assets, including the Collateral securing the Issuers' obligations under the Swaps and Indentures, and deposited the proceeds into accounts held by each Trustee for that purpose.  The Trustees subsequently distributed the proceeds pursuant to the applicable Waterfall (the "Distributions").  In each instance, the Trustees applied Noteholder Priority because the Early Terminations were the result of an Event of Default and LBSF was the Defaulting Party.[33]  The amount of the proceeds of the liquidation of the Collateral was insufficient to make any payment to LBSF under the Waterfall after proceeds were paid pursuant to Noteholder Priority.

### D. The *BNY* and *Ballyrock* Decisions

In addition to the Transactions at issue here, LBSF was party to additional transactions that were similarly structured, including those transactions entered into pursuant to the Dante

---

[32] The Court adopts the Noteholders' categorization of the Transactions as provided in Appendix A to the Motion, which categorization LBSF has not disputed.  The Court has not been provided information as to when distribution of the Collateral occurred for the three Sunset Park 2004 Transactions.

[33] LBSF does not dispute that the Transactions were terminated as a result of an Event of Default under the Swaps or that LBSF was the Defaulting Party.

11

Program.  In mid-2009, the holders of certain notes issued by Saphir Finance Public Limited

Company ("Saphir") pursuant to the Dante Program brought an action against BNY Corporate

Trustee Services Limited, as indenture trustee for the notes ("BNY"), in the High Court of

Justice in England seeking payment pursuant to the priority provisions in the Saphir transaction

documents ahead of LBSF, which was the counterparty to a swap transaction with Saphir.[34]  The

Saphir transaction was governed by English law.  LBSF intervened in the Perpetual Action and

then commenced its own action against BNY in this Court seeking a declaration that those

priority provisions were unenforceable *ipso facto* clauses.  Prior to resolution of LBSF's action

in this Court, the English Court determined in *Perpetual* that the relevant provisions of the

transaction documents were valid and enforceable under English law.[35]  That decision has since

been affirmed by the English appellate courts.[36]

On January 25, 2010, Judge Peck issued an opinion in the companion case pending

before this Court granting LBSF's motion for summary judgment and holding that the priority

provisions at issue constituted unenforceable *ipso facto* clauses under sections 365(e)(1) and

541(c)(1)(B) of the Code ("*BNY*").[37]  While acknowledging the conflicting ruling in *Perpetual*,

Judge Peck concluded that this Court was not bound by that result on the basis of comity and that

application of the relevant provisions of the Code dictated a contrary result to that in *Perpetual*.

---

[34] The Court refers to the action brought by the Saphir noteholders against BNY in England as the "Perpetual Action."

[35] *See Perpetual Trustee Company Limited and others v BNY Corporate Trustee Services Limited and others* [2009] EWCA Civ 1160.

[36] *Belmont Park Investments PTY Limited v. BNY Corp. Trust Servs. Ltd. and Lehman Brothers Special Fin. Inc.* [2011] UKSC 38.

[37] *Lehman Bros. Special Fin. Inc. v. BNY Corp. Trustee Servs. Ltd. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) (JMP).

Specifically, Judge Peck held in *BNY* that (i) the transaction documents in issue constituted "executory contracts" under section 365 of the Code; (ii) the priority provisions contained therein modified "LBSF's right to a priority distribution solely as a result of a chapter 11 filing"[38] and were therefore unenforceable *ipso facto* clauses under sections 365(e)(1) and 541(c)(1)(B) of the Code; (iii) the safe harbor provision in section 560 of the Code did not protect the distributions made pursuant to the priority provisions contained therein;[39] and (iv) to the extent the transaction documents constituted subordination agreements under section 510(a) of the Code, the modification of LBSF's payment priority upon the commencement of a bankruptcy case rendered that portion of the subordination agreement unenforceable.[40]

Critical to Judge Peck's holding that the priority provisions at issue in *BNY* were unenforceable *ipso facto* clauses was his conclusion that there was a modification of LBSF's rights effected by the priority provisions that occurred after the LBSF Petition Date because the notice of early termination of the swap agreements and the additional actions required to render the modification effective, including distributions, occurred after such date.[41]  Accordingly, Judge Peck acknowledged that "the relevant date for purposes of testing whether any shifting of priorities occurred under the [t]ransaction [d]ocuments [was] the LBSF Petition Date."[42]

---

[38] *Id.* at 420-21.
[39] *Id.* at 421.
[40] *Id.*
[41] *Id.* at 413-14, 418.  The Saphir transaction therefore would be a Post-Post Transaction under the framework adopted by the Court in this Decision.
[42] *Id.*

Nevertheless, Judge Peck observed in *dicta* that the LBHI Petition Date could "be considered as the operative date for a claimed reversal of the payment priority"[43] and that LBSF was entitled to claim the protections of the *ipso facto* provisions as of the LBHI Petition Date because the "chapter 11 cases of LBHI and its affiliates is a singular event for purposes of interpreting" the *ipso facto* language in sections 365(e)(1) and 541(c)(1)(B) of the Code.[44] Judge Peck principally focused on the "integrated enterprise" of the Lehman entities and the exigent circumstances surrounding the Lehman bankruptcy filings as the operative facts supporting the "singular event" theory.[45]

Approximately one year after deciding *BNY*, Judge Peck was confronted with a similar issue in another adversary proceeding in the LBHI case.[46]  In *Lehman Bros. Special Financing Inc. v. Ballyrock ABS CDO 2007-1 Ltd.*, LBSF sought relief similar to that sought in *BNY* against another issuer and trustee of multiple classes of notes issued pursuant to the Dante Program.  In that case, Ballyrock ABS CDO 2007-1 Ltd. ("Ballyrock"), as issuer, was also party to a swap agreement with LBSF.  Ballyrock terminated the swap due to an event of default under that swap agreement arising from LBHI's bankruptcy filing and the assets held as collateral in that transaction were liquidated; thereafter, the trustee for the notes issued by Ballyrock distributed the proceeds from that liquidation to the holders of such notes pursuant to the priority provisions

---

[43] *Id.* at 419.
[44] *Id.* at 420.
[45] *Id.*
[46] *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd. (In re Lehman Bros. Holdings Inc.),* 452 B.R. 31 (Bankr. S.D.N.Y. 2011) (JMP).

in the Ballyrock transaction documents.  LBSF brought suit alleging that those priority

provisions were unenforceable *ipso facto* clauses.

In denying the defendants' motion to dismiss in *Ballyrock*, Judge Peck cited his reasoning

in *BNY* and held that the priority provision at issue modified LBSF's rights.[47] Judge Peck also

found that the safe harbor contained in section 560 of the Code did not protect the distribution of

proceeds to the Ballyrock noteholders because "a [contractually] mandated elimination of a

substantive right to receive funds that existed prior to the bankruptcy of LBHI should not be

entitled to any protection under safe harbor provisions that, by their express terms, are limited

exclusively to preserving the right to liquidate, terminate and accelerate a qualifying financial

contract."[48]

## E.  The Adversary Proceeding

On September 14, 2010, LBSF commenced this adversary proceeding as a putative

defendant class action against certain of the Noteholders, the Trustees, and the Issuers, seeking,

among other things, (i) a declaratory judgment that the Priority Provisions are unenforceable *ipso

facto* clauses and that the Distributions violated the automatic stay; (ii) avoidance of the

Distributions and related transfers pursuant to sections 547, 548, and 549 of the Code; and (iii)

recovery of certain property distributed to the Noteholders.[49]  A number of additional

Noteholders were subsequently joined as defendants.

---

[47] *See id.* at 39 (the "analysis from the [*BNY*] decision would render ineffective the changes in the [w]aterfall that
would result" from LBSF's default on the swap).
[48] *Id.* at 40.
[49] The Complaint was filed as an amended complaint on October 13, 2015.

15

On July 14, 2014, the Court entered a scheduling order governing case management of the adversary proceeding.[50]  On October 27, 2014, LBSF filed a motion for certification of the Noteholders as a defendant class in this adversary proceeding.[51]  On December 17, 2014, a group of Defendants filed a motion requesting that the District Court enter an order withdrawing the reference of this adversary proceeding to this Court,[52] which motion was denied by the District Court.[53]  On August 28, 2015, the Court entered an amended scheduling order (the "Second Scheduling Order"),[54] pursuant to which, among other things, consideration of the motion for class certification was set aside.[55]  On December 14, 2015, the Noteholders filed the Motion, and two separate groups of Trustees each filed a Joinder to the Motion.  On May 4, 2016, the Court held a hearing on the Motion and the Joinders (the "Hearing").[56]

## **DISCUSSION**

### A.  **Motion to Dismiss Standard**

Federal Rule of Bankruptcy Procedure 7012(b), which incorporates Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), permits a bankruptcy court to dismiss an adversary

---

[50] ECF No. 794.

[51] ECF No. 866.

[52] ECF No. 931 (the "Reference Withdrawal Motion"); *see also* Case No. 14-cv-10070-KPF (S.D.N.Y. 2015), ECF No. 1.

[53] ECF No. 1121; *see also* Case No. 14-cv-10070-KPF (S.D.N.Y. 2015), ECF No. 62; Tr. of June 5, 2015 Hr'g in *Lehman Bros. Special Fin. Inc. v. Bank of America, et al.*, Case No. 14-cv-10070-KPF (S.D.N.Y. 2015) (the "Withdrawal Decision").

[54] ECF No. 1138.  Pursuant to the Second Scheduling Order, the Court authorized certain subsets of defendants to file motions to dismiss according to different deadlines, and established a timeline for the resolution of certain issues relating only to certain defendants.  As a result, the Motion and the Joinders do not seek dismissal of all Counts of the Complaint as against all defendants, and the parties may seek a determination by the Court on different issues in this adversary proceeding at a later date.

[55] *See* n. 54, *supra*; Second Scheduling Order at 2.

[56] *See* Tr. of May 4, 2016 Hr'g.

16

proceeding if a plaintiff's complaint fails to state a claim upon which relief may be granted.  In

reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts the factual allegations of

the complaint as true and draws all reasonable inferences in the plaintiff's favor.[57]  To survive a

challenge to the adequacy of a complaint under Rule 12(b)(6), the factual allegations in a

complaint must be supported by more than mere conclusory statements.[58]  The allegations must

be sufficient "to raise a right to relief above the speculative level" and provide more than a

"formulaic recitation of the elements of a cause of action."[59]

A court may dismiss a complaint unless a plaintiff pleads "enough facts to state a claim to

relief that is plausible on its face."[60]  "[O]nly a complaint that states a plausible claim for relief

survives a motion to dismiss."[61]  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."[62]  "[A] well-pleaded complaint may proceed even if it appears 'that a

recovery is very remote and unlikely.'"[63]  Plausibility "is not akin to a probability requirement;"

rather, plausibility requires "more than a sheer possibility that a defendant has acted

unlawfully."[64]

---

[57] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007);
*E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).
[58] *Twombly*, 550 U.S. at 555.
[59] *Id.* (citations omitted).
[60] *Id.* at 570.
[61] *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).
[62] *Id.* at 678.
[63] *Twombly*, 550 U.S. at 556 (internal citation omitted).
[64] *Iqbal*, 556 U.S. at 678.

In deciding a Rule 12(b)(6) motion, the court may not consider evidence proffered by any party. Rather, the court is limited to reviewing the complaint, any documents attached to that pleading or incorporated in it by reference, any documents heavily relied upon by the complaint as to their "terms and effect" and which are therefore integral to the plaintiff's allegations even if not explicitly incorporated by reference,[65] and facts of which the court may take judicial notice."[66] Therefore, the appropriate inquiry "is not whether a plaintiff is likely to prevail, but whether [he] is entitled to offer evidence to support [his] claims."[67]

## B. Analysis of the Priority Provisions

By the Complaint, LBSF alleges that the Priority Provisions are unenforceable *ipso facto* clauses because they modify a debtor's right under a contract solely because of a bankruptcy filing in violation of sections 365(e)(1), 541(c)(1)(B), and 363(l) of the Code.[68] LBSF also maintains that any attempt to modify its payment priority violates the automatic stay, in violation of section 362(a)(3) of the Code, because any such attempt improperly seeks to exercise control over the property of LBSF's estate. Finally, LBSF has asserted additional claims under the Code and New York law related to the purported modification of its payment priority.

---

[65] *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (considering contracts at the motion to dismiss stage when the complaint was "replete with references to the contracts and requests judicial interpretation of their terms").

[66] *Schenk v. Citibank/Citigroup/Citicorp*, No. 10 Civ. 5056 (SAS), 2010 WL 5094360, at *1-2 (S.D.N.Y. Dec. 9, 2010).

[67] *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998) (citations omitted).

[68] For the RACER Series Transactions, LBSF argues that rather than "flip" its payment priority right, the Priority Provisions eliminated LBSF's right to receive a termination payment if LBSF defaulted on the Swaps in those Transactions even if LBSF was "in-the-money" under such Swaps.

18

In response, the Movants seek to dismiss the Complaint on the grounds that LBSF has failed to state a cause of action upon which relief can be granted because (i) the Priority Provisions do not modify LBSF's rights and thus are not *ipso facto* clauses; (ii) to the extent the Priority Provisions constitute *ipso facto* clauses (*i.e.*, to the extent LBSF's rights were modified), the timing of the modification does not render the Priority Provisions unenforceable; and (iii) the Code's "safe harbor" provisions protect the Distributions from clawback or other limitation even if they were made pursuant to otherwise unenforceable *ipso facto* Priority Provisions.

Under the Code, *ipso facto* clauses – contract clauses that modify the rights of a debtor-party due to the filing of a bankruptcy petition – are, as a general matter, unenforceable.[69] Section 365(e) of the Code provides:

> an executory contract … of the debtor may not be terminated or modified, and any right or obligation under such contract … may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract … that is conditioned on … the commencement of a case under this title…

11 U.S.C. § 365(e)(1).

In addition, section 541 of the Code effectively invalidates *ipso facto* clauses, providing that a debtor's interest in property

> becomes property of the estate … notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law … that is conditioned on … the commencement of a case under this title … and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541.

---

[69] *See Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, 1993 WL 159969, *5, 1993 U.S. Dist. LEXIS 6130, *14 (S.D.N.Y. May 10, 1993) (explaining that section 365 of the Code "abrogates the power of *ipso facto* clauses" and, therefore, "[n]o default may occur pursuant to an *ipso facto* clause").

19

Finally, section 363(l) of the Code similarly preserves the right to use property of the

estate for the bankruptcy estate

> notwithstanding any provision in a contract, a lease, or applicable law that is
> conditioned … on the commencement of a case under this title concerning the
> debtor … and that effects, or gives an option to effect, a forfeiture, modification, or
> termination of the debtor's interest in such property.

11 U.S.C. § 363(l).  The Court refers collectively to these three sections of the Code as the "anti-

*ipso facto* provisions."  Under each of these three provisions, therefore, the analysis as to

whether the Priority Provisions constitute *ipso facto* clauses requires the Court to determine (i)

the nature of the rights LBSF held prior to the relevant Early Termination Date; (ii) whether the

enforcement of the Priority Provisions modified any right of LBSF; and, if so, (iii) when such

modification occurred.

As discussed above,[70] the Priority Provisions contained in the various sets of Transaction

Documents are not uniform.  As a result, the precise character of LBSF's rights prior to the Early

Termination Date with respect to payment priority varies among the Transactions.  The Court

has identified two materially distinct types of language used in the Priority Provisions for the

Transactions at issue, and it has categorized the Transactions accordingly as reflected on

Appendix B hereto, for ease of discussion.

In Type 1 Transactions, LBSF held a right to payment priority of a Swap termination

payment (if it was "in-the-money") that was fixed at the outset of the Transaction as the default

option – meaning, LBSF had an automatic right to payment priority ahead of the Noteholders

---

[70] *See* p. 4, *supra*.

20

unless the conditions for an alternative priority were satisfied. If such conditions were satisfied, LBSF would be divested of its payment priority. One way that an alternative priority could arise was if LBSF was the Defaulting Party and, by virtue of the underlying Event of Default, LBSF triggered an Early Termination of the Swap. Therefore, prior to any such Early Termination, LBSF, as the "in-the-money" Swap counterparty based on the value of the Swap's reference obligations, had a right to payment priority ahead of the Noteholders in the event there was a termination of the Swap. In other words, if, prior to LBSF's default, the conditions for an alternative priority were not otherwise satisfied, the default payment priority of LBSF Priority was in place.

For instance, the Ruby Transactions and Quartz Transactions (which, along with the transactions in *BNY* and *Ballyrock*, are part of the Dante Program) are Type 1 Transactions because the Priority Provisions in those Transactions establish priority for payments to LBSF as a default Waterfall, but "flip"[71] that default priority order in the situation in which LBSF has defaulted on the Swap, causing an Early Termination.[72] Moreover, as long as it was "in-the-money" based on the value of the reference obligations, LBSF held a right to payment priority ahead of the Noteholders throughout the life of the Transaction. If LBSF defaulted, however,

---

[71] Hence, the term "flip clauses" is used as a colloquial way to refer to these clauses. *See, e.g., Ballyrock*, 452 B.R. at 38; Pierre J. Riou, *The Flap over Flip Clauses: Should They Flop Against Debtors' Nondebtor Subsidiaries?*, Am. Bankr. Inst. J., July 2012.

[72] *See* Section 5.5 of Supplemental Trust Deed, Ruby Finance plc Series 2005-1, attached as Ex. I to Declaration of Bryan Krakauer [ECF No. 1196] (the "Krakauer Decl."):

> Application of Moneys Received: The Trustee shall apply all moneys received by it under this Deed in connection with the realization or enforcement of the [Collateral] as follows: [LBSF] Priority unless (i) an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and [LBSF] is the Defaulting Party (as defined in the Swap Agreement) … in which case Noteholder Priority shall apply.

21

that priority would "flip," and the Noteholders would hold a payment priority right.  Similarly, the RACER Series Transactions are Type 1 Transactions because the Priority Provisions in those Transaction Documents eliminate LBSF's right to receive any termination payment whatsoever if it is the Defaulting Party, a right that LBSF held prior to its default as a result of the value of the reference obligations.[73]

In contrast to Type 1 Transactions, in Type 2 Transactions (which comprise the majority of the Transactions), however, the Priority Provisions do not establish a default priority position for a termination payment to the "in-the-money" Swap counterparty; the prevailing Waterfall with respect to an Early Termination Payment, whether LBSF Priority or Noteholder Priority, was not fixed at the outset of the Transaction and remained unfixed until the Swap was actually terminated.  Put another way, the Priority Provisions in Type 2 Transactions create a toggle between two potential Waterfalls that could have become applicable upon Early Termination; which Waterfall would become applicable would remain unknown until an Early Termination occurred and the circumstances surrounding it were determined.

For example, the Indenture for the Greystone CDO Series 2006-1 Transaction provides a Waterfall for payments to be made "[o]n the Early Termination Payment Date (if any)…."[74] That section sets forth the priority of payment with respect to specific payments, establishing one priority position for termination payments to LBSF if the Early Termination was not caused by

---

[73] *See* Part 5(h) of Schedule to ISDA Master Agreement, RACER Series 2005-21-C Trust, Krakauer Decl., Ex. O.
[74] *See* Section 5(a)(iii) of Indenture for Greystone CDO Series 2006-1 Transaction, Krakauer Decl, Ex. I.

22

LBSF's default, and another priority position for termination payments to LBSF if it were.[75]  But unlike Type 1 Transactions, the Waterfall was only triggered by an Early Termination.  As a result, neither LBSF nor the Noteholders had any right under one particular Waterfall until an Early Termination occurred.  LBSF therefore held only a contingent right to payment in one of those two priority positions prior to the Early Termination, not a right – contingent or otherwise – to a senior priority position.  Similarly, the Noteholders' priority position was undetermined prior to Early Termination.

For the reasons set forth below, the Court concludes that (i) enforcement of the Priority Provisions in Type 1 Transactions effected an *ipso facto* modification of LBSF's rights and (ii) enforcement of the Priority Provisions in Type 2 Transactions did not effect any modification of LBSF's rights.  As explained below, however, while the Priority Provisions in Type 1 Transactions (all of which are Post-Post Transactions) modify LBSF's rights because of its default, the safe harbor of section 560 nonetheless protects the Distributions in these Transactions from clawback.  Because the Court also rules that the Priority Provisions in Type 2 Transactions do not constitute unenforceable *ipso facto* clauses, each of LBSF's claims set forth in Counts I through XII fails to state a claim upon which relief can be granted and such Counts must be dismissed.

---

[75] *See* Sections 5(a)(iii)(B) and (G) of Indenture for Greystone CDO Series 2006-1 Transaction, Krakauer Decl., Ex. I:

> Collections received for the Early Termination Payment Date will be allocated and applied in the following order of priority … (B) if [LBSF] is not the Defaulting Party … to pay to [LBSF] all termination payments owed to [LBSF] under the Credit Swaps … (G) if [LBSF] is the Defaulting Party … to pay to [LBSF] all termination payments owed to [LBSF] under the Credit Swaps….

1. **The Priority Provisions in Type 1 Transactions Modify LBSF's Rights and Therefore Are *Ipso Facto* Clauses**

LBSF argues that after Early Termination of the Swaps, under Second Method,[76] LBSF was entitled to payment of the positive value of its position in the Swaps ahead of payment to the Noteholders even if it was the Defaulting Party, but when the Waterfall dictated by the Priority Provisions was applied, LBSF lost that payment priority right due to a default based solely on the commencement of a chapter 11 case.[77] Movants argue that LBSF's right to payment ahead of the Noteholders only came into being if there was an invoked Credit Event or an Issuer Event; LBSF remained junior to the Noteholders if the Swap terminated by reason of LBSF's default.[78] The Court agrees with LBSF that its rights in Type 1 Transactions were modified.

For Type 1 Transactions, like the transactions at issue in *BNY* and *Ballyrock*, LBSF held a right to receive its termination payment ahead of payments to the Noteholders and such right was modified as a result of LBSF's default on those Swaps; consequently, LBSF was divested of such right as a result of its default on the Swaps.[79] The Transaction Documents for Type 1 Transactions established LBSF Priority as the default priority and did not limit application of LBSF Priority to instances in which there was an Early Termination that was not caused by LBSF's default on the Swaps. Movants' position that LBSF's right to payment ahead of the Noteholders for Type 1 Transactions "only came into being" upon certain events that never

---

[76] *See* p. 7, *supra*.
[77] LBSF Opp. Br. [ECF No. 1249] at 2.
[78] Def. Br. at 10.
[79] As reflected in Appendix B, the Court has characterized five Transactions as Type 1 Transactions.

24

occurred is unavailing.[80]  While the Court does not agree with LBSF that LBSF Priority was

established as a result of the "required use of Second Method" to calculate the termination

payment,[81] the Court nevertheless concludes that, pursuant to the terms of the Priority Provisions

themselves in Type 1 Transactions, LBSF held a right to payment priority of a termination

payment ahead of payment to the Noteholders that was modified because of its default.

For Type 2 Transactions, however, the Court concludes that, contrary to LBSF's

characterization of the Transactions Documents, LBSF never held a right to payment priority;

such a right would only have arisen if, upon Early Termination of a Swap, the conditions

necessary to trigger LBSF Priority existed.[82]  One of those conditions was that Early

Termination was not the result of LBSF's default under the Swap.  Because in each Type 2

Transaction the Early Termination of the Swap was in fact the result of LBSF's default, LBSF

never enjoyed a right to payment priority ahead of the Noteholders and thus LBSF held no

priority right that could have been modified.  The only relevant right held by LBSF as of the

LBSF Petition Date (or, for that matter, the LBHI Petition Date) was the right to be paid

proceeds from the Collateral pursuant to the prevailing Waterfall.  That right, as reflected in the

Priority Provisions, was not modified (as a result of the commencement of a chapter 11 case or

---

[80] *See* Def. Br. at 14 (arguing that LBSF Priority only came into being upon a "Credit Event" or "Issuer Event" as defined in the Transaction Documents).

[81] The Court agrees with the Movants that the method of calculating the amount of a termination payment and determining which swap counterparty owes such payment is unrelated to the question of payment priority.  The calculation method simply establishes the amount of an obligation; it does not create or affect in any way a right to payment of that obligation.

[82] As reflected in Appendix B, the Court has characterized thirty-nine Transactions as Type 2 Transactions.

otherwise).[83]  Because payment priority resulting from an early termination of a Swap was set

only upon early termination, LBSF did not have an existing right to payment priority and thus

the Priority Provisions did not *ipso facto* modify LBSF's rights.

Therefore, consistent with Judge Peck's conclusion in *BNY* that the priority provisions at

issue in that case modified LBSF's rights, the Court concludes that the Priority Provisions in the

Type 1 Transactions modify LBSF's rights as *ipso facto* provisions.  Based on the distinctions

explained above, the Court, however, does not find that to be the case with respect to the Priority

Provisions in Type 2 Transactions, for which neither LBSF nor the Noteholders held a right to a

specific payment priority at the outset of the Transactions.  Rather, as the Movants argue, the

Priority Provisions in those Transactions establish a Waterfall of payment priorities based on the

occurrence of certain events and the nature of the relevant payment, thereby granting both LBSF

and the Noteholders a right to a distribution under the Waterfall but with priority to be

determined at a subsequent time.  As a result, the Priority Provisions in Type 2 Transactions are

not *ipso facto* provisions.

> **2.  Even If the Priority Provisions in Type 2 Transactions *Ipso Facto* Modified LBSF's Rights, Any Such Modifications In Pre-Pre Transactions or Pre-Post Transactions Occurred Before the LBSF Petition Date and Thus Do Not Violate Sections 365(e)(1), 541(e)(1), or 363(l) of the Code**

While the Court concludes that enforcement of the Priority Provisions in Type 2

Transactions did not modify LBSF's rights, in the alternative, even assuming the opposite

conclusion, the Court concludes that any such modifications in Pre-Pre Transactions or Pre-Post

---

[83] In fact, had the proceeds of the sale of the Collateral been much greater than they were, LBSF may have even received a payment in connection with its purported "in-the-money" position in the Swaps.

Transactions occurred before the commencement of LBSF's bankruptcy case and thus do not violate sections 365(e)(1), 541(e)(1), or 363(l) of the Code.[84]  As reflected in Appendices A and B, thirty-seven out of thirty-nine Type 2 Transactions are either a Pre-Pre Transaction or Pre-Post Transaction; accordingly, even if the Priority Provisions in those thirty-seven Type 2 Transactions (like those in Type 1 Transactions) were found to *ipso facto* modify LBSF's rights, the clauses would not violate the anti-*ipso facto* provisions of the Code.

Section 365(e)(1) provides that only "modifications" that occurred "after the commencement of the case" may be invalidated.[85]  Similarly, both sections 541(e)(1) and 363(l) incorporate section 541(a)(1)'s definition of "property of the estate" as the "legal or equitable interest of the debtor in property as of the commencement of the case."[86]  Therefore, under each of those provisions, unless a debtor's right has been modified after its petition date, enforcement of the contractual provision at issue, even if conditioned on the commencement of "a" bankruptcy case, is not contrary to the Code.

The Movants argue, persuasively, that under the plain terms of the anti-*ipso facto* provisions, the relevant petition date is the petition date of the debtor whose rights have been modified or whose property has been affected and therefore urge the Court not to adopt the "singular event" theory articulated in *BNY*.[87]  The Movants also argue that any modification

---

[84] Because each Type 1 Transaction is a Post-Post Transaction, the Court's alternative holding applies only to Type 2 Transactions that are either a Pre-Pre Transaction or a Pre-Post Transaction.

[85] 11 U.S.C. § 365(e)(1); *see LJP, Inc. v. Royal Crown Cola Co. (In re LJP, Inc.)*, 22 B.R. 556, 558 (Bankr. S.D. Fla. 1982) ("Section 365(e)(1) expressly prohibits the termination or modification of any contract 'at any time after the commencement of the case' … [T]here is no legislative intent to invalidate the pre-petition termination of a contract on the sole ground of insolvency.") (quoting 11 U.S.C. § 365(e)(1)).

[86] 11 U.S.C. § 541(a)(1).

[87] Def. Br. at 21-23.

27

caused by the Priority Provisions in the Pre-Pre Transactions and Pre-Post Transactions occurred prior to the LBSF Petition Date because the Swaps in those Transactions were terminated prior to such date.[88]

With respect to the Pre-Pre Transactions, LBSF relies on the *BNY* "singular event" theory to argue that, even though Early Termination and distribution of the proceeds of the liquidation of the Collateral both occurred prior to the LBSF Petition Date, because such events occurred after the LBHI Petition Date, the resulting modification triggered the protections of the anti-*ipso facto* provisions.[89]  For Pre-Post Transactions, LBSF argues that a modification of LBSF's priority rights occurred after the LBSF Petition Date because such modification was not "effective" until liquidation of the Collateral and distribution of the proceeds, which did not occur until after the LBSF Petition Date for those Transactions.

The Court thus must address two separate legal issues: first, whether to apply the "singular event" theory, under which the protections provided by the Code's anti-*ipso facto* provisions can be triggered not only by an entity's bankruptcy filing, but by the bankruptcy filing of a related entity; and second, whether modification of LBSF's rights as a result of the Priority Provisions occurred upon Early Termination of the Swaps or not until distribution of the proceeds of the liquidation of the Collateral.[90]

---

[88] The Movants do not dispute that to the extent that the Priority Provisions of a Post-Post Transaction effected a modification of LBSF's rights, the timing of such modification occurred after the LBSF Petition Date.
[89] LBSF Opp. Br. at 22-27.
[90] With respect to the Pre-Pre Transactions, the parties agree that the distribution of the proceeds of the Collateral occurred prior to the LBSF Petition Date.

### a.  The "Singular Event" Theory

In *BNY*, Judge Peck considered the question of "under what circumstances is the bankruptcy case of another debtor sufficiently related to rights of the parties … that it is reasonable to trigger the *ipso facto* protections."[91]  Focusing on the unique circumstances of the Lehman bankruptcy cases, Judge Peck observed that even if a modification of LBSF's rights to payment priority became effective prior to the LBSF Petition Date, LBSF was entitled to claim the protections of section 365 as of the LBHI Petition Date, which was eighteen days prior to the LBSF Petition Date.[92]

While there remains no doubt that the Lehman bankruptcy filings were unique in size, scope, and circumstances, the jurisprudence of these cases has developed considerably since the "singular event" theory was articulated in *BNY*, as have historical perspectives on that enormously difficult time in our nation's financial history – a time we truly hope was a "singular" event.  So too must perspectives on difficult legal questions develop and evolve over time.  As critical as it was early in these cases that the contours of due process of law be "situational" and "function[] as a flexible standard at times of genuine emergency,"[93] there was then, as there is now, an equally important need for uniformly applicable and readily appliable substantive legal principles.

In light of those observations, and against LBSF's suggestion that the Court should exercise its discretion to adopt, wholesale, Judge Peck's rulings in *BNY* and *Ballyrock* as "law of

---

[91] *BNY,* 422 B.R. at 419.
[92] *Id.* at 418-20.
[93] *See* Remarks of the Hon. James M. Peck (Ret.), delivered in New York City on May 18, 2016.

29

the case," the Court believes that it can and should undertake to determine anew whether there is

an enduring legal basis to allow LBSF to rely on the LBHI Petition Date for purposes of

invoking the protections of the anti-*ipso facto* provisions.[94]  After consideration of that question,

the Court declines to adopt the "singular event" theory and holds that any modification of

LBSF's rights that occurred prior to the LBSF Petition Date cannot be the basis of a violation of

the anti-*ipso facto* provisions.

The "singular event theory" as explained in *BNY* emerged from Judge Peck's inquiry into

the scope of section 365(e)(1)(B) and, in particular, what events causing a modification qualify

under that section of the Code to render such modification unenforceable.  That is a distinct issue

from the issue of *when* a modification must occur for purposes of the anti-*ipso facto* provisions.[95]

The lead-in language to section 365(e)(1) provides that any right under an executory contract of

the debtor may not be modified "at any time after the commencement of the case" because of an

*ipso facto* clause.[96]  Sections 541(c)(1) and 363(l) also deal with property of the debtor's estate

as of the "commencement of the case."[97]  The phrase "the case" in such sections refers only to

the case of the debtor who is a party to the relevant executory contract.

Following the lead-in language discussed above, section 365(e)(1) continues on to list

three separate types of contractual provisions that, if causing a modification of a debtor's rights,

---

[94] LBSF does not dispute that the doctrine of the "law of the case" is a discretionary one and cannot dispute that the parties (as well as to some extent the facts) before the Court are different from those that were before Judge Peck in *BNY* and *Ballyrock*.
[95] As Judge Peck described it in *BNY*, the inquiry focuses on what is "the relevant date for purposes of testing whether any shifting of priorities occurred under the Transaction Documents." 422 B.R. at 418.
[96] 11 U.S.C. § 365(e)(1).
[97] Sections 541(c)(1) and 363(l) incorporate section 541(a)(1)'s definition of "property of the estate" as the "legal or equitable interest of the debtor in property as of the commencement of the case."

would render the modification unenforceable, including, in section 365(e)(1)(B), "the commencement of *a* case" under the Code.  It was that language in subsection (B) that Judge Peck found provided a basis to look to the bankruptcy cases of a debtor other than the debtor party to the relevant executory contract.  But that subsection only provides detail on what renders a provision an *ipso facto* provision; it does not in any way relate to the timing of the modification addressed elsewhere in section 365(e)(1).  Therefore, the Court respectfully departs from Judge Peck's prior analysis and agrees with the Movants that the "singular event" theory as articulated in *BNY* should not be adopted.

The Court again notes that Judge Peck's statement that LBSF could rely on LBHI's bankruptcy filing to satisfy the requirements of section 365(e)(1) was *dicta* because, as the Movants point out, the transaction in *BNY* was a Post-Post Transaction, in which the Swap was terminated, and Judge Peck found that all relevant events occurred, *after* the LBSF Petition Date.[98]  It is also worth noting that, in *BNY*, Judge Peck himself recognized that his interpretation of section 365(e)(1) could be controversial.  Indeed, he subsequently declined to extend the "singular event" theory to other legal issues relating to the separate petition dates of LBHI and LBSF, and further cabined the applicability of his reasoning to the anti-*ipso facto* provisions in *Lehman Bros. Holdings Inc. v. Intel Corp. (In re Lehman Bros. Holdings Inc.).*[99]

---

[98] Def. Br. at 22 n. 21.  Contrary to LBSF's argument, the "singular event" theory should not be viewed as an alternative ground for Judge Peck's decision.
[99] 502 B.R. 376 (Bankr. S.D.N.Y. 2013).

31

### b. Any Modification of LBSF's Rights Was Effective When LBSF Received Notice of Early Termination

Having concluded that the LBSF Petition Date is the relevant date for purposes of evaluating a modification caused by an *ipso facto* clause, it is clear that, by the plain terms of the Code, a modification that occurred before that date is not prohibited by sections 365(e)(1), 541(e)(1), and 363(l) of the Code.  Turning to whether the relevant modifications occurred after the LBSF Petition Date, the Court concludes that, to the extent that enforcement of the Priority Provisions for a Pre-Pre Transaction[100] or Pre-Post Transaction modified LBSF's rights, such modification occurred prior to the LBSF Petition Date and therefore is not a violation of sections 365(e)(1), 541(e)(1), or 363(l) of the Code.

Under New York law, when interpreting a contract, a court's "primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.  The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."[101]  "The meaning of particular language … should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those

---

[100] There can be no dispute that any modification of LBSF's rights under the Pre-Pre Transactions occurred prior to the LBSF Petition Date.

[101] *Chesapeake Energy Corp. v. The Bank of New York Mellon Trust Co., N.A.*, 773 F.3d 110, 113–14 (2d Cir. 2015) (internal citations and quotations omitted); *see also U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 98 (2d Cir. 2013) ("When parties set down their agreement in a clear complete document, the New York Court of Appeals has said, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.") (internal citations and quotations omitted).

purposes."[102]    No ambiguity exists where the contract language has a "definite and precise

meaning, unattended by danger of misconception in the purport of the contract itself, and

concerning which there is no reasonable basis for a difference of opinion."[103]    The language of

a contract is not made ambiguous "simply because the parties urge different interpretations in

the litigation,"[104] especially "if the contract 'was negotiated between sophisticated, counseled

business people negotiating at arm's length.'"[105]

Applying these principles of contract interpretation to the express language of the

Priority Provisions, it is clear that (i) LBSF's right to a distribution ahead of the Noteholders

pursuant to the Priority Provisions depends on whether it is the Defaulting Party under the

Swap;[106] (ii) LBSF became the Defaulting Party when an Event of Default occurred (*i.e.*, on the

LBHI Petition Date) and notice of such Event of Default was provided;[107] and (iii) LBSF was

the Defaulting Party when the Swaps were terminated and it received notice of such

termination.    By the plain terms of the Swap, any modification of LBSF's rights was thus

effective upon the Early Termination resulting from LBSF's default, and not upon the

subsequent sale and distribution of the Collateral proceeds, as argued by LBSF.    For Pre-Pre

---

[102] *SR Int'l Bus. Ins. Co. v. Allianz Ins. Co., L.L.C.*, 343 Fed. Appx. 629, 632 (2d Cir. 2009) (internal quotation and citation omitted); *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2008) (the "cardinal principle for construction and interpretation of … all contracts … is that the intentions of the parties should control.  Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.") (alterations in original).

[103] *Id.*

[104] *Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010).

[105] *In re 785 Partners LLC*, 470 B.R. 126, 132 (Bankr. S.D.N.Y. 2012) (quoting *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548, 634 N.Y.S.2d 669, 671 (1995)).

[106] Section 5(a)(iii)(B) and (G) of Indenture for Greystone CDO Series 2006-1 Transaction, Krakauer Decl., Ex. I.

[107] *See* ISDA Master Agreement § 6(a).

33

Transactions and Pre-Post Transactions, as the Movants argue,[108] LBSF's right to receive payment ahead of the Noteholders under the Priority Provisions was thus fixed prior to the LBSF Petition Date; it is that right that LBSF has alleged was modified. LBSF's right to receive a distribution from the actual proceeds of the liquidation of the Collateral (in the event the amount of such proceeds was sufficient to pay off higher priority parties) was not modified and thus is not relevant for purposes of analysis of an alleged violation of sections 365(e)(1), 541(e)(1), or 363(l).

In *BNY*, Judge Peck noted that a modification of payment priority under the governing transactions documents in that case was not effective as long as "there are amounts to be paid" in connection with the liquidation of the Collateral.[109] Here, however, the Transaction Documents make clear that a modification of payment priority takes effect once LBSF is designated a Defaulting Party and the Swap is terminated. A modification of LBSF's right to receive a distribution from the Collateral's liquidation proceeds would be effective only upon a final determination of the amount of proceeds available for distribution to the Secured Parties upon the sale of the liquidation. But that right – the right to receive an actual payment – is not the right that LBSF has alleged was modified, and, in any event, it was not modified as a result of the enforcement of the Priority Provisions. LBSF's right to payment priority ahead of the Noteholders is the right that LBSF alleges was modified here, and, for Type 1 Transactions, that

---

[108] Def. Rep. Br. [ECF No. 1308] at 5-6.

[109] In that case, however, all of the relevant termination events occurred after the LBSF Petition Date (*i.e.*, the transactions would be categorized as Post-Post Transactions under the framework adopted by the Court in this Decision), including termination of the relevant swap agreement and therefore, Judge Peck's conclusion that a modification was not effective until after liquidation of Collateral was *dicta*.

34

right was modified as a result of the Early Termination notice designating LBSF a Defaulting

Party.  Such modification occurred prior to the LBSF Petition Date and thus is not prohibited by

sections 365(e)(1), 541(e)(1), or 363(l).[110]

Contrary to LBSF's arguments, the fact that the relevant contracts are executory or could

be viewed as "integrated" has no relevance to the question of when a modification of LBSF's

priority rights occurred.  The effectiveness of one provision of a contract – here, the Priority

Provisions – is a distinct issue from whether the parties to such contract generally have ongoing

obligations.  Payment priority rights were established no later than the Early Termination Date

(even if the amount of payment was not determined at that time) and the Priority Provisions were

immediately and fully enforceable on the designated Early Termination Date.  Therefore, for the

Pre-Pre Transactions and Pre-Post Transactions, any modification effected by the Priority

Provisions does not run afoul of the anti-*ipso facto* provisions because such modification

occurred and was fully effective prior to the LBSF Petition Date.

### 3.  The Section 560 Safe Harbor Protects The Distributions

Section 560 of the Code provides:

> The exercise of any contractual right of any swap participant or financial
> participant to cause the liquidation, termination, or acceleration of one or more
> swap agreements because of a condition of the kind specified in section 365(e)(1)
> of this title … shall not be stayed, avoided, or otherwise limited by operation of
> any provision of this title or by order of a court … in any proceeding under this
> title.

---

[110] Because the Court concludes that, to the extent LBSF's right to payment priority ahead of the Noteholders was modified prior to the LBSF Petition Date, and thus such right did not become property of the estate under section 541 when LBSF filed its petition, sections 541(c) and 363(l) are not implicated by the modification.

11 U.S.C. § 560.  To the extent that the enforcement of the Priority Provisions of any of the Transactions resulted in a modification of LBSF's rights that is prohibited by the anti-*ipso facto* provisions (*i.e.* all Type 1 Transactions),[111] the Distributions made pursuant to such Priority Provisions are protected by the safe harbor embodied in section 560 of the Code.  Broadly speaking, the same conclusion would apply to the extent that any of the Type 2 Transactions, for one or more reasons, were held to violate the Code's anti-*ipso facto* provisions.

Seeking to navigate around the unambiguously sweeping text of section 560, LBSF first argues that the Court cannot conclude that section 560 protects the Transactions at issue at this Rule 12(b)(6) motion to dismiss stage of the proceedings;[112] citing *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,[113] LBSF contends that the safe harbor provisions of the Code are affirmative defenses that can only be invoked as a basis to dismiss a claim that is, on its face, precluded by one or more of the safe harbors.[114]  LBSF asserts that its claims here pass muster under Rule 12(b)(6) in light of Judge Peck's rulings in *BNY* and *Ballyrock* that the safe harbors did not protect the priority provisions at issue in those cases.

The Court disagrees.  First and foremost, LBSF's reliance on *Picard v. Merkin* is misplaced in light of the District Court's subsequent decision in *Picard v. Katz* and the Second Circuit's decision in *Picard v. Ida Fishman Revocable Trust*, both of which implicitly rejected the proposition for which LBSF cites *Picard v. Merkin*.[115]  Second, if the safe harbor provisions

---

[111] As reflected in Appendices A and B, each of the five Type 1 Transactions is a Post-Post Transaction.
[112] *See* LBSF Opp. Br. at 33-34.
[113] 440 B.R. 243, 266 (S.D.N.Y. 2010).
[114] *See* LBSF Opp. Br. at 33-34.
[115] *See, e.g. Picard v. Katz,* 462 B.R. 447, 452 (S.D.N.Y. 2011) (Rakoff, J.) (implicitly rejecting bankruptcy court's decision to decline to reach the issue of whether section 546(e) applied at the pleading stage of the litigation in

36

of the Code are to function as Congress intended, they must be brought into play at the outset of an action, not only after the parties have been at sea in litigation for years (as they are here, since this proceeding has been pending since 2010).  Moreover, as explained below, the Court finds that the language of section 560 "is plain and controlling on its face,"[116] and there is no legal basis for any limitation on its authority to conclude, at this procedural juncture, that the safe harbors apply to the Transactions here.

Turning to the analysis of section 560, it is important to recognize that, as the Movants argue, the Second Circuit and courts in this District have repeatedly noted in cases decided subsequent to *BNY* and *Ballyrock* that the safe harbors require a "broad and literal interpretation."[117]  Many courts have explained that a broad reading of the safe harbors is consistent, and goes hand-in-hand, with congressional intent in creating (and subsequently expanding) the safe harbors to promote the stability and efficiency of financial markets.[118]

---

*Picard v. Merkin,* 440 B.R. 243, 266–67 (Bankr. S.D.N.Y. 2010)), *abrogated on unrelated grounds by Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 513 B.R. 437 (S.D.N.Y. 2014); *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)* ("*Ida Fishman*"), 773 F.3d 411, 415 (2d Cir. 2014) (same).

[116] *Picard v. Katz,* 462 B.R. at 452; *see also* n. 115, *supra.*

[117] *Ida Fishman,* 773 F.3d at 419 (rejecting Ponzi scheme exception to the safe harbors under a broad and literal reading of section 546(e)); *Whyte v. Barclays Bank PLC,* 494 B.R. 196, 200 (S.D.N.Y. 2013) (rejecting and criticizing attempt to evade bankruptcy safe harbors and reading sections 546(e) and (g) broadly), *aff'd,* No. 13-2653-CV, 2016 WL 1138642 (2d Cir. Mar. 24, 2016); *In re Tribune Co. Fraudulent Conveyance Litig.,* 818 F.3d 98, 121 (2d Cir. 2016) ("*Tribune*") *rev'ing in part* 499 B.R. 310 (S.D.N.Y. 2013) (confirming sweeping breadth of section 546(e) safe harbor).

[118] *Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC),* 505 B.R. 135, 144-45 (S.D.N.Y. 2013) (finding a broad reading of the phrase "in connection with" in section 546(g) to be consistent with and reinforced by legislative intent to protect financial markets broadly); *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re Enron Creditors Recovery Corp.),* 651 F.3d 329, 346-47 (2d Cir. 2011) (safe harbors should be interpreted broadly to promote certainty and predictability); *Official Comm. of Unsecured Creditors v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.),* 719 F.3d 94, 99-100 (2d Cir. 2013) (stressing importance of promoting stability in the financial markets when interpreting the safe harbor).  *See also Tribune,* 818 F.3d at 121 (confirming sweeping breadth of section 546(e) safe harbor).

Although the Second Circuit has not specifically addressed the issue presented here, it is against that backdrop that the Court evaluates whether section 560 protects the modifications effected by the Priority Provisions.

LBSF challenges the applicability of section 560 to the Transactions at issue here on several grounds. LBSF primarily argues that enforcement of the Priority Provisions and distribution of the Collateral pursuant to Noteholder Priority do not constitute the exercise of a right to cause the "liquidation, termination, or acceleration" of a swap agreement.[119] In addition, LBSF also argues that the enforcement of the Priority Provisions was not an exercise of a contractual right of the Issuers, who are without dispute parties to the Swaps, but rather the exercise of a right of the Trustees, whose status as a "swap participant" or "financial participant," according to LBSF, is less clear.[120] For the reasons that follow, LBSF's arguments are unavailing. The Court concludes that the enforcement of the Priority Provisions satisfies the elements of the section 560 safe harbor and thus may not be stayed, avoided, or otherwise limited by other provisions of the Code or by Court order.

> **a. Enforcement of the Priority Provisions Was Part of the Exercise of a Right to Cause the Liquidation or Termination of the Swaps**

The terms of the safe harbors must be interpreted based on their plain meaning and are subject only to the limitations that are found in the express language of the relevant provision.[121] The term "liquidate" is not defined by the Code, and thus, in interpreting Section 560, "liquidate"

---

[119] LBSF Opp. Br. at 36-43.
[120] *Id.* at 44.
[121] *Ida Fishman*, 773 F.3d at 421-22.

must be interpreted based on its "ordinary, contemporary, common meaning."[122]  As argued by

the Movants, legal, financial, and general dictionaries define "liquidate" to include the payment

of the proceeds of the liquidation.[123]  Given the clear and unambiguous meaning of the text of

the statute, resort to legislative history is unnecessary;[124] nevertheless, it is worth noting that the

legislative history of section 560 indicates that the exercise of a right to "determine … upon

default, which party is owed how much" falls within the scope of the safe harbor.[125]

LBSF argues that the enforcement of Noteholder Priority and resulting distribution to

Noteholders do not constitute either "liquidation" or "termination" of a swap agreement and thus

cannot be protected by section 560.  Once again, LBSF relies heavily on language in Judge

Peck's decisions in *BNY* and *Ballyrock* holding that section 560 did not protect the priority

provisions at issue in those cases.  Specifically, LBSF argues that the Distributions to

Noteholders are "ancillary" or unrelated to the liquidation and termination of the Swaps and thus

fall outside the scope of section 560.[126]  LBSF asserts that because distribution of the proceeds of

the Collateral was not mandatory under the Transaction Documents, distribution is not

sufficiently related to the liquidation or termination of the Swaps for purposes of the section 560

---

[122] *Perrin v. United States*, 444 U.S. 37, 42 (1979).  *See also Enron*, 651 F.3d at 334 (safe harbors should be
construed in accordance with their "plain" meanings).

[123] Def. Br. at 39-40 (citing *Liquidation*, Black's Law Dictionary (10th ed. 2014) ("To settle (an obligation) by
payment or other adjustment; to extinguish (a debt) … To determine the liabilities and distribute the assets of (an
entity), esp. in bankruptcy or dissolution." (emphasis added)); *Liquidation*, Dictionary of Banking and Finance (4th
ed. 2009) ("To pay a debt in full."); *Liquidation*, Oxford English Dictionary (2d ed. 1989) ("To clear off, pay (a
debt).")).

[124] *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (finding reference to legislative history unnecessary in
light of clear meaning of the language of the statute); *In re Caldor Corp.*, 303 F.3d 161, 167 (2d Cir. 2002) ("The
task of resolving a dispute over the meaning of a provision of the Bankruptcy Code begins where all such
inquiries must begin: with the language of the statute itself.").

[125] S. REP. No. 101-285, at 9 (1990).

[126] LBSF Opp. Br. at 35.

safe harbor.  The Court notes, however, that Judge Peck's determination in *BNY* that section 560 did not apply relied in no small measure on a ruling that the priority provisions at issue in that case "did not comprise part of the swap agreement," and thus the provisions governing the liquidation were not a part of the swap agreement.[127]  The facts here are different: here, it is clear that the Priority Provisions are either explicitly set forth in the schedules to the ISDA Master Agreements or are incorporated into such schedules from the Indentures.[128]

Both LBSF and Movants point to Judge Peck's ruling in *Michigan Housing* to support their respective positions.[129]  The Movants cite to Judge Peck's analysis of the "ordinary meaning of 'liquidation'" and his conclusion that "liquidation" includes determination of "the exact amount due and payable under the swap agreement" and "the manner of carrying [the liquidation] out"[130] to argue that the Distributions were part of the liquidation of the Swaps and therefore fall squarely within the scope of the safe harbor.[131]  In contrast, LBSF argues that *Michigan Housing* "holds only that a counterparty's use of a calculation mechanism in a swap agreement authorized as a result of the other party's bankruptcy falls within the Section 560 safe harbor" and points to Judge Peck's emphasis that nothing in *Michigan Housing* was intended to

---

[127] *BNY*, 422 B.R at 421.  Judge Peck's ruling in *Ballyrock* relied on his decision in *BNY* without further analysis of the scope of section 560.

[128] *See, e.g.*, Section 5(i) of the Schedule to ISDA Master Agreement of 801 Grand CDO SPC Series 2006-1 Transaction ("all amounts, payable or expressed to be payable by [the Issuer] on, under or in respect of its obligations and liabilities under this Agreement and any Confirmation hereunder shall be recoverable … subject in any case to the Priority of Payments set out in the Indenture."); *see also* Def. Br. at 33.  LBSF has not disputed this.

[129] *Michigan State Housing Dev. Auth. v. Lehman Bros. Special Fin. Inc. (In re Lehman Bros. Holdings Inc.)*, 502 B.R. 383 (Bankr. S.D.N.Y. 2013) (JMP) ("*Michigan Housing*").

[130] *Michigan Housing*, 502 B.R. at 393, 395.

[131] Def. Br. at 40.

40

alter his rulings in *BNY* and *Ballyrock* that the section 560 safe harbor did not protect the distributions at issue in those cases.[132]

In *Michigan Housing*, Judge Peck held that section 560 protects the contractual right to "calculate the Settlement Amount" due under the Swap. As the Movants point out, consistent with the legislative intent outlined above, Judge Peck noted that "the plain meaning of [section 560] protects both the act of liquidating and the manner for carrying it out."[133] However, in *Michigan Housing*, Judge Peck expressly distinguished the *BNY* and *Ballyrock* situations, reaffirming that in his view section 560 did not protect the rights exercised in those cases by the swap counterparties.[134] Specifically, Judge Peck explained that unlike in *BNY*, the provisions governing liquidation and distribution in *Michigan Housing* were "part of the swap agreement at issue," while *Ballyrock* was distinguishable because that decision dealt "with a provision altering priority of payment and not a provision strictly dealing with liquidation, termination or acceleration."[135]

While the Court acknowledges that, as the District Court observed when addressing the Reference Withdrawal Motion, there is "daylight" between *Michigan Housing* and *BNY*,[136] the Court concludes that section 560 protects the enforcement of the Priority Provisions and the distribution of the proceeds of the sale of the Collateral as part of the exercise of the right to liquidate the Swaps. Not only have there been decisions by the Second Circuit in the intervening

---

[132] LBSF Opp. Br. at 38.
[133] *Michigan Housing*, 502 B.R. at 395.
[134] *Id.* at 394.
[135] *Id.* at 395.
[136] Withdrawal Decision at 9:25-10:2.

41

years since *BNY* making clear that the safe harbors under the Code are meant to be read broadly

and according to their plain terms,[137] but Judge Peck's reasoning in *Michigan Housing* itself

supports a reading of "liquidation" of a swap agreement to include the events at issue here.

LBSF urges that the term "liquidation" be limited to the termination of the Swap and no

more – but that could not have been Congress' intent in adding "liquidation" to the statute.

Applying an accepted rule of statutory interpretation,[138] the Court must read the terms

"termination" and "liquidation" to have distinct meanings, otherwise the two would be

redundant.  Liquidation of a swap therefore must refer to something other than its termination.

The liquidation of the Collateral and the distribution of the proceeds pursuant to the

Priority Provisions directly followed the termination of the Swaps.  The Priority Provisions

specified to whom and in what order of priority those distributions were to be made.

Accordingly, the termination of the Swaps led to the liquidation of the Collateral, the

determination of the amount due to each Secured Party, and the corresponding distribution of

those amounts pursuant to the applicable Waterfall.  Had the proceeds from the Collateral been

sufficient to make a distribution to LBSF under the Waterfall, that distribution would clearly

have been made as part of the liquidation of the Swaps.  Distinguishing between a distribution

made to LBSF pursuant to the Priority Provisions and a distribution to the Noteholders pursuant

---

[137] *See, e.g.*, *Ida Fishman*, 773 F.3d at 419 (noting that Congress intended the safe harbor in section 546(e) "to sweep broadly") and *Enron*, 651 F.3d at 336 (rejecting debtor's narrow interpretation of section 546(e) that "would result in commercial uncertainty and unpredictability at odds with the safe harbor's purpose and in an area of law where certainty and predictability are at a premium").  *See also Tribune*, 818 F.3d at 121 (confirming sweeping breadth of section 546(e) safe harbor).

[138] It is a "basic rule of statutory interpretation … to avoid reading statutory language in a way that would 'in any way make some of its provisions surplusage.'"  *United States v. Martinez-Santos*, 184 F.3d 196, 204 (2d Cir. 1999) (citing *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir. 1985)).

to the same Priority Provisions is inconsistent with the Second Circuit's broad reading of the safe harbors and with a plain-meaning interpretation of the statute and the Transaction Documents. The Priority Provisions only have relevance and import when viewed in connection with the termination of the Swap and liquidation of the Collateral, and therefore cannot be viewed as "ancillary" or "unrelated" to the rights to terminate and liquidate a swap agreement.

LBSF contends, unconvincingly, that because the Trustees had discretion not to distribute proceeds from the liquidation of the Collateral, the distribution thereof cannot be considered part of the termination and liquidation of the Swap.[139]  Whether each step in that process was contractually or legally mandated is irrelevant for the purposes of determining whether each step was an integral part of the overall process of liquidating the Swaps.  LBSF cannot dispute that once the Trustees decided to distribute the proceeds of the Collateral, such distributions were required to be made pursuant to the prevailing Waterfall.  In addition, had LBSF Priority been the prevailing Waterfall, such distributions to LBSF would undoubtedly be viewed as part of the liquidation of the Swap.  That Noteholder Priority was in effect does not change that conclusion.

This conclusion is further supported by the fact that the non-recourse language of the Swaps[140] indicates that distributing proceeds pursuant to the Priority Provisions was a fundamental element of the process of liquidation or termination of the Swaps under the Swaps themselves.  By LBSF's own admission, "the non-recourse language relied on [by Movants]

---

[139] LBSF Opp. Br. at 40.

[140] In particular, the fact that the swap confirmations for all Transactions other than the RACER Series Transactions provide that payments under the Swaps are "subject in any case to the Priority of Payments set out in the Indenture" supports evaluating payments made pursuant to the Priority Provisions as part of the liquidation of the Swaps.  Def. Br. at 38.

43

does no more than clarify that amounts payable must follow the Waterfall as set out in the

Indenture."[141]  Therefore, there can be no dispute that the distribution of the liquidated Collateral

was directly governed by the Priority Provisions.

    As the Movants correctly argue, the liquidation of the Collateral was necessitated by the

termination of the Swaps and the distribution of the proceeds of that liquidation to the

Noteholders completed the liquidation of the Swaps; the enforcement of Noteholder Priority was

part and parcel of the exercise of the right to cause the termination and liquidation of the Swaps.

### b.  The Enforcement of the Priority Provisions Was the Exercise of a Right of the Issuers As Swap Participants

    In order for the protections of section 560 to apply to the exercise of a contractual right,

such right must belong either to a "swap participant" or to a "financial participant" as defined in

the Code.  LBSF argues that enforcement of the Priority Provisions does not meet this

requirement because the right to enforce the Priority Provisions and make distributions belonged

to the Trustees and/or Noteholders, who LBSF argues are neither "swap participants" nor

"financial participants" as defined in the Code.[142]  The Movants assert, however, that

enforcement of the Priority Provisions was a right of the Issuers, who indisputably meet the

definition of "swap participants."[143]

    The Court agrees with the Movants.  Section 101(B)(53C) defines "swap participant" as

"an entity that, at any time before the filing of the petition, has an outstanding swap agreement

---

[141] LBSF Opp. Br. at 38.
[142] LBSF Opp. Br. at 44-50.
[143] Def. Rep. Br. at 18-20.

with the debtor."[144]  Each Issuer was a party to the respective Swaps and therefore meet the

Code's definition of a "swap participant."[145]  The express terms of the Transaction Documents

make clear that the termination of the Swaps and the liquidation and distribution of the Collateral

and its proceeds (which, as explained above, are integral steps in the process of the liquidation of

the Swaps) were rights that could be exercised by the Issuers.  That the Trustees acted on behalf

of the Issuers in exercising such rights does not preclude the application of the safe harbor,[146]

especially in light of the Second Circuit's recent pronouncement in *Tribune* that the safe harbors

are intended to and must protect transactions, not individual parties, if they are to protect the

stability and efficiency of the financial markets.[147]

There is no dispute that the Issuers were parties to the Swaps and incurred obligations to

LBSF under the Transaction Documents.  It is also beyond dispute that the Issuers incurred

obligations to the Noteholders upon issuance of the Notes.  Under the Transaction Documents,

LBSF and the Noteholders only had recourse for satisfaction of the Issuers' obligations against

the Collateral and any other assets of the Issuers related to the respective Transaction or series of

Notes.  The obligation to pay LBSF and the Noteholders from the proceeds of the Collateral was

---

[144] 11 U.S.C. § 101(B)(53C).

[145] Because the Court concludes that the enforcement of the Priority Provisions was an exercise of the Issuers' rights, it need not reach the question of whether the Trustees or Noteholders qualify as "swap participants" or "financial participants" under the Code.

[146] For example, Section 10.1(d) of the Indenture for the 801 Grand CDO Transaction provides: "If at any time the Credit Swaps become subject to early termination due to the occurrence of an Event of Default or a Termination Event (each as defined in the Credit Swaps), the Issuer and the Trustee shall take such actions … to enforce the rights of the Issuer and the Trustee thereunder as may be permitted by the terms of such agreement and consistent with the terms hereof, and shall apply the proceeds of any such actions to Principal Collections."

[147] *Tribune*, 818 F.3d at 121 (confirming sweeping breadth of section 546(e) safe harbor and rejecting interpretation of section 546(e) that would lead to irreconcilable conflict with the purpose of the statute).

45

at all times an obligation of the Issuers, and while various parties held interests in the Collateral during the life of the Transactions, the Collateral was held by the Trustees in trust for the Issuers to secure the obligations the Issuers owed to the Secured Parties. The Issuers therefore held a corresponding right to liquidate the Collateral upon the Early Termination to satisfy their obligations in accordance with the terms of the Transaction Documents. Distribution pursuant to the prevailing Waterfall – whether such Waterfall established LBSF Priority or Noteholder Priority under the circumstances – was a part of the Issuers' rights to terminate and wind down the Transactions.

### C. LBSF's State Law Claims Fail to State a Cause of Action

In light of the foregoing rulings with respect to the applicability of the anti-*ipso facto* provisions of the Code and the safe harbor contained in section 560 of the Code, the Court concludes that LBSF's state law claims also fail to state a cause of action upon which relief can be granted.[148] The Court agrees with the Movants that Counts XIII through XVI and XVIII are predicated on the unenforceability of the Priority Provisions as *ipso facto* clauses under the Code, and therefore such counts do not survive a motion to dismiss in light of the Court's rulings above. As to Count XIX, the Court concludes that the claim asserted in such count fails as a matter of law and therefore Count XIX should also be dismissed.

### 1. Counts XIII - XVI

Counts XIII through XVI fail to state a cause of action upon which relief can be granted because each is premised on this Court's determination that the Distributions were improper in

---

[148] The state law claims at issue here are set forth in Counts XIII through XIX of the Complaint.

some way and thus deprived LBSF of its property.  For the reasons stated above, the Court

concludes that the Priority Provisions are not unenforceable *ipso facto* clauses under the Code

but instead constitute the contractually mandated roadmap that the parties followed to enforce

their express contractual rights.  Accordingly, as a matter of law, the Distributions were not in

any way improper, nor was LBSF deprived of any of its property.

LBSF's claim for unjust enrichment as set forth in Count XIII therefore must also fail.

The elements of an unjust enrichment claim are (i) a benefit to the defendants; (ii) at the

plaintiff's expense; and (iii) that in equity and good conscience requires restitution to the

plaintiff.[149]  LBSF's argument requires the Court to conclude in the first instance that "LBSF

was rightfully entitled"[150] to the distribution that the Noteholders received, which proposition the

Court has rejected.  LBSF therefore cannot satisfy the second element of a claim for unjust

enrichment under New York law.  In addition, for similar reasons, there is also no basis – in

"equity and good conscience" or otherwise – for the Court to grant restitution to LBSF here, and

therefore LBSF also cannot satisfy the third element of a claim for unjust enrichment under New

York law.  Moreover, in at least one other case, the District Court has found that the enforcement

of a similar swap provision did not constitute unjust enrichment of the party receiving the

distribution.[151]  Accordingly, Count XIII must be dismissed.  Because one of the elements

---

[149] *Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In re Mid-Island Hosp., Inc.)*, 276 F.3d 123, 129 (2d Cir. 2002); *Farina v. Bastianich*, 984 N.Y.S.2d 46, 49 (1st Dep't 2014).

[150] LBSF Opp. Br. at 92; *see* pp. 18-46, *supra*.

[151] *Drexel Burnham Lambert Prod. Corp. v. Midland Bank PLC*, 1992 U.S. Dist. LEXIS 21223, at *4 (S.D.N.Y. Nov. 9, 1992) (holding that a payment provision in a swap agreement that eliminated an early termination payment due to be made to the defaulting party was "neither a penalty, nor an unjust enrichment" because it merely required a party to "forego an unrealized investment gain").

required to demonstrate the existence of a constructive trust is unjust enrichment, Count XIV

(Constructive Trust) therefore must also be dismissed.

Similarly, LBSF's claim for "money had and received" asserted in Count XV also fails

because such a claim requires that LBSF be entitled to the money distributed to the

Noteholders,[152] which, as the Court has found, is not the case here.  Finally, LBSF's claim for

replevin set forth in Count XVI fails to state a claim upon which relief can be granted.  LBSF

argues that it has pled a proper claim for replevin because it holds "a superior possessory right"

to the proceeds of the liquidation of the Collateral which property is currently held by the

Movants.[153]  Because the Court concludes that the Distributions did not improperly deprive

LBSF of any rights or property, LBSF's claim for replevin fails as a matter of law.

### 2.    Count XVII

LBSF's breach of contract claim asserted only against the Trustees in Count XVII fails to

state a claim upon which relief can be granted because the Trustees acted in a manner consistent

with the terms of the Transaction Documents and, in light of the Court's rulings that the Priority

Provisions are not unenforceable, the Trustees did not have an obligation to act otherwise.  At the

Hearing, counsel for LBSF acknowledged that if all other Counts in the Complaint were

dismissed, then Count XVII could not survive.[154]  The Court today holds that all other Counts

must be dismissed and therefore Count XVII must be dismissed as well.

---

[152] *See* LBSF Opp. Br. at 96-97 (a money had and received claim requires "that defendant 'received or is holding sums of money to which [plaintiff] is entitled'") (citing *State of N.Y. v. Int'l Asset Recovery Corp.*, 56 A.D.3d 849, 852-53, 866 N.Y.S.2d 823, 826 (3d Dep't 2008)).
[153] LBSF Opp. Br. at 97.
[154] Tr. of May 4, 2016 Hr'g at 263:7-16.

### 3. Count XVIII

In Count XVIII of the Complaint, LBSF asserts a constructive fraudulent transfer claim under New York law against the Trustees and Noteholders.  To establish such a claim, a party must demonstrate, among other things, that the transferor did not receive "fair consideration" in exchange for the transfer at issue; under section 272(a) of the New York Debtor and Creditor Law, "fair consideration" is given when "an antecedent debt is satisfied" in good faith.[155] LBSF's state law claims for constructive fraudulent conveyance by the Issuers fail because the Distributions to the Noteholders (i) were made pursuant to the terms of the Transaction Documents to satisfy the Issuers' obligations to the Noteholders under the Notes, and moreover, as explained above, (ii) do not constitute an improper payment of a junior debt ahead of a senior debt, as LBSF alleges.  Therefore, as Movants point out, the Issuers received "fair consideration" in exchange for the Distributions and LBSF's constructive fraudulent transfer claims under New York law fail to state a claim upon which relief can be granted.

LBSF also asserts a claim in Count XVIII of the Complaint for intentional fraudulent transfer under New York law, which requires a conveyance to be made with actual intent to "hinder, delay, or defraud" creditors in order for such conveyance to be fraudulent.[156]  LBSF has failed to state a claim that the Trustees or Noteholders acted with intent to hinder, delay, or defraud the Issuers' creditors.  As the Movants argue, the Distributions were made to repay the Issuers' debts to the Noteholders pursuant to agreements that were negotiated in good-faith and

---

[155] N.Y. Debt. & Cred. Law § 272 (McKinney).
[156] N.Y. Debt. & Cred. Law § 276 (McKinney).

49

at arms'-length.[157]  Moreover, the purported badges of fraud identified by LBSF in the

Complaint are predicated on the Trustees' knowledge that distributions to the Noteholders would

be invalid under the Code.[158]  The Court has found that the Priority Provisions are not

unenforceable *ipso facto* clauses and are protected by the section 560 safe harbor, and, therefore,

the Distributions do not violate the Code.  Therefore, LBSF's claims for intentional fraudulent

conveyance fail and Count XVIII must be dismissed in its entirety.[159]

### 4.  Count XIX

In Count XIX of the Complaint, LBSF seeks a declaratory judgment that the Priority

Provisions in each Swap operate as an unenforceable penalty under New York law based on

LBSF's view that the enforcement of the Priority Provisions deprived LBSF of payments it was

rightfully owed.  Although Judge Peck decided in *Ballyrock* that it was not necessary for the

Court to rule on LBSF's theory that the Priority Provisions constituted an invalid penalty, he

noted that "it is difficult to characterize the [priority provision] as either a penalty or forfeiture.

The clause does not appear to be an impermissible penalty because it does not fix damages, but

instead eliminates the right to receive funds that would have been distributed to LBSF absent a

---

[157] Def. Br. at 74 (citing *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.),* 403 F.3d 43, 54-55, 56 (2d Cir. 2005) (dismissing constructive and intentional fraudulent transfer claims where transfer merely satisfied preexisting debt)).  *See also Sherman v. FSC Realty LLC (In re Brentwood Lexford Partners, LLC)*, 292 B.R. 255, 265 (Bankr. N.D. Tex. 2003) (concluding that a transfer made in order to satisfy contractual obligations "does not constitute a transfer made with the intent to hinder or delay creditors"); *Butler v. Loomer (In re Loomer)*, 222 B.R. 618, 623 ("[T]he inference of fraudulent intent is rebutted by the fact that these transfers were simply payments on a bona fide preexisting loan.").

[158] Complaint, ¶ 283.

[159] The Court need not and does not make any determination here as to whether the intent of each of the Noteholders, Trustees, and Issuers can or should be imputed to one another.

50

default."[160]  Judge Peck relied on a decision of the District Court with facts similar to those before the Court in which that court found that a provision in a swap agreement that eliminated a defaulting party's entitlement to a termination payment if the termination was caused by the default was not a penalty.[161]

The Court concurs with Judge Peck's observations.  In light of the Court's holdings here dismissing all of the other Counts of the Complaint, the Court concludes that Count XIX fails as a matter of law and must also be dismissed.

## CONCLUSION

For the reasons stated herein, the Court concludes that LBSF has failed to state a claim upon which relief may be granted in Counts I through XIX of the Complaint.  The Motion to Dismiss is GRANTED.  Counts I through XIX of the Complaint asserted against the Movants are dismissed with prejudice.  The parties are directed to submit an order consistent with this Decision.

Dated: June 28, 2016
New York, New York

/s/ Shelley C. Chapman
UNITED STATES BANKRUPTCY JUDGE

---

[160] *Ballyrock*, 452 B.R. at 38.

[161] *Drexel Burnham Lambert Prod. Corp. v. Midland Bank PLC*, 1992 U.S. Dist. LEXIS 21223, at *4 (S.D.N.Y. Nov. 9, 1992) (holding that a payment provision in a swap agreement that eliminated an early termination payment due to be made to the defaulting party was "neither a penalty, nor an unjust enrichment" because it merely required a party to "forego an unrealized investment gain.").

51

**APPENDIX A**
**PRE-PRE, PRE-POST, AND POST-POST TRANSACTIONS**

### Pre-Pre Transactions[162]

| | |
|---|---|
| ALTA Series 2007-2 | Greystone Series 2006-1 |
| Barton Springs Series 2005-1 | Greystone Series 2006-2 |
| Barton Springs Series 2005-2 | Jefferson Valley Series 2006-1 |
| Blue Point Series 2005-1 | Pantera Vive Series 2007-1 |
| Cherry Hill Series 2007-1 | Penn's Landing Series 2007-1 |
| Cherry Hill Series 2007-2 | Stowe Series 2008-2A |
| Crown City Series 2005-1 | Sunset Park Series 2005-3 |
| Crown City Series 2005-2 | Sunset Park Series 2005-5 |
| Freedom Park Series 2005-1 | Tavares Square |
| Fullerton Drive | Vox Place |

### Pre-Post Transactions

| | |
|---|---|
| 801 Grand Series 2006-1 | Pebble Creek Series 2007-2 |
| 801 Grand Series 2006-2 | Pyxis Series 2007-1 |
| ALTA Series 2007-1 | Solar V CDO SPC |
| Copper Creek Series 2007-1 | SPRC 2007-1 (TABXSPOKE) |
| Lakeview Series 2007-1 | Stowe Series 2006-1 |
| Lakeview Series 2007-2 | Sunset Park Series 2005-6 |
| Lakeview Series 2007-3 | |

### Post-Post Transactions

| | |
|---|---|
| Quartz 2004-1 | Ruby 2005-1 |
| Restructured Asset Certificates with Enhanced Returns, Series 2005-2-1C Trust | Securitized Product of Restructured Collateral Limited SPC 2007-1 A-1 |
| Restructured Asset Certificates with Enhanced Returns, Series 2006-1-C Trust | Securitized Product of Restructured Collateral Limited SPC 2007-1 A-2 |
| Restructured Asset Certificates with Enhanced Returns, Series 2007-4-C Trust | |

---

[162] The Court has not been provided information as to when the Kings River Limited Transaction was terminated, or as to when distribution of the Collateral occurred for the three Sunset Park 2004 Transactions.  Therefore, those Transactions are not included in this Appendix A.

**APPENDIX B**
**TYPE 1 AND TYPE 2 TRANSACTIONS**

## Type 1 Transactions

| | |
|---|---|
| Quartz 2004-1 | Restructured Asset Certificates with Enhanced Returns, Series 2007-4-C Trust |
| Restructured Asset Certificates with Enhanced Returns, Series 2005-21-C Trust | Ruby 2005-1 |
| Restructured Asset Certificates with Enhanced Returns, Series 2006-1-C Trust | |

## Type 2 Transactions

| | |
|---|---|
| 801 Grand Series 2006-1 | Lakeview Series 2007-3 |
| 801 Grand Series 2006-2 | Pantera Vive Series 2007-1 |
| ALTA Series 2007-1 | Pebble Creek Series 2007-2 |
| ALTA Series 2007-2 | Penn's Landing Series 2007-1 |
| Barton Springs Series 2005-1 | Pyxis Series 2007-1 |
| Barton Springs Series 2005-2 | Securitized Product of Restructured Collateral Limited SPC 2007-1 A-1 |
| Blue Point Series 2005-1 | Securitized Product of Restructured Collateral Limited SPC 2007-1 A-2 |
| Cherry Hill Series 2007-1 | Securitized Product of Restructured Collateral Limited SPC 2007-1 TABXSPOKE |
| Cherry Hill Series 2007-2 | Solar V CDO SPC |
| Copper Creek Series 2007-1 | Stowe Series 2006-1 |
| Crown City Series 2005-1 | Stowe Series 2008-2A |
| Crown City Series 2005-2 | Sunset Park Series 2004-1 |
| Freedom Park Series 2005-1 | Sunset Park Series 2004-2 |
| Fullerton Drive | Sunset Park Series 2004-4 |
| Greystone Series 2006-1 | Sunset Park Series 2005-3 |
| Greystone Series 2006-2 | Sunset Park Series 2005-5 |
| Jefferson Valley Series 2006-1 | Sunset Park Series 2005-6 |
| Kings River Limited Transaction | Tavares Square |
| Lakeview Series 2007-1 | Vox Place |
| Lakeview Series 2007-2 | |